Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

(*additional counsel on signature page*)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN BARRY, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> COLONY NORTHSTAR, INC., RICHARD B. SALTZMAN, DARREN J. TANGEN, NEALE REDINGTON, and DAVID T. HAMAMOTO, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Brian Barry ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by

Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Colony NorthStar, Inc. ("Colony NorthStar" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Colony NorthStar from February 28, 2017 through March 1, 2018, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company has principal executive offices and conducts business within this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United

Class Action Complaint for Violations of the Federal Securities Laws

States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.      Defendant Colony NorthStar is a global real estate and investment management firm incorporated in Maryland and maintaining principal executive offices at 515 S. Flower Street, 44th Floor, Los Angeles, California 90071. The Company's securities are traded on New York Stock Exchange ("NYSE") under the ticker symbol "CLNS."

8.      Defendant Richard B. Saltzman ("Saltzman") served as the Company's President and Chief Executive Officer ("CEO") during the Class Period and is a member of the Company's Board of Directors ("Board").

9.      Defendant Darren J. Tangen ("Tangen") served as the Company's Chief Financial Officer ("CFO"), Executive Vice President and Treasurer during the Class Period and is also a member of the Company's Board.

10.     Defendant Neale Redington ("Redington") served as the Company's Chief Accounting Officer ("CAO") during the Class Period.

11.     Defendant David T. Hamamoto ("Hamamoto") served as the Company's Executive Vice Chairman until his resignation effective January 11, 2018. He was previously Chairman and CEO of NorthStar Asset Management Group Inc. (pre-merger Colony NorthStar entity) from January 2014 until August 2015, later becoming its Executive Chairman in August 2015. Hamamoto was also Chairman of the Board of NorthStar Realty Finance Corp. (pre-merger Colony NorthStar entity) from October 2007 until January 2017, having served as one of its directors since October 2003. Hamamoto also served as NorthStar Realty Finance's CEO from October 2004 until August 2015. Hamamoto further

Class Action Complaint for Violations of the Federal Securities Laws

served as Chairman of NorthStar Healthcare Income, Inc. from January 2013 until January 2014. He served as Co-Chairman of NorthStar/RXR New York Metro Real Estate Inc. from March 2014 until August 2015. He co-founded NorthStar Capital Investment Corp., the predecessor to NorthStar Realty Finance Corp., for which he served as Co-CEO until October 2004.

12.     Defendants Saltzman, Tangen, Redington, and Hamamoto are sometimes referred to herein as the "Individual Defendants."

13.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

Class Action Complaint for Violations of the Federal Securities Laws

15.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.    The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

17.    On or around January 10, 2017, Colony NorthStar was formed through a tri-party merger of Colony Capital, Inc., NorthStar Asset Management Group Inc. and NorthStar Realty Finance Corp. (collectively, the "Pre-Merger Entities").

18.    That day, the Company issued a press release announcing the completion of the merger. In the release, Defendant Hamamoto stated the merger would benefit Colony NorthStar's combined stockholders "with an even stronger value proposition through enhanced relationships, substantial synergies and greater scale in established, durable real estate and investment management business with broad-based capital access and investment opportunities."

### Materially False and Misleading Statements

19.    On February 28, 2017, the Company issued a press release entitled, "Colony NorthStar Announces Fourth Quarter 2016 Financial Results and Post-Merger Update," cutting "Core [funds from operations] guidance for the year ending 2017 to a range of $1.40 to $1.58 per share" and announcing it did "not intend to provide updates to Core [funds from operations] guidance going forward."

20.    The Company expected lower earnings due to: "1) less third party capital raising; 2) less cash available to deploy into investments resulting from the increase of the [NorthStar Asset Management Group Inc.] special dividend among other reasons; and 3) accelerating the replacement of higher-yielding, non-

core investments with lower-yielding investments that better fit the strategic direction of the Company."

