ROBBINS GELLER RUDMAN
& DOWD LLP
SPENCER A. BURKHOLZ (147029)
DOUGLAS R. BRITTON (188769)
JUAN CARLOS SANCHEZ (301834)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
dougb@rgrdlaw.com
jsanchez@rgrdlaw.com

Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| BRIAN BARRY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>COLONY NORTHSTAR, INC., et al.,<br><br>Defendants. | Case No. 2:18-cv-002888-GW-MRW<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS

**Page**

JURISDICTION AND VENUE .......... 1
INTRODUCTION .......... 2
PARTIES .......... 4
COMPREHENSIVE STATEMENT OF THE CASE .......... 6
Background Information to CLNS's Business Model .......... 6
Defendants Intend the Three-Way Merger to Unlock Purported Hidden "Value" in the Three "Undervalued" Entities .......... 9
Colony Gains Control of NSAM While NorthStar's Executives Receive a Windfall .......... 11
Defendants Complete the Merger, Issue Unreachable Core FFO Guidance, and Falsely Emphasize Retail Investment Management's Ability to Generate "Upside" to that Guidance .......... 12
Defendants Announce Third Quarter 2017 Results with a Run Rate Short of Guidance, Emphasizing that the Investment Management Business Would "Fill that Gap" .......... 18
Defendant Hamamoto's Untimely Resignation and Dumping of Nearly $27 Million Worth of Stock .......... 21
Gilbert, the Lone NorthStar Executive Remaining at CLNS, Resigns .......... 22
Defendants Reveal the Truth – Dividend Collapses 60% as Defendants Write Off Most of the Investment Management Business .......... 23
DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .......... 25
DEFENDANTS DISCLOSE THE TRUTH .......... 44
ADDITIONAL SCIENTER ALLEGATIONS .......... 47
LOSS CAUSATION/ECONOMIC LOSS .......... 53
NO SAFE HARBOR .......... 56
APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET .......... 56
CLASS ACTION ALLEGATIONS .......... 57
COUNT I .......... 59



1460913_1

**Page**

For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants .................................................. 59

COUNT II ........................................................................................ 60

For Violation of §20(a) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants .................................................. 60

PRAYER FOR RELIEF ...................................................................... 62

JURY DEMAND ................................................................................ 62

Court-appointed Lead Plaintiff Teamsters Local 710 Pension Fund ("plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and under the supervision of plaintiff's counsel, which included, among other things: (1) review of press releases, news articles, conference call transcripts, and other public statements issued by or concerning Colony NorthStar, Inc. ("CLNS" or the "Company"); (2) review of research reports issued by financial analysts concerning CLNS's business; (3) review of CLNS's U.S. Securities and Exchange Commission ("SEC") filings; and (4) review of other publicly available information and data concerning CLNS, its securities, and the markets therefor. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5)).

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

3. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE, the world's largest stock exchange by market capitalization.

## INTRODUCTION

4. Plaintiff brings this securities class action individually and on behalf of all persons who purchased or otherwise acquired the publicly traded securities of CLNS between February 28, 2017 and March 1, 2018 (the "Class Period"), against defendants CLNS, Richard B. Saltzman ("Saltzman") (CLNS's Chief Executive Officer ("CEO"), President, and Director), Darren J. Tangen ("Tangen") (CLNS's Chief Financial Officer ("CFO")), and David T. Hamamoto ("Hamamoto") (CLNS's former Director and Executive Vice Chairman) (collectively, "defendants"), for violating the 1934 Act. CLNS, a hybrid real estate investment trust ("REIT") was formed in January of 2017 after a merger (the "merger") between Colony Capital, Inc. ("Colony") and two publicly traded NorthStar real estate investment companies: NorthStar Asset Management Group Inc. ("NSAM") and NorthStar Realty Finance Corp. ("NRF") (together, "NorthStar"). A REIT is a company that owns or finances income-producing real estate (*e.g.*, apartment buildings and office buildings) in a range of property sectors. And a hybrid REIT, like CLNS, is a REIT that physically owns real estate as well as debt instruments secured by mortgages on real estate. With the merger, specifically with the addition of NSAM, defendants added an embedded retail investment management ("IM") business to Colony's fee-generating arsenal.

5. Defendants extolled the merger from the outset, telling investors that the merger was "'expect[ed to] deliver substantial value for all three sets of shareholders'" and was "'poised for meaningful multiple expansion and substantially enhanced long-term returns for shareholders.'"[1] As a result, defendants declared a fiscal year 2017 core funds from operation ("Core FFO") guidance range of $1.40-$1.58 per share and set an annual CLNS dividend "to start ***comfortably***" at $1.08 per share, given its expected "potential for higher earnings growth and value creation from the overlay of

[1] All citations and footnotes are omitted and emphasis is added unless otherwise noted.

***investment management economics*** on top of high quality real estate asset level returns." With an equity market capitalization of approximately $9 billion at the time the merger closed, defendants told investors that they "couldn't be more excited about [the Company's] future prospects."

6. Defendants' plan, however, faced an irremediable problem – newly implemented regulations requiring more transparent fee-related disclosures were devastating CLNS's lucrative retail capital fundraising efforts. Specifically, investors were refusing to pay the high fees that came with CLNS's retail funds and, in turn, financial advisors were steering their clients away from CLNS's retail funds because of these high fees. Indeed, defendants were reliant on CLNS's ability to grow its fee-rich retail fundraising efforts to meet the Company's 2017 Core FFO guidance, and to cover and sustain its dividend. But rather than disclosing how investors and financial advisors were reacting to CLNS's retail IM fees, defendants instead repeatedly misled the market by stressing that the Company was "on track" to meet its guidance, due, in large part, to "upside" tied to its third-party retail IM business. Defendants acknowledged what they called "headwinds" from these regulations, but told investors during the Class Period that "we've got the regulatory headwinds behind us," that they were experiencing "positive momentum" with retail capital raising, and that the IM business would "turbocharge" CLNS's growth and returns for shareholders. This ruse, in turn, allowed certain defendants to collectively dump over 2.5 million shares of CLNS stock at artificially high prices for proceeds of over $30 million.

7. Ultimately, on March 1, 2018, defendants shocked investors by announcing that CLNS's full-year 2017 Core FFO was $1.16 per share – 22% below the midpoint of the Company's guidance – and that CLNS was slashing its dividend from $1.08 per share in 2017 to $0.44 per share in 2018 – a nearly 60% reduction to the dividend it had previously described as having "very substantial and adequate coverage." Defendant Saltzman admitted that one of the primary reasons that led to CLNS's dramatic Core FFO result was the Company's anemic third-party retail

capital raising, disclosing $375 million in impairment charges related to CLNS's retail IM business and acknowledging that they were "discounting [the retail IM business] completely" in 2018.

8. On this news, CLNS's stock price declined nearly 23%. Consequently, with a current market capitalization of approximately $3.2 billion at the end of the Class Period – defendants' fraud destroyed nearly $6 billion in CLNS's shareholder value.

**PARTIES**

9. Plaintiff Teamsters Local 710 Pension Fund acquired CLNS securities as set forth in the certification attached as Exhibit B to the Declaration of Tricia L. McCormick in Support of Motion [for] Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel (ECF No. 25-2) and has been damaged thereby.

10. Defendant CLNS is a global real estate and investment management firm. Defendant CLNS is a Maryland corporation with its principal executive offices located at 515 South Flower Street, 44th Street, Los Angeles, California 90071. CLNS's securities traded throughout the Class Period on the NYSE under the ticker "CLNS."[2]

11. Defendant Saltzman was, at all relevant times, CLNS's CEO, President, and a director. Prior to the merger, Saltzman was Colony's CEO.

12. Defendant Tangen was, at all relevant times, CLNS's CFO. Prior to the merger, Tangen was Colony's CFO.

13. Defendant Hamamoto was, from the completion of the merger until his resignation became effective on January 11, 2018, CLNS's Executive Vice Chairman

---

[2] On June 22, 2018, CLNS filed Articles of Amendment to its charter with the State Department of Assessment's and Taxation of Maryland to change its name to "Colony Capital, Inc." The Articles of Amendment became effective on June 25, 2018. In connection with the name change, CLNS's Class A common stock trading symbol changed from "CLNS" to "CLNY."

and a director. Prior to the merger, defendant Hamamoto was Chairman and CEO of NSAM from January 2014 until August 2015, later becoming its Executive Chairman in August 2015. Defendant Hamamoto was also Chairman of NRF's board of directors from October 2007 until January 2017, having served as one of its directors since October 2003. Defendant Hamamoto also served as NRF's CEO from October 2004 until August 2015. Defendant Hamamoto further served as Chairman of NorthStar Healthcare Income, Inc. ("NorthStar Healthcare") from January 2013 until January 2014. Defendant Hamamoto served as Co-Chairman of NorthStar/RXR New York Metro Real Estate Inc. ("NorthStar/RXR") from March 2014 until August 2015. Defendant Hamamoto also co-founded NorthStar Capital Investment Corp., the predecessor to NRF, for which he served as co-CEO until October 2004.

14. The defendants referenced above in ¶¶11-13 are referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements that caused the prices of CLNS securities to be artificially inflated during the Class Period.

15. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of CLNS's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases, alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## COMPREHENSIVE STATEMENT OF THE CASE

**Background Information to CLNS's Business Model**

*Characteristics of REITs*

16. A REIT, generally, is a company that owns and typically operates income-producing real estate or real-estate related assets. REITs provide a way for investors to earn a share of the income produced through commercial real estate ownership – without actually having to go out and buy commercial real estate. The income-producing real estate assets owned by a REIT may include office buildings, shopping malls, apartments, hotels, resorts, self-storage facilities, warehouses and mortgages or loans.

17. To qualify as a REIT, a company must have the bulk of its assets and income connected to real estate and must distribute at least 90% of its taxable income to shareholders annually in the form of dividends. The benefit – and the expectation from investors who choose to invest in REITs – is the payment of a significant dividend. As a *Forbes* article described it, "'[i]ncreasing the dividend is all people really care about.'" When CLNS set its $1.08 dividend in 2017, the dividend yield was approximately 8%.

18. Throughout the Class Period, CLNS reported on a quarterly basis the financial metrics Funds From Operations ("FFO") and Core FFO. FFO is a widely used financial measure for the equity REIT industry. CLNS disclosed that the Company calculated FFO in accordance with standards established by the Board of

Governors of the National Association of Real Estate Investment Trusts.[3] CLNS also reported Core FFO, which adjusted FFO for certain items.[4]

*Investment Management Business*

19. CLNS's IM business was a combination of Colony's institutional IM and NSAM's retail IM businesses, as well as the Townsend Group ("Townsend").[5] NSAM's retail IM business focused on earning fees by managing capital in the retail marketplace by accessing a variety of pools of capital through various vehicles, which included REITs and closed-end funds, which were referred to as the Retail Companies.[6] The Retail Companies raised capital through NorthStar Securities, a captive broker-dealer platform registered with the SEC. Each quarter, CLNS would report the capital raised and the investments and fees earned from the Retail

---

[3] The National Association of Real Estate Investment Trusts defines FFO as net income or loss calculated in accordance with GAAP, excluding extraordinary items, as defined by GAAP, gains and losses from sales of depreciable real estate and impairment write-downs associated with depreciable real estate, plus real estate-related depreciation and amortization, and after similar adjustments for unconsolidated partnerships and joint ventures.

[4] The Company computes Core FFO by adjusting FFO for the following items, including the Company's share of these items recognized by its unconsolidated partnerships and joint ventures: (i) gains and losses from sales of depreciable real estate within the Other Equity and Debt segment, net of depreciation, amortization and impairment previously adjusted for FFO; (ii) equity-based compensation expense; (iii) effects of straight-line rent revenue and straight-line rent expense on ground leases; (iv) amortization of acquired above- and below-market lease values; (v) amortization of deferred financing costs and debt premiums and discounts; (vi) unrealized fair value gains or losses and foreign currency re-measurements; (vii) acquisition-related expenses, merger and integration costs; (viii) amortization and impairment of finite-lived intangibles related to IM contracts and customer relationships; (ix) gain on re-measurement of consolidated investment entities and the effect of amortization thereof; (x) non-real estate depreciation and amortization; (xi) change in fair value of contingent consideration; and (xii) tax effect on certain of the foregoing adjustments.

