ROBBINS GELLER RUDMAN
& DOWD LLP
SPENCER A. BURKHOLZ (147029)
DOUGLAS R. BRITTON (188769)
JUAN CARLOS SANCHEZ (301834)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
dougb@rgrdlaw.com
jsanchez@rgrdlaw.com

Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| BRIAN BARRY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>COLONY NORTHSTAR, INC., et al.,<br><br>Defendants. | Case No. 2:18-cv-002888-GW-MRW<br><br><u>CLASS ACTION</u><br><br>SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS


Page

I. JURISDICTION AND VENUE ..... 1

II. INTRODUCTION ..... 2

III. PARTIES ..... 9

IV. STATEMENT OF THE CASE ..... 11

A. Background Information for CLNS and Its Business Model ..... 11

1. Characteristics of REITs ..... 11

2. Colony Capital's Expansion into the Investment Management Business ..... 13

3. The NorthStar Realty Finance Business ..... 15

4. The NorthStar Asset Management Business ..... 17

5. The Combined Investment Management Business ..... 21

6. Defendants Intend for the Merger to Unlock Purported Hidden "Value" in the Three "Undervalued" Entities ..... 24

7. Colony Capital Gains Control of NSAM While NorthStar's Executives Receive a Windfall ..... 26

B. False and Misleading Statements About Core FFO Guidance and CLNS's Retail IM Fundraising ..... 27

1. False and Misleading Statements When Reporting Fourth Quarter and Fiscal Year 2016 Results ..... 27

2. False and Misleading Statements When Reporting CLNS's First Quarter 2017 Results ..... 33

3. False and Misleading Statements When Reporting CLNS's Second Quarter 2017 ..... 37

4. False and Misleading Statements When Reporting CLNS's Third Quarter 2017 Results ..... 39

C. Hamamoto Dumps Nearly $27 Million Worth of Stock as He Resigns Early ..... 42

D. Mr. Gilbert, the Lone NorthStar Executive Remaining at CLNS, Resigns Early ..... 44

E. Defendants Reveal the Truth When Reporting CLNS's Fourth Quarter and Fiscal Year 2017 Results ..... 45

**Page**

V. ADDITIONAL SCIENTER ALLEGATIONS .......... 49

VI. LOSS CAUSATION/ECONOMIC LOSS .......... 59

VII. NO SAFE HARBOR .......... 61

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET .......... 62

IX. CLASS ACTION ALLEGATIONS .......... 63

COUNT I .......... 64

COUNT II .......... 66

PRAYER FOR RELIEF .......... 67

JURY DEMAND .......... 68

Court-appointed Lead Plaintiff Teamsters Local 710 Pension Fund ("plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and under the supervision of plaintiff's counsel, which included, among other things: (1) review of press releases, news articles, conference call transcripts, and other public statements issued by or concerning Colony NorthStar, Inc. ("CLNS" or the "Company"); (2) review of research and industry reports issued by financial and industry analysts concerning CLNS's business; (3) review of CLNS's U.S. Securities and Exchange Commission ("SEC") filings; and (4) review of other publicly available information and data concerning CLNS, the pre-merged entities, their securities, and the markets therefor. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. JURISDICTION AND VENUE

1. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5)).

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

3. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

4. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of

the New York Stock Exchange ("NYSE"), the world's largest stock exchange by market capitalization.

## II. INTRODUCTION

5. Plaintiff brings this securities class action individually and on behalf of all persons who purchased or otherwise acquired the publicly traded securities of CLNS between February 28, 2017 and March 1, 2018 (the "Class Period"), against defendants CLNS, Richard B. Saltzman ("Saltzman") (CLNS's former Chief Executive Officer ("CEO"), President, and Director), Darren J. Tangen ("Tangen") (CLNS's Chief Financial Officer ("CFO") until January 1, 2019 and now CLNS's President), and David T. Hamamoto ("Hamamoto") (CLNS's former Director and Executive Vice Chairman) (collectively, "defendants"), for violating the 1934 Act.

6. CLNS, a hybrid real estate investment trust ("REIT"), was formed in January 2017 after a merger (the "merger") between Colony Capital, Inc. ("Colony") and two publicly traded NorthStar real estate investment companies: NorthStar Asset Management Group, Inc. ("NSAM") and NorthStar Realty Finance Corp. ("NRF") (together, "NorthStar").[1] Colony's executives, who controlled CLNS after the merger as NorthStar's executives largely cashed out and departed, had their eyes on NSAM's retail investment management ("IM") business. They told investors that it would unlock the value in the combined entities' stock price as it enabled CLNS's "embedded" IM business, which was the cornerstone of CLNS's new "Investment Management economics" strategy of investing third party capital.

7. While the merger involved both NorthStar entities, NSAM was Colony's focus. NRF – which focused 75%-80% of its direct investments in hospitality and healthcare assets in 2016 – was struggling mightily in the years preceding the merger, having lost over $500 million between the third quarter of 2015 ("3Q 2015") and the

[1] A REIT is a company that owns or finances income-producing real estate (*e.g.*, apartment buildings and office buildings) in a range of property sectors. And a hybrid REIT, like CLNS, is a REIT that physically owns real estate as well as debt instruments secured by mortgages on real estate.

third quarter of 2016 (“ 3Q 2016”). In fact, NRF cut its dividend in half just four months before Colony announced the merger and had started a process of liquidating its assets to, purportedly, take advantage of an over 75% collapse in NRF’s stock price in the prior two years. While NRF at the time characterized the liquidation strategy as an attempt to “‘create substantial value for shareholders and reduce risk,’” Colony’s Chairman, Thomas J. Barrack, Jr., would later reveal Colony’s true sentiment about NRF’s business. Mr. Barrack noted that NRF’s hospitality and healthcare businesses “don’t lend themselves to immediate third-party access” – Colony’s key strategy and the main driver behind the merger – and that Colony’s strategy with those businesses was to “run to the exit door every time that we can to lighten up our balance sheet”:

> Yes. ***I think – the [lodging and healthcare] segments have been built with such complication that they don’t lend themselves to immediate third-party access***. . . . [Q]uite honestly, I’ve never understood the business, right? You’re just staying even. So if you look at all of our competitive REITs, they all have the same problem, which is to keep market share as occupancy is moving up and ADR [Average Daily Rate] is slowly moving up. Wages and expenses eat into it, and then just as you start making gains you have to redo your PIF [Public Improvement Fees], CapEx comes in and you lose it again. So long term for us, at this point in the cycle where always assets are priced to perfection and that marketplace is really, in our estimation, confusing return of capital and return on capital, ***you exit every time you have an opportunity in the private markets for a total sale***. So the third-party annexing of assets in both of those portfolios is piecemeal, too complicated to do in whole. ***So we’ll run to the exit door every time that we can to lighten up our balance sheet load***.

8. NSAM – which had reported over $100 million in income between 3Q 2015 and 3Q 2016 – was clearly the merger’s crown jewel and the only NorthStar

entity that Colony could hope to contribute to its growth. Indeed, it reported consistent Cash Available for Distribution ("CAD") to shareholders, which was the equivalent of Colony's Core Funds from Operations ("Core FFO") metric, and fit Colony's "Investment Management economics" strategy like a glove. NRF and its healthcare and hospitality businesses, however, were the opposite. As Mr. Barrack acknowledged, NRF's primary businesses did not fit Colony's IM business strategy, its businesses were struggling and generating massive losses, and it had to rely on a unique adjustment to an account titled "Unrealized (gain) loss from fair value adjustments / Provision for (reversal of) loan losses, net" (the "Fair Value Adjustment") to convert its losses to positive CAD numbers. Coincidentally, NRF had liquidated over $6 billion in assets in the year leading up to the Class Period, eliminating approximately 50% of its real estate assets and its ability to contribute to the growth that CLNS's projections demanded. And those liquidations continued up to and during the Class Period.

9. Defendants nonetheless extolled the merger from the outset, telling investors that the merger was "'expect[ed to] deliver substantial value for all three sets of shareholders.'"[2] When defendants completed the merger, they issued approximately 597.8 million shares of stock and operating units with a total market capitalization of $9 billion. And when they reported results for the fourth quarter of 2016 ("4Q 2016") at the beginning of the Class Period, they declared a fiscal year 2017 Core FFO guidance range of $1.40 to $1.58 per share, emphasizing their focus on IM economics and stating that "our guidance only assumes $2 billion of new fundraising in 2017," which defendant Saltzman acknowledged included "a mix of institutional and retail" IM fundraising.

10. Defendants' expectation was that retail IM fundraising would contribute substantially to the $2 billion assumption and to guidance. According to the

[2] All citations and footnotes are omitted and emphasis is added unless otherwise noted.

Registration Statement filed in connection with the merger, NSAM had projected just three months before defendants issued guidance that retail IM fundraising would be $1.5 billion during the Class Period. Retail IM fundraising was thus critical to CLNS meeting Core FFO guidance. In fact, defendants were focused on it. When Saltzman issued guidance, he emphasized CLNS's capital raise activity, explaining that "the tide appears to have turned for both institutional and retail placements based upon the momentum we're now experiencing in both [institutional and retail] markets." And in CLNS's simultaneously filed Annual Report, defendants represented that capital raising activity for its open retail fund, NorthStar/RXR New York Metro Income, Inc. ("NorthStar/RXR"), was expected to "accelerate in 2017."

11. But defendants' statements were false and misleading. Their Core FFO guidance simply had no reasonable basis. The combined entities were in no position to produce the growth defendants required to meet Core FFO guidance. After the merger, defendants had materially changed how they defined Core FFO. According to defendant Tangen, CLNS had modified the definition of Core FFO after the merger to exclude adjustments based on loan loss provisions and fair value adjustments:

> The new guidance is based on a new Core FFO definition . . . [Specifically,] core FFO does not add back provisions for loan losses . . . [and] Colony NorthStar will no longer use fair value accounting for certain legacy NRF assets.

12. CLNS, in fact, revised Core FFO after the merger to exclude the Fair Value Adjustment. But as defendants knew from the sheer size of the adjustments, NRF had used that Fair Value Adjustment to offset $186 million in losses in 2016 to create positive CAD. Given NRF's financial condition, including its massive and continued liquidation of revenue-generating assets, defendants simply had no reasonable basis for the guidance they issued, especially given the nearly 600 million shares issued and outstanding after the merger. Indeed, a straight-line calculation adjusting for CLNS's revised definition of Core FFO and its increased share count

would bring combined results for 2016 in at $1.06 per share, $0.34 to $0.52 below the guided range and thus requiring a substantial 33% to 50% growth rate for CLNS to meet guidance. *See* Exhibit 1 attached hereto.

13. NRF's financial condition – and defendants' view of its real estate assets – left defendants dependent on NSAM and its retail IM business. But the retail IM business was in no position to support this type of growth. Contrary to defendants' claims of "momentum" in fundraising and that they expected retail capital raising activity to "accelerate in 2017," capital raising activity in the only active retail fund, NorthStar/RXR, was anemic at $6.5 million in 4Q 2016 – and $378.7 million (90.4%) less retail fundraising than a year earlier when they issued guidance. The reason for NSAM's negligible capital raising performance, as defendants' comments and their acts to minimize fees show they knew, was that newly implemented regulations required NSAM to disclose its fees, to which investors objected not only given the size of those fees, but also given the performance of the underlying funds. In fact, a Blue Vault industry report issued in the fourth quarter of 2017 ("4Q 2017") revealed that NorthStar/RXR's performance throughout the Class Period was nearly non-existent, performing no better than a 10-year Treasury note – "The REIT's recent 12-month average return on assets ***is less than yields on 10-year Treasuries***, indicating negative risk adjusted returns." Investors and their financial advisors were not willing to pay excessive fees for a fund with such a dismal return.

14. The same was true for NSAM's closed funds. Despite having been effective for well over three years and having raised a combined total of $4.3 billion, all three funds that NSAM had completed before the Class Period had ***declined*** in value. As SEC filings for the closed funds confirm, each of their estimated per share value three years after their offerings were ***lower*** than their per share offering price. These results, combined with the new regulations requiring that defendants disclose their very high fees, effectively shut down retail IM fundraising. Defendants' claims about retail fundraising "momentum" were thus false and misleading. And their claim

that capital raising activity in NorthStar/RXR would "accelerate in 2017" had no reasonable basis. Defendants could not reasonably believe that incremental retail funds would contribute to CLNS's growth needs under these circumstances.

15. Colony's institutional IM business could not offset the problems with NorthStar. The fees that CLNS was able to charge institutional investors were a fraction (less than half) of the fees that CLNS sought to charge retail investors and CLNS did not charge institutional investors sales commissions or dealer management fees, which combined reached as high as 10% for retail investors. In fact, NSAM's retail IM fees outpaced Colony's institutional IM fees in 2016 by $32 million ($100 million NSAM; $68 million Colony) even though Colony's institutional assets under management ("AUM") of $11 billion far exceeded NSAM's retail AUM of $7 billion. And to make matters worse, Colony's Core FFO had grown only 4.5% in the year before the merger, while its Core FFO per share total ***declined*** in that period, leaving it in no position to produce the growth that CLNS required.

16. Rather than disclosing throughout the Class Period how investors and financial advisors were reacting to CLNS's retail IM fees and the performance of the underlying funds, defendants instead misled the market by highlighting its retail fundraising totals each quarter. They emphasized "positive momentum in the overall retail marketplace as well as in our own fundraising," boasted about "strong progress in building the selling groups in our current offerings and a commensurate acceleration in the pace of fundraising," and assured investors that CLNS was "on track" to meet Core FFO guidance of $1.40-$1.58 per share.

17. But these statements were similarly false and misleading. CLNS was not experiencing "positive momentum" or an "acceleration in the pace fundraising," especially when they made these statements while reporting results from the first quarter of 2017 ("1Q 2017"). In fact, its capital raising activity in only one of two active retail funds, NorthStar/RXR, had ***declined*** from $6.5 million in 4Q 2016 to $5.2 million in 1Q 2017 as investors largely continued to avoid the NorthStar/RXR fund.

And the same was true for CLNS's other active retail fund, NorthStar Real Estate Capital Income Fund ("NorthStar Capital Income Fund"), which it offered to investors in 1Q 2017. Like NorthStar/RXR, investors and their financial advisors also refused to pay exorbitant fees given the performance of NSAM's funds, leaving CLNS without a meaningful incremental contribution to its $2 billion IM fundraising assumption. The NorthStar Capital Income Fund, in fact, did not raise any funds in 1Q 2017. And similar retail IM fundraising results in CLNS's active funds persisted throughout the Class Period. Retail IM fundraising, in fact, collapsed between approximately 65.5% and 94.1% on a year-over-year basis each quarter in 2017.