21.    That same day, the Company filed its annual report for the fiscal year ended December 31, 2016 on Form 10-K (the "2016 10-K") with the SEC, which provided the Company's annual financial results and position. The 2016 10-K was signed by Defendants Saltzman, Tangen, Redington and Hamamoto. The 2016 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Saltzman and Tangen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

22.    The 2016 10-K discussed the Company's five core strategic real estate segments, including its Healthcare and Investment Management segments:

Colony NorthStar segments
Our business objective is to provide attractive risk-adjusted returns to our investors through five core strategic real estate segments summarized as follows:

- *Healthcare* - Our healthcare properties are comprised of a diverse portfolio of medical office buildings, senior housing, skilled nursing and other healthcare properties. Over half of our healthcare properties are medical office buildings and properties structured under a net lease to healthcare operators. Substantially all of our net leases include annual escalating rent provisions. In addition, our portfolio consists of senior housing operating facilities which include healthcare properties that operate through management agreements with independent third-party operators, predominantly through structures permitted by the REIT Investment Diversification and Empowerment Act of 2007, or RIDEA, structures that permit us, through a taxable REIT subsidiary, or TRS, to have direct exposure to resident fee income and incur customary related operating expenses. Our medical office buildings are a combination of single tenant and multi-tenant properties typically structured with long-term leases with the

Class Action Complaint for Violations of the Federal Securities Laws

tenants.

\* \* \*

- *Investment Management* - Our investment management business is expected to generate fee income through investment management services, sponsoring numerous investment products across a diverse set of institutional and retail investors.

23.    On May 10, 2017, the Company filed a Form 10-Q for the quarter ended March 31, 2017 (the "1Q 2017 10-Q") with the SEC, which provided the Company's first quarter 2017 financial results and position. The 1Q 2017 10-Q was signed by Defendants Saltzman, Tangen and Redington.

24.    The 1Q 2017 10-Q contained signed SOX certifications by Defendants Saltzman and Tangen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

25.    The 1Q 2017 10-Q discussed the Company's five reportable segments, including Healthcare and Investment Management, stating in relevant part:

- Healthcare—The Company's healthcare segment is composed of a diverse portfolio of medical office buildings, senior housing, skilled nursing and other healthcare properties. The Company earns rental income from medical office buildings and properties structured under net leases to healthcare operators, and resident fee income from senior housing operating facilities that operate through management agreements with independent third-party operators.

\* \* \*

- Investment Management—The Company generates fee income through investment management services, sponsoring numerous investment products across a diverse set of institutional and retail investors.

26.    The Company further described its Healthcare segment interests in the 1Q 2017 10-Q, stating in relevant part:

***Healthcare***

Class Action Complaint for Violations of the Federal Securities Laws

\* \* \*

In connection with our on-going sales initiative, subsequent to the Merger, we closed on the sale of an 18.7% noncontrolling interest in our healthcare real estate portfolio through a newly formed joint venture for $350 million (including $20 million of certain pre-funded capital items). Our healthcare joint venture in turn owns approximately 87.7% of our healthcare portfolio, with the remaining 12.3% owned by existing minority interest holders. We act as the manager of our healthcare joint venture and are responsible for the day-to-day business and affairs of our healthcare portfolio.

At March 31, 2017, our interest in our healthcare segment was approximately 71.3%.

Our healthcare portfolio is located across 33 states domestically and 10% of our portfolio (based on facility count) is in the United Kingdom.