[5] On January 29, 2016, NSAM acquired an approximate 84% interest in Townsend, a leading global provider of IM and advisory services focused on real estate.

[6] The Retail Companies during the Class Period included the following funds: NorthStar Income, NorthStar Income II, NorthStar Healthcare, NorthStar/RXR and NorthStar Real Estate Capital Income Master Fund ("NorthStar Capital Income"). The Company also told investors that the NorthStar/Townsend Investment Fund would become effective during the Class Period, but that never occurred. Ultimately, the Company completed the sale of the Townsend business in December 2017.

Companies. For example, each quarter within the Class Period, the Company included a slide in its Supplemental Financial Reports detailing this information, as follows:

## VIIIc. Investment Management - Retail Companies

*($ in thousands, except as noted; as of September 30, 2017, unless otherwise noted)*

| | NorthStar Income | NorthStar Healthcare | NorthStar Income II | NorthStar/RXR NY Metro Real Estate[1] | NorthStar Real Estate Capital Income Fund | Total |
|---|---|---|---|---|---|---|
| Capital Raising Status | Completed July 2013 | Completed January 2016 | Completed November 2016 | Active | Active | |
| Primary Strategy | CRE Debt | Healthcare Equity and Debt | CRE Debt | NY Metro Area CRE Equity and Debt | CRE Debt | |
| Offering Size | $1.2 billion[2] | $2.1 billion[2] | $1.65 billion[2] | $2.0 billion[2] | $3.2 billion[2] | $10.15 billion |
| Capital Raised[3] | | | | | | |
| During Q3 2017 | $ 8,699 | $ 16,917 | $ 8,823 | $ 4,790 | $ 8,639 | $ 47,868 |
| Year-to-date through 11-3-17 | 26,832 | 61,729 | 26,378 | 24,947 | 22,561 | 162,447 |
| Inception to 11-3-17 | 1,310,543 | 1,930,871 | 1,165,841 | 35,458 | 22,794 | 4,465,507 |
| Investments[4] | | | | | | |
| During Q3 2017 | 30,720 | 217,720 | 60,000 | 12,000 | 9,500 | 329,940 |
| As of 9-30-17 | 1,541,466 | 3,622,296 | 1,789,034 | 32,531 | 26,241 | 7,011,568 |
| Cash as of 9-30-17 | 163,087 | 27,395 | 85,724 | 4,487 | 984 | 281,677 |
| Fees earned during Q3 2017 | | | | | | |
| Asset management fees | 4,355 | 8,733 | 5,427 | 71 | 38 | 18,624 |
| Acquisition fees | — | 4,633 | 600 | — | — | 5,233 |
| Disposition fees | 567 | — | 828 | — | — | 1,395 |
| Total fees | $ 4,922 | $ 13,366 | $ 6,855 | $ 71 | $ 38 | $ 25,252 |

20. This slide confirmed that NorthStar Income, NorthStar Healthcare, and NorthStar Income II were "Completed," meaning that CLNS was no longer raising new capital for these funds.[7] NorthStar/RXR and NorthStar Capital Income, by contrast, were "Active," meaning that CLNS sought to raise new capital for those funds.[8] And as the "Offering Size" for these funds reveal, defendants expected to raise $5.2 billion of retail capital in these funds – nearly $1.5 billion more than the funds that were completed in 2016. The Company's Supplemental Financial Reports,

---

[7] Any capital raised during the Class Period from these three funds would have primarily been from a distribution reinvestment plan and not new capital raising.

[8] CLNS disclosed during the Class Period that the NorthStar Capital Income funds represented a master/feeder structure and pooled investor capital raised through three feeder funds.

however, did not provide an explanation or offer any other commentary on the state of fundraising.

**Defendants Intend the Three-Way Merger to Unlock Purported Hidden "Value" in the Three "Undervalued" Entities**

21. From the outset, the merger was about "unlocking" the "value" underlying the three entities – Colony and the two NorthStar entities, NSAM and NRF. Prior to the merger, the trading multiple of all three pre-merger entities was substantially undervalued, according to defendants. As they described it pointedly in a slide presentation promoting the merger, they believed that "each of the stand-alone companies is undervalued relative to peer groups." The objective of the merger was thus to unlock what defendants perceived to be "hidden" value.

22. The press release announcing the deal repeatedly emphasized this objective, explaining that the combination would "'***creat[e]*** substantial value for shareholders'" because it was "'poised for meaningful multiple ***expansion*** and substantially ***enhanced*** long-term returns for shareholders.'" Among the "Strategic and Financial Benefits" listed in the release was "Increased Scale and Value ***Creation***," which emphasized "***enhanced*** returns," and a market capitalization "***in the top*** quartile" of REIT investments:

> Increased Scale and Value Creation: Colony NorthStar ***is expected to be in the top quartile ranked by equity market capitalization***, according to the MSCI U.S. REIT Index (RMZ) classification, with a broad platform that expands its ability to deploy third-party fee-bearing capital ***to accelerate growth and provide enhanced returns to shareholders*** from consistent, longer duration fee related income.

23. Thus, what defendants sought to do with the merger was to inflate the combined company's stock price and the resulting value of their own holdings. Indeed, defendants had substantial ownership interests, the value of which hinged on the success of the merger. Combined, they would own nearly 11.5 million CLNS

shares. If these shares reached the top quartile, as defendants said they expected, the value of their personal holdings would jump exponentially.

24. The merger was thus designed to cure a perceived fundamental valuation problem – and it sought to do so through the addition of an embedded IM business and the regular fees earned from managing other investors' capital. As a REIT, Colony was largely dependent on generating returns from its own invested capital, which brought considerable risk. But an embedded IM business would enable defendants to earn fees from investing and managing other investor's capital (*i.e.*, third-party capital) while minimizing risk. The combined IM business had two components – capital from institutional investors (from Colony's legacy business) and capital from individual retail investors (from NSAM). While the capital raised in 2017 from institutional investors would be substantially higher than retail, the fees that defendants could earn from institutional investors were relatively low. Retail fees, by contrast, were the opposite, reaching as high as 7%. NorthStar, in fact, had gained a reputation for charging large fees, with one article even noting that "NorthStar focus[ed] excessively on fees earned." Capturing NSAM would enable Colony's executives to continue generating large fees while minimizing risk and elevating the value of defendants' personal holdings.

25. The IM business – and specifically retail fundraising – was thus critical to a successful merger. Defendants' merger presentation, in fact, fixated on the benefits from the IM business – all of the benefits revolved around the merger adding "an embedded investment management platform." The presentation explained that the merger would "unlock value via increase scale and multiple expansion," specifically because it had an embedded IM business. The defendants even included a slide demonstrating that, with their embedded IM model, there could be an increase of 40%+ in return on equity for their investments.

26. The merger presentation also had a slide showing how the three entities were undervalued individually, but a combined entity could roughly double their

valuation. For example, defendants explained that the three standalone companies had a "blended multiple" (*i.e.*, stock price of all three entities/FFO) of only "9.0x," but a combined entity via increased scale and multiple expansion (*i.e.*, the "Hybrid Peer Average") had a far higher multiple at "17.6x." Individual entities in that peer group had FFO multiples that reached as high as "21.8x." With the merger then, defendants thought they could roughly double the stock price multiple of the combined entity and, again, the value of their own personal holdings.

27. But defendants' plan faced a hurdle – newly implemented regulations required more transparent fee-related disclosures for non-traded REITs (such as the funds in which defendants would seek third-party capital). In April of 2016, certain Financial Industry Regulatory Authority ("FINRA") and National Association of Securities Dealer ("NASD") rule amendments went into effect mandating changes to the way non-traded REIT investment values were reported on customer account statements. Specifically, the new rules required that the statements either list the security purchase price less any fees or commissions or, in the alternative, list a current value for the security. Before the rule change, account statements could simply identify a security's gross purchase price even though commissions and fees could have significantly eroded its value over time. The new fee disclosure requirements, in turn, created downward pressure on fees throughout the industry while also causing significant reductions in third-party fundraising.

28. But the allure of a higher trading multiple was apparently too hard to resist. Defendants pursued the merger in the face of these regulations – emphasizing its IM component and its purported benefits – with an expanded stock price multiple as their stated goal.

**Colony Gains Control of NSAM While NorthStar's Executives Receive a Windfall**

29. For NorthStar executives, the merger was nothing short of a windfall. Pursuant to the merger agreement, the executives of the combined entity would be



1460913_1

restricted to legacy Colony executives, with the exception of defendant Hamamoto, who secured the role of Vice Chairman of CLNS's board of directors, and Dan Gilbert, who would serve as the Head of Retail Platform at CLNS. Defendant Hamamoto, however, was the founder of the NorthStar entities and had filled many key NorthStar executive leadership roles in the years before the merger. His involvement was thus necessary for CLNS's success. The same was true for Dan Gilbert, who was the Chief Investment and Operating Officer of NSAM – the retail arm of the critical embedded IM business. As further discussed below, both Hamamoto and Gilbert signed agreements that incentivized their tenure at CLNS for at least two years, although their stock awards fully vested after only one year. The remaining NorthStar executives all agreed to assist with the transition for only one year. And in return, defendant Hamamoto, along with his NorthStar executive leadership team, pulled a whopping $120 million out of the merger pursuant to change-of-control and other agreements.

30. This was a win-win for all insiders; NorthStar executives cashed out while Colony's executives controlled CLNS's operations, including the coveted embedded IM business. And because Colony's executives had been previously granted an incentive plan that specifically tied awards of stock, in part, to real estate fundraising – awards that could reach up to 4.5 million common shares and operating company units – they were highly incentivized to maintain, and even inflate, the Company's stock price throughout the Class Period. The key was third-party capital fundraising.

**Defendants Complete the Merger, Issue Unreachable Core FFO Guidance, and Falsely Emphasize Retail Investment Management's Ability to Generate "Upside" to that Guidance**

31. Defendants were successful in completing the merger on January 10, 2017, with CLNS having a market capitalization of approximately $9 billion and assets under management ("AUM") of $56 billion. Immediately following the merger, defendants continued to highlight the value that the embedded IM business

would bring to investors. On the very first earnings call as a combined entity, defendants hyped the merger and the benefits that it was bringing to shareholders. They issued Core FFO guidance of $1.40-$1.58 per share with a dividend for the year of $1.08, stating that they anticipated covering the dividend with a "meaningful cushion."[9] They also explained that "our guidance only assumes $2 billion of new fundraising in 2017" for the IM business.

32. Defendants also specifically addressed capital fundraising. Despite the regulatory hurdles that were constricting retail fundraising, defendants said that the "ability to raise third-party outside capital . . . [was] intended to turbocharge growth and returns" and noted that the capital fundraising "tide appear[ed] to have turned [from the new regulations] for both institutional and retail placements based upon the momentum we are now experiencing in both markets." Defendants added that "if momentum continues to build, [institutional and retail capital fundraising] is an area where we could be very pleasantly surprised." And in response to a question about the "breakdown of retail versus institutional" in the $2 billion capital raise assumption, defendant Saltzman stated that "we haven't been transparent about that," admitting only that "there is a mix" of the two:

> [Analyst]: Got you. And with regard to the capital raising, I think you said $2 billion versus $1 billion last year. Is there a breakdown of retail versus institutional in terms of how that $2 billion is comprised?
>
> [Saltzman:] Well, we haven't been transparent about that, so yes, there is a mix of institutional and retail. I'm probably not going to comment on it per se at this point.

---

[9] On February 28, 2017, defendants reduced Core FFO from a range of $1.55 to $1.75 per share in large part, they claimed, because of a special dividend CLNS had to pay to NSAM shareholders to complete the merger and from reduced fundraising in the IM business.

33. Without being "transparent" about the mix of institutional and retail capital necessary to meet CLNS's targets, defendants repeatedly hyped the benefits of the merger throughout the Class Period, starting each earnings call with boastful comments, such as "our new company is off to a very promising start in 2017" and "our new company is off to an excellent start in the first half of 2017." And they expressed confidence in their ability to cover the $1.08 dividend, emphasizing that it was covered by "true recurring income" and that it was "well covered by . . . core FFO." And when they spoke of Core FFO, they told investors that they remained "on track" to meet guidance of $1.40-$1.58 because of "new investor client capital" where there was "strong progress in building the selling groups in our current offerings and a commensurate acceleration in the pace of fundraising." Specific to retail, defendants noted that "we are finally seeing positive momentum in the overall retail marketplace as well as in our own fundraising," and that they had "[p]roduct structures [that] are innovative and best-in-class" that would be "highly attractive to a very broad group of financial advisers and their clients." They even said that "[a]dditional core FFO ***upside*** exists from reaching full capital deployment and expected ramp up over the course of the year from other investments and businesses, including retail investment management."