18. Given the dismal state of retail IM fundraising, defendants sought to create the appearance of growth. Between the second quarter of 2017 ("2Q 2017") and the third quarter of 2017 ("3Q 2017"), defendants reported that fundraising figures from the active funds had increased to $38 million, as they emphasized "momentum," "acceleration in the pace of fundraising," and said that they remained "optimistic" that retail fundraising "will ***continue to*** institutionalize and rebound." But defendants concealed material facts that made these statements misleading – omitting that ***CLNS*** was the main source of those funds. In fact, as reported in SEC filings through the underlying NorthStar Capital Income Fund, CLNS contributed nearly ***50%*** of the totals reported for the active funds in both 2Q 2017 and 3Q 2017. And its contributions represented up to ***nearly 100%*** of the quarterly totals reported for the active NorthStar Capital Income Fund and ***nearly 70%*** of the capital for that fund throughout the Class Period. Defendants' misled investors about the true state of the retail IM business.

19. Defendants' ruse, in turn, allowed certain defendants to collectively dump over 2.5 million shares of CLNS stock at artificially high prices for proceeds of over $30 million. These sales were particularly suspicious given that they occurred around the same time and mostly after CLNS was omitting that its own funds were the driving force behind much of its third party retail IM fundraising.

20. Ultimately, on March 1, 2018, defendants shocked investors by announcing that CLNS's full-year 2017 Core FFO was $1.16 per share – a startling 17% below the low end and 27% below the high end of the Company's guidance – and that CLNS was slashing its dividend by 60%, from $1.08 per share in 2017 to $0.44 per share in 2018. Defendant Saltzman admitted that one of the primary reasons that led to CLNS's dramatic Core FFO result was the Company's anemic third-party retail IM fundraising while also disclosing $375 million in impairment charges related to CLNS's retail IM business and acknowledging that they were "discounting [the retail IM business] completely" in 2018.

21. On this news, CLNS's stock price declined nearly 23%. With a then-current market capitalization of approximately $3.2 billion at the end of the Class Period, defendants' fraud destroyed nearly $6 billion in CLNS's shareholder value.

## III. PARTIES

22. Plaintiff Teamsters Local 710 Pension Fund acquired CLNS securities as set forth in the certification attached as Exhibit B to the Declaration of Tricia L. McCormick in Support of Motion [for] Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel (ECF No. 25-2) and has been damaged thereby.

23. Defendant CLNS is a global real estate and investment management firm. Defendant CLNS is a Maryland corporation with its principal executive offices located at 515 South Flower Street, 44th Street, Los Angeles, California 90071. CLNS's securities traded throughout the Class Period on the NYSE under the ticker "CLNS."[3]

---

[3] On June 22, 2018, CLNS filed Articles of Amendment to its charter with the State Department of Assessment's and Taxation of Maryland to change its name to "Colony Capital, Inc." The Articles of Amendment became effective on June 25, 2018. In connection with the name change, CLNS's Class A common stock trading symbol changed from "CLNS" to "CLNY."

24. Defendant Saltzman was, at all relevant times during the Class Period, CLNS's CEO, President, and a director. Prior to the merger, Saltzman was Colony's CEO.

25. Defendant Tangen was, at all relevant times during the Class Period, CLNS's CFO. Prior to the merger, Tangen was Colony's CFO.

26. Defendant Hamamoto was, from the completion of the merger until his resignation became effective on January 11, 2018, CLNS's Executive Vice Chairman and a director. Prior to the merger, defendant Hamamoto was Chairman and CEO of NSAM from January 2014 until August 2015, later becoming its Executive Chairman in August 2015. Defendant Hamamoto was also Chairman of NRF's Board of Directors from October 2007 until January 2017, having served as one of its directors since October 2003. Defendant Hamamoto also served as NRF's CEO from October 2004 until August 2015. Defendant Hamamoto further served as Chairman of NorthStar Healthcare Income, Inc. ("NorthStar Healthcare") from January 2013 until January 2014. Defendant Hamamoto served as Co-Chairman of NorthStar/RXR from March 2014 until August 2015. Defendant Hamamoto also co-founded NorthStar Capital Investment Corp., the predecessor to NRF, for which he served as co-CEO until October 2004.

27. The defendants referenced above in ¶¶24-26 are referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements that caused the prices of CLNS securities to be artificially inflated during the Class Period.

28. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of CLNS's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases, alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity

to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## IV. STATEMENT OF THE CASE

### A. Background Information for CLNS and Its Business Model

#### 1. Characteristics of REITs

29. A REIT, generally, is a company that owns and typically operates income-producing real estate or real-estate related assets. REITs provide a way for investors to earn a share of the income produced through commercial real estate ownership without actually having to go out and buy commercial real estate. The income-producing real estate assets owned by a REIT may include office buildings, shopping malls, apartments, hotels, resorts, self-storage facilities, warehouses and mortgages or loans. To qualify as a REIT, a company must have the bulk of its assets and income connected to real estate and must distribute at least 90% of its taxable income to shareholders annually in the form of dividends.

30. Throughout the Class Period, CLNS reported on a quarterly basis the financial metrics Funds From Operations ("FFO") and Core FFO. FFO is a widely used financial measure for the equity REIT industry. CLNS disclosed that the Company calculated FFO in accordance with standards established by the Board of Governors of the National Association of Real Estate Investment Trusts.[4] CLNS also reported Core FFO, which adjusted FFO for certain items.[5]

---

[4] The National Association of Real Estate Investment Trusts defines FFO as net income or loss calculated in accordance with Generally Accepted Accounting Principles ("GAAP"), excluding extraordinary items, as defined by GAAP, gains and losses from sales of depreciable real estate and impairment write-downs associated

31. These measures contrasted with how the legacy NorthStar businesses calculated funds available for distribution to shareholders. The NorthStar entities used a measure termed Cash Available for Distribution ("CAD"), which, like Core FFO, adjusted net income for a number of financial metrics, including "Unrealized (gain) loss from fair value adjustments / Provision for (reversal of) loan losses, net." Depending on whether these metrics were positive or negative, defendants would adjust net income accordingly to produce an amount available for distribution to shareholders.

32. Defendant Tangen explained the variations during the 4Q 2016 conference call, stating that the combined CLNS would use a modified version of Core FFO for reporting purposes going forward. As he explained it, that modified Core FFO version would not "add back provisions for loan losses" or "use fair value accounting," which the NorthStar entities had used to adjust net income:

> [T]he prior guidance [that defendants issued when the entities merged] was based on a combination of two different reporting metrics: core FFO for Colony Capital, and CAD for NSAM and NRF. ***The new guidance is based on a new core FFO definition***, which is very similar to Colony

---

with depreciable real estate, plus real estate-related depreciation and amortization, and after similar adjustments for unconsolidated partnerships and joint ventures.

[5] The Company computes Core FFO by adjusting FFO for the following items, including the Company's share of these items recognized by its unconsolidated partnerships and joint ventures: (i) gains and losses from sales of depreciable real estate within the Other Equity and Debt segment, net of depreciation, amortization and impairment previously adjusted for FFO; (ii) equity-based compensation expense; (iii) effects of straight-line rent revenue and straight-line rent expense on ground leases; (iv) amortization of acquired above- and below-market lease values; (v) amortization of deferred financing costs and debt premiums and discounts; (vi) unrealized fair value gains or losses and foreign currency re-measurements; (vii) acquisition-related expenses, merger and integration costs; (viii) amortization and impairment of finite-lived intangibles related to IM contracts and customer relationships; (ix) gain on re-measurement of consolidated investment entities and the effect of amortization thereof; (x) non-real estate depreciation and amortization; (xi) change in fair value of contingent consideration; and (xii) tax effect on certain of the foregoing adjustments.

Capital's historical core FFO definition, except that ***we will no longer include realized gains or losses for our core property verticals***.

This exclusion is consistent with how most single-sector equity REITs report their FFO and/or AFFO, as they are generally not in the business of trading properties. However, we will continue to include realize gains and losses for the other equity and debt segment during the next few years while this segment winds down because gains are a regular part of this business. Our current expectation is for gains to constitute approximately 15% to 20% of our core FFO for 2017.

***In addition, the legacy Colony core FFO differs from the legacy NorthStar CAD definition in two other primary respects. Number one, core FFO does not add back provisions for loan losses. And two, Colony NorthStar will no longer use fair value accounting for certain legacy NRF assets***.

33. CAD and Core FFO reconciliations reflecting the effect of the new Core FFO definition for the stand-alone entities and for the entities combined, as well as their effect on guidance, are attached hereto as Exhibits 1-4. The Core FFO reconciliation for CLNS during the Class Period is attached hereto as Exhibit 5.

### 2. Colony Capital's Expansion into the Investment Management Business

34. According to its 2015 Form 10-K, Colony was a "global real estate and investment management firm" that "manage[d] capital on behalf of both Company shareholders and limited partners in private investment funds . . . where the Company may earn management fees and carried interests." Colony's portfolio primarily comprised: (i) real estate equity; (ii) real estate and real estate-related debt; and (iii) investment management of Company-sponsored private equity funds and vehicles. By 2016, Colony had $16.8 billion in assets under management and $6.9 billion in fee-earning equity under management.

35. Similar to NRF, Colony was an externally-managed REIT until April of 2015 when it acquired substantially all of its former manager's real estate and institutional investment management business for an aggregate upfront consideration of $672.3 million. Colony's executives therefore developed a strategy to enhance Colony's returns. As Colony's press release announcing the acquisition of its institutional IM business described, Colony "expect[ed] to generate more accretive economics," especially now that its business objective was "to provide attractive risk-adjusted returns . . . through (i) a diversified portfolio of direct and indirect real estate-related equity and real estate debt investments and (ii) fee bearing management contracts on investment funds that we manage."

36. Expanding on its IM economics strategy, the press release stated that "the Company plans to continue [its former manager's] role of forming the general partner or sponsor of private equity funds and other investment vehicles, allowing the Company to capture fees and carried interest from the funds and vehicles it sponsors and manages. Furthermore, the Company intends to invest primarily through these sponsor positions prospectively as opposed to just directly in assets . . . ." Colony thus decided that it could enhance returns and the value of its own holdings by expanding its third party capital base.

37. After the acquisition, Colony operated through the following three segments: (1) Real Estate Equity, which included light industrial real estate assets, single-family residential rentals, and other real estate equity investments; (2) Real Estate Debt, which included originations including senior and subordinated loans, commercial mortgage backed securities, and preferred equity; and (3) Investment Management, which included the management of Colony-sponsored funds and other investment vehicles for institutional investors. The first two segments, Real Estate Equity and Real Estate Debt, represented over 92% of Colony's income in 2016. The institutional IM segment, on the other hand, was Colony's smallest and thus least significant income source, representing a mere 7.6% of income in 2016.

| Year Ended December 31, | Total Income (Loss) | | | Net (Loss) Income | | | Net (Loss) Income Attributable to Colony Capital, Inc. | | |
|---|---|---|---|---|---|---|---|---|---|
| (In thousands) | 2016 | 2015 | 2014 | 2016 | 2015 | 2014 | 2016 | 2015 | 2014 |
| Real Estate Equity: | | | | | | | | | |
| Light Industrial [(1)] | $ 196,357 | $ 162,540 | $ 5,365 | $ (3,003) | $ (21,178) | $ (8,667) | $ (911) | $ (9,560) | $ (5,524) |
| Single Family Residential Rentals | (9,722) | (14,787) | (15,901) | (9,722) | (14,787) | (15,901) | (8,189) | (13,033) | (15,901) |
| Other Real Estate Equity | 247,233 | 152,390 | 18,832 | 131,397 | 20,896 | 7,862 | 72,338 | 24,726 | 5,840 |
| Real Estate Debt | 425,223 | 473,785 | 291,457 | 305,994 | 370,872 | 267,718 | 157,819 | 232,814 | 230,035 |
| Investment Management [(2)] | 70,576 | 63,919 | NA | 21,287 | 20,953 | NA | 17,961 | 17,575 | NA |

(1) Results of the light industrial segment in 2014 is for the period from December 18, 2014 to December 31, 2014.

(2) Results of the investment management segment in 2015 is for the period from April 2, 2015 to December 31, 2015.

38. The IM sector's lackluster performance was largely due to its low investment advisor management fees. Given that its targeted investors were sophisticated institutions, Colony was limited in the scope and amount of the fees it charged. As its 2016 Form 10-K described, base management fees were generally around 1% per annum of net funded capital. And it also charged a one-time asset management fee upon the closing of each investment made, which was typically 0.5% of the net funded capital on each investment. Consequently, Colony's institutional IM sector recorded just $67.7 million in 2016, representing less than 1% in average fees on $6.9 billion in fee-earning equity under management.

39. To further its IM economics strategy, Colony had to expand its third party capital base. Since it already possessed an institutional IM business, acquiring a retail IM business would complete the picture and enable Colony to dramatically increase its chargeable fees. Colony's target thus became NSAM.

### 3. The NorthStar Realty Finance Business

40. According to the 2015 Form 10-K that NRF filed before the merger, NRF was "a diversified commercial real estate company with 85% of [its] total assets invested directly or indirectly in real estate, of which 78% [was] invested in direct real estate." Unlike the IM economics model that Colony pursued, NRF "generated 89% of [its] revenue from [its] real estate portfolio for the year ended December 31, 2015." As it explained, NRF "invest[ed] in multiple asset classes across commercial real estate, or CRE, that [it] expect[ed] [would] generate attractive risk-adjusted returns

and may take the form of acquiring real estate, originating or acquiring senior or subordinate loans, as well as pursuing opportunistic CRE investments."

41. But NRF's business was struggling mightily before the merger. According to its 2015 Form 10-K, NRF had lost hundreds of millions of dollars in every year for five years preceding the merger, for a combined total net loss of $1.4 billion:

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2015 | 2014 | 2013 | 2012 | 2011 |
| **Operating Data:** | (Dollars in thousands, except per share data) | | | | |
| Total property and other revenues | $ 1,817,436 | $ 679,500 | $ 240,847 | $ 114,308 | $ 109,402 |
| Net interest income on debt and securities | 218,805 | 298,139 | 266,357 | 335,496 | 355,921 |
| Total expenses | 2,210,001 | 1,062,287 | 370,765 | 240,076 | 289,887 |
| Equity in earnings (losses) of unconsolidated ventures | 219,077 | 165,053 | 91,726 | 88 | (2,738) |
| Income (loss) from continuing operations | (158,713) | (276,385) | (79,149) | (257,718) | (234,173) |
| Income (loss) from discontinued operations | (108,554) | (44,701) | (8,761) | (17,450) | (25,551) |
| Net income (loss) | (267,267) | (321,086) | (87,910) | (273,089) | (242,526) |
| Net income (loss) attributable to NorthStar Realty Finance Corp. common stockholders | (327,497) | (371,507) | (137,453) | (288,587) | (263,014) |
| *Earnings (loss) per share:* | | | | | |
| Basic | $ (1.87) | $ (3.79) | $ (2.60) | $ (9.22) | $ (11.34) |
| Diluted | $ (1.87) | $ (3.79) | $ (2.60) | $ (9.22) | $ (11.34) |
| Dividends per share of common stock[1][2] | $ 2.75 | $ 3.60 | $ 3.40 | $ 2.64 | $ 1.84 |

(1) Adjusted for the Reverse Split completed on November 1, 2015.
(2) The dividend per share for the third and fourth quarter 2015 represents the dividends declared subsequent to the NRE Spin-off.