The following table presents selected operating metrics of our healthcare segment at March 31, 2017:

| Type | Number of Properties / Facilities | Capacity | Average Occupancy [1] | Average Remaining Lease Term (Years) | NOI for the Three Months Ended March 31, 2017 (in thousands) |
|---|---|---|---|---|---|
| Medical office buildings | 113 | 4.02 square million feet | 85.1% | 5.1 | $ 11,974 |
| Senior housing—operating | 109 | 6,436 units | 86.8% | NA | 16,314 |
| Net lease—senior housing | 82 | 4,065 units | 85.7% | 11.5 | 12,461 |
| Net lease—skilled nursing facilities | 107 | 12,794 beds | 84.2% | 7.6 | 25,384 |
| Net lease—hospitals | 14 | 817 beds | 60.9% | 12.0 | 4,995 |
| Total | 425 | | 83.6% | 9.5 | $ 71,128 |

\* \* \*

- 8 -

Class Action Complaint for Violations of the Federal Securities Laws

Subsequent to the Merger, we sold one medical office building for net proceeds of $3.1 million. At March 31, 2017, we had one portfolio and two skilled nursing facilities held for sale, with an aggregate real estate carrying value of $228.6 million and corresponding debt carrying value of $150.7 million. These activities reflect our continued asset monetization initiatives.

27.     The Company further described in its 1Q 2017 10-Q its Investment Management segment and the extent to which NorthStar Asset Management Group Inc. contributed to this segment, stating in relevant part:

***Investment Management***

We manage capital on behalf of third party institutional and retail investors through private funds, traded and non-traded REITs and investment companies, which provide a stable stream of management fee income. We also have an embedded broker-dealer platform which raises capital in the retail market.

Our investment management platform allows us to raise private third party capital in partnership with our own balance sheet to further scale our core real estate segments and also allows us to pursue a balance sheet light tactical strategy.

For the three months ended March 31, 2017, we closed on approximately $980 million of third party capital commitments, with $940 million from institutional clients and $40 million from retail clients.

Total third party assets under management ("AUM") were as follows:

| (In billions) | March 31, 2017 | December 31, 2016 |
|---|---|---|
| Third party AUM [(1)] | $40.7 | $10.7 |

The acquisition of NSAM's [NorthStar Asset Management Group Inc.'s] investment management business contributed $30.9 billion of our third party AUM at March 31, 2017. In the first quarter of 2017, Colony's third party AUM decreased approximately $0.9 billion, due to continued realization of investments by liquidating funds, including the sale of shares in Colony Starwood Homes held by our managed funds, partially offset by new capital raised during this period.

Class Action Complaint for Violations of the Federal Securities Laws

Our third party AUM at March 31, 2017 by type is summarized below:

| Type | Products | Description | AUM (in billions) |
|---|---|---|---|
| Institutional Funds | Credit funds, opportunistic funds, value-add funds, Colony industrial open end fund, other co-investment vehicles and special accounts | Earns base and asset management fees, potential for incentives on sponsored funds | $ 10.2 |
| Retail Companies | NorthStar Income I, NorthStar Income II | Public non-traded REITs and investment companies | 7.0 |
| | NorthStar Healthcare | Broker-dealer subsidiary acts as dealer-manager for all retail product offerings | |
| | NorthStar/RXR NY Metro [1] | Earns base management fees from all Retail Companies, acquisition and disposition fees from non-traded REITs (except for NorthStar/RXR NY Metro), and potential for performance fees (except for NorthStar/Townsend) | |
| | NorthStar Capital Fund NorthStar/Townsend [1] [2] | | |
| Public Companies | NorthStar Realty Europe Corp. | NYSE-listed European equity REIT<br><br>Earns base management fees, potential for incentives | 2.0 |
| Townsend | Commingled funds, segregated mandates, advisory services | 84% interest in Townsend group<br><br>Manage fund-of-funds and custom portfolios primarily invested in direct real estate funds<br><br>Source co-investments and joint ventures alongside GPs<br><br>Earns base management fees, performance fees, advisory fees | 14.5 |
| Pro Rata Corporate Investments | Joint venture investments | Earns share of earnings from unconsolidated ventures<br><br>Includes investments in RXR Realty (27%), real estate owner, developer and asset manager with AUM over $12 billion; and (ii) AHI (43%), healthcare asset manager and sponsor of non-traded vehicles with AUM of $2.5 billion | 7.0 |

Class Action Complaint for Violations of the Federal Securities Laws

| | |
|---|---|
| | **$   40.7** |

28.     On August 9, 2017, the Company filed a Form 10-Q for the quarter ended June 30, 2017 (the "2Q 2017 10-Q") with the SEC, which provided the Company's second quarter 2017 financial results and position. The 2Q 2017 10-Q was signed by Defendants Saltzman, Tangen and Redington.