34. As the Class Period progressed, defendants minimized the effect that regulatory changes had on their ability to raise retail capital. They noted the "industry challenges," but emphasized that "we remain optimistic that the retail investment management business will continue to institutionalize and rebound." And when they said that "[t]he majority of our fundraising year-to-date has been sourced from institutional clients," noting it as a trend, they said that the trend would continue "as the retail market stabilizes from the regulatory headwinds previously described and starts to grow again during the second half of 2017 and into 2018 and beyond." They even reiterated that the "investment management platform," with its "investment management fees and carried interest, [was] the turbocharged financial model without

incremental financial risks," and that their "objective is to replace what's burning off in terms of gains and replace it with more investment management economics, primarily base investment management fees through incremental capital raises." By all accounts then, the merger was a resounding success. One analyst even congratulated defendants during the third quarter 2017 conference call, stating that "I want to say congratulations on the huge amount of progress it seems like you've made already thus far this year."

35. But defendants' statements were false and misleading. At the same time that defendants were telling investors that they were "on track" to meet Core FFO guidance because of "new investor client capital" and were experiencing "positive momentum" in retail fundraising, where the "tide appear[ed] to have turned for both institutional and retail placements," defendants knew that the new regulations requiring full disclosure of non-traded REIT fees had constricted their retail fundraising capabilities because financial advisors were steering their clients away from CLNS's funds, and retail investors were objecting to the high fees that CLNS was charging. Those fees contained an astonishing sales commission of up to 7% with various additional management fees, including "acquisition," "disposition," and other "incentive" fees. The result, as defendants knew, was a wholesale inability to raise the retail capital necessary for the combined company to meet its stated business targets and to sustain a $1.08 dividend. In fact, through the first quarter of the merger, the retail IM business had raised a paltry 2% of the $2 billion in IM third-party capital that formed the basis of defendants' guidance. By contrast, prior to the merger, NSAM's retail IM fees generated larger fee income than Colony's institutional IM fees. On a combined basis in 2016, for example, NSAM's retail fees represented 60% of the combined IM fees that NSAM retail and Colony institutional earned for the year. When Townsend was added to the mix, NSAM was over 70% of the combined

IM fees.[10] And since defendant Saltzman refused to be "transparent" about the "mix" of institutional and retail capital embedded in the $2 billion capital raise assumption underlying guidance, investors were reasonable in assuming a mix similar to the prior year – 40% (retail) to 60% (institutional). But, as defendants knew, it would not. And, without retail capital, defendants were reliant upon institutional IM, which brought lower fees and thus could not reach Core FFO or sustain a $1.08 dividend. In fact, while institutional fundraising was proceeding apace, institutional fees were actually ***lower*** than they were before the merger and would ***decline*** from 2016 to 2017. And even with these declining institutional results, the actual mix of institutional to retail capital fundraising for 2017 was a stunning 93% (institutional) to 7% (retail). Defendants' boastful comments about the state of fundraising thus created a picture of a state of affairs at CLNS that was very different than what was actually occurring or necessary for defendants to meet their stated business targets.

36. Defendants knew that retail fundraising had stalled specifically because of NSAM's high fees. In fact, they even attempted in February 2017 – right before the Class Period – to make their purported "best in class" and "attractive" investment offerings more palatable to retail investors by slashing their asset management fees on two separate funds. NorthStar/RXR reduced its asset management fee by approximately 20% and completely eliminated all acquisition and disposition fees. And NorthStar Capital Income reduced management fees from an annual rate of 2.0% of its average ***gross*** assets to an annual rate of 1.25% of its average daily ***net*** assets. But these attempts failed miserably – CLNS raised a grand total of $99 million in retail investment capital during the first half of 2017, a mere pittance compared to the $2 billion in fundraising that defendants said was necessary to reach their Core FFO target. Since NSAM was, by far, the largest contributor to the combined entities' fee

[10] For this calculation, plaintiff has not included fee income NSAM earned from its management agreement with NRF in 2016 since that agreement ended with the closing of the merger.

income historically, the institutional IM business and its significantly lower fees was simply not going to make up for the dismal retail capital fundraising results and allow defendants to meet their Core FFO guidance. Even more problematic was the fact that only 30% of the $99 million raised in retail investment capital during the first half of 2017 was attributable to the two active funds raising new capital, which had just slashed their fees in February 2017 (*i.e.*, NorthStar Capital Income and NorthStar/RXR). The pace of retail capital raising in the first half of 2017 was a harbinger that any efforts to make the funds more sellable by reducing the fees was failing and that defendants had no reasonable basis for the Core FFO guidance they had issued.

37. Defendants' knowledge that they could not reach Core FFO or sustain a $1.08 dividend is confirmed by their own actions only three months into the merger – they put their "category killer advisor," Townsend, up for sale despite having just purchased it in 2016. Defendants were selling Townsend even though it represented over 60% of NSAM's fee-generating AUM at over $14 billion and had $66 million in revenues in 2016. And they ultimately sold Townsend in the fourth quarter of 2017 for what defendant Tangen described as "a modest loss."[11] Far from growing the IM business to "turbocharge" growth and returns from shareholders, CLNS's IM portfolio would shrink down to $27 billion of AUM from $41 billion at the start of the Class Period.

38. Defendants' statements about CLNS's Core FFO guidance and its annual dividend were also false and misleading. What defendants concealed from investors was that neither was attainable with the dismal state of its retail IM business. Given that, by defendants' estimate, 15% to 20% of Core FFO and 25% of the dividend would come from legacy Colony capital gains – which defendants knew were not

[11] In the third quarter of 2017, CLNS recorded a $9.1 million impairment charge to Townsend based on the net asset value of the Townsend business compared to its contracted sale price.

recurring – the retail IM business was crucial to attaining Core FFO guidance and sustaining a $1.08 dividend. But that business – and the fees from it – had all but dried up because of the regulations that required more transparency on NSAM's high fees. Through the first half of 2017, retail fundraising – and thus the available capital from which defendants could expect high retail fees – was less than 5% of the $2 billion capital raise that defendants were relying on to meet Core FFO guidance and to sustain a $1.08 dividend, and only 30% of those funds came from the two active funds that were raising new retail capital.

39. Without the retail IM business, defendants were left with low fee-bearing institutional capital and stagnant assets in the "healthcare" and "hospitality" verticals to reach their targets – the very assets that fell outside of the business model required, in defendants' view, to "turbocharge growth and returns." In fact, these were the very types of assets that produced low returns and, in defendants' view, an "undervalued" stock price multiple for the pre-merged entities. And to make this reality more apparent to defendants, CLNS's healthcare hospitality verticals had fallen out of defendants' definition of a "core" business. In fact, defendants were in the process of pruning those assets and other non-core investments because they were inconsistent with CLNS's business strategy. By the third quarter of 2017, defendants had sold $4.3 billion of non-core assets, leaving massive pools of cash sitting idle as few opportunities existed to generate the type of returns that defendants needed to meet guidance and sustain the dividend.

**Defendants Announce Third Quarter 2017 Results with a Run Rate Short of Guidance, Emphasizing that the Investment Management Business Would "Fill that Gap"**

40. On November 9, 2017, CLNS announced its results for the third quarter of 2017 and bragged about "another excellent quarter of strategic accomplishments at Colony NorthStar," reporting Core FFO that, they claimed, was a "solid quarterly result" that covered the quarterly dividend. Defendants acknowledged that the result produced a "cumulative year-to-date core FFO [that] has been below our beginning of

the year target," but explained that they expected to "fill that gap" with fees from the IM business, stating that "[a]s we invest on more than $1 billion of dry powder and grow our investment management business through complementary coinvesting and related fund placements, we expect to fill that gap over time." And when asked specifically about whether third-party assets under management would grow, defendant Saltzman stated that "[w]e fall into the category of a preferred manager," expressing that he was "[q]uite confident . . . about getting . . . more than our fair share, of the [IM] market."

41. Defendants' statements about CLNS being a "preferred manager" that would get "more than our fair share, of the [IM] market," which would "fill that gap" between the Company's Core FFO and actual results (either then or over time), were false and misleading. Because of the high fees that CLNS charged retail investors, defendants were unable to raise the capital in CLNS's retail business that they would need to contribute to Core FFO and to sustain the Company's dividend. Indeed, despite efforts in February 2017 to make its funds more palatable by eliminating certain fees and reducing others, the Company raised only $48 million in incremental retail capital in the third quarter of 2017 – down $11 million from the previous quarter and far short of an amount that would help defendants "fill that gap." Indeed, by the third quarter of 2017, defendants' retail fundraising had contributed a combined total of only $147 million – just over 7% of the $2 billion in fundraising that defendants used for their Core FFO guidance and only 29% of the capital raised came from the active funds. Defendants could not reasonably expect to fill the gap with institutional IM fees – fees from CLNS's institutional investors came in ***lower*** than the same period a year earlier.

42. NorthStar Securities, as defendants knew, struggled mightily to raise third-party capital throughout the Class Period because financial advisors were steering clients away from CLNS's retail funds while investors were refusing to invest

in those funds due to the high fees. The following chart presents the capital raised through the Retail Companies from 2014 through 2017:




43. Defendants had another reason for not reasonably believing that the IM business could "fill that gap" between Core FFO guidance and actual results (either then or over time). By September 2017, defendants were under contract to sell Townsend, which was the largest fund in AUM terms from the legacy NSAM business. Without Townsend's over $14 billion in AUM (and the $66 million in fees that came with it) and the then-current state of its retail fundraising efforts, the retail business with its high fees could not fill the gap or provide any hope of CLNS reaching its Core FFO guidance of between $1.40-$1.58 or sustaining a $1.08 "per annum" dividend, as defendants knew. This conclusion was reinforced for defendants since, by this time, they had exhausted the legacy Colony assets that were generating the capital gains that were keeping defendants' quarterly Core FFO and quarterly dividends afloat.

**Defendant Hamamoto's Untimely Resignation and Dumping of Nearly $27 Million Worth of Stock**

44. On November 9, 2017, CLNS also announced that defendant Hamamoto had delivered his voluntary resignation from all director and officer positions held with the Company and any of its affiliates. CLNS provided no information for defendant Hamamoto's abrupt departure beyond the platitude that it was a "personal life choice decision" and that his "resignation did not involve a disagreement with the Company or any matter relating to the Company's operations, policies or practices." Defendant Hamamoto's unceremonious exit from CLNS was in stark contrast to the remarks made by the Company's Executive Chairman, Thomas J. Barrack, Jr., during the merger's announcement that "David [Hamamoto], Richard [Saltzman], myself and our teams are ***personally committed to partner in leading the new combined company*** to become the dominant performer of global real estate." Indeed, defendant Hamamoto was one of just two NorthStar executives highlighted by the merger's promotional presentation as being a part of the "highly experienced [six-person] team, providing ***continuity***, transparency and a clear, ***consistent*** vision."

45. Defendant Hamamoto's departure was not just contrary to CLNS's rhetoric, it was also inconsistent with the spirit of his employment agreement with the Company. As defendant Hamamoto's Letter Agreement outlined, CLNS clearly expected him to remain with the Company for at least two years.[12] As consideration for the merger, CLNS agreed to compensate defendant Hamamoto with over $52 million worth of the Company's shares that, importantly, were "subject to [defendant Hamamoto's] continued employment with [CLNS] or one of its subsidiaries through the Vesting Date," the one-year anniversary of the merger's closing – January 10,

---

[12] On June 2, 2016, each of NSAM's named executive officers, including Hamamoto, Gilbert, Albert Tylis (CEO and President of NSAM), Debra Hess (CFO of NSAM and NRF) and Ronald Lieberman (General Counsel of NSAM and NRF) entered into a letter agreement with NSAM and NRF that described, among other things, the compensation each executive would receive at the closing of the merger.