42. And at the end of 2015, NRF cut its dividend in half, after its stock price collapsed dramatically in value. According to NRF's 2015 Form 10-K, NRF's stock price traded as high as $69.52 in the second quarter of 2014 ("2Q 2014") and had dropped to $17.03 by the fourth quarter of 2015 ("4Q 2015"), after it had spun off NSAM and NorthStar Europe ("NRE").

43. By late 2015, then, NRF was in liquidation mode. As NRF described in the 2015 Form 10-K, "given recent market conditions, we are currently focused on exploring [asset] sales to generate liquidity to repurchase our common stock and reduce our leverage." And liquefy it did. In only a year's time, NRF sold off $6.6 billion of its portfolio, representing 45% of its real estate assets as of November 2016. And it continued to liquidate assets up to and during the Class Period.

44. NRF's portfolio focused almost entirely on healthcare and hospitality. While it invested in other commercial real estate ventures, including manufactured housing, net leases, multifamily and multi-tenant office space, healthcare and

hospitality were the drivers of NRF's business. In fact, healthcare and hospitality alone represented approximately 80% of NRF's revenue during 2016. Understandably, those were not the assets that Colony wanted when it pursued the merger. As Mr. Barrack explained after the Class Period, the healthcare and hospitality segments "don't lend themselves to immediate third-party access," which was Colony's primary strategy for the merger. Mr. Barrack also acknowledged that "I've never understood the business," and noted for those segments that "we'll run to the exit door every time that we can to lighten up our balance sheet load."

### 4. The NorthStar Asset Management Business

45. The target of the merger was thus clearly NSAM. As NSAM's 2015 Form 10-K confirmed, NSAM's retail IM business was in line with Colony's "Investment Management economics" business model. The Form 10-K described NSAM as "a global asset management firm focused on strategically managing real estate and other investment platforms in the United States and internationally." NSAM commenced operations in 2014 upon the spin-off by NRF "of its asset management business into a separate publicly-traded company." NSAM focused on earning fees by managing capital in the retail marketplace by accessing a variety of pools of capital through various vehicles, which included REITs and closed-end funds, which were referred to as the Retail Companies.[6] The Retail Companies raised capital through NorthStar Securities, a captive broker-dealer platform registered with the SEC.

46. At the time of the merger, NSAM was a profitable enterprise. According to NSAM's 2015 Form 10-K, NSAM had recently turned the corner from producing annual losses to producing income in the two years prior to the merger:

---

[6] The Retail Companies during the Class Period included the following funds: NorthStar Real Estate Income Trust, Inc. ("NorthStar Income I"), NorthStar Real Estate Income II, Inc. ("NorthStar Income II"), NorthStar Healthcare, NorthStar/RXR, and the NorthStar Capital Income Fund.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2015 | 2014 | 2013 | 2012 | 2011 |
| Operating Data: | (Dollar in thousands, except per share data) | | | | |
| Asset management and other fees, related parties | $ 307,988 | $ 147,738 | $ 26,633 | $ 8,112 | $ 993 |
| Selling commission and dealer manager fees, related parties | 126,907 | 110,563 | 62,572 | 42,385 | 12,024 |
| Commission expense | 117,390 | 104,428 | 57,325 | 38,506 | 10,764 |
| Interest expense | 778 | — | — | — | — |
| Total general and administrative expenses | 159,203 | 106,572 | 32,873 | 29,287 | 27,814 |
| Income (loss) before equity in earnings (losses) of unconsolidated ventures and income tax benefit (expense) | 140,991 | 21,761 | (1,995) | (17,322) | (25,682) |
| Equity in earnings (losses) of unconsolidated ventures | 1,625 | (1,039) | — | — | — |
| Income (loss) before income taxes benefit (expense) | 142,616 | 20,722 | (1,995) | (17,322) | (25,682) |
| Income tax benefit (expense) | (21,869) | (1,622) | — | — | — |
| Net income (loss) | 120,747 | 19,100 | (1,995) | (17,322) | (25,682) |
| Net income (loss) attributable to NorthStar Asset Management Group Inc. common stockholders | 119,794 | 19,100 | (1,995) | (17,322) | (25,682) |
| *Earnings (loss) per share:* | | | | | |
| Basic | $ 0.61 | $ 0.10 | $ (0.01) | $ (0.09) | $ (0.14) |
| Diluted | $ 0.60 | $ 0.10 | $ (0.01) | $ (0.09) | $ (0.14) |
| Dividends per share of common stock[1] | $ 0.40 | $ 0.20 | N/A | N/A | N/A |

(1) On October 30, 2014, we declared our first dividend of $0.10 on common stock, on a per share basis, for the three months ended September 30, 2014.

47. NSAM's historical business segments included the following: (1) NorthStar Listed Companies, providing asset management and other services on a fee basis by managing the day-to-day activities of NRF, NRE, and two publicly-listed REITs; (2) Retail Companies, providing asset management and other services on a fee basis by managing the day-to-day activities of the Retail Companies; (3) Broker-Dealer, raising capital in the retail market through NorthStar Securities and earning dealer manager fees for selling equity in the Retail Companies; (4) Direct Investments, investing in partnerships and joint ventures with third-parties; and (5) Corporate/Other, servicing on a fee basis in connection with certain securitization transactions and opportunistic investments such as the purchase of the NorthStar Listed Companies common stock.

48. NSAM organized its revenues from its five business segments into the following categories: (1) Asset Management and other Fees, which included various fees derived from managing the NorthStar Listed Companies, the Retail Companies, and institutional capital through the Townsend Group ("Townsend"); (2) Selling Commissions and Dealer Manager Fees, which represented fees earned for selling equity in the Retail Companies through NorthStar Securities; and (3) Other Income, which included dividend income earned from common stock owned in the NorthStar Listed Companies and other such assets and other revenue sources. At 92% of

revenues in 2016, the Asset Management and other Fees category accounted for most of NSAM's revenues.

| | Years Ended December 31, | | Increase (Decrease) | |
|---|---|---|---|---|
| | 2016 | 2015 | Amount | % |
| **Revenues** | | | | |
| Asset management and other fees | $ 366,615 | $ 307,988 | $ 58,627 | 19.0 % |
| Selling commission and dealer manager fees | 22,803 | 126,907 | (104,104) | (82.0)% |
| Other income | 9,124 | 926 | 8,198 | 885.3 % |
| Total revenues | 398,542 | 435,821 | (37,279) | (8.6)% |

49. Within Asset Management and other Fees, NSAM derived in 2016 approximately 54.8% of its fees from managing the NorthStar Listed Companies, approximately 27.2% from managing the Retail Companies, and 18.1% from managing institutional capital through Townsend:

| | Years Ended December 31, | | Increase (Decrease) |
|---|---|---|---|
| | 2016 | 2015 | |
| NorthStar Listed Companies: | | | |
| Base fee | $ 200,833 | $ 192,305 | $ 8,528 |
| Incentive fee | — | 8,744 | (8,744) |
| Subtotal NorthStar Listed Companies | 200,833 | 201,049 | (216) |
| Retail Companies: | | | |
| Asset management fees | 72,235 | 54,280 | 17,955 (1) |
| Acquisition fees | 19,656 | 48,702 | (29,046) (2) |
| Disposition fees | 7,703 | 3,957 | 3,746 (3) |
| Subtotal Retail Companies | 99,594 | 106,939 | (7,345) |
| Institutional Capital - Townsend: | | | |
| Management fees | 54,797 | — | 54,797 (4) |
| Incentive fees | 11,391 | — | 11,391 (4) |
| Subtotal Institutional Capital - Townsend | 66,188 | — | 66,188 |
| Total | $ 366,615 | $ 307,988 | $ 58,627 |

(1) The increase was driven by the growth in assets of the Retail Companies. The average invested assets of the Retail Companies for the years ended December 31, 2016 and 2015 is $6.8 billion and $5.8 billion, respectively.
(2) The decrease was due to less investment activity of the Retail Companies for the year ended 2016 as compared to 2015, with aggregate investment acquisitions of $1.8 billion in 2016 as compared to $2.8 billion in 2015.
(3) The increase was due to more repayment or disposition activity of the Retail Companies for the year ended 2016 as compared to 2015, with aggregate investment repayments or dispositions of $801.4 million in 2016 as compared to $280.6 million in 2015.
(4) NSAM began earning fees on January 29, 2016, or the Townsend Acquisition Date.

50. The NorthStar Listed Companies, however, include NRF and NRE – with the NRF management agreement being by far the most lucrative of the agreements. In fact, NRF paid NSAM approximately $186.8 million in 2016 as a base management

fee, which represented 93% of NSAM's NorthStar Listed Companies revenue and 51% of its Asset Management and other Fees revenue. And at 46.9%, the management agreement with NRF was the single largest – and therefore most important – source of revenue for NSAM. By way of comparison, the Retail Companies represented approximately 30.7% of NSAM's revenue source in 2016.

51. Importantly to NSAM's financial outlook beyond 2016, its management agreement with NRF would cease to exist upon the merger's completion. According to CLNS's 2016 10-K, "Upon completion of the Mergers, the management agreement with NorthStar Realty ceased to exist." As a result, NSAM lost nearly half of its revenue source after the merger. In turn, revenues derived from the Retail Companies – both under Asset Management and other Fees as well as from Selling Commissions and Dealer Manager Fees – became NSAM's focus.

52. Without the $186.8 million NRF management fee, revenue derived from the Retail Companies jumped from 30.7% of NSAM's total revenues in 2016 to approximately 57.8%. Fees derived from the Retail Companies would thus drive NSAM's success or lead to its failure as incremental retail IM fundraising became critical to CLNS meeting its Core FFO guidance.

| NSAM REVENUES | | | | |
|---|---|---|---|---|
| | 2016 Revenue | Percent of 2016 Revenues | 2016 Adjusted Revenues* | Percent of 2016 Adjusted Revenues* |
| **ASSET MANAGEMENT AND OTHER FEES** | $366,615,000 | 92.0% | $179,815,000 | 84.9% |
| **NorthStar Listed Companies** | $200,833,000 | 50.4% | $14,033,000 | 6.6% |
| *NRF Management Agreement* | *$186,800,000* | 46.9% | n/a | n/a |
| *NorthStar Europe Management Agreement* | *$14,400,000* | 3.6% | $14,400,000 | 6.8% |
| **Retail Companies** | $99,594,000 | 25.0% | $99,594,000 | 47.0% |
| **Institutional Capital** | $66,188,000 | 16.6% | $66,188,000 | 31.3% |
| **SELLING COMMISSIONS AND DEALER MANAGER FEES** | $22,803,000 | 5.7% | $22,803,000 | 10.8% |
| **OTHER INCOME** | $9,124,000 | 2.3% | $9,124,000 | 4.3% |
| **TOTAL:** | $398,542,000 | **TOTAL:** | $211,742,000 | |
| * Adjusted to reflect effect of loss of $186.8 million NRF management agreement. | | | | |

**5. The Combined Investment Management Business**

53. CLNS's IM business was a combination of Colony's institutional IM business and NSAM's retail IM business, as well as Townsend.[7] And the retail IM business was the driving force behind the merger. Defendants' merger presentation, in fact, fixated on the benefits from the IM business – all of the benefits revolved around the merger adding "an embedded investment management platform." The presentation explained that the merger would "unlock value via increase scale and multiple expansion," specifically because it had an embedded IM business. The defendants even included a slide demonstrating that, with their embedded IM model, there could be an increase of 40%+ in return on equity for their investments.

54. Like its predecessor, the retail IM business focused on earning fees by managing capital in the retail marketplace, raised through five investment vehicles that included three closed REITs, one open REIT, and an investment feeder fund structure comprised of various companies registered under the Investment Company Act of 1940 (collectively, the Retail Companies), as reflected in the schedule below:

[7] On January 29, 2016, NSAM acquired an approximate 84% interest in Townsend, a leading global provider of IM and advisory services focused on real estate.

## VIIIc. Investment Management - Retail Companies

*($ in thousands, except as noted; as of September 30, 2017, unless otherwise noted)*

| | NorthStar Income | NorthStar Healthcare | NorthStar Income II | NorthStar/RXR NY Metro Real Estate[1] | NorthStar Real Estate Capital Income Fund | Total |
|---|---|---|---|---|---|---|
| Capital Raising Status | Completed July 2013 | Completed January 2016 | Completed November 2016 | Active | Active | |
| Primary Strategy | CRE Debt | Healthcare Equity and Debt | CRE Debt | NY Metro Area CRE Equity and Debt | CRE Debt | |
| Offering Size | $1.2 billion[2] | $2.1 billion[2] | $1.65 billion[2] | $2.0 billion[2] | $3.2 billion[2] | $10.15 billion |
| Capital Raised[3] | | | | | | |
| During Q3 2017 | $ 8,699 | $ 16,917 | $ 8,823 | $ 4,790 | $ 8,639 | $ 47,868 |
| Year-to-date through 11-3-17 | 26,832 | 61,729 | 26,378 | 24,947 | 22,561 | 162,447 |
| Inception to 11-3-17 | 1,310,543 | 1,930,871 | 1,165,841 | 35,458 | 22,794 | 4,465,507 |
| Investments[4] | | | | | | |
| During Q3 2017 | 30,720 | 217,720 | 60,000 | 12,000 | 9,500 | 329,940 |
| As of 9-30-17 | 1,541,466 | 3,622,296 | 1,789,034 | 32,531 | 26,241 | 7,011,568 |
| Cash as of 9-30-17 | 163,087 | 27,395 | 85,724 | 4,487 | 984 | 281,677 |
| Fees earned during Q3 2017 | | | | | | |
| Asset management fees | 4,355 | 8,733 | 5,427 | 71 | 38 | 18,624 |
| Acquisition fees | — | 4,633 | 600 | — | — | 5,233 |
| Disposition fees | 567 | — | 828 | — | — | 1,395 |
| Total fees | $ 4,922 | $ 13,366 | $ 6,855 | $ 71 | $ 38 | $ 25,252 |

55. NSAM had enjoyed considerable fundraising success in the years leading up to the merger. The first REIT, NorthStar Income I, was completed – meaning that CLNS was no longer raising new capital – in July 2013, after raising approximately $1.07 billion through its offering. The second REIT, NorthStar Healthcare, was completed in January 2016 after raising approximately $1.7 billion through its offering. The third REIT, NorthStar Income II, was completed in November 2016 after raising approximately $1.1 billion through its offering. Combined, these vehicles raised approximately $3.9 billion in third party retail IM capital.