29.     The 2Q 2017 10-Q contained signed SOX certifications by Defendants Saltzman and Tangen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

30.     The 2Q 2017 10-Q discussed the Company's desire to sell certain Healthcare segment assets, stating in relevant part:

***Healthcare***

\* \* \*

In connection with our on-going sales initiative, subsequent to the Merger, we closed on the sale of an 18.7% noncontrolling interest in our healthcare real estate portfolio through a newly formed joint venture for $350 million (including $20 million of certain pre-funded capital items). Our healthcare joint venture in turn owns approximately 87.7% of our healthcare portfolio, with the remaining 12.3% owned by existing minority interest holders. We act as the manager of our healthcare joint venture and are responsible for the day-to-day business and affairs of our healthcare portfolio.

At June 30, 2017, our interest in our healthcare segment was approximately 71.3%.

Our healthcare portfolio is located across 33 states domestically and 10% of our portfolio (based on property count) is in the United Kingdom.

The following table presents selected operating metrics of our healthcare segment:

Class Action Complaint for Violations of the Federal Securities Laws

| Type | Number of Buildings at June 30, 2017 | Capacity at June 30, 2017 | Average Occupancy[1] | Average Remaining Lease Term (Years) | NOI for the Three Months Ended June 30, 2017 (In thousands) | NOI for the Six Months Ended June 30, 2017 (In thousands) |
|---|---|---|---|---|---|---|
| Medical office building | 113 | 4.02 square million feet | 84.0% | 5.0 | $ 14,408 | $ 26,382 |
| Senior housing—operating | 109 | 6,436 units | 86.7% | N/A | 19,418 | 35,732 |
| Net lease—senior housing | 82 | 4,065 units | 83.6% | 11.3 | 14,407 | 26,868 |
| Net lease—skilled nursing facilities | 107 | 12,794 Beds | 83.4% | 7.7 | 24,904 | 50,288 |
| Net lease—hospitals | 14 | 872 Beds | 63.4% | 11.9 | 5,375 | 10,370 |
| Total | 425 | | 83.0% | 9.4 | $ 78,512 | $ 149,640 |

\* \* \*

Subsequent to the Merger, we sold one medical office building for net proceeds of $3.1 million. At June 30, 2017, we had one portfolio, five medical office buildings and two skilled nursing facilities held for sale, with an aggregate real estate carrying value of $228.8 million and corresponding debt carrying value of $168.7 million. These activities reflect our continued asset monetization initiatives.

31.    The Company further described in its 2Q 2017 10-Q its Investment Management segment and the extent to which NorthStar Asset Management contributed to this segment, stating in relevant part:

### *Investment Management*

We manage capital on behalf of third party institutional and retail investors through private funds, traded and non-traded REITs and investment companies, which provide a stable stream of management fee income. We also have an embedded broker-dealer platform which raises capital in the retail market.

Our investment management platform allows us to raise private third party capital in partnership with our own balance sheet to further scale our core real estate segments and also allows us to pursue a balance sheet light tactical strategy.

For the six months ended June 30, 2017, we closed on approximately $1.4 billion of third party capital commitments, including our pro rata share from equity method investments in third party asset managers.

Our total third party assets under management ("AUM") were as follows:

| (In billions) | June 30, 2017 | December 31, 2016 |
|---|---|---|
| Third party AUM [(1)] | $40.3 | $10.7 |

The acquisition of NSAM's [NorthStar Asset Management Group Inc.'s] investment management business contributed $30.7 billion of our third party AUM at June 30, 2017. In the six months ended June 30, 2017, Colony's third party AUM decreased $1.1 billion, due to continued realization of investments by liquidating funds, including the sale of shares in SFR held by our managed funds.