2018. In addition, CLNS further incentivized defendant Hamamoto to remain at the Company by subjecting his shares to a holding requirement through the first anniversary of the Vesting Date – January 10, 2019. But despite his Letter Agreement and CLNS's intentions, defendant Hamamoto announced his resignation on November 7, 2017, a mere 10 months after the merger's closing and well before his one-year tenure vesting requirement. Conveniently, defendant Hamamoto made his resignation effective on January 11, 2018 – thus allowing his exit at nearly the earliest possible date without forfeiting any of his merger-related stock.

46. Defendant Hamamoto, as NSAM's former Chairman and CEO, knew first hand that CLNS's retail capital raising expectations were unreasonably high, which rendered the Company's 2017 Core FFO guidance unreachable and a $1.08 dividend "per annum," as defendant Saltzman characterized the dividend, unsustainable. Recognizing the inevitable reality, the month after announcing his resignation, defendant Hamamoto dumped over 2.2 million of his artificially inflated CLNS shares in a four-day time period, a stake representing approximately half of his total unrestricted Company shares. In doing so, defendant Hamamoto pocketed nearly $27 million at the expense of the Company's unsuspecting shareholders. These sales, however, may be the tip of the iceberg because, due to this resignation, defendant Hamamoto is no longer required to report his CLNS sales. In fact, a Koneko research analyst issued a report on January 28, 2018, stating that "Colony NorthStar shares ha[d] fallen sharply in recent weeks (-18% YTD)" and that he "believe[d] the selling pressure comes from ex-Northstar executives."

**Gilbert, the Lone NorthStar Executive Remaining at CLNS, Resigns**

47. Like defendant Hamamoto, Gilbert was the other NorthStar executive praised during the merger's announcement as a member of the "highly experienced team" that would lead CLNS with a "clear, consistent vision." Gilbert was tapped as head of CLNS's newly combined Retail Platform and, during the June 3, 2016 conference call to announce the merger, defendant Saltzman even deferred to him

when asked about "growth and leveraging the retail network." As with Hamamoto, Gilbert's Letter Agreement also provided the same one-year continued employment stock vesting and additional one-year stock holding requirements. And like Hamamoto, by the end of 2017, Gilbert was gone.

48. On December 15, 2017, NorthStar Capital Income – one of CLNS's Retail Companies – announced through an SEC filing that Gilbert had tendered his resignation from the Company. In doing so, Gilbert made his resignation as NorthStar Capital Income's Chairman of the Board, CEO, President, and member of the Advisor's investment committee effective as of December 15, 2017. However, like Hamamoto, Gilbert made his resignation from CLNS effective on January 11, 2018 – thus enabling him to leave the Company with all of his shares intact.

49. Neither CLNS nor any of its entities provided a reason for Gilbert's purported resignation. Indeed, the only pronouncement made about Gilbert's exit was the same boilerplate language provided when Hamamoto resigned: "The decision of Mr. Gilbert was not a result of any disagreement with [CLNS] or the Trust on any matter relating to their operations, polices or practices." Nevertheless, when Gilbert resigned, it was clear that CLNS's retail fundraising was significantly underperforming and that it would ultimately lead to the Company failing to meet its Core FFO guidance and "per annum" dividend.[13]

**Defendants Reveal the Truth – Dividend Collapses 60% as Defendants Write Off Most of the Investment Management Business**

50. Then, on March 1, 2018, after a full year of incredibly optimistic claims about the status and benefits of the merger, defendants shocked investors by slashing the dividend by approximately 60% and writing down CLNS's IM assets by $375

[13] In the same December 15, 2017 SEC filing, NorthStar Capital Income also announced that yet another former NorthStar executive, Brett S. Klein, had announced his intent to resign from CLNS and its affiliates by the end of the first quarter of 2018. Predictably, NorthStar Capital Income indicated that Klein's purported "decision . . . was not a result of any disagreement with Colony NorthStar or the Trust on any matter relating to their operations, polices or practices."

million, which included a $316 million impairment charge to the IM goodwill that was recorded as a direct result of the merger. The stock reacted accordingly, collapsing 23% in a single day of trading.

51. This material impairment charge demonstrated that the merger was an unmitigated disaster. And because defendants admitted that the $316 million charge was "primarily attributable to our retail broker-dealer distribution business," it demonstrated that the retail business had failed. In fact, when asked by an analyst during the earnings call to "talk about retail in general as an opportunity set and then also kind of institutional," defendant Saltzman explained as much on the earnings call, stating that "our model for 2018 is pretty much 100% focused on the institutional side," that they were "discounting [retail] completely," and that defendants were bringing in the wholesale broker-dealer S2K Financial, LLC ("S2K") to try to save the retail business, if it could be saved at all:

> Sure. Look, I think clearly markets are still quite liquid. There's a lot of capital sitting on the sidelines. And I think that capital, despite the liquidity, is quite judicious and discriminating about where it wants to be and who it wants to be with. ***So right now, our model for 2018 is pretty much 100% focused on the institutional side***, okay. We think given what's happened in the retail capital raising environment, that hopefully there's a strong future there over the course of that whole space transitioning to a new model and a new approach. ***But at least for the time being, we're just discounting it completely in terms of thinking that it's really going to benefit us. So we have a lot of confidence in our new partner. We haven't yet closed, but S2K, that if there's a group that's going to be able to figure it out, they're at the front of the class. But really, the focus is completely on the institutional side of the business.***

52. In the first quarter of 2018, the Company continued to write down the IM business, recognizing another approximately $140 million in impairments of its management contract intangible assets for certain of its Retail Companies. And in the second quarter of 2018, defendants wrote off another $60 million in intangible assets associated with the NorthStar trade name, changing CLNS's name back to Colony Capital.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**

53. On February 28, 2017, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K") with the SEC, which was signed by defendants Saltzman, Tangen, and Hamamoto. The 2016 10-K included the standalone financial results of the pre-merger entities. Specifically, the consolidated financial statements included in the 2016 10-K represented the standalone financial results of NSAM. The NRF and Colony standalone financial results were filed as exhibits to the 2016 Form 10-K.[14] The 2016 Form 10-K also included the five core strategic real estate segments of the newly formed CLNS: (1) Healthcare (2) Light Industrial, (3) Hospitality, (4) Other Equity and Debt, and (5) Investment Management.

54. Presented in the 2016 Form 10-K were the historical financial results and capital raising details of NSAM, which formed part of the Investment Management segment of CLNS after the merger closed on January 10, 2017. For example, the 2016 Form 10-K included a summary table of the Retail Companies, which included their capital raise activity and investments up through February 23, 2017:

---

[14] The 2016 Form 10-K stated that "[t]he historical consolidated financial statements included herein represent the consolidated financial position, results of operations, other comprehensive income and cash flows of NSAM prior to the mergers. . . . The consolidated financial statements included herein should be read and considered with the Colony and NorthStar Realty consolidated financial statements and notes thereto that are included as exhibits to this Form 10-K and pro forma financial statements and notes thereto that are filed with the SEC."

*Retail Companies*

The following table presents a summary of the Retail Companies, including capital raise activity and investments as of or through February 23, 2017:

| Retail Company | Primary Strategy | Offering Amount (in millions)[1] | Offering Period | Capital Raised (in millions)[1] | Total Investments (in millions) |
|---|---|---|---|---|---|
| **Effective** | | | | | |
| NorthStar Income | CRE Debt | $ 1,200.0 | Completed July 2013 | $ 1,293.4 | $ 1,599.9 |
| NorthStar Healthcare | Healthcare Equity and Debt | 2,100.0 | Completed January 2016[2] | 1,880.8 | 3,413.7 |
| NorthStar Income II | CRE Debt | 1,650.0 | Completed November 2016[2] | 1,145.5 | 1,739.8 |
| NorthStar/RXR New York Metro[3] | New York Metro Area CRE Equity and Debt | 2,000.0 | Ends February 2018[4][5] | 12.8 [9] | 11.0 |
| NorthStar Capital Fund | CRE Debt and Equity | 3,200.0 [6] | Ends July 2019[5][7] | 2.2 [9] | 0.1 |
| **Not Yet Effective** | | | | | |
| NorthStar/Townsend Investment | CRE Debt and Equity | $ 1,000.0 | N/A[8] | N/A | N/A |

(1) Represents amount of shares registered and raised to offer pursuant to each Retail Company's public offering, distribution reinvestment plan and follow-on public offering.
(2) NorthStar Healthcare successfully completed its initial public offering on February 2, 2015 by raising $1.1 billion in capital and its follow-on public offering on January 19, 2016 by raising $0.7 billion in capital. NorthStar Income II closed its initial public offering on November 9, 2016 and raised $1.1 billion in capital.
(3) Any asset management and other fees incurred by NorthStar/RXR New York Metro will be shared equally between NSAM and RXR Realty, as co-sponsors.
(4) NorthStar/RXR New York Metro's registration statement became effective in 2015 and began raising capital in 2016. Colony NorthStar expects the capital raise to accelerate in 2017.
(5) Offering period subject to extension as determined by the board of directors or trustees of each Retail Company.
(6) Offering is for two feeder funds in a master feeder structure.
(7) NorthStar Capital Fund's registration statement was declared effective by the SEC in May 2016. Colony NorthStar expects NorthStar Capital Fund to begin raising capital from third parties in the first half 2017.
(8) NorthStar/Townsend Investment submitted a registration statement on Form N-2 to the SEC in October 2016. Colony NorthStar expects NorthStar/Townsend Investment to begin raising capital in the first half 2017.
(9) In connection with the distribution support agreement with each Retail Company, an affiliate of Colony NorthStar purchased shares of common stock in NorthStar/RXR New York Metro and NorthStar Capital Fund for $1.5 million and $2.0 million, respectively, since inception through December 31, 2016.

55. The table detailed that only two of the Retail Companies had a current active offering period: NorthStar/RXR and NorthStar Capital Income. The table detailed that both would be active for third-party investments in 2017 and that for NorthStar/RXR its ***capital raise was expected "to accelerate in 2017***." Significantly, the table displayed that the total offering amounts for NorthStar/RXR and NorthStar Capital Income combined ($5.2 billion) totaled an approximately 40% greater offering amount than the previous two Retail Companies combined that were now closed to new investments (NorthStar Income II and NorthStar Healthcare totaled $3.75 billion). The table also noted that CLNS expected a third Retail Company with a total offering amount of $1 billion, NorthStar/Townsend Investment ("NorthStar Townsend"), to become active and "***begin raising capital from third parties in the first half of 2017***."

56. Defendants' statements about CLNS's capital fundraising, including that NorthStar/RXR's capital raising would "accelerate" in 2017, were false and/or misleading. Because of the high fees that these funds charged retail investors, the newly implemented disclosure regulations severely hampered defendants' retail

fundraising capabilities. Indeed, as defendants knew, the capital raise environment was on a downward trend in which 2016 capital raised had missed projections by $2 billion, with only $1 billion in capital raised combined for institutional and retail in 2016 versus defendants' $3 billion projection. Defendants' statement that they expected NorthStar/RXR's capital raising to "accelerate in 2017" created the misleading impression that the fund would be able to raise retail funds in sufficient amounts to materially contribute to CLNS's financial results, including Core FFO. In reality, however, NorthStar/RXR capital raising was off to a miserable start because of its large fees, as the REIT had begun raising capital in 2016 and only $12.8 million had been raised through February 23, 2017, or less than 1% of the offering amount. As defendants were aware, NSAM had raised 83% less third-party capital in the fourth quarter of 2016 compared to a year earlier ($448.8 million versus $76.5 million), so raising just $12.8 million since inception for the NorthStar/RXR fund was a huge red flag that investors and financial advisors were reacting to the fund's fees, which were required to be disclosed by the newly implemented regulations. In fact, in 2015 and 2016, NSAM had raised significantly more capital with two Retail Companies (NorthStar Income II and NorthStar Healthcare) that had an approximately 40% lower total offering amount than the current two Retail Companies (NorthStar/RXR and NorthStar Capital Income) active for 2017. Defendants could have no reasonable expectation that NorthStar/RXR's capital raising would "accelerate" in 2017.

57. Defendants' statement in the table that the NorthStar Townsend offering was expected to start raising capital in the first half of 2017 was also false and misleading. In fact, defendants would put the Townsend business up for sale only three months into the merger on March 31, 2017. As a result, defendants knew that the NorthStar Townsend REIT would never go effective in 2017 since the Company expressed no desire to keep Townsend for the long term. Like defendants' statements about "accelerating" fundraising, these statements created the false and misleading

impression that fees from the Townsend offering would contribute materially to the Company's Core FFO and to sustaining its $1.08 dividend.