56. Defendants had similar expectations for retail fundraising after the merger, through its active funds NorthStar/RXR and NorthStar Capital Income Fund. NorthStar/RXR – the active REIT in the portfolio – became effective in February 2015 and sought to raise up to $2 billion while the NorthStar Capital Income Fund – comprised of four separate feeder investment companies – which became effective in

May 2016 sought to raise up to $3.2 billion.[8] Combined, the "Offering Size" for these funds revealed that defendants' fundraising expectations were lofty – at $5.2 billion, they expected to raise nearly a billion dollars ***more*** than the funds that were designated as "Completed" in 2016. And according to the 2016 Registration Statement for the merger, defendants had lofty retail fundraising expectations for the Class Period, projecting to raise ***$1.5 billion*** in 2017 alone:

> In developing the NSAM Standalone Projections, NSAM's management made numerous material assumptions with respect to NSAM for the periods covered by the NSAM Standalone Projections, including the following material assumptions: (i) no additional capital raised or growth in base management fees from NRF and NRE and no incentive fees; (ii) ***approximately*** $1.4 billion, ***$1.5 billion*** and $1.6 billion ***of capital raised in NSAM's retail companies in*** 2016, ***2017*** and 2018, respectively; (iii) approximately $70 million, $285 million and $95 million in purchases of NSAM, NRF and NRE common stock, respectively, over the projection period; and (iv) effective tax rate of 15% on pre-tax CAD.

57. CLNS's retail IM growth depended upon incremental retail fundraising from the active funds. Any capital raised during the Class Period from any of the funds whose capital raising status was designated as "Completed" would have primarily been from distribution reinvestment plan ("DRP") and not new capital raising. And according to the SEC filings for the underlying REITs, "[n]o selling commissions or dealer manager fees [were] paid on shares issued pursuant to the

---

8 The NorthStar Capital Income Fund included: (i) NorthStar Real Estate Capital Income Fund; (ii) NorthStar Real Estate Capital Income Fund-T; (iii) NorthStar Real Estate Capital Income Fund-ADV; and (iv) NorthStar Real Estate Capital Income Fund-C. These entities, in turn, invested substantially all of their assets in NorthStar Real Estate Capital Income Master Fund ("NorthStar Master Fund").

DRP." Any growth from CLNS's retail IM business thus largely depended on the two active funds available during the Class Period to raise incremental capital.[9]

### 6. Defendants Intend for the Merger to Unlock Purported Hidden "Value" in the Three "Undervalued" Entities

58. From the outset, the merger was purportedly about "unlocking" the "value" underlying the three entities – Colony and the two NorthStar entities, NSAM and NRF. Prior to the merger, defendants said that the trading multiple of all three pre-merger entities was substantially undervalued, noting in a slide presentation promoting the merger that "each of the stand-alone companies is undervalued relative to peer groups." The admitted objective of the merger was thus to unlock what defendants perceived to be "hidden" value.

59. The press release announcing the deal repeatedly emphasized this objective, explaining that the combination would "'creat[e] substantial value for shareholders'" because it was "'poised for meaningful multiple expansion and substantially enhanced long-term returns for shareholders.'" Among the "Strategic and Financial Benefits" listed in the release was "Increased Scale and Value Creation," which emphasized "enhanced returns," and a market capitalization "in the top quartile" of REIT investments:

> Increased Scale and Value Creation: Colony NorthStar is expected to be in the top quartile ranked by equity market capitalization, according to the MSCI U.S. REIT Index (RMZ) classification, with a broad platform that expands its ability to deploy third-party fee-bearing capital to

---

[9] Given the lack of selling commissions and dealer manager fees from the DRP programs, the Second Amended Complaint for Violations of the Federal Securities Laws focuses on CLNS's fundraising totals from the "Active" funds as those funds would be the primary driver of any incremental growth from the retail IM business. Including DRP investments in the totals would nevertheless lead to similarly large year-over-year declines: 83% in 4Q 2016, 67% in 1Q 2017, 45% in 2Q 2017, 48% in 3Q 2017, and 60% in 4Q 2017. *See* Exhibit 6 attached hereto.

accelerate growth and provide enhanced returns to shareholders from consistent, longer duration fee related income.

60. The merger presentation also focused on increasing an "undervalued" stock price, showing how the three entities were undervalued individually whereas a combined entity could roughly double their valuation. For example, defendants explained that the three standalone companies had a "blended multiple" (*i.e.*, stock price of all three entities/FFO) of only "9.0x," but a combined entity via increased scale and multiple expansion (*i.e.*, the "Hybrid Peer Average") had a far higher multiple at "17.6x." Individual entities in that peer group had FFO multiples that reached as high as "21.8x." With the merger then, defendants thought they could roughly double the stock price multiple of the combined entity and, again, the value of their own personal holdings.

61. Thus, what defendants sought to do with the merger was to inflate the combined company's stock price and the resulting value of their own holdings. Defendants had substantial ownership interests, the value of which hinged on the success of the merger. Combined, they would own nearly 11.5 million CLNS shares. If these shares reached the top quartile, as defendants said they expected, the value of their personal holdings would jump exponentially.

62. The merger was thus designed to cure a perceived fundamental valuation problem – and it sought to do so through the addition of an embedded IM business and the regular fees earned from managing other investors' capital. As a REIT, Colony was largely dependent on generating returns from its own invested capital, which brought considerable risk. But an embedded IM business would enable defendants to earn fees from investing and managing other investor's capital (*i.e.*, third-party capital) while minimizing risk. And while the capital raised in 2017 from institutional investors would be substantially higher than retail, the fees that defendants could earn from institutional investors were much lower.

63. Capturing NSAM and its retail IM business would thus enable Colony's executives to continue generating large fees while minimizing risk and elevating the value of defendants' personal holdings.

**7. Colony Capital Gains Control of NSAM While NorthStar's Executives Receive a Windfall**

64. For NorthStar executives, the merger was nothing short of a windfall. Pursuant to the merger agreement, the executives of the combined entity would be restricted to legacy Colony executives, with the exception of defendant Hamamoto, who secured the role of Vice Chairman of CLNS's board of directors, and Dan Gilbert, who would serve as the Head of Retail Platform at CLNS. Defendant Hamamoto, however, was the founder of the NorthStar entities and had filled many key NorthStar executive leadership roles in the years before the merger. His involvement was thus necessary for CLNS's success.

65. The same was true for Mr. Gilbert, who was the Chief Investment and Operating Officer of NSAM – the retail arm of the critical embedded IM business. As further discussed below, both defendant Hamamoto and Mr. Gilbert signed agreements that incentivized their tenure at CLNS for at least two years, although their stock awards fully vested after only one year. The remaining NorthStar executives all agreed to assist with the transition for only one year. And in return, defendant Hamamoto, along with his NorthStar executive leadership team, pulled a whopping $120 million out of the merger pursuant to change-of-control and other agreements.

66. This was a win-win for all insiders. NorthStar executives cashed out while Colony's executives controlled CLNS's operations, including the coveted embedded IM business. And because Colony's executives had been previously granted an incentive plan that specifically tied awards of stock, in part, to real estate fundraising – awards that could reach up to 4.5 million common shares and operating company units – they were highly incentivized to maintain, and even inflate, the

Company's stock price throughout the Class Period. The key was third-party capital fundraising.

67. Defendants successfully completed the merger on January 10, 2017, with CLNS having a market capitalization of approximately $9 billion and AUM of $56 billion.

### B. False and Misleading Statements About Core FFO Guidance and CLNS's Retail IM Fundraising

#### 1. False and Misleading Statements When Reporting Fourth Quarter and Fiscal Year 2016 Results

68. On February 28, 2017, CLNS issued a press release and filed a Form 8-K, which was signed by defendant Tangen, announcing the Company's fourth quarter 2016 standalone financial results and a post-merger update. In the press release, the Company "updated" its Core FFO guidance for 2017 to a range of $1.40 to $1.58 per share – a reduction from its previous $1.55 to $1.75 per share guidance that they attributed to a special dividend paid to NSAM shareholders as part of the merger transaction and also to less third-party capital raising:

> The Company is updating its Core FFO guidance for the year ending 2017 to a ***range of $1.40 to $1.58 per share***, but does not intend to provide updates to Core FFO guidance going forward. In comparison to the original 2017 guidance that was provided in the Investor Presentation related to the merger filed on June 7, 2016, the update includes lower earnings due primarily to: 1) less third party capital raising; 2) less cash available to deploy into investments resulting from the increase of the NSAM special dividend among other reasons; and, 3) accelerating the replacement of higher-yielding, non-core investments with lower-yielding investments that better fit the strategic direction of the Company.

69. On March 1, 2017, during CLNS's conference call with analysts, media representatives, and investors, defendant Saltzman reiterated the Company's 2017

Core FFO guidance, stating that they "anticipated core FFO earnings [in the] range of $1.40 to $1.58 per share." He also explained that the Company's guidance "assumes $2 billion of new fundraising in 2017." But when asked about the "breakdown of retail versus institutional" in the $2 billion capital raise assumption, defendant Saltzman said "we haven't been transparent about that," admitting only that "there is a mix of institutional and retail:"

> [Analyst]: Got you. And with regard to the capital raising, I think you said $2 billion versus $1 billion last year. Is there a breakdown of retail versus institutional in terms of how that $2 billion is comprised?
>
> [Saltzman:] Well, we haven't been transparent about that, ***so yes, there is a mix of institutional and retail***. I'm probably not going to comment on it per se at this point.

70. Defendant Saltzman acknowledged "headwinds in 2016" in both institutional and retail capital raising, but explained that "the tide appears to have turned for both institutional and retail placements," noted the "momentum we're now experiencing in both markets," and boasted about the current "positive" environment for capital fundraising:

> In terms of capital raises, we experienced headwinds in 2016 on both the institutional and retail fronts . . . .
>
> * * *
>
> Fortunately, ***the tide appears to have turned for both institutional and retail placements*** based upon the ***momentum we're now experiencing in both markets.*** In fact, our guidance only assumes $2 billion of new fundraising in 2017. If momentum continues to build, this is an area where we could be very pleasantly surprised.
>
> * * *
>
> But I think, consistent with my comments earlier, I think we're pretty sanguine and cautiously optimistic about how we're likely to do

> better in terms of capital raising this year. We were very disappointed with where we ended up last year for the reasons that I mentioned. But I think now that we're stabilized, the merger is behind us, ***the environment is as positive as it is***, and we have all of these interesting opportunities in terms of both the existing balance sheet as well as what we're doing on the investment management side, I'd be very surprised if we don't exceed that for this year.

71. Defendants' statements forecasting 2017 Core FFO at a range between $1.40 to $1.58 were made without a reasonable basis and omitted material facts, making these statements misleading. Defendants built their guidance on a foundation of 597.8 million shares and knew because of the change in how the Company defined Core FFO that NRF was losing the adjustment that had converted hundreds of millions of dollars in losses to positive CAD and that, without those adjustments, NRF's reported CAD would have been negative in 2 out of the 4 quarters in 2016. By losing the ability to inflate CAD at NRF by using fair value accounting or provisions for loan losses, CLNS was faced with an insurmountable share count and unreachable Core FFO growth rates between 33% and 50%. Indeed, even a straight-line calculation using the modified Core FFO definition yields $1.06 per share annually, significantly below the actual $1.16 per share Core FFO result that CLNS achieved in 2017. With the dismal state of NRF's business, approximately half of its real estate assets sold, the nearly nonexistent retail fundraising at NSAM because of the dynamic between NSAM's fees and the nearly non-existent returns in its funds, NSAM's loss of $186.8 million in fees from NRF through the merger, and only 4.5% Core FFO growth at Colony in 2016 with a $0.01 per share Core FFO decline, defendants had no reasonable basis to believe that CLNS would achieve those lofty Core FFO growth rates. At the same time, defendants had discovered a conflict between NSAM's Townsend business and Colony's legacy institutional IM business, requiring that CLNS sell a business that had contributed $66 million in fees to NSAM's results in

2016. The loss of this business further undermined NSAM's ability to contribute to CLNS meeting guidance.

72. For the same reason, defendants' claims that they were experiencing "momentum" in retail IM fundraising where the "the tide appears to have turned for both institutional and retail placements" and where "the environment is as positive as it is" were false and misleading. In 4Q 2016, defendants had raised just $6.5 million in a fund with a total offering amount of a lofty $2 billion, and experiencing ***a $378.7 million (90.4%) collapse in active retail fundraising year-over-year*** because the fund's performance (indeed the performance of most NorthStar funds) did not warrant the fees defendants sought to charge. *See* Exhibit 6. In fact, when boasting about the "positive" environment for retail capital raising, defendants omitted the material fact that NorthStar/RXR was struggling to raise capital because its returns had been less than a 10-year treasury note, which was yielding around 2.4%. With these negligible returns, fees as high as 11.25% during the quarter (in addition to acquisition and disposition fees that could total up to 1% for debt and 2.25% for property), and a fundraising total that represented less than 1% of the $1.5 billion that NSAM projected in November 2016, and less than 1% of the $2 billion fundraising assumption, defendants created a misleading impression about the state of CLNS's retail IM business.

73. On the same day that defendants announced the Company's 4Q 2016 standalone financial results and a post-merger update, February 28, 2017, the Company also filed its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K") with the SEC, which was signed by defendants Saltzman, Tangen, and Hamamoto. The 2016 10-K included the standalone financial results of the pre-merger entities. Specifically, the consolidated financial statements included in the 2016 10-K represented the standalone financial results of NSAM. The

NRF and Colony standalone financial results were filed as exhibits to the 2016 10-K.[10] The 2016 10-K also included the five core strategic real estate segments of the newly formed CLNS: (1) Healthcare (2) Light Industrial, (3) Hospitality, (4) Other Equity and Debt, and (5) Investment Management.

74. Presented in the 2016 10-K were the historical financial results and capital raising details of NSAM. For example, the 2016 10-K included a summary table of the Retail Companies, which included their capital raise activity and investments up through February 23, 2017:

| Retail Company | Primary Strategy | Offering Amount (in millions)(1) | Offering Period | Capital Raised (in millions)(1) | Total Investments (in millions) |
|---|---|---|---|---|---|
| **Effective** | | | | | |
| NorthStar Income | CRE Debt | $ 1,200.0 | Completed July 2013 | $ 1,293.4 | $ 1,599.9 |
| NorthStar Healthcare | Healthcare Equity and Debt | 2,100.0 | Completed January 2016(2) | 1,880.8 | 3,413.7 |
| NorthStar Income II | CRE Debt | 1,650.0 | Completed November 2016(2) | 1,145.5 | 1,739.8 |
| NorthStar/RXR New York Metro(3) | New York Metro Area CRE Equity and Debt | 2,000.0 | Ends February 2018(4)(5) | 12.8 (9) | 11.0 |
| NorthStar Capital Fund | CRE Debt and Equity | 3,200.0 (6) | Ends July 2019(5)(7) | 2.2 (9) | 0.1 |
| **Not Yet Effective** | | | | | |
| NorthStar/Townsend Investment | CRE Debt and Equity | $ 1,000.0 | N/A(8) | N/A | N/A |

_______________

(1) Represents amount of shares registered and raised to offer pursuant to each Retail Company's public offering, distribution reinvestment plan and follow-on public offering.