Our third party AUM at June 30, 2017 by type is summarized below:

| Type | Products | Description | AUM (in billions) |
|---|---|---|---|
| **Institutional Funds** | Credit funds, opportunistic funds, value-add funds, Colony industrial open end fund, other co-investment vehicles and special accounts | Earns base and asset management fees, potential for incentives on sponsored funds | $ 10.0 |

- 13 -

Class Action Complaint for Violations of the Federal Securities Laws

| | | | |
|---|---|---|---|
| **Retail Companies** | NorthStar Income I, NorthStar Income II | Public non-traded REITs and investment companies | 6.9 |
| | NorthStar Healthcare | Broker-dealer subsidiary acts as dealer-manager for all retail product offerings | |
| | NorthStar/RXR NY Metro [(1)] | Earns base management fees from all retail companies, acquisition and disposition fees from non-traded REITs (except for NorthStar/RXR NY Metro), and potential for performance fees (except for NorthStar/Townsend) | |
| | NorthStar Capital Fund NorthStar/Townsend [(1)] [(2)] | | |
| **Public Companies** | NorthStar Realty Europe Corp. | NYSE-listed European equity REIT | 2.1 |
| | | Earns base management fees, potential for incentives | |
| **Townsend** [(3)] | Commingled funds, segregated mandates, advisory services | 84% interest in Townsend group | 14.2 |
| | | Manage fund-of-funds and custom portfolios primarily invested in direct real estate funds | |
| | | Source co-investments and joint ventures alongside GPs | |
| | | Earns base management fees, performance fees, advisory fees | |
| **Pro Rata Corporate Investments** | Joint venture investments | Earns share of earnings from unconsolidated ventures | 7.1 |
| | | Includes investments in RXR Realty (27% interest), a real estate owner, developer and asset manager with AUM over $12 billion; and AHI (43% interest), a healthcare asset manager and sponsor of non-traded vehicles with AUM of $2.9 billion | |
| | | | **$   40.3** |

32.    On November 9, 2017, the Company filed a Form 10-Q for the quarter ended September 30, 2017 (the "3Q 2017 10-Q") with the SEC, which provided the Company's third quarter 2017 financial results and position. The 3Q 2017 10-Q was signed by Defendants Saltzman, Tangen and Redington.

33.    The 3Q 2017 10-Q contained signed SOX certifications by Defendants Saltzman and Tangen attesting to the accuracy of financial reporting,

the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

34.    The 3Q 2017 10-Q discussed the Company's desire to sell certain "noncore" Healthcare segment assets, stating in relevant part:

***Healthcare***

\* \* \*

In connection with our on-going sales initiative, subsequent to the Merger, we closed on the sale of an 19% noncontrolling interest in our healthcare real estate portfolio through a newly formed joint venture for $350 million (including $20 million of certain pre-funded capital items). Our healthcare joint venture in turn owns approximately 88% of our healthcare portfolio, with the remaining 12% owned by existing minority interest holders. We act as the manager of our healthcare joint venture and are responsible for the day-to-day business and affairs of our healthcare portfolio

At September 30, 2017, our interest in our healthcare segment was approximately 71%.

Our healthcare portfolio is located across 33 states domestically and 10% of our portfolio (based on property count) is in the United Kingdom.