58. The same day that the Company filed its 2016 10-K, February 28, 2017, CLNS issued a press release and filed a Form 8-K, which was signed by defendant Tangen, announcing the Company's fourth quarter 2016 standalone financial results and a post-merger update. In the press release, the Company "updated" its Core FFO guidance for 2017 to a range of $1.40 to $1.58 per share – a reduction from its previous $1.55 to $1.75 per share guidance that they attributed to a special dividend paid to NSAM shareholders as part of the merger transaction and also to less third-party capital raising:

> The Company is updating its Core FFO guidance for the year ending 2017 to a ***range of $1.40 to $1.58 per share***, but does not intend to provide updates to Core FFO guidance going forward. In comparison to the original 2017 guidance that was provided in the Investor Presentation related to the merger filed on June 7, 2016, the update includes lower earnings due primarily to: 1) less third party capital raising; 2) less cash available to deploy into investments resulting from the increase of the NSAM special dividend among other reasons; and, 3) accelerating the replacement of higher-yielding, non-core investments with lower-yielding investments that better fit the strategic direction of the Company.

59. The Form 8-K included an investor presentation as an exhibit in which defendants highlighted the benefits of the merger through its five business segments, including the IM segment. In the presentation, defendants highlighted a near-term priority in the IM segment that included "***accelerate fundraising in new retail vehicles***" (*i.e.*, NorthStar/RXR, NorthStar Capital Income and NorthStar Townsend).

60. On March 1, 2017, during CLNS's conference call with analysts, media representatives, and investors, defendant Saltzman reiterated the Company's 2017

Core FFO guidance, stating that they "anticipated core FFO earnings [in the] range of $1.40 to $1.58 per share." He noted that it was down by just under 10% because of a special dividend paid to NSAM shareholders to complete the merger, reduced capital raised in 2016, and a redeployment of capital into lower yielding core strategic assets. He also explained that the Company's guidance "assumes $2 billion of new fundraising in 2017." But when asked about the "breakdown of retail versus institutional" in the $2 billion capital raise assumption, defendant Saltzman said "we haven't been transparent about that," admitting only that "there is a mix" of the two:

> [Analyst]: Got you. And with regard to the capital raising, I think you said $2 billion versus $1 billion last year. Is there a breakdown of retail versus institutional in terms of how that $2 billion is comprised?
>
> [Saltzman:] Well, we haven't been transparent about that, so yes, there is a mix of institutional and retail. I'm probably not going to comment on it per se at this point.

61. Defendant Saltzman acknowledged "headwinds in 2016" in both institutional and retail capital raising, but explained that they were now experiencing "momentum" in both. Saltzman even added that if the "momentum" they were experiencing continued, they could be "very pleasantly surprised" on both fronts:

> In terms of capital raises, we experienced headwinds in 2016 on both the institutional and retail fronts . . . .
>
> * * *
>
> Fortunately, the tide appears to have turned for both institutional and retail placements based upon the ***momentum we're now experiencing in both markets.*** In fact, our guidance only assumes $2 billion of new fundraising in 2017. ***If momentum continues to build, this is an area where we could be very pleasantly surprised***.
>
> * * *

> But I think, consistent with my comments earlier, I think we're pretty sanguine and cautiously optimistic about how we're likely to do better in terms of capital raising this year. We were very disappointed with where we ended up last year for the reasons that I mentioned. But I think now that we're stabilized, the merger is behind us, ***the environment is as positive as it is***, and we have all of these interesting opportunities in terms of both the existing balance sheet as well as what we're doing on the investment management side, I'd be very surprised if we don't exceed that for this year.

62. In an effort to further allay investor concerns regarding CLNS's significant reduction in Core FFO guidance right out of the gate of its heralded merger, defendant Tangen emphasized that CLNS's dividend was not at risk because the Company's "new core FFO guidance ***more than covers*** our new annual dividend of $1.08 per share."

63. Defendant Saltzman continued the bullish tone regarding the merger's prospects by emphasizing its accretive nature, including an ability of the IM business to "turbocharge growth and returns":

> As we've discussed previously, the balance sheet of Colony NorthStar will be organized in a series of from three to five core property verticals that are each easy to understand and valued from a public market's perspective. The commonality will be very favorable supply/demand fundamentals for the particular real estate asset class, ***along with an ability to raise third-party outside capital with investment management economics***.
>
> The latter at an ultimate ratio of at least 2 to 1 outside to inside capital is intended to ***turbocharge growth and returns***, as you see today in single-sector-focused equity REITs with embedded investment management platforms.



1460913_1

64. Defendants' statements, as alleged in ¶¶58-63, forecasting 2017 Core FFO at a mid-range of $1.49 per share with a $1.08 dividend were made without a reasonable basis. In fact, they depended on $2 billion in capital fundraising, with a substantial contribution from the retail IM business and the higher fees that managing retail capital involved. But the new regulations that required defendants to disclose those fees to investors effectively constricted defendants' fundraising capabilities on the highest fee-generating platform that defendants had secured through the merger. Defendants' professed strategy to "turbocharge" growth and earnings depended, to a large extent, on managing retail capital. In fact, prior to the merger, fees that NSAM earned from managing retail capital were considerably higher than the fees that Colony made from managing institutional capital. For example, fee income in 2016 for NSAM's retail business was larger than Colony's institutional business by 32%. And with Townsend included, NSAM represented over 70% of the IM fees that the combined IM businesses earned for 2016. Since defendant Saltzman refused to be "transparent" about the mix underlying defendants' $2 billion capital raise assumption, investors were reasonable in assuming a fundraising mix similar to the prior year – 40% (retail) to 60% (institutional). But, as defendants knew, it would not. Defendants could not have reasonably assumed that fees from institutional investors would make up the difference. Institutional IM fees were far lower than retail fees, and fee income from Colony's institutional business was over 30% lower than NSAM's retail business in 2016, even though more institutional capital was raised than retail for the year. Given that retail capital fundraising had effectively ceased because regulations revealed CLNS's high fees, causing financial advisors to steer clients away from CLNS's retail funds and investors to put their funds elsewhere, defendants could have no reasonable expectation of reaching their Core FFO guidance or of sustaining a $1.08 dividend.

65. For the same reason, defendants' claim that they were experiencing "momentum" and would "accelerate fundraising in new retail vehicles" was false and

misleading, as defendants knew. The Company raised a mere $40 million in retail capital during the first quarter of 2017 – just 2% of the $2 billion capital raise that defendants assumed when issuing guidance, and only 13% of that capital came from "active" funds. And defendants knew the problem was retail investors' and financial advisors' reaction to their fees, as they had already begun reducing those fees in an attempt to make their fee structure more palatable to retail investors. Defendants' statements created the false and misleading impression that retail fundraising would contribute meaningfully to CLNS's financial results, including its Core FFO target and its "per annum" dividend.

66. On May 9, 2017, CLNS issued a press release and filed a Form 8-K, which was signed by defendant Tangen, announcing its first quarter 2017 financial results. The Company reported Core FFO for the quarter of $173.1 million, or $0.31 per share, 17% below the midpoint of the 2017 Core FFO guidance – an inauspicious performance, given that these were CLNS's first combined post-merger financial results. In the press release, defendant Saltzman reassured investors that "[w]e remain on track to achieve our 2017 full year goals for Core FFO including synergies, new investor client capital formation, and simplification; notwithstanding some seasonal and other timing related performance differences in the first quarter."

67. During the conference call the next day, defendant Saltzman reiterated that CLNS remained on track to achieve full year Core FFO guidance:

> Our core FFO for the quarter was $0.31 per share, which Darren will discuss in greater detail on this call. This result reflects the seasonality of our hospitality segment as well as other timing differences, and ***we remain on track to achieve our 2017 full year goals for core FFO***. For example, the first quarter did not reflect the full impact of capital raising and investments that occurred during the quarter, including our common stock repurchases, which generally happen later in the quarter or subsequent to quarter end.

68. Defendant Saltzman also confirmed that "consistent with the updated earnings guidance range from last quarter, we anticipate that 2017 core FFO will cover the annual dividend by a ***meaningful cushion***."

69. Defendant Tangen reassured investors that full year Core FFO guidance was conservative, given that "[a]dditional core FFO upside exists" and that "retail investment management is certainly one example of" such upside:

> Results, which we do not consider as representative of the company's stabilized earnings potential. Notably, the seasonal impact of our hospitality business in the first quarter was approximately $0.02 per share, which is the difference between actual Q1 results and the simple quarterly average based on expected results in this segment over the calendar year. Furthermore, if we apply the forecast $80 million cash G&A synergy benefit and the stock repurchases, which happened in the past 2 months, core FFO would have been a further (technical difficulty) per share higher. ***Additional core FFO upside exists*** from reaching full capital deployment and expected ramp up over the course of the year from other investments and businesses, ***including retail investment management***. For these reasons, we believe ***we remain on track to achieve the full year 2017 core FFO guidance range presented on our last call***.

70. Defendant Tangen, in response to a question about Core FFO, highlighted "further core FFO upside" and again remarked that "retail investment management" was one area of such upside:

> ***I didn't give a number but we do expect further core FFO upside*** from achieving full capital deployment, which we certainly didn't have in the first quarter as well as there are certain businesses and even other assets that we expect will have improved operating performance over the course of the year. ***And retail investment management is certainly one***

***example of that, for some of the reasons that Richard mentioned during his remarks***.

71. Despite disappointing IM results from the Retail Companies, where only $68 million had been raised through the first four months of 2017, defendant Saltzman falsely described the "positive momentum" in the "improving" retail channel and the "best-in-class" nature of their offerings. And as previously discussed, defendant Saltzman once again falsely lauded a "soon-to-be effective" new retail company offering, NorthStar Townsend, even though the Company was looking to sell the Townsend business, which had just been acquired in January 2016:

> Turning to our retail platform. After an extended period of extraordinary market disruption mainly driven by significant regulatory changes, ***we are finally seeing positive momentum in the overall retail marketplace as well as in our own fundraising***. We've positioned our retail platform and product lineup to take full advantage of the evolving market environment and to support our goals of broadening the pool and channels of capital we access, which now includes registered investment advisers and traditional Wall Street firms, in addition to the historical network of independent broker-dealers, all with an objective of bringing Colony NorthStar's institutional asset management acumen and best practices to the retail investor client. And post merger, this includes using our balance sheet to foster better alignment of interest with investors. Our offerings include nontraded REITs and 40 Act funds allowing us to serve both long-term existing relationships and targeted new pools of capital. Product structures are innovative and ***best-in-class, well suited to the new market environment and reflect our drive to be a visionary value-producing leader in the marketplace***.
>
> ***In connection therewith, we've seen strong progress in building the selling groups in our current offerings and a commensurate***

> ***acceleration in the pace of fundraising***. More than $6 billion of targeted capital is anticipated to be raised in products that are generally early in their life cycles and just starting the capital raising process, ***including our 2 effective programs the $2 billion NorthStar/RXR New York Metro real estate nontraded REIT and a $3.2 billion NorthStar Real Estate Capital Income 40 Act closed-end fund, as well as our soon-to-be effective $1 billion NorthStar/Townsend Institutional Real Estate 40 Act interval fund***. Privately placed retail products, or institutional funds that have a retail sleeve, are also in various stages of development. ***All of these are structured to be highly attractive to a very broad group of financial advisers and their clients***.

72. Defendants were asked a question about the environment for capital raising in the IM business, to which defendant Saltzman responded that the retail environment was "improving" and falsely stated that the "regulatory headwinds" were behind CLNS:

> And then I think the retail environment, as I suggested in my remarks, I think is ***improving***. ***And now that we've got these regulatory headwinds behind us***, I think is more open-minded about getting invested again in the space. ***And I think the variety of offerings that we have before them represent a very attractive menu of choices that hopefully, they will participate in***.

73. Defendant Saltzman told investors that the positive momentum in the retail channel would lead to "incremental" retail fundraising results in the upcoming second quarter and that they were "more likely to be ***robust on our behalf during the second half of the year*** and then going into 2018."