(2) NorthStar Healthcare successfully completed its initial public offering on February 2, 2015 by raising $1.1 billion in capital and its follow-on public offering on January 19, 2016 by raising $0.7 billion in capital. NorthStar Income II closed its initial public offering on November 9, 2016 and raised $1.1 billion in capital.

(3) Any asset management and other fees incurred by NorthStar/RXR New York Metro will be shared equally between NSAM and RXR Realty, as co-sponsors.

(4) NorthStar/RXR New York Metro's registration statement became effective in 2015 and began raising capital in 2016. Colony NorthStar expects the capital raise to accelerate in 2017.

(5) Offering period subject to extension as determined by the board of directors or trustees of each Retail Company.

(6) Offering is for two feeder funds in a master feeder structure.

(7) NorthStar Capital Fund's registration statement was declared effective by the SEC in May 2016. Colony NorthStar expects NorthStar Capital Fund to begin raising capital from third parties in the first half 2017.

(8) NorthStar/Townsend Investment submitted a registration statement on Form N-2 to the SEC in October 2016. Colony NorthStar expects NorthStar/Townsend Investment to begin raising capital in the first half 2017.

(9) In connection with the distribution support agreement with each Retail Company, an affiliate of Colony NorthStar purchased shares of common stock in NorthStar/RXR New York Metro and NorthStar Capital Fund for $1.5 million and $2.0 million, respectively, since inception through December 31, 2016.

75. The table detailed that only two of the Retail Companies had a current active offering period: NorthStar/RXR and the NorthStar Capital Income Fund. The table detailed that both would be active for third-party investments in 2017 and that for NorthStar/RXR its ***capital raise was expected "to accelerate in 2017***." The table

---

[10] The 2016 10-K stated that "[t]he historical consolidated financial statements included herein represent the consolidated financial position, results of operations, other comprehensive income and cash flows of NSAM prior to the mergers. . . . The consolidated financial statements included herein should be read and considered with the Colony and NorthStar Realty consolidated financial statements and notes thereto that are included as exhibits to this Form 10-K and pro forma financial statements and notes thereto that are filed with the SEC."

also noted that CLNS expected a third Retail Company with a total offering amount of $1 billion, NorthStar/Townsend Investment ("NorthStar Townsend"), to become active and "***begin raising capital from third parties in the first half of 2017***."

76. Defendants' statements about CLNS's capital fundraising, including that NorthStar/RXR's capital raising would "accelerate" in 2017, were false and/or misleading. Defendants had no reasonable basis to believe that NorthStar/RXR's capital raise would accelerate in any material amount. Defendants were charging investors extremely high fees (up to 11%, including 10% in sales-related commissions and fees even after defendants cut their fees in February 2017 and eliminated acquisition and disposition fees) for a fund that had been producing returns lower than a 10-year Treasury note, which at the time was 2.4%. As defendants knew from CLNS's fundraising totals, investors and their financial advisers were largely unwilling to pay the fees CLNS was demanding under these circumstances. In fact, it was for this reason that retail fundraising was anemic. Despite having fundraised for nine months, NorthStar/RXR's cumulative capital raise from third parties had only reached approximately $8.5 million through 4Q 2016, less than 0.5% of its Offering Amount, less than 1% of the projected $1.5 billion that NSAM expected in November 2016, and less than 1% of defendants' $2 billion fundraising assumption. By omitting these material facts, defendants created a misleading impression about the state of the retail IM business.

77. Defendants' statement in the table that the NorthStar Townsend offering was expected to start raising capital in the first half of 2017 omitted a material fact, making the statement false and misleading. As CLNS would reveal months later in its September 2017 sales announcement of Townsend, the market perceived a conflict between NSAM's Townsend business and Colony's legacy institutional IM business, requiring CLNS to sell a business that had represented over 60% of NSAM's AUM. Defendants knew about the conflict in January 2017 – over four weeks before they made the statement – and mentioned nothing about it in CLNS's 2016 10-K. Without

knowing about this conflict, investors were unable to accurately assess the actual impact of the NorthStar Townsend capital raise on CLNS's business and financial prospects and did not know that CLNS would be losing an important part of its business.

### 2. False and Misleading Statements When Reporting CLNS's First Quarter 2017 Results

78. On May 9, 2017, CLNS issued a press release and filed a Form 8-K, which was signed by defendant Tangen, announcing its first quarter 2017 financial results. The Company reported Core FFO for the quarter of $173.1 million, or $0.31 per share, 11% below the low point and 21% below the high point of the 2017 Core FFO guidance – an inauspicious performance, given that these were CLNS's first combined post-merger financial results. In the press release, defendant Saltzman reassured investors that "***[w]e remain on track to achieve our 2017 full year goals for Core FFO*** including synergies, new investor client capital formation, and simplification; notwithstanding some seasonal and other timing related performance differences in the first quarter."

79. During the conference call the next day, defendant Saltzman reiterated that CLNS remained on track to achieve full year Core FFO guidance:

> Our core FFO for the quarter was $0.31 per share, which Darren will discuss in greater detail on this call. This result reflects the seasonality of our hospitality segment as well as other timing differences, and ***we remain on track to achieve our 2017 full year goals for core FFO***. For example, the first quarter did not reflect the full impact of capital raising and investments that occurred during the quarter, including our common stock repurchases, which generally happen later in the quarter or subsequent to quarter end.

80. Defendant Tangen also reassured investors that CLNS "***remain[ed] on track to achieve the full year 2017 core FFO guidance range,"*** in particular, because of retail investment management:

> Results, which we do not consider as representative of the company's stabilized earnings potential. Notably, the seasonal impact of our hospitality business in the first quarter was approximately $0.02 per share, which is the difference between actual Q1 results and the simple quarterly average based on expected results in this segment over the calendar year. Furthermore, if we apply the forecast $80 million cash G&A synergy benefit and the stock repurchases, which happened in the past 2 months, core FFO would have been a further (technical difficulty) per share higher. Additional core FFO upside exists from reaching full capital deployment and expected ramp up over the course of the year from other investments and businesses, ***including retail investment management***. For these reasons, we believe ***we remain on track to achieve the full year 2017 core FFO guidance range presented on our last call***.

81. Despite disappointing IM results from the Retail Companies, defendant Saltzman falsely described the "positive momentum" in "our fundraising" and "acceleration in the pace of our [retail] fundraising" with funds that "are structured to be highly attractive to a very broad group of financial advisers and their clients":

> Turning to our retail platform. After an extended period of extraordinary market disruption mainly driven by significant regulatory changes, ***we are finally seeing positive momentum in the overall retail marketplace as well as in our own fundraising***. We've positioned our retail platform and product lineup to take full advantage of the evolving market environment and to support our goals of broadening the pool and channels of capital we access, which now includes registered investment

> advisers and traditional Wall Street firms, in addition to the historical network of independent broker-dealers, all with an objective of bringing Colony NorthStar's institutional asset management acumen and best practices to the retail investor client. And post merger, this includes using our balance sheet to foster better alignment of interest with investors. Our offerings include nontraded REITs and 40 Act funds allowing us to serve both long-term existing relationships and targeted new pools of capital. Product structures are innovative and best-in-class, well suited to the new market environment and reflect our drive to be a visionary value-producing leader in the marketplace.
>
> ***In connection therewith, we've seen strong progress in building the selling groups in our current offerings and a commensurate acceleration in the pace of fundraising***. More than $6 billion of targeted capital is anticipated to be raised in products that are generally early in their life cycles and just starting the capital raising process, including our 2 effective programs the $2 billion NorthStar/RXR New York Metro real estate nontraded REIT and a $3.2 billion NorthStar Real Estate Capital Income 40 Act closed-end fund, as well as our soon-to-be effective $1 billion NorthStar/Townsend Institutional Real Estate 40 Act interval fund. Privately placed retail products, or institutional funds that have a retail sleeve, are also in various stages of development. ***All of these are structured to be highly attractive to a very broad group of financial advisers and their clients***.

82. Defendants Saltzman and Tangen's statements that CLNS "remain[ed] on track" to meet the $1.40 to $1.58 guidance range was false and misleading. The sheer number of shares issued and outstanding combined with the revised Core FFO calculation that eliminated the very adjustments that NRF used to inflate CAD made the guidance hurdle insurmountable. The Core FFO results for the quarter, at $0.31

per share, proved that neither NRF nor NSAM would produce in a manner to contribute to the 33% to 50% growth defendants' guidance required. On a straight-line basis, CLNS was tracking to miss the bottom end of the guidance range by $0.16 per share (11%) and the top end by $0.34 per share (21%). To the extent defendants were describing the current state of the business, they knew those statements were false or misleading given that defendants had liquidated approximately half of NRF's real estate assets, and were continuing to liquidate assets, as they were "running for the exit" on NRF's primary businesses with capital fundraising results from the active funds at NSAM that had collapsed over 94% year-over-year because the performance of its funds did not warrant the fees defendants sought to charge. To the extent defendants were projecting the future, they simply had no reasonable basis for the same reasons. Indeed, these results confirmed that the legacy NorthStar entities would not contribute sufficiently for CLNS to meet its guidance range.

83. Defendants' statements that "we are finally seeing positive momentum in the overall retail marketplace as well as in our own fundraising," that "we've seen strong progress in building the selling groups in our current offerings and a commensurate acceleration in the pace of fundraising," and that "[a]ll of these are structured to be highly attractive to a very broad group of financial advisers and their clients" were false and misleading. CLNS was not experiencing "positive momentum" or an "acceleration in the pace fundraising." Its capital raising activity in only one of two active retail funds, NorthStar/RXR, had ***declined*** from $6.5 million in 4Q 2016 to $5.2 million in 1Q 2017 when defendant Saltzman made these statements, as investors continued to avoid NorthStar/RXR, not only given the size of its fees but also given its performance. The same was true for CLNS's second active retail fund, NorthStar Capital Income Fund, which it offered to investors that quarter. Like NorthStar/RXR, investors and their financial advisors refused to pay its high fees given its underlying performance, leaving CLNS without a meaningful incremental contribution to its $2 billion fundraising assumption. By omitting that these funds, in

reality, were not "highly attractive to a very broad group of financial advisers and their clients" because of their high fees and poor performances, Saltzman's statement that they were "structured" as such was materially misleading.

### 3. False and Misleading Statements When Reporting CLNS's Second Quarter 2017

84. On August 8, 2017, CLNS issued a press release and filed a Form 8-K, which was signed by defendant Tangen, announcing its 2Q 2017 financial results, which included Core FFO of $203.6 million, or $0.35 per basic share. CLNS also included with its Form 8-K filing a financial supplement that outlined its retail fundraising results:

## VIIIc. Investment Management - Retail Companies

*($ in thousands, except as noted; as of June 30, 2017, unless otherwise noted)*

| | NorthStar Income | NorthStar Healthcare | NorthStar Income II | NorthStar/RXR NY Metro Real Estate[1] | NorthStar Real Estate Capital Income Fund | Total |
|---|---|---|---|---|---|---|
| Capital Raising Status | Completed July 2013 | Completed January 2016 | Completed November 2016 | Active | Active | |
| Primary Strategy | CRE Debt | Healthcare Equity and Debt | CRE Debt | NY Metro Area CRE Equity and Debt | CRE Debt | |
| Offering Size | $1.2 billion[2] | $2.1 billion[2] | $1.65 billion[2] | $2.0 billion[2] | $3.2 billion[2] | $10.15 billion |
| Capital Raised[3] | | | | | | |
| During Q2 2017 | $ 8,779 | $ 16,975 | $ 8,841 | $ 12,375 | $ 12,144 | $ 59,114 |
| Year-to-date through 8-4-17 | 23,912 | 44,909 | 23,406 | 18,879 | 12,346 | 123,452 |
| Inception to 8-4-17 | 1,310,624 | 1,914,051 | 1,162,867 | 29,389 | 12,346 | 4,429,277 |
| Investments[4] | | | | | | |
| During Q2 2017 | 60,721 | — | 34,000 | 9,500 | 15,761 | 119,982 |
| As of 6-30-17 | 1,553,806 | 3,415,706 | 1,830,741 | 20,531 | 15,761 | 6,836,545 |
| Cash as of 6-30-17 | 174,567 | 135,639 | 125,792 | 12,150 | 109 | 448,257 |
| Fees earned during Q2 2017 | | | | | | |
| Asset management fees | 4,542 | 8,386 | 5,454 | 42 | 9 | 18,433 |
| Acquisition fees | — | 51 | 340 | — | — | 391 |
| Disposition fees | 1,278 | — | 138 | — | — | 1,416 |
| Total fees | $ 5,820 | $ 8,437 | $ 5,932 | $ 42 | $ 9 | $ 20,240 |

Notes:
(1) Fees earned are split 50/50 with partner.
(2) Represents dollar amounts of shares registered to offer pursuant to each company's public offering, distribution reinvestment plan, and follow-on public offering.
(3) Includes amounts contributed by CLNS.
(4) Based on cost for real estate equity investments, which includes net purchase price allocation related to intangibles, deferred costs and other assets, if any, committed principal amount for real estate debt and securities and carrying value plus deferred acquisition prices for limited partnership interests in private equity funds.

85. The following day, during the Company's conference call to discuss its results, defendant Saltzman recognized certain purported "industry challenges" facing

the retail IM business for the first time, but made clear that the Company "***remain[ed] optimistic***" that it "***will continue to institutionalize and rebound***":

> On the other hand, an extended period of extraordinary structural change and market disruption, including the very recent Department of Labor fiduciary for adoption and implementation in June, has negatively impacted the retail investment management business year-to-date. ***Despite these industry challenges, we remain optimistic that the retail investment management business will continue to institutionalize and rebound***.

86. Defendants' statements in ¶84 about CLNS's fundraising totals were false and misleading. Defendants' report that total fundraising figures from the active funds had jumped from $5.2 million in 1Q 2017 to $24.5 million in 2Q 2017 – a ***three-fold*** increase in retail IM fundraising – but in doing so omitted a material fact that made their statements misleading. *See* Exhibit 6. As reported in SEC filings through the underlying NorthStar Capital Income Fund, of the $24.5 million retail IM fundraising total, defendants concealed that CLNS was the source of ***50% of the increase*** and ***nearly all*** of the capital raised by the NorthStar Capital Income Fund in 2Q 2017. In fact, CLNS purchased 1.3 million shares of the NorthStar Capital Income Fund for $12.1 million during the quarter, leaving just $44,000 raised from third parties. And while defendants footnoted that CLNS's "Capital Raised" figures "[i]nclude[d] amounts contributed by CLNS," they did not also reveal the amounts or the funds to which CLNS contributed. Coupled with CLNS's prior statement that it "expect[ed] NorthStar Capital Fund to begin raising capital from third parties in the first half of 2017," defendants' statements thus created the impression that CLNS's retail IM fundraising was increasing at a much faster rate than it actually was.