The following table presents selected operating metrics of our healthcare segment:

| Type | Number of Buildings at September 30, 2017 | Capacity at September 30, 2017 | Average Occupancy[1] | Average Remaining Lease Term (Years) | NOI for Three Months Ended September 30, 2017 (In thousands) | NOI for Nine Months Ended September 30, 2017 (In thousands) |
|---|---|---|---|---|---|---|
| Medical office buildings | 109 | 3.9 square million feet | 83.5% | 4.9 | $   13,843 | $   40,225 |
| Senior housing— operating | 109 | 6,436 units | 87.8% | N/A | 18,704 | 54,436 |
| Net lease— | 82 | 4,065 units | 82.3% | 11.1 | 14,638 | 41,506 |

- 15 -

Class Action Complaint for Violations of the Federal Securities Laws

| | | | | | | |
|---|---|---|---|---|---|---|
| senior housing | | | | | | |
| Net lease—skilled nursing facilities | 103 | 12,420 beds | 82.1% | 7.2 | 25,513 | 75,801 |
| Net lease—hospitals | 14 | 872 beds | 61.5% | 11.7 | 5,304 | 15,674 |
| Total | 417 | | 82.9% | 9.0 | $ 78,002 | $ 227,642 |

* * *

Subsequent to the Merger, we sold five medical office buildings totaling 0.2 million square feet and four skilled nursing facilities totaling 374 beds for aggregate net proceeds of $2.8 million. At September 30, 2017, we had one portfolio, one medical office building and four skilled nursing facilities held for sale, with an aggregate real estate carrying value of $197.5 million and corresponding debt carrying value of $143.4 million. These activities reflect our continued monetization initiatives on non core assets.

35.     The Company described its Investment Management segment in the 3Q 2017 10-Q, stating in relevant part:

**Investment Management**

We manage capital on behalf of third party institutional and retail investors through private funds, traded and non-traded REITs and investment companies, which provide a stable stream of management fee income. We also have an embedded broker-dealer platform which raises capital in the retail market.

Our investment management platform allows us to raise private third party capital in partnership with our own balance sheet to further scale our core real estate segments and also allows us to pursue a balance sheet light tactical strategy.

For the nine months ended September 30, 2017, we closed on approximately $1.7 billion of third party capital commitments, including our pro rata share from equity method investments in third party asset managers.

Our total third party assets under management ("AUM") were as follows:

Class Action Complaint for Violations of the Federal Securities Laws

| (In billions) | September 30, 2017 | December 31, 2016 |
|---|---|---|
| Third party AUM [(1)] | $41.7 | $10.7 |

The acquisition of NSAM's [NorthStar Asset Management Group Inc.'s] investment management business, including Townsend and NSAM's investments in third party asset managers, contributed $31.5 billion of our third party AUM at September 30, 2017. Colony's third party AUM of $10.2 billion at September 30, 2017 decreased $0.4 billion from December 31, 2016 due to continued realization of investments by liquidating funds, including the sale of shares in SFR held by our managed funds, partially offset by the July 2017 acquisition of the THL Hotel Portfolio which is co-invested with our managed funds, as well as the acquisition and subsequent syndication of a California office building investment to third party investors in September 2017.

36.    That same day, the Company held a conference call for the 3Q 2017. On the call, Defendant Tangen stated that the Company "ended the quarter with a slightly smaller healthcare portfolio, 417 properties compared to 425 last quarter, as a result of our ongoing selective portfolio pruning."

37.    The statements referenced in ¶¶17-36 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Colony NorthStar's Healthcare and Investment Management segments were performing worse than reported; (2) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

38.    On March 1, 2018, the Company reported its financial results for the fourth quarter and full year ended December 31, 2017 with the SEC ("2017 10-K"), announcing a goodwill impairment of $375 million, attributable to the Company's Investment Management segment. Specifically, the Company

impaired goodwill related to its investment management reporting unit, NorthStar Healthcare Income Inc., and NorthStar/RXR NY Metro Real Estate Inc. The 2017 10-K stated, in relevant part:

> Investment Management—The impairment recognized in 2017 consisted of the following:
>
> • $316.0 million write-down in goodwill, which represents the excess in carrying value of our investment management reporting unit, including its assigned goodwill, over its estimated fair value . . .; and
> • write-down of management contract intangibles for non-traded REITs that were acquired through the Merger, specifically $55.3 million for NorthStar Healthcare Income Inc. [] based on an amendment to its advisory agreement as part of our efforts to preserve liquidity in NorthStar Healthcare and $3.7 million for NorthStar/RXR NY Metro Real Estate Inc [] based on revised capital raising projections.