74. Defendants' statements regarding their retail fundraising performance and outlook, including defendant Saltzman's claim that "we've got these regulatory headwinds behind us," as alleged in ¶¶66-73, were false and misleading. The

regulatory "headwinds" were certainly not "behind" CLNS, as the regulations continued to require disclosure of the Company's high retail fees and continued to constrict retail fundraising, as investors and their financial advisors turned away from those fees, which included an up-front sales commission that reached up to 7% of the investment. In fact, contrary to defendants' claims that retail fundraising showed "positive momentum," would be "robust" in the second half of 2017, and that it represented potential "upside" to Core FFO, retail capital fundraising continued to lag. By May 5, 2017 – just five days before the conference call – retail fundraising year-to-date was a mere $68 million – just 3% of the $2 billion total that was necessary for CLNS to reach its Core FFO guidance and to sustain its dividend – with only $10.7 million (16%) of that coming from CLNS's active funds. In reality, by the time defendants made these statements, new capital fundraising from those funds was a grand total of just 0.5% of the fundraising dollars that defendants needed to hit the Core FFO target – a number that defendant Saltzman admitted had to include a "mix" of retail and institutional fundraising dollars. And these dismal results came after CLNS had slashed its fees to make the funds more palatable for investors and their financial advisors. At the same time, the gap that the dismal retail fundraising was causing CLNS could not be filled with institutional IM capital, as those funds were actually generating lower fees than institutional IM capital had made a year earlier in the same period. CLNS was certainly not "on track" to meet Core FFO guidance. Defendants' statements suggesting the contrary, at a minimum, were made without a reasonable basis. Their statements continued to create the false and misleading impression that retail fundraising would contribute meaningfully to CLNS's financial results, including its Core FFO target and its "per annum" dividend.

75. Thereafter, defendants hit the road to peddle CLNS's message that the Company was well in line to meet its rosy post-merger financial guidance. On June 22, 2017, defendants Tangen and Saltzman addressed investors and analysts at the JPM Securities Financial Services and Real Estate Conference. In doing so,

defendant Saltzman boasted that he was "very comfortable" with the sustainability and general outlook of the Company's "per annum" dividend:

> So today, we feel ***very comfortable*** with the $1.08 ***per annum*** dividend yield level that we've set. And the [Core FFO] guidance that we've provided . . . currently the midpoint of that guidance is around $1.49 per share. So ***very substantial and adequate coverage around that $1.08 dividend***. But when you peel the onion back, what people want to ask us about is that with respect to the $1.49, Colony Capital since its inception going public back in 2009 has very consistently generated maybe 20%, 25% of its earnings through gains that have been recurring because these were opportunistic investments that we made at the depths of the financial crisis . . . . So today as a combined entity, Colony NorthStar, we're continuing to tell people probably 15% to 20% of our core FFO is going to be recurring gains . . . [a]nd first of all, if you take 15% to 20% away from $1.49, you're still covering the $1.08. So the cushion is not quite as large, of course, but you're still covering it. So that's why we're ***so confident around that number***, it's covered by our true recurring income. But then our objective is to replace what's burning off in terms of gains and ***replace it with more investment management economics, primarily base investment management fees through incremental capital raises*** that we're going to be able to do in all of these various constructs that we're describing.

76. Defendants had no reasonable basis for the statements in ¶75 that "we feel very comfortable with the $1.08 per annum dividend" and that there was "substantial and adequate coverage around that $1.08 dividend." The reality was that without a meaningful contribution from the retail IM business, defendants were left with capital gains (which they knew would expire in the third quarter of 2017) and the same low paying institutional IM business and stagnant healthcare and hospitality

assets (which defendants were de-emphasizing) to reach projected numbers that they, themselves, said assumed a $2 billion capital fundraise with a mix of institutional and retail capital. At the same JPM conference, defendants minimized healthcare and hospitality stating that they preferred industrial and Europe as core verticals given their better future prospects. But with half of their balance sheet assets tied up in two expendable verticals that were producing no growth, defendants' statements, including the assertion that they were "very comfortable with the $1.08 per annum dividend yield level that we've set," were simply not reasonable without a meaningful contribution from the retail IM business, which historically was a larger contributor to fee income than Colony's institutional IM business.

77. On August 8, 2017, CLNS issued a press release and filed a Form 8-K, which was signed by defendant Tangen, announcing its second quarter 2017 financial results, which included Core FFO of $203.6 million, or $0.35 per basic share. The following day, during the Company's conference call to discuss its results, defendant Saltzman reiterated that CLNS's dividend "will be well covered by our 2017 core FFO." As for CLNS's retail IM business, defendant Saltzman recognized certain purported "industry challenges" facing the sector for the first time, but made clear that the Company "***remain[ed] optimistic***" that it "***will continue to institutionalize and rebound***":

> On the other hand, an extended period of extraordinary structural change and market disruption, including the very recent Department of Labor fiduciary for adoption and implementation in June, has negatively impacted the retail investment management business year-to-date. ***Despite these industry challenges, we remain optimistic that the retail investment management business will continue to institutionalize and rebound***.

78. Despite knowing the Company's retail channel had only raised a meager $123 million in the first seven months of the merger, only 25% of which was from the

Company's two active funds (NorthStar/RXR and NorthStar Capital Income), defendant Saltzman falsely told investors that the retail market was stabilizing from the regulatory headwinds and that growth would occur in the retail channel in the second half of 2017:

> The majority of our fundraising year-to-date has been sourced from institutional clients, and we expect this trend to continue through the balance of the year ***as the retail market stabilizes from the regulatory headwinds previously described and starts to grow again during the second half of 2017 and into 2018 and beyond***.

79. Defendant Saltzman sang the praises of the merger and even highlighted an IM business that would "turbocharge[]" earnings without the corresponding "incremental financial risks":

> Our investment management platform, with $40 billion of assets under management, inclusive of $14 billion of AUM within our accounts and subsidiary, supports our core real estate verticals by leveraging our current asset level returns with investment management fees and carried interest, the ***turbocharged financial model without incremental financial risks***.

80. Defendants' statements about CLNS's retail IM business were false and misleading. The retail market was not stabilizing for CLNS from regulatory headwinds, as defendants claimed, and IM could not be "the turbocharged financial model" that defendants were asserting, because the regulations continued to require CLNS to disclose its high fees and continued to constrict CLNS's retail fundraising capabilities and retail investors and financial advisors continued to turn away from CLNS's retail fees. Indeed, even though CLNS had slashed its fees in February 2017, CLNS had raised just over $99 million from retail investors by the end of the second quarter of 2017 – less than 5% of the IM fundraising that defendants needed to reach CLNS's Core FFO guidance and to cover its dividend – and only 30% of that was

from the "active" funds. A year earlier, by comparison, NSAM had raised over $234 million by this time and as much as $646 million for the first half of 2015. And at $59.1 million, CLNS's second quarter 2017 retail fundraising result was the second lowest amount raised of the previous 13 quarters dating back to the first quarter of 2014, while fees from institutional IM continued to be lower than prior year's results. Defendants thus had no reasonable basis to assert that the dividend would be "well covered" by Core FFO, to claim that retail fundraising would "***start[] to grow again during the second half of 2017***" or to express optimism ***"that the retail investment management business will continue to institutionalize and rebound***."

81. Defendant Saltzman's statement that CLNS's dividend would be "well covered" by Core FFO was false and misleading for additional reasons. Without a meaningful contribution from the retail IM business, defendants were dependent upon capital gains (which they knew would expire in the third quarter of 2017) and the same low paying institutional IM business and stagnant healthcare and hospitality assets (which defendants were de-emphasizing) to reach projected numbers that they, themselves, said assumed a $2 billion capital fundraise with a mix of institutional and retail capital. Defendants knew the strategic verticals of healthcare and hospitality that came from the NorthStar business (which was over 50% of their balance sheet assets) were underperforming and would not provide the upside necessary to offset paltry retail capital fundraising. Both verticals were producing, in defendants' words, "slightly softer results" and they were vague on the conference call when questioned about their future plans for healthcare and hospitality, stating that "it's still a little bit unclear to us whether we want to have them as strategic verticals" and "[w]e're certainly not trying to grow those businesses at the moment." Simply put, defendants' statements about covering the dividend or sustaining it were simply not reasonable given the then-current state of affairs.

82. On November 9, 2017, CLNS issued a press release and filed a Form 8-K, which was signed by defendant Tangen, announcing its third quarter 2017

financial results, which included Core FFO of $193.4 million, or $0.33 per basic share – below the consensus analyst estimate. By the end of the third quarter of 2017, CLNS's reported Core FFO implied a run rate of approximately $1.25 for full-year 2017, below the midpoint of its guidance with one quarter remaining in the fiscal year. Regardless of the concerning result, in the Company's conference call the same day, defendant Saltzman declared "another excellent quarter of strategic accomplishments at Colony NorthStar" and downplayed the Company's poor performance by focusing on the IM business's ability to "fill that gap" between targeted Core FFO and actual results:

> In terms of operating performance for the quarter, we generated core FFO of $193 million or $0.33 per share, which covered our dividend of $0.27 per share after adjusting for $0.06 per share of net gain contribution in the quarter. A solid quarterly result, but admittedly, cumulative year-to-date core FFO has been ***below our beginning of the year target***. As we invest on more than $1 billion of dry powder and ***grow our investment management business*** through complementary coinvesting and related fund placements, ***we expect to fill that gap over time***.

83. During the quarter, CLNS entered in to an agreement to sell the $15 billion Townsend business for a "modest loss," which led to one analyst questioning the Company about its ability to fundraise outside third-party capital:

> Q. Okay. So probably, just it's as usual dependent upon opportunities and whatnot. But maybe just specifically on kind of the third-party asset under management side of the equation, do you have any bigger-picture thoughts or just kind of same view that, "Hey, as it comes along and as things kind of move in transition, it will grow?"
>
> [Saltzman:] Well, we have no specific number forecast, if that's what you're looking for. I mean, I think – look, there's lots of capital

> available in the market today, albeit I would say it's fairly selective and picky with respect to strategies and managers that people want to invest with. So it's kind of good news/bad news, if you will, although ***I think we fall into the category of a preferred manager***. And simultaneously, I think we've done a great job of really selecting what are the appropriate strategies, consistent with all of things I reviewed earlier in the call, some of – all the things that we've been doing in the last 10 years, whether in single-family for rent or other spaces. ***And so as a result, notwithstanding that the market is picky and selective, we're quite confident and optimistic about getting at least our fair share, if not more than our fair share, of the market***.

84. Defendant Saltzman's statement, as alleged in ¶83, that CLNS would "fill that gap" between targeted Core FFO and CLNS's actual results (either then or over time) was false and misleading and made without a reasonable basis. By the third quarter of 2017, CLNS had exhausted the legacy assets that were generating the capital gains bolstering CLNS's reported Core FFO and covering its dividend. CLNS had previously announced that approximately 20% of its Core FFO would be attributable to one-off asset sale gains, or $0.30 per share of its $1.49 per share Core FFO midpoint guidance. By the end of the third quarter, however, CLNS had already recorded gains of $0.28 per share. As a result, defendants were well aware by the end of the third quarter of 2017 that CLNS's Core FFO guidance, and its future dividend, were in serious jeopardy, but nonetheless they concealed the Company's precarious financial condition – instead declaring "another excellent quarter."

85. At the same time, CLNS's retail IM business had effectively dried up. In fact, by November, retail fundraising had slowed by nearly 20% as compared to the previous quarter, as investors and financial advisors continued to turn away from CLNS's high retail fees. Indeed, defendants had raised a mere $48 million in retail capital in the third quarter of 2017, which was $11 million ***lower*** than the previous

quarter and $45 million lower than the same quarter a year earlier. And only 28% of the capital raised in the third quarter of 2017 was from CLNS's active retail funds. By the third quarter of 2017, total retail capital fundraising for the year was just shy of $147 million – or just 7% of the $2 billion in IM fundraising that CLNS required to meet Core FFO guidance. And of that miserable result, only 29% was from the active retail funds. Defendants' fee-cutting measures obviously did not remedy the fundamental problem underlying CLNS's prized retail IM business. Their assertions that CLNS fell into the category of a "preferred manager" was simply not true and the "confiden[ce]" and "optimis[m]" that they expressed "***about getting at least our fair share, if not more than our fair share, of the market***" simply had no reasonable basis given the actual state of affairs.