87. Defendants' statement that they "remain[ed] optimistic that the retail investment management business will continue to institutionalize and rebound" was also false and misleading. Given the actual fundraising totals combined with the

performance of the underlying funds, defendants could not have had a reasonable basis to believe that retail IM fundraising would "rebound," at least not anytime soon. Indeed, at $24.5 million raised, the retail IM capital fundraising totals from the active funds represented a nearly 66% collapse in fundraising year-over-year, even with CLNS's undisclosed contribution. *See* Exhibit 6. Excluding those contributions, the year-over-year shortfall amounted to $58.9 million (82.6%) from active fundraising. *Id*. Indeed, that CLNS felt compelled to infuse $12.1 million into the NorthStar Capital Income Fund reflects the reality that defendants did not feel optimistic about retail IM fundraising prospects. By expressing optimism that retail IM would "continue to institutionalize and rebound" while concealing that CLNS was the source of half of the active retail fundraising totals during the quarter, defendants misled investors about the true state of the retail IM business.

### 4. False and Misleading Statements When Reporting CLNS's Third Quarter 2017 Results

88. On November 9, 2017, CLNS issued a press release and filed a Form 8-K, which was signed by defendant Tangen, announcing its 3Q 2017 financial results, which included Core FFO of $193.4 million, or $0.33 per basic share – again below the low end of guidance. By the end of the 3Q 2017, CLNS's reported Core FFO implied a run rate of approximately $1.25 for full-year 2017, below the low end of its guidance range by $0.15 (11%) and below the high end by $0.33 (21%) with one quarter remaining in the fiscal year. CLNS also included with its Form 8-K filing a financial supplement that outlined its retail fundraising results:

## VIIIc. Investment Management - Retail Companies

*($ in thousands, except as noted; as of September 30, 2017, unless otherwise noted)*

| | NorthStar Income | NorthStar Healthcare | NorthStar Income II | NorthStar/RXR NY Metro Real Estate[1] | NorthStar Real Estate Capital Income Fund | Total |
|---|---|---|---|---|---|---|
| Capital Raising Status | Completed July 2013 | Completed January 2016 | Completed November 2016 | Active | Active | |
| Primary Strategy | CRE Debt | Healthcare Equity and Debt | CRE Debt | NY Metro Area CRE Equity and Debt | CRE Debt | |
| Offering Size | $1.2 billion[2] | $2.1 billion[2] | $1.65 billion[2] | $2.0 billion[2] | $3.2 billion[2] | $10.15 billion |
| Capital Raised[3] | | | | | | |
| During Q3 2017 | $ 8,699 | $ 16,917 | $ 8,823 | $ 4,790 | $ 8,639 | $ 47,868 |
| Year-to-date through 11-3-17 | 26,832 | 61,729 | 26,378 | 24,947 | 22,561 | 162,447 |
| Inception to 11-3-17 | 1,310,543 | 1,930,871 | 1,165,841 | 35,458 | 22,794 | 4,465,507 |
| Investments[4] | | | | | | |
| During Q3 2017 | 30,720 | 217,720 | 60,000 | 12,000 | 9,500 | 329,940 |
| As of 9-30-17 | 1,541,466 | 3,622,296 | 1,789,034 | 32,531 | 26,241 | 7,011,568 |
| Cash as of 9-30-17 | 163,087 | 27,395 | 85,724 | 4,487 | 984 | 281,677 |
| Fees earned during Q3 2017 | | | | | | |
| Asset management fees | 4,355 | 8,733 | 5,427 | 71 | 38 | 18,624 |
| Acquisition fees | — | 4,633 | 600 | — | — | 5,233 |
| Disposition fees | 567 | — | 828 | — | — | 1,395 |
| Total fees | $ 4,922 | $ 13,366 | $ 6,855 | $ 71 | $ 38 | $ 25,252 |

Notes:
(1) Fees earned are split 50/50 with partner.
(2) Represents dollar amounts of shares registered to offer pursuant to each company's public offering, distribution reinvestment plan, and follow-on public offering.
(3) Includes amounts contributed by CLNS.
(4) Based on cost for real estate equity investments, which includes net purchase price allocation related to intangibles, deferred costs and other assets, if any, committed principal amount for real estate debt and securities and carrying value plus deferred acquisition prices for limited partnership interests in private equity funds.

89. Regardless of the concerning result, in CLNS's conference call the same day, defendant Saltzman downplayed the Company's poor performance by focusing on the IM business's ability to "fill that gap" between targeted Core FFO and actual results:

> In terms of operating performance for the quarter, we generated core FFO of $193 million or $0.33 per share, which covered our dividend of $0.27 per share after adjusting for $0.06 per share of net gain contribution in the quarter. A solid quarterly result, but admittedly, cumulative year-to-date core FFO has been ***below our beginning of the year target***. As we invest on more than $1 billion of dry powder and ***grow our investment management business*** through complementary



1541100_1

coinvesting and related fund placements, ***we expect to fill that gap over time***.

90. Defendants' statements in ¶88 about CLNS's fundraising totals were false and misleading. Defendants' report that total fundraising figures from the active funds were $13.4 million in 3Q 2017 omitted a material fact that made their statements misleading. *See* Exhibit 6. As reported in SEC filings through the underlying NorthStar Capital Income Fund, of the $13.4 million retail IM fundraising total, defendants concealed that CLNS was the source of nearly ***47% of the total*** and ***most*** of the capital raised by the NorthStar Capital Income Fund in 3Q 2017. In fact, CLNS purchased over 700,000 shares of the NorthStar Capital Income Fund in 3Q 2017 for $6.25 million, leaving only $2.4 million raised from third parties. While defendants again footnoted that CLNS's "Capital Raised" figures "[i]nclude[d] amounts contributed by CLNS," they again failed to also reveal the amounts contributed or identify the funds to which CLNS contributed. Defendants' statements created the impression that CLNS's retail IM fundraising was increasing at a much faster rate than it actually was.

91. Defendants' statement that they "expect to fill that gap" between "cumulative year-to-date core FFO [and] . . . our beginning of the year target" with the IM business was also false and misleading. By 3Q 2017, CLNS had exhausted the legacy assets that were generating the capital gains that bolstered CLNS's reported Core FFO the prior two quarters. CLNS had previously announced that approximately 20% of its Core FFO would be attributable to one-off asset sale gains, or $0.28 per share of the low end of CLNS's $1.40 to $1.58 Core FFO guidance. By the end of the third quarter, however, CLNS had already recorded gains of $0.28 per share. And given that it results in the three previous quarters had produced Core FFO of $0.99 per share, CLNS had to produce $0.41 per share to reach the low end of its guidance range. With 597.8 million shares, CLNS had to produce $245 million in Core FFO in 4Q 2017 just to reach the bottom end of the guided range, a feat the

combined companies had not achieved in any quarter for at least a year before the Class Period. There was simply no reasonable basis to believe that CLNS could "fill that gap" between "cumulative year-to-date core FFO [and] . . . our beginning of the year target" in 4Q 2017.

92. Defendants also could not have reasonably expected the IM business to fill the $0.41 gap either. The actual retail fundraising totals and the performance of the underlying funds were so dismal that CLNS was compelled to infuse over $18 million of its own funds the last two quarters into the NorthStar Capital Income Fund, without also revealing to investors that it was the source of those funds. And even with the undisclosed infusion, the retail IM capital fundraising totals from the active funds represented an over 76% collapse in fundraising year-over-year. *See* Exhibit 6. While institutional fundraising was keeping pace, the fees that institutional funds were generating were of no help. Year-to-date institutional IM fees actually came in lower than what Colony's legacy institutional IM business had produced a year earlier.

### C. Hamamoto Dumps Nearly $27 Million Worth of Stock as He Resigns Early

93. On November 9, 2017, CLNS also announced that defendant Hamamoto had delivered his voluntary resignation from all director and officer positions held with the Company and any of its affiliates. CLNS provided no information for defendant Hamamoto's abrupt departure beyond the platitude that it was a "personal life choice decision" and that his "resignation did not involve a disagreement with the Company or any matter relating to the Company's operations, policies or practices." Defendant Hamamoto's unceremonious exit from CLNS was in stark contrast to the remarks made by Mr. Barrack during the merger's announcement that "David [Hamamoto], Richard [Saltzman], myself and our teams are ***personally committed to partner in leading the new combined company*** to become the dominant performer of global real estate." Indeed, defendant Hamamoto was one of just two NorthStar executives highlighted by the merger's promotional presentation as being a part of the

"highly experienced [six-person] team, providing ***continuity***, transparency and a clear, ***consistent*** vision."

94. Defendant Hamamoto's departure was not just contrary to CLNS's rhetoric, it was also inconsistent with the spirit of his employment agreement with the Company. As defendant Hamamoto's Letter Agreement outlined, CLNS clearly expected him to remain with the Company for at least two years.[11] As consideration for the merger, CLNS agreed to compensate defendant Hamamoto with over $52 million worth of the Company's shares that, importantly, were "subject to [defendant Hamamoto's] continued employment with [CLNS] or one of its subsidiaries through the Vesting Date," the one-year anniversary of the merger's closing – January 10, 2018. In addition, CLNS further incentivized defendant Hamamoto to remain at the Company by subjecting his shares to a holding requirement through the first anniversary of the Vesting Date – January 10, 2019. But despite his Letter Agreement and CLNS's intentions, defendant Hamamoto announced his resignation on November 7, 2017, a mere 10 months after the merger's closing and well before his one-year tenure vesting requirement. Conveniently, defendant Hamamoto made his resignation effective on January 11, 2018 – thus allowing his exit at nearly the earliest possible date without forfeiting any of his merger-related stock.

95. Defendant Hamamoto, as NSAM's former Chairman and CEO, knew first hand that CLNS's retail capital raising expectations were unreasonably high, which rendered the Company's 2017 Core FFO guidance unreachable. In fact, defendant Hamamoto signed the Registration Statement containing NSAM's projection for $1.5 billion in retail IM fundraising in 2017. Recognizing the inevitable reality, the month after announcing his resignation and right after CLNS had to infuse

---

[11] On June 2, 2016, each of NSAM's named executive officers, including defendant Hamamoto, Mr. Gilbert, Albert Tylis (CEO and President of NSAM), Debra Hess (CFO of NSAM and NRF) and Ronald Lieberman (General Counsel of NSAM and NRF) entered into a letter agreement with NSAM and NRF that described, among other things, the compensation each executive would receive at the closing of the merger.

another $1.2 million into the NorthStar Capital Income Fund, defendant Hamamoto dumped over 2.2 million of his artificially inflated CLNS shares in a four-day time period, a stake representing nearly 57% of his total unrestricted Company shares. In doing so, defendant Hamamoto pocketed nearly $27 million at the expense of the Company's unsuspecting shareholders. These sales, however, may be the tip of the iceberg because, due to his resignation, defendant Hamamoto is no longer required to report his CLNS sales. In fact, a Koneko research analyst issued a report on January 8, 2018, stating that "Colony NorthStar shares ha[d] fallen sharply in recent weeks (-18% YTD)" and that he "believe[d] the selling pressure comes from ex-NorthStar executives."

### D. Mr. Gilbert, the Lone NorthStar Executive Remaining at CLNS, Resigns Early

96. Like defendant Hamamoto, Mr. Gilbert was the other NorthStar executive praised during the merger's announcement as a member of the "highly experienced team" that would lead CLNS with a "clear, consistent vision." Mr. Gilbert was tapped as head of CLNS's newly combined retail platform and, during the June 3, 2016 conference call to announce the merger, defendant Saltzman even deferred to him when asked about "growth and leveraging the retail network." As with defendant Hamamoto, Mr. Gilbert's Letter Agreement also provided the same one-year continued employment stock vesting and additional one-year stock holding requirements. And like defendant Hamamoto, by the end of 2017, Mr. Gilbert was gone.

97. On December 15, 2017, and right after CLNS had to infuse $1.2 million into the NorthStar Capital Income Fund, NorthStar Income I announced through an SEC filing that Gilbert had tendered his resignation from the Company and its affiliates. In doing so, Mr. Gilbert made his resignation effective as of December 15, 2017. However, like defendant Hamamoto, Mr. Gilbert made his resignation from

CLNS effective on January 11, 2018 – thus enabling him to leave the Company with all of his shares intact.

98. Neither CLNS nor any of its entities provided a reason for Mr. Gilbert's purported resignation. Indeed, the only pronouncement made about Mr. Gilbert's exit was the same boilerplate language provided when defendant Hamamoto resigned: "The decision of Mr. Gilbert was not a result of any disagreement with [CLNS] or the Trust on any matter relating to their operations, polices or practices." Nevertheless, when Mr. Gilbert resigned, it was clear that CLNS's retail fundraising was significantly underperforming and that it would ultimately lead to the Company failing to meet its Core FFO guidance.[12]

### E. Defendants Reveal the Truth When Reporting CLNS's Fourth Quarter and Fiscal Year 2017 Results

99. On March 1, 2018, CLNS announced its fourth quarter and full-year 2017 financial results. In doing so, CLNS shocked investors by revealing that its full-year 2017 Core FFO was $1.16 per share – a 17%-27% miss from the Company's $1.40 to $1.58 per share guidance made throughout the Class Period – and that it was taking impairment charges of $375 million related to the Company's IM segment. Specifically, the Company impaired goodwill related to its IM reporting unit by $316 million, which was primarily attributable to the failing retail broker-dealer distribution business. Additionally, the Company impaired two of its struggling Retail Companies, NorthStar Healthcare and NorthStar/RXR, for $59 million. The Company's 2017 Form 10-K stated, in relevant part:

[12] In the same December 15, 2017 SEC filing, NorthStar Income I also announced that yet another former NorthStar executive, Brett S. Klein, had announced his intent to resign from CLNS and its affiliates by the end of the first quarter of 2018. Predictably, NorthStar Income I indicated that Mr. Klein's purported "decision . . . was not a result of any disagreement with Colony NorthStar or the Trust on any matter relating to their operations, polices or practices."

Investment Management – The impairment recognized in 2017 consisted of the following:

- $316.0 million write-down in goodwill, which represents the excess in carrying value of our investment management reporting unit, including its assigned goodwill, over its estimated fair value . . . ; and
- write-down of management contract intangibles for non-traded REITs that were acquired through the merger, specifically $55.3 million for NorthStar Healthcare Income Inc. . . . based on an amendment to its advisory agreement as part of our efforts to preserve liquidity in NorthStar Healthcare and $3.7 million for NorthStar/RXR NY Metro Real Estate Inc[.] . . . based on revised capital raising projections.

100. One of the primary reasons for CLNS's disappointing Core FFO result, as defendant Saltzman acknowledged, was the Company's third-party capital raising and, in particular, its retail broker-dealer distribution business acquired from NSAM:

> Retail broker-dealer distribution was another area of very disappointing results. The industry generally remains in enormous transition for major regulatory headwinds, including the newly implemented fiduciary rule, as well as a change in product constructs, more conservative, 40 Act in interval funds that operate with less leverage and offer more liquidity options.
>
> Capital raising in 2017 from these channels totaled only $137 million, down from past levels of an excess of $1 billion per year.
>
> * * *
>
> Our business model is to fill in as much of the earnings GAAP as we can through Investment Management economics both recurring fees

and profits interests. ***But in 2017, we merely treaded water in that regard***.