39.   On the Company's conference call that same day, Defendant Saltzman stated, in relevant part:

> On the other hand, our earnings performance has not lived up to expectations, emanating from more challenging industry conditions in healthcare, real estate as well as our retail broker dealer distribution business[.] . . .
>
> * * *
>
> Retail broker dealer distribution was another area of very disappointing results. The industry generally remains in enormous transition from major regulatory headwinds, including the newly implemented fiduciary rule as well as a change in product constructs, more conservative 40 Act and interval funds that operate with less leverage and offer more liquidity options.

40.   On the Company's conference call, Defendant Tangen stated, in relevant part:

> A few material accounting items to mention during the fourth quarter that impacted our GAAP results. We recorded a goodwill impairment of $316 million to reflect a lower value in our Investment

- 18 -

Management business, primarily attributable to our retail broker-dealer distribution business. And we also wrote down management agreement intangible assets by $35 million to reflect amendments to our management agreement in our healthcare and untreated REIT NHI net of deferred tax impact.

41.     On this news, shares of the Company fell $1.78 per share or over 22% to close at $6.00 per share on March 1, 2018, damaging investors.

42.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

43.     As alleged herein, Individual Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Colony NorthStar, their control over, and/or receipt and/or modification of Colony NorthStar's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Colony NorthStar, participated in the fraudulent scheme alleged herein.

44.     On November 9, 2017, the Company announced in its 3Q 2017 10-Q that Defendant Hamamoto would resign effective January 11, 2018 from all positions with the Company, its affiliates, subsidiaries and any other entity in which the Company or its affiliates is the manager or serves in a similar capacity.

Class Action Complaint for Violations of the Federal Securities Laws

45.     But before his resignation became effective and the Company impaired $375 million in goodwill, Defendant Hamamoto suspiciously sold tens of millions of dollars in Company shares.

46.     Specifically, on December 18, 2017, Defendant Hamamoto filed a Form 4 with the SEC reporting the sale of 2,225,909 of Company shares between December 14, 2017 and December 18, 2017 for approximately $26.9 million.

47.     Defendant Hamamoto's sales are rendered even more suspicious given his intimate knowledge of the Company's Investment Management segment and healthcare-related entities through his service as: (i) Executive Chairman, Chairman, and CEO of NorthStar Asset Management Group Inc. (pre-merger Colony NorthStar entity); (ii) CEO and Chairman of NorthStar Realty Finance Corp. (pre-merger Colony NorthStar entity); (iii) Chairman of NorthStar Healthcare Income, Inc.; and (iv) Co-Chairman of NorthStar/RXR New York Metro Real Estate Inc.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the publicly traded securities of Colony NorthStar during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate

discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

Class Action Complaint for Violations of the Federal Securities Laws

(e)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)    whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

54.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)    the Company traded on NYSE, and was covered by multiple analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold

the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

55. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

56. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants

57. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

59. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

60.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

61.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

62.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

Class Action Complaint for Violations of the Federal Securities Laws

63.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

64.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

65.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

66.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

67.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

69.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

70.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

71.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complaint.

Class Action Complaint for Violations of the Federal Securities Laws

72.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 6, 2018                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (SBN 134180)
Robert V. Prongay (SBN 270796)
1925 Century Park East, Suite 2100

Class Action Complaint for Violations of the Federal Securities Laws

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  lglancy@glancylaw.com
Email:  rprongay@glancylaw.com

Counsel for Plaintiff

Class Action Complaint for Violations of the Federal Securities Laws