86. On the same day, CLNS posted an investor presentation on its website that included false statements concerning the state of its retail capital fundraising. For example, defendants highlighted in the presentation that a benefit of CLNS being an investment manager was that "***[g]rowing, stable fees*** generate [a] diversified income stream." Also, the presentation disclosed the same near-term priority in the IM segment that was part of CLNS's March 2017 investor presentation to "***accelerate fundraising in new retail vehicles***."

87. Clearly, these statements were false and misleading, as the retail capital raising environment was in shambles with only $13.4 million in raised capital for the third quarter of 2017 in the two active retail funds (NorthStar/RXR and NorthStar Capital Income), which had a combined offering amount of $5.2 billion. The capital raised through the first nine months of 2017 in the Retail Companies was not accelerating, but rather was in a freefall. Further, both institutional and retail year-to-date 2017 fees were not growing, but rather were down compared to the prior year. As a result, defendants continued to mislead investors about how the Company's retail capital raising would turn around.

**DEFENDANTS DISCLOSE THE TRUTH**

88. On March 1, 2018, CLNS announced its fourth quarter and full-year 2017 financial results. In doing so, CLNS shocked investors by revealing that, despite its prior promises of "turbocharged" economics, its full-year 2017 Core FFO was $1.16 per share – a dramatic miss from the Company's $1.40 to $1.58 per share guidance made throughout the Class Period. Indeed, CLNS's 2017 Core FFO result was 22% below the midpoint of the Company's guidance. The Company also announced impairment charges of $375 million related to the Company's Investment Management segment. Specifically, the Company impaired goodwill related to its IM reporting unit by $316 million, which was primarily attributable to the failing retail broker-dealer distribution business. Additionally, the Company impaired two of its struggling Retail Companies, NorthStar Healthcare and NorthStar/RXR, for $55 million. The Company's 2017 Form 10-K stated, in relevant part:

> Investment Management – The impairment recognized in 2017 consisted of the following:
>
> - $316.0 million write-down in goodwill, which represents the excess in carrying value of our investment management reporting unit, including its assigned goodwill, over its estimated fair value . . . ; and
> - write-down of management contract intangibles for non-traded REITs that were acquired through the merger, specifically $55.3 million for NorthStar Healthcare Income Inc. . . . based on an amendment to its advisory agreement as part of our efforts to preserve liquidity in NorthStar Healthcare and $3.7 million for NorthStar/RXR NY Metro Real Estate Inc[.] . . . based on revised capital raising projections.

89. One of the primary reasons for Colony NorthStar's disappointing Core FFO result, as defendant Saltzman acknowledged, was the Company's third-party

capital raising and, in particular, its retail broker-dealer distribution business acquired from NSAM:

> Retail broker-dealer distribution was another area of very disappointing results. The industry generally remains in enormous transition for major regulatory headwinds, including the newly implemented fiduciary rule, as well as a change in product constructs, more conservative, 40 Act in interval funds that operate with less leverage and offer more liquidity options.
>
> Capital raising in 2017 from these channels totaled only $137 million, down from past levels of an excess of $1 billion per year.
>
> * * *
>
> Our business model is to fill in as much of the earnings GAAP as we can through Investment Management economics both recurring fees and profits interests. ***But in 2017, we merely treaded water in that regard***.

90. After three quarters of boasting about the benefits of the merger, including a best-in-class retail-broker business acquired from NSAM, defendant Saltzman owned up to the disappointing results from the inherited NorthStar businesses:

> The NorthStar merger, which closed a little over 1 year ago, has not produced the math tha[t] we anticipated when we completed the transaction. It was a merger that was supposed to be earnings neutral at worst. And so far, it has proven to be earnings dilutive. Furthermore, the merger integration has taken longer than expected. We believe that we are largely at the end of that process, and we have much greater confidence around the go-forward anticipated results from the inherited NorthStar businesses ***that have been the primary source of our underperformance in 2017***.

91. CLNS further disclosed that it was slashing its dividend from $1.08 per share in 2017 to $0.44 per share in 2018 – a nearly 60% reduction to the dividend it had previously described as having "***very substantial and adequate coverage***":

> Let me next focus on our go-forward business, including the resetting of our dividends. Based on the confidence we have around our new baseline of recurring earnings, excluding gains, combined with a generally conservative bias we have toward preserving cash at this juncture of the real estate and economic cycles. Earlier today, via our earnings release, we announced expected dividend level of $0.44 per share for the calendar year 2018. ***This is a meaningful reduction from $1.08 per share we paid in 2017***.

92. On this news, CLNS's stock price plummeted $1.78 per share to close at $6.00 per share on March 1, 2018, a one-day decline of nearly 23%. CLNS's market capitalization was approximately $9 billion when it announced the merger. By March 1, 2018, however, CLNS's market capitalization was approximately $3.2 billion – approximately a third of its original valuation. Similarly, despite the merger's promises of growth and enhanced value, the Company's AUM had cratered down to $42.7 billion from $56 billion at the time of the merger.

93. Securities analysts covering CLNS connected defendants' disclosures and the stock price decline to the fraud alleged in the case:

- CLNS's "[v]aluation is more than pricing-in underperformance," which included its Core FFO results "impacted by slow asset redeployment, no gains, and lower management fee revenue, while an unexpectedly sizable dividend cut and asset management business write-downs were also negatives."
- CLNS's "[l]ackluster" results were the results of "relatively weak results in 3rd party fundraising, especially in its broker dealer which it has now agreed to merge with S2K."

- CLNS's "private capital, particularly the non-traded business, has failed to live up to expectations, illustrated by a $300M+ impairment this quarter."
- CLNS's "fourth quarter and full-year earnings results were a disappointment, as the merger and subsequent portfolio rationalization strategy failed to materialize in earnings creation."
- "The NorthStar merger has proven to be a ***dud***."

## ADDITIONAL SCIENTER ALLEGATIONS

94. As alleged herein, defendants acted with scienter in that they either knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of CLNS were materially false and misleading and that such statements or documents would be issued or disseminated to the investing public, and they substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding CLNS, their control over, and/or receipt and/or modification of CLNS's allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning CLNS, participated in the fraudulent scheme alleged herein.

95. Defendants had actual knowledge that CLNS's 2017 retail capital raising expectations were unreasonably high and, as a result, that the Company would be unable to meet its 2017 Core FFO guidance – thus jeopardizing the sustainability of its "per annum" dividend. As one of CLNS's "top strategic priorities" highlighted soon after the merger, each defendant knew about and closely followed the Company's IM fundraising performance. CLNS provided such figures, including retail capital raised by fund, on a quarterly basis. Indeed, the level of defendants' scrutiny of CLNS's third-party capital raising efforts was magnified by their concern over recent

regulatory changes, which caused severe fundraising constraints because they required CLNS to disclose its numerous and high fees.

96. Each defendant was well aware of the deleterious implications that the new rule changes could have on NSAM's retail fundraising efforts prior to the merger. In fact, this concern was a reason why Colony originally walked away from a merger with NSAM. As disclosed in the jointly filed merger proxy statement:

> Colony had concerns regarding the current status of [NSAM's] non-traded REIT business resulting from recent regulatory changes, which had affected the ability of non-traded REIT's to raise capital in the retail investor market. Colony believed that changes would need to be made to this market to make it more investor friendly and "institutionalized."

97. And Colony's concern regarding the negative impact the new regulations would have on NSAM's retail capital raising was entirely justified. By the end of its first quarter of 2016, it was evident that NSAM's retail fundraising was undergoing a precipitous decline. NSAM's retail fundraising dropped an astounding $323 million from the fourth quarter of 2015 to the first quarter of 2016, representing a 72% drop. NSAM's first quarter 2016 fundraising drop was not an isolated incident; rather, it was a harbinger of NSAM's anemic retail fundraising to come. Indeed, NSAM's deteriorating retail fundraising persisted throughout 2016, as NSAM raised 16% less retail capital during the second quarter, 14% less during the third quarter, and 20% less during the fourth quarter. In total, NSAM's total retail capital raised in 2016 was an unprecedented $999 million less than its 2015 total, representing a 71% drop.

98. This precipitous decline occurred, as defendants knew, because of the fees that NSAM was charging, which included an up-front sales commission of up to 7% of the investment. In February 2017 – the very beginning of the Class Period – CLNS cut its asset management fees on the two funds that were supposed to drive CLNS's retail capital fundraising – NorthStar/RXR and NorthStar Capital Income. NorthStar/RXR reduced its asset management fee by approximately 20% and

eliminated all acquisition and disposition fees, while NorthStar Capital Income reduced management fees from an annual rate of 2.0% of its average ***gross*** assets to an annual rate of 1.25% of its average daily ***net*** assets. These fee cuts confirm that defendants knew it was CLNS's high fees that precluded the retail fundraising CLNS needed to meet its Core FFO target and cover its $1.08 dividend and that, as retail fundraising continued to fall, their fee cuts did not remedy the problem.

99. Defendants' own actions confirm their knowledge that NSAM's business was faltering. Only three months into the merger – in March 2017 – they put their largest NSAM business, Townsend, up for sale, despite having just purchased it in 2016 and describing it as an "enormous asset" and "category killer advisor." CLNS was selling Townsend even though it represented over 60% of NSAM's fee-generating AUM at over $14 billion and earned $66 million in revenues in 2016. And they ultimately sold Townsend in the fourth quarter of 2017 for what Tangen described as a "modest loss." With Townsend on the chopping block, institutional IM fee income declining year-over-year and retail IM fundraising falling off a cliff, defendants had actual knowledge that CLNS's Core FFO was unreachable and its "per annum" $1.08 dividend was unsustainable.

100. Nevertheless, throughout the Class Period, defendants made clear that CLNS was relying heavily on its capital raising efforts to meet its 2017 Core FFO guidance. As previously detailed, defendant Tangen informed investors during the Company's May 10, 2017 conference call that CLNS was on track to achieve its 2017 Core FFO guidance because "[a]dditional core FFO upside exists" from an expected retail IM "ramp up." Defendant Saltzman, for his part, also stated during the Company's November 9, 2017 conference call that CLNS would "fill" its Core FFO "gap" by growing its IM business. As such, defendants were closely tracking CLNS's retail fundraising performance because, despite NSAM's fundraising collapse the previous year, growing its AUM fee income was critical to meeting the Company's 2017 Core FFO guidance.

101. Beyond CLNS's ability to meet its 2017 Core FFO guidance, defendants Saltzman and Tangen had an additional motive to continuously monitor the Company's third-party fundraising performance – their annual cash bonus. Under CLNS's 2017 Annual Incentive Plan, 15% of defendants Saltzman's and Tangen's annual cash bonuses was based on "the amount of third-party capital raised, ***a key strategic objective for the Company***." But despite failing to meet the minimum adjusted Core FFO goal under the 2017 Annual Incentive Plan, a performance metric that represented 45% of the entire incentive award, defendants Saltzman's and Tangen's annual cash bonuses for 2017 were nonetheless over $1.4 million and nearly $900,000, respectively, based on third-party capital raising and other individual personal performance targets. At the same time, Colony had implemented an incentive plan that tied up to 4.5 million common shares and operating company units, in part, to capital fundraising. Thus, because they were able to nearly double their base salary through a cash bonus system and stock awards based largely on CLNS's capital raising, defendants Saltzman and Tangen had a strong pecuniary interest in closely monitoring the Company's institutional and retail fundraising progress throughout the Class Period.

102. Defendants Hamamoto and Tangen also had an additional motive to keep CLNS's stock price artificially inflated – to cash out Company shares at the expense of unsuspecting shareholders. Defendant Hamamoto, as NSAM's former Chairman and CEO, knew first hand that CLNS's retail capital raising expectations were unreasonably high, which rendered the Company's 2017 Core FFO guidance unreachable and its "per annum" $1.08 dividend unsustainable. In December 2017, less than three months before the market learned the truth about CLNS's precarious financial condition, defendant Hamamoto sold nearly 2,226,000 CLNS shares, pocketing over $26.9 million.