101. After three quarters of boasting about the benefits of the merger, defendant Saltzman owned up to the disappointing results from the inherited NorthStar businesses:

> The NorthStar merger, which closed a little over 1 year ago, has not produced the math tha[t] we anticipated when we completed the transaction. It was a merger that was supposed to be earnings neutral at worst. And so far, it has proven to be earnings dilutive. Furthermore, the merger integration has taken longer than expected. We believe that we are largely at the end of that process, and we have much greater confidence around the go-forward anticipated results from the inherited NorthStar businesses ***that have been the primary source of our underperformance in 2017***.

102. CLNS further disclosed that it was slashing its dividend from $1.08 per share in 2017 to $0.44 per share in 2018 – a nearly 60% reduction to the dividend:

> Let me next focus on our go-forward business, including the resetting of our dividends. Based on the confidence we have around our new baseline of recurring earnings, excluding gains, combined with a generally conservative bias we have toward preserving cash at this juncture of the real estate and economic cycles. Earlier today, via our earnings release, we announced expected dividend level of $0.44 per share for the calendar year 2018. ***This is a meaningful reduction from $1.08 per share we paid in 2017***.

103. On this news, CLNS's stock price plummeted $1.78 per share to close at $6.00 per share on March 1, 2018, a one-day decline of nearly 23%. CLNS's market capitalization was approximately $9 billion when it announced the merger. By March 1, 2018, however, CLNS's market capitalization was approximately $3.2

billion – approximately a third of its original valuation. Similarly, despite the merger's promises of growth and enhanced value, the Company's AUM had cratered down to $42.7 billion from $56 billion at the time of the merger.

104. Securities analysts covering CLNS connected defendants' disclosures and the stock price decline to the fraud alleged in the case:

- CLNS's "[v]aluation is more than pricing-in underperformance," which included its Core FFO results "impacted by slow asset redeployment, no gains, and lower management fee revenue, while an unexpectedly sizable dividend cut and asset management business write-downs were also negatives."
- CLNS's "[l]ackluster" results were the results of "relatively weak results in 3rd party fundraising, especially in its broker dealer which it has now agreed to merge with S2K."
- CLNS's "private capital, particularly the non-traded business, has failed to live up to expectations, illustrated by a $300M+ impairment this quarter."
- CLNS's "fourth quarter and full-year earnings results were a disappointment, as the merger and subsequent portfolio rationalization strategy failed to materialize in earnings creation."
- "The NorthStar merger has proven to be a ***dud***."

105. In the first quarter of 2018, the Company continued to write down the IM business, recognizing another approximately $140 million in impairments of its management contract intangible assets for certain of its Retail Companies. Then, in the second quarter of 2018, defendants wrote off another $60 million in intangible assets associated with the NorthStar trade name, changing CLNS's name back to Colony Capital. And, in the third quarter of 2018, defendants wrote off $7 million of its NorthStar Healthcare Management Contract intangible assets based on revised estimated future cash flows.

106. The extreme nature of CLNS's retail fundraising collapse for the Company's two active funds in 2017 (NorthStar/RXR and NorthStar Capital Income Fund) is further demonstrated by CLNS deciding to liquidate both funds. For example, NorthStar/RXR which raised a grand total of $28.3 million in 2017 from a $2 billion total offering was liquidated in October 2018. As disclosed in the Company's 2018 Form 10-K, "In October 2018, NorthStar/RXR NY Metro was liquidated, as approved by its board of directors and shareholders. We wrote off our $1.5 million investment in NorthStar/RXR NY Metro in the third quarter of 2018 as we effectively forfeited our shareholding upon liquidation." Similarly, NorthStar Capital Income Fund raised a grand total of $28.7 million (most of which was the Company's own money) in 2017 from a $3.2 billion total offering. According to the Company's 2018 Form 10-K, the Board of Directors of NorthStar Capital Income Fund approved a plan to liquidate the fund in February 2019.

## V. ADDITIONAL SCIENTER ALLEGATIONS

107. As alleged herein, defendants acted with scienter in that they either knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of CLNS were materially false and misleading and that such statements or documents would be issued or disseminated to the investing public, and they substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding CLNS, their control over, and/or receipt and/or modification of CLNS's allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning CLNS, participated in the fraudulent scheme alleged herein.

108. Defendants had actual knowledge that their Core FFO guidance of $1.40 to $1.58 was unattainable given the number of shares outstanding, the asset sales of NRF, and the lack of retail IM fundraising, and thus had no reasonable basis.

Defendant Tangen admitted his knowledge when he explained how the new Core FFO definition would eliminate adjustments that inflated CAD at NRF. During the 4Q 2016 earnings call, in which defendant Saltzman participated, Tangen explained that "[t]he new guidance is based on a new core FFO definition" and outlined how the new definition affected NorthStar's CAD, explaining that:

> [T]he legacy Colony core FFO definition differs from the legacy NorthStar CAD definition in two primary respects. Number one, core FFO does not add back provisions for loan losses. And two, Colony NorthStar will no longer use fair value accounting for certain legacy NRF assets.

109. Given the size of the "fair value" adjustments at NRF, which totaled $197 million in 2015 and $186 million in 2016, both defendants Saltzman and Tangen knew that NRF's CAD would experience a substantial and corresponding decline. They also knew that NRF had liquidated $6.6 billion (45%) of its real estate assets by November 2016, and continued to liquidate assets thereafter, not only from the sheer size of the sell-off but also from NRF's press releases, which described the total amount of the sales. They therefore knew that NRF was not in a position to contribute to the 33% to 50% growth rate that was necessary for CLNS to meet Core FFO guidance and that any growth had to come from NSAM and incremental retail IM fundraising.

110. But as defendants Saltzman and Tangen knew from the fundraising totals they released each quarter, incremental retail IM fundraising had effectively dried up. Defendants Saltzman and Tangen also knew from CLNS's 2016 10-K that the management agreement with NRF that brought $186.8 million in fees to NSAM in 2016 would be cancelled as part of the merger closing, and that in January 2017 – just one month before the start of the Class Period – that the market perceived a conflict between NSAM's Townsend business and Colony's legacy institutional IM business, requiring CLNS to sell Townsend and eliminating its $14 billion in AUM, including

its $66 million in fees. Defendants Saltzman and Tangen thus knew that NSAM was in no position to contribute to the 33% to 50% growth rate necessary for CLNS to meet its Core FFO guidance. At a minimum, they were aware of facts that seriously undermined their guidance.

111. Defendants knew from Colony's reported financial results that it, too, was in no position to produce the 33% to 50% growth that CLNS's guidance demanded. Indeed, in the year before the merger, Colony's total Core FFO had increased ***only 4.5%*** from $260 million in 2015 to $272 million in 2016. On a share count of a fraction of the total shares and operating units outstanding after the merger, Colony's reported per share Core FFO actually ***declined*** from $2.03 per share in 2015 to $2.02 per share in 2016. Defendants thus knew that Core FFO guidance, which required a growth rate between 33% and 50% on nearly 600 million shares, lacked a reasonable basis.

112. Defendants had actual knowledge that CLNS's 2017 retail capital raising expectations were unreasonably high and, as a result, that the Company would be unable to meet its 2017 Core FFO guidance. As one of CLNS's "top strategic priorities" highlighted soon after the merger, each defendant knew about and closely followed the Company's IM fundraising performance. In fact, the projected retail IM fundraising total of $1.5 billion was listed in the November 14, 2016 Registration Statement for the merger, just three months before the start of the Class Period, which defendant Hamamoto signed. Defendant Saltzman also admitted his knowledge about the importance of retail IM fundraising to meeting guidance when he acknowledged during the 4Q 2016 earnings call that CLNS's $2 billion IM fundraising assumption included "a mix of institutional and retail." And defendants Saltzman, Tangen, and Hamamoto tracked those figures closely. In fact, CLNS disclosed those figures, including retail capital raised by fund, on a quarterly basis.

113. The level of defendants' scrutiny of CLNS's third-party capital raising efforts was magnified by their concern over recent regulatory changes, which caused

severe fundraising constraints because they required CLNS to disclose its numerous and high fees. And the acts that CLNS took to address their concerns reflect their knowledge. Indeed, they introduced a T-share class in October 2015 for the NorthStar/RXR fund and cut fees in February 2017 – just days before issuing guidance. The T-share was designed to minimize the appearance of the fees that NorthStar/RXR was charging investors, reducing up-front sales commissions while adding other fees to compensate for the reduction. As a November 13, 2015 article by *InvestmentNews.com* entitled "Nontraded REIT sponsors changing compensation for advisers" described it, the "new share class dubbed a 'T share' . . . cuts the upfront commission brokers are paid . . . but creates an annual trailing commission." While minimizing the appearance of upfront fees, this trailing commission and/or other similar types of annual fees could actually increase the cost to investors. The February 2017 fee cuts actually went a step further. NorthStar/RXR actually reduced management fees by 20% and eliminated the acquisition and disposition fees that the funds charged when acquiring or selling property or debt, which were 1% for debt and between 2% and 2.25% on property. New share classes and fee cuts do not occur without the knowledge of senior executives, including the CEO and CFO like defendants Saltzman and Tangen. In fact, NorthStar/RXR's SEC filings recognized the involvement of the Individual Defendants, stating that "[o]ur success depends to a significant degree upon the contributions of key personnel of our Advisory Entities and their affiliates, such as Messrs. . . . Hamamoto, . . . Saltzman, . . . [and] Tangen[.]" The filings also recognized that NorthStar/RXR's "future success depend[ed], to a significant extent, upon the continued services of" the Individual Defendants.

114. Each defendant was well aware of the deleterious implications that the new rule changes could have on NSAM's retail fundraising efforts prior to the merger. In fact, this concern was a reason why Colony originally walked away from a merger with NSAM. As disclosed in the jointly filed merger proxy statement:

> Colony had concerns regarding the current status of [NSAM's] non-traded REIT business resulting from recent regulatory changes, which had affected the ability of non-traded REIT's to raise capital in the retail investor market. Colony believed that changes would need to be made to this market to make it more investor friendly and "institutionalized."

115. Defendants knew that retail IM fundraising was insufficient to contribute to CLNS's growth. In fact, after telling investors in the 2016 10-K that "Colony NorthStar expects NorthStar Capital Fund to begin raising capital from third parties in the first half 2017," CLNS made an undisclosed contribution of $18.35 million in funds to the NorthStar Capital Income Fund that materially inflated the retail IM fundraising totals in 2Q 2017 and 3Q 2017. And they did so while stating in the press releases announcing CLNS's financial results for those quarters that the amounts that the Company and its share of affiliates raised were "of third-party capital from . . . retail investors." A contribution of this size and importance does not escape the attention of the top executives, especially executives that were tracking quarterly IM fundraising figures like defendants Saltzman and Tangen. That CLNS did not also reveal the amount of contribution and that it was the source of those funds reveals defendants' intent to mislead. In fact, when making a disclosure about contributions that CLNS made to the NorthStar/RXR and the NorthStar Capital Income Fund in 4Q 2016, it placed a footnote next to the contributions expressly disclosing the source and the amount. The change in disclosure pattern, alone, reveals the importance of the information and defendants' intent to mislead investors.

116. Defendants knew that retail IM fundraising would be far below the amount defendants assumed for the purpose of contributing to meeting guidance because of the fees that NSAM was charging and the performance of the funds, which included up-front sales-related commissions and fees of up to 10% of the investment. Indeed, they were aware from actual fundraising that the results were far below the $1.5 billion that NSAM had projected for the year. Both defendants Saltzman and

Tangen, who were described in NorthStar/RXR's SEC filings as "key personnel" that were utilized by "Advisor Entities" to the NorthStar/RXR's Fund, were obviously aware of this performance. In fact, NorthStar/RXR's performance was tracked in industry reports and was the cause of the collapse in CLNS's active retail fundraising. Defendants' response was to further cut fees. In February 2017 – the very beginning of the Class Period – CLNS cut its asset management fees on the two funds that were supposed to drive CLNS's retail capital fundraising – NorthStar/RXR and the NorthStar Capital Income Fund. NorthStar/RXR reduced its asset management fee by approximately 20% and eliminated all acquisition and disposition fees. And the NorthStar Master Fund reduced management fees from an annual rate of 2.0% of its average ***gross*** assets to an annual rate of 1.25% of its average daily ***net*** assets. These fee cuts, which also do not occur without the knowledge of the senior executives, confirm that defendants knew it was CLNS's high fees that precluded the retail fundraising CLNS needed to meet its Core FFO target and that, as retail fundraising continued to fall, their fee cuts did not remedy the problem.

117. Defendants were closely tracking CLNS's retail fundraising performance because, despite NSAM's fundraising collapse the previous year, growing its AUM fee income was critical to meeting the Company's 2017 Core FFO guidance. In fact, they made clear throughout the Class Period that CLNS was relying heavily on its capital raising efforts to meet its 2017 Core FFO guidance. As previously detailed, defendant Tangen informed investors during the Company's May 10, 2017 conference call that CLNS was on track to achieve its 2017 Core FFO guidance because "[a]dditional core FFO upside exists" from an expected retail IM "ramp up." Defendant Saltzman, for his part, also stated during the Company's November 9, 2017 conference call that CLNS would "fill" its Core FFO "gap" by growing its IM business. These statements confirm defendants' knowledge about the importance of IM fundraising to guidance and that they were tracking it throughout the Class Period.

118. Beyond CLNS's ability to meet its 2017 Core FFO guidance, defendants Saltzman and Tangen had an additional motive to continuously monitor the Company's third-party fundraising performance – their annual cash bonus. Under CLNS's 2017 Annual Incentive Plan, 15% of defendants Saltzman's and Tangen's annual cash bonuses were based on "the amount of third-party capital raised, ***a key strategic objective for the Company***." But despite failing to meet the minimum adjusted Core FFO goal under the 2017 Annual Incentive Plan, a performance metric that represented 45% of the entire incentive award, defendants Saltzman's and Tangen's annual cash bonuses for 2017 were nonetheless over $1.4 million and nearly $900,000, respectively, based on third-party capital raising and other individual personal performance targets. At the same time, Colony had implemented an incentive plan that tied up to 4.5 million common shares and operating company units, in part, to capital fundraising. Thus, because they were able to nearly double their base salary through a cash bonus system and stock awards based largely on CLNS's capital raising, defendants Saltzman and Tangen had a strong pecuniary interest in closely monitoring the Company's institutional and retail fundraising progress throughout the Class Period.