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 12/14/2017 | 805,174 | $12.15 | $9,782,864 |
| 12/14/2017 | 304,786 | $12.13 | $3,697,054 |
| 12/15/2017 | 666,169 | $12.04 | $8,020,675 |
| 12/18/2017 | 449,780 | $12.05 | $5,419,849 |
| **TOTAL** | **2,225,909** | | **$26,920,442** |

103. Defendant Hamamoto's sales were suspicious in timing and amount for the following reasons: (a) these sales were the first time that defendant Hamamoto sold as much as a single CLNS share since the merger; (b) defendant Hamamoto's sales occurred near CLNS's all-time trading high of $14.70 per share after the merger's completion was announced; (c) defendant Hamamoto sold approximately half of his total unrestricted Company shares; (d) Hamamoto had not sold any stock since April 2015; and (e) defendant Hamamoto sold nearly 2 million shares and reaped at least over $23.4 million ***more*** than any other CLNS insider.

104. Recognizing that the market's reaction would be swift once CLNS revealed that its capital fundraising was insufficient to both meet Core FFO guidance and sustain its dividend, defendant Tangen also cashed out a significant amount of his Company shares while the stock price remained artificially inflated. During the second and third quarters of 2017, defendant Tangen sold just under 276,000 shares for nearly $3.5 million in total proceeds.

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/12/2017 | 75,926 | $13.12 | $996,149 |
| 9/28/2017 | 200,000 | $12.42 | $2,484,000 |
| **TOTAL** | **275,926** | | **$3,480,149** |

105. Similar to defendant Hamamoto's sales, defendant Tangen's sales were suspicious because the sales occurred near CLNS's all-time trading high of $14.70 per share after the merger's completion was announced. Also, defendant Tangen had not sold any stock since January 2015 and the amount was significantly less at

approximately 15,000 shares. And his larger stock sale in September 2017 was made with full knowledge that CLNS had exhausted its 2017 capital gain contributions to Core FFO, demonstrating that a guidance miss and dividend cut were inevitable.

106. The departures of defendant Hamamoto and Daniel Gilbert, who headed the Retail IM business, also supports an inference of scienter. When the merger was announced, both Hamamoto and Gilbert were included as part of the "highly experienced [six-person] team, providing ***continuity***, transparency and a clear, ***consistent*** vision." As the Letter Agreements demonstrated, CLNS clearly expected both to remain with the Company for at least two years and set up their stock awards accordingly. On the June 3, 2016 conference call, defendant Saltzman even deferred to Gilbert when asked a question about the Retail IM business and stated: "I'm going to turn it over to Dan Gilbert, who runs that business today for NorthStar and who will continue to run that business for the combined companies."

107. Pursuant to their Letter Agreements, former NorthStar executives were entitled to receive substantial compensation at the closing of the merger. Specifically, Hamamoto received a one-time equity award worth $52.6 million and Gilbert's award was worth $23.1 million.[15] The Letter Agreements stated that Hamamoto would serve as Executive Vice Chairman of CLNS, Gilbert would oversee the retail platform of CLNS, and Tylis, Hess and Lieberman would provide one year transition services. The one-time equity award granted to the executives was subject to vesting based on continued employment with the Company through the first anniversary of the closing of the merger. However, for Hamamoto and Gilbert, an additional one-year post-vesting holding requirement was required before they could sell any of the stock award. This additional provision was put in place for Hamamoto and Gilbert, as their

[15] Albert Tylis, CEO of NSAM, received $29.9 million; Debra Hess, CFO of NSAM and NRF, received $8.6 million; and Ronald Lieberman, General Counsel of NSAM and NRF, received $5.4 million.

departures from CLNS were not supposed to be imminent, unlike the other former NorthStar executives.

108. Yet both Hamamoto and Gilbert resigned less than a year into the merger and timed their departures to be effective the day after the merger's one-year anniversary, thereby retaining their full merger windfall. Specifically, Hamamoto announced his resignation on November 7, 2017 while Gilbert announced his resignation on December 11, 2017. Both resignations had an effective date of January 11, 2018, one day after the one-year anniversary of the merger, and just over two months before investors would learn that the retail IM business had collapsed. These supposed "resignations" appear extremely suspicious, as NorthStar's businesses, with Gilbert's Retail IM platform leading the way, significantly underperformed during 2017. As defendant Saltzman stated on the last day of the Class Period:

> The NorthStar merger, which closed a little over 1 year ago, has not produced the math tha[t] we anticipated when we completed the transaction. It was a merger that was supposed to be earnings neutral at worst. And so far, it has proven to be earnings dilutive. Furthermore, the merger integration has taken longer than expected. We believe that we are largely at the end of that process, and we have much greater confidence around the go-forward anticipated results from ***the inherited NorthStar businesses that have been the primary source of our underperformance in 2017.***

## LOSS CAUSATION/ECONOMIC LOSS

109. During the Class Period, defendants made false and misleading statements by misrepresenting CLNS's ability to meet its 2017 Core FFO guidance and, correspondingly, to sustain its $1.08 "per annum" dividend due to its anemic third-party fundraising results and the slowdown in its healthcare and hospitality verticals. Defendants' misrepresentations and material omissions artificially inflated

and maintained the inflation in the prices of CLNS securities and operated as a fraud or deceit on members of the Class. Then, when the true facts were revealed, the prices of CLNS's securities fell significantly, as the prior artificial inflation came out of the prices. As a result of their purchases of CLNS securities during the Class Period, plaintiff and other members of the Class (as defined below) suffered an economic loss, *i.e.*, damages, under the federal securities laws.

110. On March 1, 2018, before the market opened, CLNS issued an earnings press release announcing its fourth quarter and full-year 2017 financial results. As discussed more fully in ¶¶88-93, CLNS revealed that its full-year 2017 Core FFO results were well below its guidance, that the Company was taking impairment charges of $375 million related to its IM business, and that the Company was cutting its dividend by nearly 60%. During the earnings call with analysts held later that day, defendant Saltzman acknowledged that a primary reason for CLNS's significant Core FFO miss was the "more challenging industry conditions in Healthcare Real Estate as well as our retail broker-dealer distribution business" – the Company's retail third-party capital raising segment. The relevant truth was thus directly related to the fraud alleged herein.

111. The disclosure on March 1, 2018 had a direct impact on CLNS's stock price. As set forth in the chart below, the price of CLNS tumbled $1.78 per share, to close at $6.00 per share, a one-day decline of nearly 23% with abnormally high volume of nearly 69 million shares. As one analyst aptly commented on March 2, 2018, CLNS's "[v]aluation is more than pricing-in underperformance," which included its "[v]ery [d]isappointing" Core FFO results "impacted by slow asset redeployment, no gains, and lower management fee revenue, while an unexpectedly sizable dividend cut and asset management business write-downs were also negatives."

112. The decline in CLNS's stock price on March 1, 2018 was a direct result of the nature and extent of defendants' prior misstatements and omissions being

revealed to investors and the market. The timing and magnitude of CLNS's stock price collapse negates any inference that the losses suffered by plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors, or by Company specific factors unrelated to defendants' misrepresentations.

113. The economic losses suffered by plaintiff and other members of the Class were a direct result of defendants' misrepresentations that inflated CLNS's stock price and the subsequent decline in the value of that stock when defendants' prior misrepresentations and omissions were revealed.






1460913_1

## NO SAFE HARBOR

114. CLNS's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

115. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of CLNS who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made. On the contrary, such statements concealed critical information about CLNS's financial performance.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

116. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact that there was a duty to disclose.

117. Plaintiff is entitled to a presumption of reliance because, as more fully alleged above, defendants failed to disclose that CLNS's 2017 Core FFO guidance, and correspondingly its per annum dividend, were in significant jeopardy throughout the Class Period.

118. Alternatively, plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's securities traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiff and other members of the Class purchased CLNS securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

119. At all relevant times, the market for CLNS securities was efficient for the following reasons, among others:

(a) Since January 2017, CLNS's stock has been listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, CLNS filed periodic public reports with the SEC;

(c) CLNS regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d) There is a cause-and-effect relationship between unexpected corporate events and/or financial releases and an immediate response in the stock price as evidenced, for example, by the 23% stock price decline following the disclosure on March 1, 2018.

## CLASS ACTION ALLEGATIONS

120. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased CLNS

publicly traded securities during the Class Period (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of CLNS and their families, and defendants' legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

121. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. CLNS has more than 542 million Class A common shares of stock outstanding, owned by thousands of persons.

122. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the prices of CLNS securities were artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

123. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

124. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

125. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

126. Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein. This Count is asserted pursuant to §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder by the SEC against all defendants.

127. As alleged herein, throughout the Class Period, defendants, individually and in concert, directly and indirectly, by use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading and carried out a plan, scheme and course of conduct in violation of §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein: (i) deceive the investing public, including plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of CLNS securities; and (iii) cause plaintiff and members of the Class to purchase CLNS securities at artificially inflated prices.

128. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

129. As set forth above, defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon plaintiff and the other members of the Class who purchased CLNS securities during the Class Period.

130. In ignorance of the false and misleading nature of defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for CLNS securities, plaintiff and other members of the Class purchased CLNS securities at artificially inflated prices during the Class Period. But for the fraud, plaintiff and members of the Class would not have purchased CLNS securities at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the prices of CLNS securities declined precipitously and plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of CLNS securities at artificially inflated prices and the subsequent decline in the prices of those securities when the truth was disclosed.

131. By virtue of the foregoing, defendants are liable to plaintiff and members of the Class for violations of §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

**For Violation of §20(a) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

132. Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein. This Count is asserted pursuant to §20(a) of the 1934 Act against all defendants.

133. As alleged above, CLNS violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of CLNS securities and by participating in a fraudulent scheme

and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate and/or reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

134. As set forth above, the Individual Defendants were controlling persons of CLNS during the Class Period due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations. By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of CLNS, including the content of its public statements.

135. CLNS had the power to control and influence the Individual Defendants and other Company executives through its Board of Directors and its power to hire, fire, supervise and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation and other employment considerations. By virtue of the foregoing, CLNS had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Individual Defendants, including the content of their public statements.

136. Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon plaintiff and the other members of the Class who purchased CLNS securities during the Class Period.

137. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for CLNS securities, plaintiff and other members of the Class purchased CLNS securities at artificially inflated prices during the Class Period. But for the fraud, plaintiff and members of the Class would not have purchased CLNS securities at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the prices of CLNS securities declined

precipitously and plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of CLNS common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth began to be disclosed.

138. By reason of the foregoing, defendants are liable to plaintiff and the members of the Class as controlling persons of CLNS in violation of §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action, appointing Lead Plaintiff to serve as a Class representative, and appointing Lead Counsel as Class Counsel;

B. Awarding plaintiff and the members of the Class damages and interest;

C. Awarding plaintiff's reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 17, 2018

ROBBINS GELLER RUDMAN
& DOWD LLP
SPENCER A. BURKHOLZ
DOUGLAS R. BRITTON
JUAN CARLOS SANCHEZ

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on August 17, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: dougb@rgrdlaw.com

# Mailing Information for a Case 2:18-cv-02888-GW-MRW Brian Barry v. Colony NorthStar, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Douglas R Britton**
  dougb@rgrdlaw.com,e_file_sd@rgrdlaw.com,lmix@rgrdlaw.com
- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com,lmix@rgrdlaw.com
- **Rachele R Byrd**
  byrd@whafh.com,eallen@whafh.com,cabrera@whafh.com,boyles@whafh.com,warren@whafh.com
- **Matthew W Close**
  mclose@omm.com,brogers@omm.com
- **Brittany DeJong**
  dejong@whafh.com
- **Lionel Zevi Glancy**
  lglancy@glancylaw.com
- **John T Jasnoch**
  jjasnoch@scott-scott.com,ksteinberger@scott-scott.com,edewan@scott-scott.com,aweas@scott-scott.com,efile@scott-scott.com
- **Marisa C Livesay**
  livesay@whafh.com,boyles@whafh.com
- **Betsy C Manifold**
  manifold@whafh.com,eallen@whafh.com,cabrera@whafh.com,boyles@whafh.com,warren@whafh.com
- **Adam C McCall**
  amccall@zlk.com
- **Tricia L McCormick**
  tmccormick@rgrdlaw.com,e_file_sd@rgrdlaw.com,triciam@rgrdlaw.com
- **Daniel M Petrocelli**
  dpetrocelli@omm.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com
- **Brittany Rogers**
  brogers@omm.com,kvolkar@omm.com
- **Laurence M Rosen**
  lrosen@rosenlegal.com
- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`