119. Defendants Hamamoto and Tangen also had an additional motive to keep CLNS's stock price artificially inflated – to cash out Company shares at the expense of unsuspecting shareholders. Defendant Hamamoto, as NSAM's former Chairman and CEO, knew first hand that CLNS's retail capital raising expectations were unreasonably high, which rendered the Company's 2017 Core FFO guidance unreachable. In December 2017, less than three months before the market learned the truth about CLNS's precarious financial condition and just after CLNS had infused the NorthStar Capital Income Fund with $1.2 million of its own funds, defendant Hamamoto sold nearly 2,226,000 CLNS shares, pocketing over $26.9 million:

| David T. Hamamoto - Insider Sales | | | | | | |
|---|---|---|---|---|---|---|
| Pre-Class Period Sales | | | | | | |
| Insider | Date Sold | Company | Shares Sold | Price | Proceeds | Percent of Holdings Sale Represents |
| Hamamoto | 3/2/2015 | NSAM | 400,000 | $23.74 | $9,496,280 | 21.7% |
| Hamamoto | 4/2/2015 | NRF | 400,000 | $18.22 | $7,288,600 | 51.2% |
| | | **2015 Totals:** | 800,000 | n/a | $16,784,880 | n/a |
| | | **2016 Totals:** | 0 | n/a | $0 | |
| Class Period Sales (through 1/10/2018) | | | | | | |
| Hamamoto | 12/14-18/2017 | CLNS | 2,225,909 | $12.04 - $12.15 | $26,920,442 | 56.8%* |
| | | **2017 Totals:** | 2,225,909 | n/a | $26,920,442 | n/a |
| * Based on common share equivalents owned of 3,919,542. CLNS's 2016 Proxy states that defendant Hamamoto's common share equivalents owned as of February 28, 2017 was 7,425,929 shares, but this figure erroneously includes his 3,506,387 Replacement Award shares which would not vest until January 10, 2018. | | | | | | |

120. Defendant Hamamoto's sales were suspicious in timing and amount for the following reasons: (a) these sales were the first time that defendant Hamamoto sold as much as a single CLNS share since the merger; (b) defendant Hamamoto's sales were strategically timed after CLNS's cash infusion and occurred near CLNS's all-time trading high of $14.70 per share after the merger's completion was announced; (c) defendant Hamamoto sold approximately half of his total unrestricted Company shares; (d) Hamamoto had not sold any stock since April 2015; and (e) defendant Hamamoto sold nearly 2 million shares and reaped at least over $23.4 million ***more*** than any other CLNS insider.

121. Recognizing that the market's reaction would be swift once CLNS revealed that its capital fundraising was insufficient to both meet Core FFO guidance and sustain its dividend, defendant Tangen also cashed out a significant amount of his Company shares while the stock price remained artificially inflated. During 2Q and 3Q 2017 – the quarters in which CLNS infused the NorthStar Capital Income Fund with $18.35 million in capital without also revealing the source or the amount – defendant Tangen sold just under 276,000 shares for nearly $3.5 million in total proceeds:

| Darren J. Tangen - Insider Sales | | | | | | |
|---|---|---|---|---|---|---|
| **Pre-Class Period Sales** | | | | | | |
| **Insider** | **Date Sold** | **Company** | **Shares Sold** | **Price** | **Proceeds** | **Percent of Holdings Sale Represents** |
| Tangen | 1/2/2015 | Colony | 10,279 | $24.07 | $247,419 | 8.7% |
| Tangen | 1/7/2015 | Colony | 4,647 | $24.26 | $112,754 | 3.2% |
| | | **2015 Totals:** | 14,926 | n/a | $360,173 | n/a |
| | | **2016 Totals:** | 0 | n/a | $0 | |
| **Class Period Sales** | | | | | | |
| Tangen | 5/12/2017 | CLNS | 75,926 | $13.12 | $996,149 | 15.0% |
| Tangen | 9/28/2017 | CLNS | 200,000 | $12.42 | $2,484,000 | 46.4% |
| | | **2017 Totals:** | 275,926 | n/a | $3,480,149 | 54.4% |

122. Similar to defendant Hamamoto's sales, defendant Tangen's sales were suspicious, not only because of the timing of CLNS's undisclosed contributions but also because he sold over half of his CLNS holdings and the sales occurred near CLNS's all-time trading high of $14.70 per share after the merger's completion was announced. Also, defendant Tangen had not sold any stock since January 2015 and the amount was significantly less at approximately 15,000 shares. And his larger stock sale in September 2017 was made with full knowledge that CLNS had exhausted its 2017 capital gain contributions to Core FFO, demonstrating that a guidance miss and dividend cut were inevitable.

123. The departures of defendant Hamamoto and Mr. Gilbert, who headed the retail IM business, also supports an inference of scienter. When the merger was announced, both Hamamoto and Mr. Gilbert were included as part of the "highly experienced [six-person] team, providing ***continuity***, transparency and a clear, ***consistent*** vision." As the Letter Agreements demonstrated, CLNS clearly expected both to remain with the Company for at least two years and set up their stock awards accordingly. On the June 3, 2016 conference call, defendant Saltzman even deferred to Mr. Gilbert when asked a question about the retail IM business and stated: "I'm going to turn it over to Dan Gilbert, who runs that business today for NorthStar and who will continue to run that business for the combined companies."

124. Pursuant to their Letter Agreements, former NorthStar executives were entitled to receive substantial compensation at the closing of the merger. Specifically,

Hamamoto received a one-time equity award worth $52.6 million and Mr. Gilbert's award was worth $23.1 million.[13] The Letter Agreements stated that defendant Hamamoto would serve as Executive Vice Chairman of CLNS, Mr. Gilbert would oversee the retail platform of CLNS, and Mr. Tylis, Mrs. Hess and Mr. Lieberman would provide one year transition services. The one-time equity award granted to the executives was subject to vesting based on continued employment with the Company through the first anniversary of the closing of the merger. However, for defendant Hamamoto and Mr. Gilbert, an additional one-year post-vesting holding requirement was required before they could sell any of the stock award. This additional provision was put in place for defendant Hamamoto and Mr. Gilbert, as their departures from CLNS were not supposed to be imminent, unlike the other former NorthStar executives.

125. Yet both defendant Hamamoto and Mr. Gilbert resigned less than a year into the merger and timed their departures to be effective the day after the merger's one-year anniversary, thereby retaining their full merger windfall. Specifically, defendant Hamamoto announced his resignation on November 7, 2017 while Mr. Gilbert announced his resignation on December 11, 2017. Both resignations had an effective date of January 11, 2018, one day after the one-year anniversary of the merger, and just over two months before investors would learn that the retail IM business had collapsed. These supposed "resignations" appear extremely suspicious, as NorthStar's businesses, with Mr. Gilbert's retail IM platform leading the way, significantly underperformed during 2017. As defendant Saltzman stated on the last day of the Class Period:

> The NorthStar merger, which closed a little over 1 year ago, has not produced the math tha[t] we anticipated when we completed the

---

[13] Albert Tylis, CEO of NSAM, received $29.9 million; Debra Hess, CFO of NSAM and NRF, received $8.6 million; and Ronald Lieberman, General Counsel of NSAM and NRF, received $5.4 million.

> transaction. It was a merger that was supposed to be earnings neutral at worst. And so far, it has proven to be earnings dilutive. Furthermore, the merger integration has taken longer than expected. We believe that we are largely at the end of that process, and we have much greater confidence around the go-forward anticipated results from ***the inherited NorthStar businesses that have been the primary source of our underperformance in 2017***.

## VI. LOSS CAUSATION/ECONOMIC LOSS

126. During the Class Period, defendants made false and misleading statements about CLNS's 2017 Core FFO guidance and its retail IM business. Defendants' misrepresentations and material omissions artificially inflated and maintained the inflation in the prices of CLNS securities and operated as a fraud or deceit on members of the Class. Then, when the true facts were revealed, the prices of CLNS's securities fell significantly, as the prior artificial inflation came out of the prices. As a result of their purchases of CLNS securities during the Class Period, plaintiff and other members of the Class (as defined below) suffered an economic loss, *i.e.*, damages, under the federal securities laws.

127. On March 1, 2018, before the market opened, CLNS issued an earnings press release announcing its fourth quarter and full-year 2017 financial results. As discussed more fully in ¶¶99-104, CLNS revealed that its full-year 2017 Core FFO results were well below its guidance, that the Company was taking impairment charges of $375 million related to its IM business, and that the Company was cutting its dividend by nearly 60%. During the earnings call with analysts held later that day, defendant Saltzman acknowledged that a primary reason for CLNS's significant Core FFO miss was the "more challenging industry conditions in Healthcare Real Estate as well as our retail broker-dealer distribution business" – the Company's retail third-party capital raising segment. The relevant truth was thus directly related to the fraud alleged herein.

128. The disclosure on March 1, 2018 had a direct impact on CLNS's stock price. As set forth in the chart below, the price of CLNS tumbled $1.78 per share, to close at $6.00 per share, a one-day decline of nearly 23% with abnormally high volume of nearly 69 million shares. As one analyst aptly commented on March 2, 2018, CLNS's "[v]aluation is more than pricing-in underperformance," which included its "[v]ery [d]isappointing" Core FFO results "impacted by slow asset redeployment, no gains, and lower management fee revenue, while an unexpectedly sizable dividend cut and asset management business write-downs were also negatives."

129. The decline in CLNS's stock price on March 1, 2018 was a direct result of the nature and extent of defendants' prior misstatements and omissions being revealed to investors and the market. The timing and magnitude of CLNS's stock price collapse negates any inference that the losses suffered by plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors, or by Company specific factors unrelated to defendants' misrepresentations.

130. The economic losses suffered by plaintiff and other members of the Class were a direct result of defendants' misrepresentations that inflated CLNS's stock price and the subsequent decline in the value of that stock when defendants' prior misrepresentations and omissions were revealed.




## VII. NO SAFE HARBOR

131. CLNS's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

132. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of CLNS who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or

present tense statements when made. On the contrary, such statements concealed critical information about CLNS's financial performance.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

133. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact that there was a duty to disclose. In particular, as more fully alleged above, defendants failed to disclose that CLNS's 2017 Core FFO guidance was in significant jeopardy throughout the Class Period, that retail IM capital fundraising was insufficient to support growth requirements because of CLNS's high fees and poor performance of its funds, and that CLNS was the source of a material amount of what defendants described as third party capital.

134. Alternatively, plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's securities traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiff and other members of the Class purchased CLNS securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

135. At all relevant times, the market for CLNS securities was efficient for the following reasons, among others:

(a) Since January 2017, CLNS's stock has been listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, CLNS filed periodic public reports with the SEC;

(c) CLNS regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d) There is a cause-and-effect relationship between unexpected corporate events and/or financial releases and an immediate response in the stock price as evidenced, for example, by the 23% stock price decline following the disclosure on March 1, 2018.

## IX. CLASS ACTION ALLEGATIONS

136. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased CLNS publicly traded securities during the Class Period (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of CLNS and their families, and defendants' legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

137. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. CLNS has more than 542 million Class A common shares of stock outstanding, owned by thousands of persons.

138. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e) Whether the prices of CLNS securities were artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

139. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

140. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

141. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

142. Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein. This Count is asserted pursuant to §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder by the SEC against all defendants.

143. As alleged herein, throughout the Class Period, defendants, individually and in concert, directly and indirectly, by use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges,

made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading and carried out a plan, scheme and course of conduct in violation of §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein: (i) deceive the investing public, including plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of CLNS securities; and (iii) cause plaintiff and members of the Class to purchase CLNS securities at artificially inflated prices.

144. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

145. As set forth above, defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon plaintiff and the other members of the Class who purchased CLNS securities during the Class Period.

146. In ignorance of the false and misleading nature of defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for CLNS securities, plaintiff and other members of the Class purchased CLNS securities at artificially inflated prices during the Class Period. But for the fraud, plaintiff and members of the Class would not have purchased CLNS securities at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the prices of CLNS securities declined precipitously and plaintiff and members of the Class were harmed and damaged as a direct and

proximate result of their purchases of CLNS securities at artificially inflated prices and the subsequent decline in the prices of those securities when the truth was disclosed.

147. By virtue of the foregoing, defendants are liable to plaintiff and members of the Class for violations of §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

148. Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein. This Count is asserted pursuant to §20(a) of the 1934 Act against all defendants.

149. As alleged above, CLNS violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of CLNS securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate and/or reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

150. As set forth above, the Individual Defendants were controlling persons of CLNS during the Class Period due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations. By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of CLNS, including the content of its public statements.

151. CLNS had the power to control and influence the Individual Defendants and other Company executives through its Board of Directors and its power to hire,

fire, supervise and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation and other employment considerations. By virtue of the foregoing, CLNS had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Individual Defendants, including the content of their public statements.

152. Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon plaintiff and the other members of the Class who purchased CLNS securities during the Class Period.

153. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for CLNS securities, plaintiff and other members of the Class purchased CLNS securities at artificially inflated prices during the Class Period. But for the fraud, plaintiff and members of the Class would not have purchased CLNS securities at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the prices of CLNS securities declined precipitously and plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of CLNS common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth began to be disclosed.

154. By reason of the foregoing, defendants are liable to plaintiff and the members of the Class as controlling persons of CLNS in violation of §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action, appointing Lead Plaintiff to serve as a Class representative, and appointing Lead Counsel as Class Counsel;

B. Awarding plaintiff and the members of the Class damages and interest;

C. Awarding plaintiff's reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: March 11, 2019

ROBBINS GELLER RUDMAN
& DOWD LLP
SPENCER A. BURKHOLZ
DOUGLAS R. BRITTON
JUAN CARLOS SANCHEZ

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on March 11, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: dougb@rgrdlaw.com

# Mailing Information for a Case 2:18-cv-02888-GW-MRW Brian Barry v. Colony NorthStar, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Douglas R Britton**
  dougb@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com,lmix@rgrdlaw.com
- **Rachele R Byrd**
  byrd@whafh.com,cabrera@whafh.com,boyles@whafh.com,warren@whafh.com,loutsenhizer@whafh.com
- **Matthew W Close**
  mclose@omm.com,brogers@omm.com
- **Brittany DeJong**
  dejong@whafh.com
- **Lionel Zevi Glancy**
  lglancy@glancylaw.com,lionel-glancy-2522@ecf.pacerpro.com,info@glancylaw.com
- **John T Jasnoch**
  jjasnoch@scott-scott.com,rswartz@scott-scott.com,ksteinberger@scott-scott.com,edewan@scott-scott.com,aweas@scott-scott.com,efile@scott-scott.com
- **Marisa C Livesay**
  livesay@whafh.com,boyles@whafh.com
- **Betsy C Manifold**
  manifold@whafh.com,cabrera@whafh.com,boyles@whafh.com,warren@whafh.com,loutsenhizer@whafh.com
- **Adam C McCall**
  amccall@zlk.com
- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com
- **Daniel M Petrocelli**
  dpetrocelli@omm.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com
- **Brittany Rogers**
  brogers@omm.com,kvolkar@omm.com
- **Laurence M Rosen**
  lrosen@rosenlegal.com
- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)