1  ROBBINS GELLER RUDMAN
    & DOWD LLP
2  SPENCER A. BURKHOLZ (147029)
   DOUGLAS R. BRITTON (188769)
3  JUAN CARLOS SANCHEZ (301834)
   655 West Broadway, Suite 1900
4  San Diego, CA  92101
   Telephone:  619/231-1058
5  619/231-7423 (fax)
   spenceb@rgrdlaw.com
6  dougb@rgrdlaw.com
   jsanchez@rgrdlaw.com
7
   Lead Counsel for Plaintiff
8
                    UNITED STATES DISTRICT COURT
9
                    CENTRAL DISTRICT OF CALIFORNIA
10
                         WESTERN DIVISION
11
   BRIAN BARRY, Individually and on  )  Case No. 2:18-cv-002888-GW-MRW
12 Behalf of All Others Similarly Situated, )
                                      )  CLASS ACTION
13                    Plaintiff,      )  _____
                                      )
14     vs.                            )  THIRD AMENDED COMPLAINT
                                      )  FOR VIOLATIONS OF THE
15 COLONY NORTHSTAR, INC.,            )  FEDERAL SECURITIES LAWS
   RICHARD B. SALTZMAN,               )
16 DARREN J. TANGEN, and DAVID T.     )
   HAMAMOTO,                          )
17                                    )
                      Defendants.     )
18 _____  )
   TEAMSTERS LOCAL 710 PENSION        )
19 FUND, Individually and on Behalf of )
   All Others Similarly Situated,     )
20                                    )
                    Lead Plaintiff,   )
21                                    )
       vs.                            )
22                                    )
   COLONY NORTHSTAR, INC.,            )
23 RICHARD B. SALTZMAN,               )
   DARREN J. TANGEN, and DAVID T.     )
24 HAMAMOTO,                          )
                                      )
25                    Defendants.     )  DEMAND FOR JURY TRIAL
                                      )  _____
26 _____  )

27

28

4840-4394-8197.v1

# TABLE OF CONTENTS

**Page**

I.  JURISDICTION AND VENUE ................................................................. 1

II.  INTRODUCTION ................................................................................. 2

III.  PARTIES ............................................................................................ 10

IV.  STATEMENT OF THE CASE ............................................................ 11

    A.  Background Information for CLNS and Its Business Model ............ 11

        1.  Characteristics of REITs ............................................... 11

        2.  Colony Capital's Expansion into the Investment Management Business ................................................ 14

        3.  The NorthStar Realty Finance Business ..................... 16

        4.  The NorthStar Asset Management Business ............... 18

        5.  The Combined IM Business ........................................ 21

        6.  Defendants Intend for the Merger to Unlock Purported Hidden "Value" in the Three "Undervalued" Entities ............ 23

        7.  Colony Capital Gains Control of NSAM While NorthStar's Executives Receive a Windfall ............................. 25

    B.  False and Misleading Statements About Core FFO Guidance and CLNS's Retail IM Fundraising ...................................... 26

        1.  False and Misleading Statements When Reporting Fourth Quarter and Fiscal Year 2016 Results ...................... 26

        2.  False and Misleading Statements When Reporting CLNS's First Quarter Results ...................................... 56

        3.  False and Misleading Statements When Reporting CLNS's Second Quarter 2017 ...................................... 68

        4.  False and Misleading Statements When Reporting CLNS's Third Quarter 2017 Results ............................. 73

    C.  Hamamoto Dumps Nearly $27 Million Worth of Stock as He Resigns Prematurely ...................................................... 82

    D.  Gilbert, the Lone NorthStar Executive Remaining at CLNS, Also Resigns Prematurely ............................................... 84

    E.  Defendants Reveal the Truth When Reporting CLNS's Fourth Quarter and Fiscal Year 2017 Results .......................... 85

- i -

1
2                                                                              **Page**
3
V.      ADDITIONAL SCIENTER ALLEGATIONS ................................................ 89

VI.     LOSS CAUSATION/ECONOMIC LOSS ..................................................... 98

VII.    NO SAFE HARBOR ...................................................................................... 100

VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD
        ON THE MARKET ........................................................................................ 101

IX.     CLASS ACTION ALLEGATIONS ............................................................... 103

COUNT I ................................................................................................................ 104

COUNT II ............................................................................................................... 106

PRAYER FOR RELIEF ......................................................................................... 107

JURY DEMAND .................................................................................................... 107
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4840-4394-8197.v1

1  Court-appointed Lead Plaintiff Teamsters Local 710 Pension Fund ("plaintiff"),

2  individually and on behalf of all others similarly situated, by its undersigned attorneys,

3  alleges the following based upon personal knowledge as to plaintiff and plaintiff's

4  own acts, and upon information and belief as to all other matters based on the

5  investigation conducted by and under the supervision of plaintiff's counsel, which

6  included, among other things: (1) review of press releases, news articles, earnings call

7  transcripts, and other public statements issued by or concerning Colony NorthStar,

8  Inc. (f/k/a Colony Capital, Inc.) ("CLNS" or the "Company"); (2) review of research

9  and industry reports issued by financial and industry analysts concerning CLNS's

10  business; (3) review of CLNS's U.S. Securities and Exchange Commission ("SEC")

11  filings; and (4) review of other publicly available information and data concerning

12  CLNS, the pre-merged entities, their securities, and the markets therefor.  Plaintiff

13  believes that substantial additional evidentiary support will exist for the allegations set

14  forth herein after a reasonable opportunity for discovery.

15  **I.      JURISDICTION AND VENUE**

16  1.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a)

17  of the Securities Exchange Act of 1934 ("1934 Act") (15 U.S.C. §§78j(b) and 78t(a))

18  and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

19  2.      This Court has jurisdiction over the subject matter of this action pursuant

20  to 28 U.S.C. §1331 and §27 of the 1934 Act.

21  3.      Venue is proper in this District pursuant to §27 of the 1934 Act and

22  28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and

23  dissemination of materially false and misleading information, occurred in substantial

24  part in this District.

25  4.      In connection with the acts alleged in this complaint, defendants, directly

26  or indirectly, used the means and instrumentalities of interstate commerce, including,

27  but not limited to, the mails, interstate telephone communications, and the facilities of

28

- 1 -

the New York Stock Exchange ("NYSE"), the world's largest stock exchange by market capitalization.

## II.    INTRODUCTION

5.    Plaintiff brings this securities class action individually and on behalf of all persons or entities who purchased or otherwise acquired the publicly traded securities of CLNS between February 28, 2017 and March 1, 2018 (the "Class Period"), against defendants CLNS, Richard B. Saltzman ("Saltzman") (CLNS's Chief Executive Officer ("CEO"), President, and Director until November 6, 2018), Darren J. Tangen ("Tangen") (CLNS's Chief Financial Officer ("CFO") until January 1, 2019 and now CLNS's President), and David T. Hamamoto ("Hamamoto") (CLNS's Director and Executive Vice Chairman until January 11, 2018) (collectively, "defendants"), for violating the 1934 Act.

6.    CLNS, a hybrid real estate investment trust ("REIT"), was formed in January 2017 after a merger (the "merger") between Colony Capital, Inc. ("Colony") and two publicly traded NorthStar real estate investment companies: NorthStar Asset Management Group, Inc. ("NSAM") and NorthStar Realty Finance Corp. ("NRF") (together, "NorthStar").[1] Colony's executives, who controlled CLNS after the merger as NorthStar's executives largely cashed out and departed, had their eyes set only on NSAM – and specifically NSAM's retail investment management ("IM") business – because, as they told investors, it would unlock the value in the combined entities' stock price through CLNS's new "Investment Management economics" strategy of investing third party retail and institutional capital.

7.    But in order to consummate the merger with NSAM, Colony was forced to acquire the second, and dreadfully underperforming, NorthStar entity – NRF. NRF, which focused 75%-80% of its direct investments in hospitality and healthcare assets

---

[1]    A REIT is a company that owns or finances income-producing real estate (*e.g.*, apartment buildings and office buildings) in a range of property sectors. And a hybrid REIT, like CLNS, is a REIT that physically owns real estate as well as debt instruments secured by mortgages on real estate.

- 2 -

in 2016, was struggling mightily in the years preceding the merger, having lost over $500 million between the third quarter of 2015 ("3Q 2015") and the third quarter of 2016 ("3Q 2016").  In fact, NRF had to cut its dividend in half just four months before Colony announced the merger.  Colony's Chairman, Thomas J. Barrack, Jr., would later reveal Colony's true sentiment about NRF when he noted that its hospitality and healthcare businesses did not "lend themselves to immediate third-party access" – which access was Colony's key strategy and the main driver behind the merger – and that Colony's true objective with those businesses was to "run to the exit door every time that we can to lighten up our balance sheet."

8.     NSAM – which had reported over $100 million in income between 3Q 2015 and 3Q 2016 – was clearly the merger's crown jewel and the only NorthStar entity that Colony could legitimately hope to contribute to its growth strategy.  Indeed, it reported consistent Cash Available for Distribution ("CAD") to shareholders, which was the equivalent of Colony's most critical Core Funds from Operations ("Core FFO") metric, and fit Colony's "Investment Management economics" strategy like a glove.  On the other hand, NRF's healthcare and hospitality businesses were entirely incompatible with CLNS's strategy while it was generating such massive losses to the point that it relied on a unique adjustment to an account titled "Unrealized (gain) loss from fair value adjustments / Provision for (reversal of) loan losses, net" (the "Fair Value Adjustment") to convert its losses to positive CAD numbers.  Coincidentally, NRF also resorted to liquidating approximately 50% of its real estate assets, which all but eliminated its ability to contribute to the growth that CLNS's projections demanded.

9.     Despite these concerns, defendants nonetheless extolled the merger from the outset, telling investors that it was "'expect[ed to] deliver substantial value for all three sets of shareholders.'"[2]  And when defendants reported results for the fourth

---

[2]   All citations and footnotes are omitted and emphasis is added unless otherwise noted.

quarter of 2016 ("4Q 2016") at the beginning of the Class Period, they declared an aggressive fiscal year 2017 Core FFO guidance range of $1.40 to $1.58 per share. In doing so, defendants emphasized their focus on IM economics, with defendant Saltzman stating that "our guidance only assumes $2 billion of new fundraising in 2017," while only acknowledging that the $2 billion assumption included "a mix of institutional and retail" IM fundraising.

10.     In reality, defendants' expectation was that **retail** IM fundraising – as opposed to the less-lucrative **institutional** IM fundraising – would contribute substantially to the $2 billion assumption. Retail IM fundraising was thus critical to CLNS meeting Core FFO guidance. In fact, defendants were focused on it. When Saltzman issued guidance, he emphasized CLNS's capital raise activity, explaining that "the tide appears to have turned for both institutional and retail placements based upon the momentum we're now experiencing in both [institutional and retail] markets." And, in CLNS's simultaneously filed Annual Report, defendants represented that capital raising activity for its open retail fund, NorthStar/RXR New York Metro Income, Inc. ("NorthStar/RXR"), was expected to "accelerate in 2017" and further noted that another investment vehicle, NorthStar/Townsend Investment ("NorthStar/Townsend") and its expected $1 billion offering, would become active and "begin raising capital from third parties in the first half 2017."

11.     But defendants' statements were false and misleading. Their Core FFO guidance simply had no reasonable basis. The combined entities were in no position to produce the growth defendants required to meet Core FFO guidance. During the first earnings call after the merger, defendants explained that CLNS had materially changed how it defined Core FFO. According to defendant Tangen's explanation during that call, CLNS had modified the definition of Core FFO after the merger to exclude the Fair Value Adjustment – the same adjustment on which NRF relied – to offset $186 million in losses the year before the merger to create positive CAD.

- 4 -

12.     Given NRF's financial condition, including its massive and continued liquidation of revenue-generating assets, defendants simply had no reasonable basis for the guidance they issued, especially given the nearly 600 million shares issued and outstanding after the merger.  Indeed, a straight-line calculation adjusting for CLNS's revised definition of Core FFO and its increased share count of 597 million outstanding shares would bring combined results for 2016 in at $1.06 per share, $0.34 to $0.52 *below* the guided range and thus requiring a substantial 33%-50% growth rate for CLNS to meet guidance.  *See* Exhibit 1 attached hereto.

13.     NRF's financial condition – and defendants' view of its real estate assets – left defendants dependent on NSAM and its retail IM business to make even the low end of the guidance range.  But the retail IM business was in no position to support this type of growth either.  Contrary to defendants' claims of "momentum" in fundraising and that they expected retail capital raising activity to "accelerate in 2017," capital-raising activity in the only active retail fund, NorthStar/RXR, was anemic at $6.5 million in 4Q 2016 – and $378.7 million (90.4%) *less* retail fundraising than a year earlier when they issued guidance.  The reason for NSAM's negligible capital-raising performance, as defendants' comments and their acts to minimize fees show they knew, was that newly implemented regulations required NSAM to disclose its fees, to which investors objected not only given the size of those fees, but also given the performance of the underlying funds.  In fact, a Blue Vault industry report issued in the fourth quarter of 2017 ("4Q 2017") revealed that NorthStar/RXR's performance throughout the Class Period was nearly nonexistent, performing no better than a 10-year Treasury note.  Investors and their financial advisors were not willing to pay excessive fees for a fund with such a dismal return.  Nor could defendants reasonably expect that NorthStar/Townsend would begin raising third-party capital in the first half of 2017 because – in addition to their fundraising woes – defendants were aware as early as the first quarter of 2017 that conflicts of interest concerns would not allow the project to ever get off the ground.

- 5 -

14.     Colony's institutional IM business could not offset the problems either. The fees that CLNS was able to charge institutional investors were a fraction (less than half) of the fees that the Company sought to charge retail investors and CLNS did not charge institutional investors sales commissions or dealer management fees, which when combined reached as high as 10% for retail investors.  In fact, NSAM's retail IM fees outpaced Colony's institutional IM fees in 2016 by $32 million ($100 million NSAM; $68 million Colony) even though Colony's institutional assets under management ("AUM") of $11 billion far exceeded NSAM's retail AUM of $7 billion. And retail fees continued to exceed institutional fees throughout the Class Period even with institutional fundraising that far surpassed retail fundraising:



15.     And to make matters worse, Colony's Core FFO had grown only 4.5% in the year before the merger, while its Core FFO per share total *declined* in that period, leaving it in no position to produce the growth that CLNS required.  Combined with NSAM's 2016 CAD growth rate of just 0.9% and NRF's 2016 CAD growth rate of

4840-4394-8197.v1

1   *negative* 40%, defendants had actual knowledge that CLNS's Core FFO guidance for

2   2017 was unattainable without a significant contribution from retail IM fundraising.

3        16.    Rather than disclosing how investors and financial advisors were reacting

4   to CLNS's retail IM fees and the performance of the underlying funds, defendants

5   instead misled the market by emphasizing "positive momentum in the overall retail

6   marketplace as well as in our own fundraising," boasting about "strong progress in

7   building the selling groups in our current offerings and a commensurate acceleration

8   in the pace of fundraising," and assuring investors that CLNS was "on track" to meet

9   Core FFO guidance of $1.40 to $1.58 per share.

10        17.    But these statements were similarly false and misleading.  CLNS was not

11   experiencing "positive momentum" or an "acceleration in the pace of fundraising,"

12   especially when they made these statements while reporting results from the first

13   quarter of 2017 ("1Q 2017").  In fact, its capital-raising activity in only one of two

14   active retail funds, NorthStar/RXR, had *declined* from $6.5 million in 4Q 2016 to $5.2

15   million in 1Q 2017 as investors largely continued to avoid the NorthStar/RXR fund.

16   And the same was true for CLNS's other active retail fund, NorthStar Real Estate

17   Capital Income Fund ("NorthStar Capital Income Fund"), which it offered to investors

18   in 1Q 2017.  Like NorthStar/RXR, investors and their financial advisors also refused

19   to pay exorbitant fees given the performance of NSAM's funds, leaving CLNS

20   without a meaningful incremental contribution to its $2 billion IM fundraising

21   assumption.  In fact, the NorthStar Capital Income Fund did not raise any funds in 1Q

22   2017.  And similar retail IM fundraising results in CLNS's active funds persisted

23   throughout the Class Period.  Retail IM fundraising, in fact, collapsed between

24   approximately 65.5% and 94.1% on a year-over-year basis each quarter in 2017, as the

25   following graph reveals:

26

27

28

- 7 -





18.     Given the dismal state of retail IM fundraising, defendants sought to create the appearance of growth.  Between the second quarter of 2017 ("2Q 2017") and the third quarter of 2017 ("3Q 2017"), defendants reported that fundraising figures from the active funds had increased to $38 million, as they emphasized "momentum," "acceleration in the pace of fundraising," and said that they remained "optimistic" that retail fundraising "will *continue to* institutionalize and rebound." But defendants concealed material facts that made these statements misleading – omitting that *CLNS* itself was the main source of those funds.  In fact, as reported in SEC filings through the underlying NorthStar Capital Income Fund, CLNS contributed nearly *50%* of the totals reported for the active funds in both 2Q 2017 and 3Q 2017.  And its contributions represented up to *nearly 100%* of the quarterly totals reported for the active NorthStar Capital Income Fund and *nearly 70%* of the capital for that fund throughout the Class Period.  Defendants misled investors about the true state of the retail IM business.

4840-4394-8197.v1

19.     Defendants' statements during CLNS's earnings calls cannot qualify for the safe harbor protection under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") because the Company's boilerplate introduction used during every relevant call failed to "identif[y] the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement" as the statute requires.  15 U.S.C. §78u-5(c)(2).  And even had CLNS properly identified a document, or portion thereof, containing the additional information, none of the Company's risk factors suffice because, as further discussed below, they failed to "'relate directly to that to which plaintiffs claim to have been misled.'"  *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017) (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994)).

20.     Defendants' ruse, in turn, allowed certain defendants to collectively dump over 2.5 million shares of CLNS stock at artificially high prices for proceeds of over $30 million.  These sales were particularly suspicious given that they occurred around the same time and mostly after CLNS was omitting that its own funds were the driving force behind much of its third-party retail IM fundraising.

21.     Ultimately, on March 1, 2018, defendants shocked investors by announcing that CLNS's full-year 2017 Core FFO was $1.16 per share – a startling 17% below the low end and 27% below the high end of the Company's guidance – and that CLNS was slashing its dividend by 60%, from $1.08 per share in 2017 to $0.44 per share in 2018.  Defendant Saltzman admitted that one of the primary reasons that led to CLNS's dramatic Core FFO result was the Company's anemic third-party retail IM fundraising while also disclosing $375 million in impairment charges related to CLNS's retail IM business and acknowledging that they were "discounting [the retail IM business] completely" in 2018.

22.     On this news, CLNS's stock price declined nearly 23%.  With a then-current market capitalization of approximately $3.2 billion at the end of the Class Period, defendants' fraud destroyed nearly $6 billion in CLNS's shareholder value.

### III.   PARTIES

23.   Plaintiff Teamsters Local 710 Pension Fund acquired CLNS securities as set forth in the certification attached as Exhibit B to the Declaration of Tricia L. McCormick in Support of Motion [for] Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel (ECF No. 25-2) and has been damaged thereby.

24.   Defendant CLNS is a global real estate and investment management firm. CLNS is a Maryland corporation with its principal executive offices located at 515 South Flower Street, 44th Floor, Los Angeles, California 90071.  CLNS's securities traded throughout the Class Period on the NYSE under the ticker "CLNS."[3]

25.   Defendant Saltzman was, at all relevant times during the Class Period, CLNS's CEO, President, and a director.  Prior to the merger, Saltzman was Colony's CEO.

26.   Defendant Tangen was, at all relevant times during the Class Period, CLNS's CFO.  Prior to the merger, Tangen was Colony's CFO.

27.   Defendant Hamamoto was, from the completion of the merger until his resignation became effective on January 11, 2018, CLNS's Executive Vice Chairman and a director.  Prior to the merger, Hamamoto was Chairman and CEO of NSAM from January 2014 until August 2015, later becoming its Executive Chairman in August 2015.  Hamamoto was also Chairman of NRF's Board of Directors from October 2007 until January 2017, having served as one of its directors since October 2003.  Hamamoto also served as NRF's CEO from October 2004 until August 2015. Hamamoto further served as Chairman of NorthStar Healthcare Income, Inc. ("NorthStar Healthcare") from January 2013 until January 2014.  Hamamoto served as

---

[3]   On June 22, 2018, CLNS filed Articles of Amendment to its charter with the State Department of Assessment's and Taxation of Maryland to change its name to "Colony Capital, Inc."  The Articles of Amendment became effective on June 25, 2018.  In connection with the name change, CLNS's Class A common stock trading symbol changed from "CLNS" to "CLNY."

1    Co-Chairman of NorthStar/RXR from March 2014 until August 2015.  Hamamoto

2    also co-founded NorthStar Capital Investment Corp., the predecessor to NRF, for

3    which he served as co-CEO until October 2004.

4        28.    The defendants referenced above in ¶¶24-27 are referred to as the

5    "Individual Defendants."  The Individual Defendants made, or caused to be made,

6    false statements that caused the prices of CLNS securities to be artificially inflated

7    during the Class Period.

8        29.    The Individual Defendants, because of their positions with the Company,

9    possessed the power and authority to control the contents of CLNS's quarterly reports,

10   shareholder letters, press releases and presentations to securities analysts, money and

11   portfolio managers, and institutional investors, *i.e.*, the market.  They were provided

12   with copies of the Company's reports and press releases, alleged to be misleading

13   prior to or shortly after their issuance, and had the ability and opportunity to prevent

14   their issuance or cause them to be corrected.  Because of their positions with the

15   Company, and their access to material non-public information available to them but

16   not to the public, the Individual Defendants knew that the adverse facts specified

17   herein had not been disclosed to and were being concealed from the public, and that

18   the positive representations being made were then materially false and misleading.

19   The Individual Defendants are thus liable for their false and misleading statements.

20   **IV.   STATEMENT OF THE CASE**

21       **A.    Background Information for CLNS and Its Business Model**

22              **1.    Characteristics of REITs**

23       30.    A REIT, generally, is a company that owns and typically operates

24   income-producing real estate or real estate-related assets.  REITs provide a way for

25   investors to earn a share of the income produced through commercial real estate

26   ownership without actually having to go out and buy commercial real estate.  To

27   qualify as a REIT, a company must have the bulk of its assets and income connected

28

4840-4394-8197.v1

to real estate and must distribute at least 90% of its taxable income to shareholders annually in the form of dividends.

31.     Throughout the Class Period, CLNS reported on a quarterly basis the financial metrics Funds From Operations ("FFO") and Core FFO.  FFO is a widely used financial measure for the equity REIT industry.  CLNS disclosed that the Company calculated FFO in accordance with standards established by the Board of Governors of the National Association of Real Estate Investment Trusts.[4]  CLNS also reported Core FFO, which adjusted FFO for certain items.[5]

32.     These measures contrasted with how the legacy NorthStar businesses calculated funds available for distribution to shareholders.  The NorthStar entities used the CAD measure, which, unlike Core FFO, adjusted net income for a number of financial metrics, including "Unrealized (gain) loss from fair value adjustments / Provision for (reversal of) loan losses, net."  Depending on whether these metrics were positive or negative, NorthStar would adjust net income accordingly to produce an amount available for distribution to shareholders.

_____

[4]   The National Association of Real Estate Investment Trusts defines FFO as net income or loss calculated in accordance with Generally Accepted Accounting Principles ("GAAP"), excluding extraordinary items, as defined by GAAP, gains and losses from sales of depreciable real estate and impairment write-downs associated with depreciable real estate, plus real estate-related depreciation and amortization, and after similar adjustments for unconsolidated partnerships and joint ventures.

[5]   The Company computes Core FFO by adjusting FFO for the following items, including the Company's share of these items recognized by its unconsolidated partnerships and joint ventures: (i) gains and losses from sales of depreciable real estate within the Other Equity and Debt segment, net of depreciation, amortization and impairment previously adjusted for FFO; (ii) equity-based compensation expense; (iii) effects of straight-line rent revenue and straight-line rent expense on ground leases; (iv) amortization of acquired above- and below-market lease values; (v) amortization of deferred financing costs and debt premiums and discounts; (vi) unrealized fair value gains or losses and foreign currency re-measurements; (vii) acquisition-related expenses, merger and integration costs; (viii) amortization and impairment of finite-lived intangibles related to IM contracts and customer relationships; (ix) gain on re-measurement of consolidated investment entities and the effect of amortization thereof; (x) non-real estate depreciation and amortization; (xi) change in fair value of contingent consideration; and (xii) tax effect on certain of the foregoing adjustments.

- 12 -

33.     Defendant Tangen explained the variations during the 4Q 2016 earnings call, stating that the combined CLNS would use a modified version of Core FFO for reporting purposes going forward.   As he explained it, that modified Core FFO version would not "add back provisions for loan losses" or "use fair value accounting," which the NorthStar entities had used to adjust net income:

> [T]he prior guidance [that defendants issued when the entities merged] was based on a combination of two different reporting metrics: core FFO for Colony Capital, and CAD for NSAM and NRF.  ***The new guidance is based on a new core FFO definition***, which is very similar to Colony Capital's historical core FFO definition, except that ***we will no longer include realized gains or losses for our core property verticals***.
>
> This exclusion is consistent with how most single-sector equity REITs report their FFO and/or AFFO, as they are generally not in the business of trading properties.  However, we will continue to include realized gains and losses for the other equity and debt segment during the next few years while this segment winds down because gains are a regular part of this business.  Our current expectation is for gains to constitute approximately 15% to 20% of our core FFO for 2017.
>
> ***In addition, the legacy Colony core FFO differs from the legacy NorthStar CAD definition in two other primary respects.  Number one, core FFO does not add back provisions for loan losses.  And two, Colony NorthStar will no longer use fair value accounting for certain legacy NRF assets***.

34.     CAD and Core FFO reconciliations reflecting the effect of the new Core FFO definition for the stand-alone entities and for the entities combined, as well as their effect on guidance, are attached hereto as Exhibits 1-4.   The Core FFO reconciliation for CLNS during the Class Period is attached hereto as Exhibit 5.

- 13 -

4840-4394-8197.v1

### 2. Colony Capital's Expansion into the Investment Management Business

35.     According to its 2015 Form 10-K, Colony was a "global real estate and investment management firm" that "manage[d] capital on behalf of both Company shareholders and limited partners in private investment funds . . . where the Company may earn management fees and carried interests."  Colony's portfolio primarily comprised: (i) real estate equity; (ii) real estate and real estate-related debt; and (iii) institutional capital IM through Company-sponsored private equity funds and vehicles.  By 2016, Colony had $16.8 billion in AUM and $6.9 billion in fee-earning equity under management.

36.     Similar to NRF, Colony was an externally-managed REIT until April of 2015 when it acquired substantially all of its former manager's real estate and institutional IM business for an aggregate upfront consideration of $672.3 million.  Colony's executives therefore developed a strategy to enhance Colony's returns.  As Colony's press release announcing the acquisition of its institutional IM business described, Colony "expect[ed] to generate more accretive economics," especially now that its business objective was "to provide attractive risk-adjusted returns . . . through (i) a diversified portfolio of direct and indirect real estate-related equity and real estate debt investments and (ii) fee bearing management contracts on investment funds that we manage."

37.     Expanding on its IM economics strategy, the press release stated that "the Company plans to continue [its former manager's] role of forming the general partner or sponsor of private equity funds and other investment vehicles, allowing the Company to capture fees and carried interest from the funds and vehicles it sponsors and manages.  Furthermore, the Company intends to invest primarily through these sponsor positions prospectively as opposed to just directly in assets . . . ."  Colony thus decided that it could enhance returns and the value of its own holdings by expanding its third-party capital base.

- 14 -

4840-4394-8197.v1

38.     Colony operated through the following three segments: (1) Real Estate Equity, which included light industrial real estate assets, single-family residential rentals, and other real estate equity investments; (2) Real Estate Debt, which included originations including senior and subordinated loans, commercial mortgage backed securities, and preferred equity; and (3) Investment Management, which included the management of Colony-sponsored funds and other investment vehicles for institutional investors.  The first two segments, Real Estate Equity and Real Estate Debt, represented over 92% of Colony's income in 2016.  The institutional IM segment, on the other hand, was Colony's smallest and thus least significant income source, representing a mere 7.6% of income in 2016.

39.     The IM sector's lackluster performance was largely due to its low investment advisor management fees.  Given that its targeted investors were sophisticated institutions, Colony was limited in the scope and amount of the fees it charged.  As its 2016 Form 10-K described, base management fees were generally around 1% per annum of net funded capital.  And it also charged a one-time asset management fee upon the closing of each investment made, which was typically 0.5% of the net funded capital on each investment.  Consequently, Colony's institutional IM sector recorded just $67.7 million in 2016, representing less than 1% in average fees on $6.9 billion in fee-earning equity under management.

40.     To further its IM economics strategy, Colony had to expand its third-party capital base.  Since it already possessed an institutional IM business, acquiring a retail IM business would complete the picture and enable Colony to dramatically increase its chargeable fees.  A comparison of Colony's institutional IM fees with NSAM's retail IM fees shows why Colony's target became NSAM.  Even with a 10-to-1 ratio of institutional fundraising to retail fundraising in 2017, retail fees eclipsed institutional fees:

- 15 -

4840-4394-8197.v1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



### 3.    The NorthStar Realty Finance Business

41.    According to the 2015 Form 10-K that NRF filed before the merger, NRF was "a diversified commercial real estate company with 85% of [its] total assets invested directly or indirectly in real estate, of which 78% [was] invested in direct real estate." Unlike the IM economics model that Colony pursued, NRF "generated 89% of [its] revenue from [its] real estate portfolio for the year ended December 31, 2015." As it explained, NRF "invest[ed] in multiple asset classes across commercial real estate, or CRE, that [it] expect[ed] [would] generate attractive risk-adjusted returns and may take the form of acquiring real estate, originating or acquiring senior or subordinate loans, as well as pursuing opportunistic CRE investments."

42.    But NRF's business was struggling mightily before the merger. According to its 2015 Form 10-K, NRF had lost  hundreds of millions of dollars in every year for five years preceding the merger, for a combined total net loss of $1.4 billion:

4840-4394-8197.v1

| Operating Data: | | 2015 | | 2014 | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Dollars in thousands, except per share data) | | | | | |
| Total property and other revenues | $ | 1,817,436 | $ | 679,500 | $ | 240,847 | $ | 114,308 | $ | 109,402 |
| Net interest income on debt and securities | | 218,805 | | 298,139 | | 266,357 | | 335,496 | | 355,921 |
| Total expenses | | 2,210,001 | | 1,062,287 | | 370,765 | | 240,076 | | 289,887 |
| Equity in earnings (losses) of unconsolidated ventures | | 219,077 | | 165,053 | | 91,726 | | 88 | | (2,738) |
| Income (loss) from continuing operations | | (158,713) | | (276,385) | | (79,149) | | (257,718) | | (234,173) |
| Income (loss) from discontinued operations | | (108,554) | | (44,701) | | (8,761) | | (17,450) | | (25,551) |
| Net income (loss) | | (267,267) | | (321,086) | | (87,910) | | (273,089) | | (242,526) |
| Net income (loss) attributable to NorthStar Realty Finance Corp. common stockholders | | (327,497) | | (371,507) | | (137,453) | | (288,587) | | (263,014) |
| Earnings (loss) per share: | | | | | | | | | | |
| Basic | $ | (1.87) | $ | (3.79) | $ | (2.60) | $ | (9.22) | $ | (11.34) |
| Diluted | $ | (1.87) | $ | (3.79) | $ | (2.60) | $ | (9.22) | $ | (11.34) |
| Dividends per share of common stock[1][2] | $ | 2.75 | $ | 3.60 | $ | 3.40 | $ | 2.64 | $ | 1.84 |

Years Ended December 31,

(1)   Adjusted for the Reverse Split completed on November 1, 2015.
(2)   The dividend per share for the third and fourth quarter 2015 represents the dividends declared subsequent to the NRE Spin-off.

43.     And at the end of 2015, NRF cut its dividend in half after its stock price collapsed dramatically in value.  According to NRF's 2015 Form 10-K, NRF's stock price traded as high as $69.52 in the second quarter of 2014 ("2Q 2014") and had dropped to $17.03 by the fourth quarter of 2015 ("4Q 2015"), after it had spun off NSAM and NorthStar Europe ("NRE").

44.     By late 2015, NRF was in liquidation mode.  As NRF described in the 2015 Form 10-K, "given recent market conditions, we are currently focused on exploring [asset] sales to generate liquidity to repurchase our common stock and reduce our leverage."  And liquefy it did.  In only a year's time, NRF sold off $6.6 billion of its portfolio, representing 45% of its real estate assets as of November 2016.  Its CAD growth rate suffered as a result, falling an extraordinary 40% from $570.8 million in 2015 to $341 million in 2016.

45.     NRF's portfolio focused almost entirely on healthcare and hospitality.  While it invested in other commercial real estate ventures, including manufactured housing, net leases, multifamily and multi-tenant office space, healthcare and hospitality were the drivers of NRF's business.  In fact, healthcare and hospitality alone represented approximately 80% of NRF's revenue during 2016.  Understandably, those were not the assets that Colony wanted when it pursued the merger.  As Mr. Barrack explained after the Class Period, the healthcare and hospitality segments "don't lend themselves to immediate third-party access," which

- 17 -

4840-4394-8197.v1

access was Colony's primary strategy for the merger.  Mr. Barrack also acknowledged
that "I've never understood the business," and noted for those segments that "we'll
run to the exit door every time that we can to lighten up our balance sheet load":

> Yes.  ***I think – the [lodging and healthcare] segments have been built
> with such complication that they don't lend themselves to immediate
> third-party access***.  [Q]uite honestly, I've never understood the business,
> right?  You're just staying even.  So if you look at all of our competitive
> REITs, they all have the same problem, which is to keep market share as
> occupancy is moving up and ADR [Average Daily Rate] is slowly
> moving up.  Wages and expenses eat into it, and then just as you start
> making gains you have to redo your PIF [Public Improvement Fees],
> CapEx comes in and you lose it again.  So long term for us, at this point
> in the cycle where always assets are priced to perfection and that
> marketplace is really, in our estimation, confusing return of capital and
> return on capital, ***you exit every time you have an opportunity in the
> private markets for a total sale***.  So the third-party annexing of assets in
> both of those portfolios is piecemeal, too complicated to do in whole.  ***So
> we'll run to the exit door every time that we can to lighten up our
> balance sheet load***.

### 4.    The NorthStar Asset Management Business

46.    The target of the merger was thus clearly NSAM.  As NSAM's 2015
Form 10-K confirmed, NSAM's retail IM business was in line with Colony's
"Investment Management economics" business model.  The Form 10-K described
NSAM as "a global asset management firm focused on strategically managing real
estate and other investment platforms in the United States and internationally."
NSAM commenced operations in 2014 upon the spin-off by NRF "of its asset
management business into a separate publicly-traded company."  NSAM focused on
earning fees by managing capital in the retail marketplace by accessing a variety of

- 18 -

4840-4394-8197.v1

1    pools of capital through various vehicles, which included REITs and closed-end

2    funds, which were referred to as the Retail Companies.[6]  The Retail Companies raised

3    capital through NorthStar Securities, a captive broker-dealer platform registered with

4    the SEC.

5         47.    NSAM organized its revenues from its five business segments into the

6    following categories: (1) Asset Management and other Fees; (2) Selling Commissions

7    and Dealer Manager Fees; and (3) Other Income.  The Asset Management and other

8    Fees category was by far the largest, representing 92% of revenues in 2016.  It derived

9    fees from managing the NorthStar Listed Companies, the Retail Companies, and

10   institutional capital through the Townsend Group ("Townsend").    Selling

11   Commissions and Dealer Manager Fees, at 5.7%, were related directly to the retail IM

12   business, representing fees earned for selling equity in the Retail Companies through

13   NorthStar Securities.  Other Income, at just 2.3% of 2016 revenues, included dividend

14   income earned from common stock owned in the NorthStar Listed Companies and

15   other such assets and other revenue sources.

16        48.    Within Asset Management and other Fees, NSAM derived in 2016

17   approximately 54.8% of its fees from managing the NorthStar Listed Companies,

18   approximately 27.2% from managing the Retail Companies, and 18.1% from

19   managing institutional capital through Townsend.  The NorthStar Listed Companies,

20   included NRF and NRE – with the NRF management agreement being by far the most

21   lucrative of the agreements.  In fact, NRF paid NSAM approximately $186.8 million

22   in 2016 as a base management fee, which represented 93% of NSAM's NorthStar

23   Listed Companies revenue and 51% of its Asset Management and other Fees revenue.

24   And at 46.9%, the management agreement with NRF was the single largest – and

25   therefore most important – source of revenue for NSAM.  By way of comparison, the

26   ───────────────
27   [6]   The Retail Companies during the Class Period included the following three closed
     funds: NorthStar Real Estate Income Trust, Inc. ("NorthStar Income I"), NorthStar
     Real Estate Income II, Inc. ("NorthStar Income II"), NorthStar Healthcare; and the
28   following two active funds: NorthStar/RXR and the NorthStar Capital Income Fund.

Retail Companies represented approximately 30.7% of NSAM's revenue source in 2016.

| NSAM REVENUES (PRE-MERGER) | | | | |
|---|---|---|---|---|
| | | | 2016 Revenue | Percent of 2016 Revenues |
| **ASSET MANAGEMENT AND OTHER FEES** | | | $ 366,615,000 | 92.0% |
| **NorthStar Listed Companies:** | | | | |
| *NRF Management Agreement* | $ 186,800,000 | | | 46.9% |
| *NorthStar Europe Management Agreement* | $ 14,400,000 | | | 3.6% |
| **Total NorthStar Listed Companies** | | | $ 200,833,000 | 50.4% |
| *Retail Companies* | | | *$ 99,594,000* | *25.0%* |
| Institutional Capital (Townsend) | | | $ 66,188,000 | 16.6% |
| *SELLING COMMISSIONS AND DEALER MANAGER FEES* | | | *$ 22,803,000* | *5.7%* |
| OTHER INCOME | | | $ 9,124,000 | 2.3% |
| | | TOTAL: | $ 398,542,000 | |
| **Note:** *Red text indicates Retail IM* | | *TOTAL RETAIL IM BUSINESS* | | *30.7%* |

49.    Importantly to NSAM's financial outlook beyond 2016, its management agreement with NRF would cease to exist upon the merger's completion. As a result, NSAM lost nearly half (46.9%) of its revenue source after the merger. In turn, revenues derived from the retail IM business – both under Asset Management and other Fees as well as from Selling Commissions and Dealer Manager Fees – became NSAM's key income source. Without the $186.8 million NRF management fee, revenue derived from the Retail Companies jumped from 30.7% of NSAM's total revenues in 2016 to approximately 57.6%. And since Townsend was "held for sale" as of March 2017, fees derived from the retail IM business would amount to 83.9% of NSAM's recurring business and would thus drive NSAM's success or lead to its failure as incremental retail IM fundraising became critical to CLNS meeting its Core FFO guidance:

| NSAM REVENUES (POST-MERGER) | | | | | | |
|---|---|---|---|---|---|---|
| | | | 2016 Revenues (with Townsend) | Percent of 2016 Revenues (with Townsend) | 2016 Revenues (without Townsend) | Revenues (without Townsend) |
| **ASSET MANAGEMENT AND OTHER FEES** | | | $ 180,182,000 | 84.9% | $ 113,994,000 | |
| **NorthStar Listed Companies:** | | | | | | |
| *NorthStar Europe Management Agreement* | $ 14,400,000 | | | | | |
| **Total NorthStar Listed Companies** | | | $ 14,400,000 | 6.8% | $ 14,400,000 | 9.8% |
| *Retail Companies* | | | *$ 99,594,000* | *46.9%* | *$ 99,594,000* | *68.3%* |
| Institutional Capital Townsend | | | $ 66,188,000 | 31.2% | | |
| *SELLING COMMISSIONS AND DEALER MANAGER FEES* | | | *$ 22,803,000* | *10.7%* | *$ 22,803,000* | *15.6%* |
| OTHER INCOME | | | $ 9,124,000 | 4.3% | $ 9,124,000 | 6.3% |
| | | TOTAL: | $ 212,109,000 | | $ 145,921,000 | |
| **Note:** *Red text indicates Retail IM* | | *TOTAL RETAIL IM BUSINESS* | | *57.6%* | | *83.9%* |

### 5.   The Combined IM Business

50.   CLNS's IM business was a combination of Colony's institutional IM business and NSAM's retail IM business, as well as Townsend.[7]  But the retail IM business was the driving force behind the merger.  Defendants' merger presentation, in fact, spotlighted "an [e]mbedded [i]nvestment [m]anagement [p]latform."  The presentation explained that the merger would "[u]nlock [v]alue via [i]ncreased scale and [m]ultiple [e]xpansion," specifically because it had an embedded IM business.  The defendants even included a slide demonstrating that, with their embedded IM model, there could be an increase of 40%+ in return on equity for their investments.

51.   Like its predecessor, the retail IM business would focus on earning fees by managing capital in the retail marketplace, mostly raised through the two active Retail Companies – an open REIT (NorthStar/RXR) and an investment feeder fund structure comprised of various companies registered under the Investment Company Act of 1940 (NorthStar Capital Income Fund).[8]

52.   NSAM had enjoyed considerable fundraising success in the years leading up to the merger.  The first REIT, NorthStar Income I, was closed – meaning that CLNS was no longer raising new capital – in July 2013, after raising approximately $1.07 billion through its offering.  The second REIT, NorthStar Healthcare, was closed in January 2016 after raising approximately $1.7 billion through its offering.  The third REIT, NorthStar Income II, was closed in November 2016 after raising approximately $1.1 billion through its offering.  Combined, these vehicles, which were all closed and thus closed to new investments by November of 2016, raised approximately $3.9 billion in third-party retail IM capital.

---

[7]   On January 29, 2016, NSAM acquired an approximate 84% interest in Townsend, a leading global provider of IM and advisory services focused on real estate.

[8]   The NorthStar Capital Income Fund included: (i) NorthStar Real Estate Capital Income Fund; (ii) NorthStar Real Estate Capital Income Fund-T; (iii) NorthStar Real Estate Capital Income Fund-ADV; and (iv) NorthStar Real Estate Capital Income Fund-C.  These entities, in turn, invested substantially all of their assets in NorthStar Real Estate Capital Income Master Fund ("NorthStar Master Fund").

53.     Defendants had similar expectations for retail fundraising after the merger, through its active funds – *i.e.*, funds open to new investors – NorthStar/RXR and NorthStar Capital Income Fund.  NorthStar/RXR – the active REIT in the portfolio – became effective in February 2015 and sought to raise up to $2 billion, while the NorthStar Capital Income Fund – comprised of four separate feeder investment companies – which became effective in May 2016, sought to raise up to $3.2 billion.  Combined, the "Offering Size" for these active funds revealed that defendants' fundraising expectations were lofty – at $5.2 billion, they expected to raise nearly a billion dollars *more* from these active funds than the closed funds.  And according to the 2016 Registration Statement for the merger, filed with the SEC on November 18, 2016, defendants had lofty retail-fundraising expectations for the Class Period, projecting to raise *$1.5 billion* in 2017 alone:

> In developing the NSAM Standalone Projections, NSAM's management made numerous material assumptions with respect to NSAM for the periods covered by the NSAM Standalone Projections, including the following material assumptions: (i) no additional capital raised or growth in base management fees from NRF and NRE and no incentive fees; (ii) *approximately* $1.4 billion, *$1.5 billion* and $1.6 billion *of capital raised in NSAM's retail companies in* 2016, *2017* and 2018, respectively; (iii) approximately $70 million, $285 million and $95 million in purchases of NSAM, NRF and NRE common stock, respectively, over the projection period; and (iv) effective tax rate of 15% on pre-tax CAD.

54.     CLNS's retail IM growth was reliant on incremental retail fundraising from the two active funds.  Any capital raised during the Class Period from any of the three closed funds would have primarily been from a distribution reinvestment plan rather than new capital raising.  And according to the SEC filings for the underlying REITs, "[n]o selling commissions or dealer manager fees [were] paid on shares issued

- 22 -

4840-4394-8197.v1

1  pursuant to the DRP."  Any profit growth from CLNS's retail IM business thus largely
2  depended on the two active funds available during the Class Period to raise
3  incremental capital.[9]

      **6.**      **Defendants Intend for the Merger to Unlock**
                     **Purported Hidden "Value" in the Three**
                     **"Undervalued" Entities**

6       55.    From the outset, the merger purportedly was about "[u]nlock[ing]" the
7  "[v]alue" underlying the three entities – Colony and the two NorthStar entities,
8  NSAM and NRF.  Prior to the merger, defendants said that the trading multiple of all
9  three pre-merger entities was substantially undervalued, noting in a slide presentation
10  promoting the merger that "[e]ach of the stand-alone companies is undervalued
11  relative to peer groups."  The admitted objective of the merger thus was to unlock
12  what defendants perceived to be "hidden" value.

13       56.    The press release announcing the deal repeatedly emphasized this
14  objective, explaining that the combination would "'creat[e] substantial value for
15  shareholders'" because it was "'poised for meaningful multiple expansion and
16  substantially enhanced long-term returns for shareholders.'"  Among the "Strategic
17  and Financial Benefits" listed in the release was "Increased Scale and Value
18  Creation," which emphasized "enhanced returns," and a market capitalization "in the
19  top quartile" of REIT investments:

20       **Increased Scale and Value Creation**: Colony NorthStar is expected to
21       be in the top quartile ranked by equity market capitalization, according to
22       the MSCI U.S. REIT Index (RMZ) classification, with a broad platform
23       that expands its ability to deploy third-party fee-bearing capital to

---

[9]   Given the lack of selling commissions and dealer-manager fees from the
distribution reinvestment plans, this Complaint focuses on CLNS's fundraising totals
from the "Active" funds as those funds would be the primary driver of any
incremental growth from the retail IM business.  Including distribution reinvestment
plan investments in the totals would nevertheless lead to similarly large year-over-
year declines: 83% in 4Q 2016, 67% in 1Q 2017, 45% in 2Q 2017, 48% in 3Q 2017,
and 60% in 4Q 2017.  *See* Exhibit 6 attached hereto.

- 23 -

1    accelerate growth and provide enhanced returns to shareholders from

2    consistent, longer duration fee related income.

3        57.    The merger presentation also focused on increasing an "undervalued"

4    stock price, showing how the three entities were undervalued individually whereas a

5    combined entity could roughly double their valuation.  For example, defendants

6    explained that the three standalone companies had a "[b]lended [m]ultiple" (*i.e.*, stock

7    price of all three entities/FFO) of only "9.0x," but a combined entity via increased

8    scale and multiple expansion (*i.e.*, the "Hybrid Peer Average") had a far higher

9    multiple at "17.6x."  Individual entities in that peer group had FFO multiples that

10   reached as high as "21.8x."  In other words, defendants designed the merger to

11   roughly double the stock price multiple of the combined entity and, again, the value of

12   their own personal holdings.

13       58.    Thus, what defendants sought to do with the merger was to inflate the

14   combined company's stock price and the resulting value of their own holdings.

15   Defendants had substantial ownership interests, the value of which hinged on the

16   success of the merger.  Combined, they would own nearly 11.5 million CLNS shares.

17   If these shares reached the top quartile, as defendants said they expected, the value of

18   their personal holdings would jump exponentially.

19       59.    The merger was thus designed to cure a perceived fundamental valuation

20   problem – and it sought to do so through the addition of an embedded IM business and

21   the recurring fees earned from managing other investors' capital.  As a REIT, Colony

22   was largely dependent on generating returns from its own invested capital, which

23   brought considerable risk.  But an embedded IM business would enable defendants to

24   earn fees from investing and managing *other* investors' capital (*i.e.*, third-party

25   capital) while minimizing risk.  And while the capital raised in 2017 from institutional

26   investors would be substantially higher than retail, the fees that defendants could earn

27   from institutional investors were much lower.

28

4840-4394-8197.v1

60.     Capturing NSAM and its retail IM business would thus enable Colony's executives to continue generating large fees while minimizing risk and elevating the value of defendants' personal holdings.

### 7.     Colony Capital Gains Control of NSAM While NorthStar's Executives Receive a Windfall

61.     For NorthStar executives, the merger was nothing short of a windfall. Pursuant to the merger agreement, the executives of the combined entity would be restricted to legacy Colony executives, with the exception of defendant Hamamoto, who secured the role of Vice Chairman of CLNS's board of directors, and Dan Gilbert ("Gilbert"), who would serve as the Head of Retail Platform at CLNS.  Hamamoto, however, was the founder of the NorthStar entities and had filled many key NorthStar executive leadership roles in the years before the merger.  His involvement was thus necessary for CLNS's success.  Indeed, CLNS identified Hamamoto at the beginning of the Class Period as part of its "cohesive" management team characterized as having "unwavering commitment" to CLNS and its shareholders.

62.     Gilbert's involvement was also necessary, as he was the Chief Investment and Operating Officer of NSAM – the retail arm of the critical embedded IM business. As further discussed below, both defendant Hamamoto and Gilbert signed agreements that incentivized their tenure at CLNS for at least two years, although their stock awards fully vested after only one year.  The remaining NorthStar executives all agreed to assist with the transition for only one year.  And in return, Hamamoto, along with his NorthStar executive leadership team, pulled a whopping $120 million out of the merger pursuant to change-of-control and other agreements.

63.     This was a win-win for all insiders.  NorthStar executives cashed out while Colony's executives controlled CLNS's operations, including the coveted embedded IM business.  And because Colony's executives had been previously granted an incentive plan that specifically tied awards of stock, in part, to real estate fundraising – awards that could reach up to 4.5 million common shares and operating

- 25 -

4840-4394-8197.v1

company units – they were highly incentivized to maintain, and even inflate, the Company's stock price throughout the Class Period. The key was third-party capital fundraising.

64. Defendants successfully completed the merger on January 10, 2017, with CLNS having a market capitalization of approximately $9 billion and AUM of $56 billion.

**B.     False and Misleading Statements About Core FFO Guidance and CLNS's Retail IM Fundraising**

**1.     False and Misleading Statements When Reporting Fourth Quarter and Fiscal Year 2016 Results**

65. On February 28, 2017, CLNS issued a press release and filed a Form 8-K, which was signed by defendant Tangen, announcing the Company's 4Q 2016 standalone financial results and a post-merger update. In the press release, the Company "updat[ed]" its Core FFO guidance for 2017 to a range of $1.40 to $1.58 per share – a reduction from its previous $1.55 to $1.75 per share guidance, and that they attributed to a special dividend paid to NSAM shareholders as part of the merger transaction, less third-party capital raising, and replacement of high-yielding non-core investments with lower-yielding core investments:

> The Company is updating its Core FFO guidance for the year ending 2017 to a ***range of $1.40 to $1.58 per share***, but does not intend to provide updates to Core FFO guidance going forward. In comparison to the original 2017 guidance that was provided in the Investor Presentation related to the merger filed on June 7, 2016, the update includes lower earnings due primarily to: 1) less third party capital raising; 2) less cash available to deploy into investments resulting from the increase of the NSAM special dividend among other reasons; and, 3) accelerating the replacement of higher-yielding, non-core investments with lower-yielding investments that better fit the strategic direction of the Company.

- 26 -

66.     Defendants' statements in the press release forecasting 2017 Core FFO at a range between $1.40 to $1.58 were made without a reasonable basis and omitted material facts, making these statements misleading.  Defendants built their guidance on a foundation of 597.8 million shares and knew, because of the change in how the Company defined Core FFO, that NRF was losing the adjustment that had converted hundreds of millions of dollars in losses to positive CAD and that, without those adjustments, NRF's reported CAD would have been negative in two out of the four quarters in 2016.  By losing the ability to inflate CAD at NRF with fair-value accounting or provisions for loan losses, CLNS was faced with an insurmountable share count and unreachable Core FFO growth rates between 33%-50%.  Indeed, even a straight-line calculation using the modified Core FFO definition yielded just $1.06 per share annually, significantly below the actual $1.16 per share Core FFO result that CLNS achieved in 2017.  With the dismal state of NRF's business – with approximately half of its real estate assets sold and a *negative* 40% CAD growth rate in 2016 – NSAM's nearly nonexistent retail fundraising because of the dynamic between its fees and the nearly nonexistent returns in its funds, NSAM's loss of $186.8 million in fees from NRF through the merger (*after* producing a CAD growth rate of only 0.9%), and Colony's meager 4.5% Core FFO growth in 2016 (with a $0.01 per share Core FFO *decline*), defendants had no reasonable basis to believe that CLNS would achieve those lofty Core FFO growth rates.  In fact, defendants could not count on synergies to convert these slow-growth entities – or in the case of NRF, a non-growth entity – into growth drivers.  Defendants projected only $115 million in total synergies from the merger, an amount that would not even fill the $186 million hole left by NRF losing the Fair Value Adjustment, and had already achieved 75% of total synergies before the Class Period even started.  At the same time, defendants had discovered a conflict between NSAM's Townsend business and Colony's legacy institutional IM business, requiring that CLNS sell a business that had contributed $66 million in fees to NSAM's results in 2016, further undermining NSAM's ability to

- 27 -

4840-4394-8197.v1

1   contribute to CLNS meeting guidance.  And since CLNS's Other Equity & Debt
2   segment was merely a combination of NRF's and Colony's legacy businesses,
3   defendants had no reasonable basis to believe that this segment would suddenly
4   produce total Core FFO growth of 33%-50%, especially on 597 million shares.

5       67.   Defendants' statements in the press release forecasting 2017 Core FFO at
6   a range between $1.40 to $1.58 do not qualify for safe harbor protection.  The
7   PSLRA's safe harbor applies only if "the forward-looking statement is – (i) identified
8   as a forward-looking statement, and is accompanied by meaningful cautionary
9   statements identifying important factors that could cause actual results to differ
10  materially from those in the forward-looking statement."   15 U.S.C. §78u-
11  5(c)(1)(A)(i).  The Ninth Circuit holds that "[w]e measure the protective function of
12  forward-looking cautionary language using the 'bespeaks caution' doctrine" which
13  "'provides a mechanism by which a court can rule as a matter of law . . . that
14  defendants' forward-looking representations contained enough cautionary language or
15  risk disclosure to protect the defendant against claims of securities fraud.'" *Atossa*
16  *Genetics*, 868 F.3d at 798 (quoting *Worlds of Wonder*, 35 F.3d at 1413).  For the
17  doctrine to apply, "[t]here must be sufficient cautionary language or risk disclosure
18  such that reasonable minds could not disagree that the challenged statements were not
19  misleading.'" *Id.* (quoting *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416
20  F.3d 940, 947 (9th Cir. 2005)).  "To meet this standard, 'the language bespeaking
21  caution [must] relate directly to that to which plaintiffs claim to have been misled.'"
22  *Id.* (quoting *Worlds of Wonder*, 35 F.3d at 1415) (alteration in original).  These
23  cautions did not, as explained immediately *infra* in ¶¶68-69.

24      68.   CLNS's February 28, 2017 press release explained that "[t]he updated
25  2017 guidance included in this press release is subject to the cautionary statements
26  and limitations described in the Cautionary Statement Regarding Forward-Looking
27  Statements section at the end of this press release."  The end of the press release stated
28  as follows:

- 28 -

4840-4394-8197.v1

Forward-looking statements involve known and unknown risks, uncertainties, assumptions and contingencies, many of which are beyond our control, and may cause actual results to differ significantly from those expressed in any forward-looking statement. Factors that might cause such a difference include, without limitation, [1] our failure to achieve anticipated synergies in and benefits of the completed merger among NorthStar Asset Management Group Inc., Colony Capital, Inc. and NorthStar Realty Finance Corp. [the "Synergies Warning"], [2] Colony NorthStar's liquidity, including its ability to complete identified monetization transactions and other potential sales of non-core investments [the "Liquidity Warning"], [3] whether Colony NorthStar will be able to achieve a streamlined organization as a leading diversified equity REIT with a concentration in select areas demonstrating the most favorable supply/demand dynamics globally that further benefits from an embedded best-in-class investment management operation in the anticipated timeframe or ever [the "Streamlined Organization Warning"], [4] the timing of and ability to deploy available capital [the "Deploying Capital Warning"], [5] the timing of and ability to complete repurchases of Colony NorthStar's stock [the "Stock Repurchase Warning"], [6] Colony NorthStar's ability perform on the RMZ [the "RMZ Warning"], [7] Colony NorthStar's leverage, including the timing and amount of borrowings under its credit facility, increased interest rates and operating costs, adverse economic or real estate developments in Colony NorthStar's markets [the "Leverage Warning"], [8] Colony NorthStar's failure to successfully operate or lease acquired properties, decreased rental rates, increased vacancy rates or failure to renew or replace expiring leases, defaults on or non-renewal of leases by tenants [the "Property Warning"], [9] the impact of economic conditions on the

- 29 -

borrowers of Colony NorthStar's commercial real estate debt investments and the commercial mortgage loans underlying its commercial mortgage backed securities [the "Borrower Warning"], [10] adverse general and local economic conditions [the "Economic Conditions Warning"], [11] an unfavorable capital market environment [the "Capital Market Warning"], [12] decreased leasing activity or lease renewals [the "Lease Warning"], and [13] other risks and uncertainties detailed in our filings with the Securities and Exchange Commission ("SEC") [the "Catchall Warning"]. All forward-looking statements reflect the Company's good faith beliefs, assumptions and expectations, but they are not guarantees of future performance. Additional information about these and other factors can be found in Colony NorthStar's reports filed from time to time with the Securities and Exchange Commission.

69.     These cautions were required to, but did not, "'relate directly to that to which plaintiffs claim to have been misled.'"   *Atossa Genetics*, 868 F.3d at 798.  In fact, ***none*** of them had anything at all to do with retail IM fundraising or the underlying cause of CLNS's retail IM fundraising being derailed.  The Deploying Capital Warning, the Stock Repurchase Warning, the RMZ Warning, the Leverage Warning, the Property Warning, the Borrower Warning, the Economic Conditions Warning, the Capital Market Warning, and the Lease Warning spoke to completely different aspects of CLNS's business.  And the Synergy and Streamlined Organization Warnings only cautioned investors that results could vary if the merger was unsuccessful.  But that is not the relevant truth that defendants concealed, which made Core FFO guidance false and misleading.   The relevant truth that defendants concealed was that retail fees and the poor performance of the retail funds (both the closed funds and the active funds) were causing financial advisers and their clients to avoid investing new capital in the active retail funds, preventing CLNS from ever

reaching Core FFO guidance.  In fact, the Streamlined Organization Warning was the only warning that even mentioned the IM business at all.  But that warning said nothing about fees and performance derailing retail IM fundraising or the effect that it would have on CLNS meeting guidance.  It was in fact a warning that results could differ if CLNS did not become "a leading diversified equity REIT" that further benefited from "an embedded *best-in-class* investment management operation."  This amounted to another plain-vanilla warning that results could differ if the merger was unsuccessful.   The vague reference to "best-in-class investment management operation" did not speak at all to the amount of retail IM fees, the requirement that they be disclosed, the performance of the underlying funds, or the effect that those conditions were having on fundraising and thus could not "'relate directly to that to which plaintiffs claim to have been misled.'"  *Id.*  Indeed, this Court has held that the same "best-in-class" phrase was too vague to be actionable.  ECF No. 57 at 20.  If reasonable investors would not rely on such vague phrases, that same vague phrase cannot support the conclusion that the warnings were such "'that reasonable minds could not disagree that the challenged statements were not misleading.'"  *Atossa Genetics*, 868 F.3d at 798.

70.   Defendant Saltzman, who was involved in issuing the press release where he is quoted immediately following CLNS's false and misleading statements about updated guidance, had actual knowledge that CLNS's Core FFO guidance depended on a substantial contribution from incremental retail IM funds and thus lacked a reasonable basis.   In fact, during CLNS's earnings call with analysts, media representatives, and investors the next day on March 1, 2017, he admitted knowing that guidance required incremental retail IM funds but purposely concealed what the amount was, stating only that the Company's guidance "assumes $2 billion of new fundraising in 2017," that "there is a mix of institutional and retail" fundraising embedded in CLNS's $2 billion fundraising assumption,  and that "I'm probably not going to comment on it per se at this point":

4840-4394-8197.v1

[Analyst:] Got you. And with regard to the capital raising, I think you said $2 billion versus $1 billion last year. Is there a breakdown of retail versus institutional in terms of how that $2 billion is comprised?

[Saltzman:] Well, we haven't been transparent about that, *so yes, there is a mix of institutional and retail*. I'm probably not going to comment on it per se at this point.

71.     These statements amount to an admission by Saltzman that he knew that retail IM fundraising was a substantive component of guidance. And by purposely concealing the relative mix of institutional and retail IM fundraising while also speaking about the $2 billion fundraising assumption, Saltzman intentionally misled investors and thus acted with scienter. Indeed, investors were unable to recognize that CLNS could not achieve even the low end of the guidance range if institutional IM fundraising was the primary source of incremental IM funds, as CLNS's 2017 actual results reveal. CLNS achieved the $2 billion fundraising assumption in 2017 with a ratio of a lopsided 10-to-1 mix of institutional to retail funds and *missed* guidance by an extraordinary $145 million. The size of this miss, in combination with the $2 billion total fundraising figure (91% of which was institutional IM funds), confirms that incremental retail IM fundraising was a critical component of guidance – a fact that defendants' comments show they knew. *See Novak v. Kasaks*, 216 F.3d 300, 312-13 (2d Cir. 2000) ("significant write-off of inventory directly following the Class Period . . . tends to support the plaintiffs' contention that inventory was seriously overvalued at the time the purportedly misleading statements [during the Class Period] were made"). In fact, CLNS's November 18, 2016 Registration Statement for the merger had disclosed to investors that NSAM had projected $1.5 billion in retail IM fundraising in 2017, which defendant Saltzman knew from his involvement in the merger and its public reporting. And since CLNS's guidance called for 33%-50% Core FFO growth, Saltzman knew that NSAM had to produce far more than the $398.8 million in retail IM fundraising that it had produced in 2016 to at least break

- 32 -

1  even with 2016 CAD results given its loss of the $186 million NRF management

2  agreement.

3      72.    The circumstances surrounding the merger confirm that defendant

4  Saltzman also knew that the NorthStar entities would not contribute to the 33%-50%

5  growth figures that CLNS's Core FFO guidance required without substantial retail IM

6  fundraising.  Indeed, he participated in the earnings call where defendant Tangen, as

7  alleged below, explained that CLNS would "no longer use fair value accounting for

8  certain legacy NRF assets," which eliminated a $197 million adjustment in 2015 and a

9  $186 million adjustment in 2016 used by NRF to convert losses into positive CAD.

10  This, combined with NRF's negative 40% CAD growth in 2016, NSAM's 0.9% CAD

11  growth in 2016, and NSAM's loss of its $186 million management agreement with

12  NRF – all of which Saltzman knew from his involvement in the merger –

13  demonstrates that Saltzman lacked a reasonable basis for guiding investors to a 33%-

14  50% Core FFO result for 2017.  His reporting of NSAM's retail IM fundraising

15  figures put him in possession of facts that seriously undermined CLNS's ability to

16  achieve guidance.

17      73.    Defendant Tangen, who was also involved in issuing the press release,

18  which identified him as the primary investor contact, had actual knowledge that

19  CLNS's Core FFO guidance depended on a substantial contribution from incremental

20  retail IM funds and thus lacked a reasonable basis.  In fact, he participated in the

21  March 1, 2017 earnings call where defendant Saltzman admitted that guidance

22  depended on retail IM fundraising but refused to identify the required mix.  He also

23  revealed his knowledge that guidance was unattainable by explaining that NRF's Fair

24  Value Adjustment affected CLNS's guidance:

25      The new guidance is based on a new core FFO definition . . . .

26                  *      *      *

27

28

4840-4394-8197.v1

1   [Specifically,] core FFO does not add back provisions for loan losses

2   [and] Colony NorthStar will no longer use fair value accounting for

3   certain legacy NRF assets.

4       74.   As with defendant Saltzman, NRF's historic losses, its loss of the Fair

5   Value Adjustment, its negative 40% CAD growth in 2016, NSAM's 0.9% CAD

6   growth in 2016, and NSAM's loss of its $186 million management agreement with

7   NRF, combined with these statements revealing Tangen's knowledge of the effect of

8   the Fair Value Adjustment on guidance, demonstrate that he knew that Core FFO

9   guidance was unattainable given the state of retail IM fundraising and therefore issued

10  guidance with scienter.

11      75.   On March 1, 2017, during CLNS's 4Q 2016 earnings call with analysts,

12  media representatives, and investors, defendant Saltzman reiterated the Company's

13  2017 Core FFO guidance, stating that they "anticipated core FFO earnings [in the]

14  range of $1.40 to $1.58 per share" and that "our guidance only assumes $2 billion of

15  new fundraising in 2017":

16          Next, I'd like to turn to our expected financial performance in

17      2017.  As you may already appreciate, our general philosophy is not to

18      provide guidance on future performance.  However, at the time of the

19      Colony NorthStar merger announcement at the beginning of June last

20      year, we felt compelled to provide such detail.

21          Today, some nine months later, we need to revise such guidance

22      down by just under 10% to an anticipated core FFO earnings range of

23      $1.40 to $1.58 per share.  The primary reasons for this modification

24      include, one, approximately $200 million less cash to invest, inclusive of

25      the $100 million extra special dividend paid to NSAM shareholders,

26      which was announced back in October.

27          Two, approximately $2 billion of reduced capital raised in 2016

28      versus expected results, leading to a smaller base of fee-paying AUM at

- 34 -

4840-4394-8197.v1

the beginning of 2017.  Three, correspondingly, we have assumed a more conservative level of fundraising for 2017, albeit $1 billion higher than 2016 actuals.  And finally, four, an anticipated acceleration of non-core generally high-yielding assets divestitures that will be redeployed into our core strategic verticals and investment management business at initial core FFO yields that are somewhat lower until such time as we raise additional fee-bearing capital that will ultimately compensate for the difference, and hopefully then some.

76.    Defendant Saltzman acknowledged "headwinds in 2016" in both institutional and retail capital raising, but he also explained that "the tide appears to have turned for both institutional and retail placements," noted the purported "momentum we're now experiencing in both markets," and boasted about the current "positive" environment for capital fundraising:

> In terms of capital raises, we experienced headwinds in 2016 on both the institutional and retail fronts . . . .
>
> *          *          *
>
> Fortunately, ***the tide appears to have turned for both institutional and retail placements*** based upon the ***momentum we're now experiencing in both markets.***  In fact, our guidance only assumes $2 billion of new fundraising in 2017.  If momentum continues to build, this is an area where we could be very pleasantly surprised.
>
> *          *          *
>
> But I think, consistent with my comments earlier, I think we're pretty sanguine and cautiously optimistic about how we're likely to do better in terms of capital raising this year.  We were very disappointed with where we ended up last year for the reasons that I mentioned.  But I think now that we're stabilized, the merger is behind us, ***the environment is as positive as it is***, and we have all of these interesting

- 35 -

1    opportunities in terms of both the existing balance sheet as well as what
2    we're doing on the investment management side, I'd be very surprised if
3    we don't exceed that for this year.

4    77.    Defendant Saltzman's statements during the earnings call forecasting a
5    2017 Core FFO range of $1.40 to $1.58 were made without a reasonable basis and
6    omitted material facts, making these statements false and misleading.  Defendants
7    built their guidance on a foundation of 597.8 million shares and knew because of the
8    change in how the Company defined Core FFO that NRF was losing the adjustment
9    that had converted hundreds of millions of dollars in losses to positive CAD and that,
10   without those adjustments, NRF's reported CAD would have been *negative* in two out
11   of the four quarters in 2016.  By losing the ability to inflate CAD at NRF with fair
12   value accounting or provisions for loan losses, CLNS was faced with an
13   insurmountable share count and unreachable Core FFO growth rates between
14   33%-50%.  Indeed, even a straight-line calculation using the modified Core FFO
15   definition yielded $1.06 per share annually, significantly below the actual $1.16 per
16   share Core FFO result that CLNS achieved in 2017.  Given the dismal state of NRF's
17   business with approximately half of its real estate assets sold and a *negative* 40%
18   CAD growth rate in 2016, NSAM's nearly nonexistent retail fundraising because of
19   the dynamic between its fees and the nearly nonexistent returns in its funds, NSAM's
20   loss of $186.8 million in fees from NRF through the merger (*after* producing a CAD
21   growth rate of only 0.9%), and Colony's meager 4.5% Core FFO growth in 2016
22   (with a $0.01 per share Core FFO *decline*), defendants had no reasonable basis to
23   believe that CLNS would achieve those lofty Core FFO growth rates.  In fact, CLNS
24   could not count on synergies to convert these slow-growth or, in the case of NRF,
25   non-growth entities into growth drivers.  CLNS had projected only $115 million in
26   total synergies from the merger – an amount that would not even fill the $186 million
27   hole left by NRF losing the Fair Value Adjustment – and had achieved 75% of total
28   synergies before the Class Period even started.  At the same time, defendants had

- 36 -

4840-4394-8197.v1

discovered a conflict between NSAM's Townsend business and Colony's legacy institutional IM business, requiring that CLNS sell a business that had contributed $66 million in fees to NSAM's results in 2016, further undermining NSAM's ability to contribute to CLNS meeting guidance.  And since CLNS's Other Equity & Debt segment was merely a combination of NRF's and Colony's legacy businesses, defendants had no reasonable basis to believe that this segment would suddenly produce total Core FFO growth of 33%-50%, especially on 597 million shares.

78.   For the same reason, defendants' claims that they were experiencing "momentum" in retail IM fundraising where "the tide appears to have turned for both institutional and retail placements" and where "the environment is as positive as it is" were false and misleading.  There was no momentum in retail placements and the tide had certainly not turned.  Retail IM fundraising, in fact, came in at a total of $76.3 million (with only $40.3 million coming from active funds) and had been on a rapid descent in every quarter since 1Q 2016:



79.     As defendants were aware from previous fundraising results, these totals were horrific.  In fact, they  represented a more-than-90% collapse in ***fundraising year-over-year (in total and from active funds)*** because the fund's performance (indeed the performance of most NorthStar funds) did not warrant the fees defendants sought to charge.  *See* Exhibit 6.  In fact, when boasting about the "positive" environment for retail capital raising, defendants omitted the material fact that NorthStar/RXR was struggling to raise capital because its returns had been less than a 10-year Treasury note, which was yielding around 2.4%.  With these negligible returns, fees as high as 11.25% during the quarter (in addition to acquisition and disposition fees that could total up to 1% for debt and 2.25% for property), and a fundraising total that represented less than 1% of the $1.5 billion that NSAM projected in November 2016, and less than 1% of the $2 billion fundraising assumption, defendants' statements created a misleading impression about the state of CLNS's retail IM business.

80.     Defendants' statements during the earnings call forecasting a 2017 Core FFO range of $1.40 to $1.58 do not qualify for safe harbor protection.  The PSLRA's safe harbor applies to oral forward-looking statements only if:

(A) the oral forward-looking statement is accompanied by a cautionary statement –

(i) that the particular oral statement is a forward-looking statement; and

(ii) that the actual results might differ materially from those projected in the forward-looking statement; ***and***

(B) if –

(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking

- 38 -

1    statement is contained in a readily available written document, or portion

2    thereof;

3           (ii) the accompanying oral statement referred to in clause (i)

4    identifies the document, or portion thereof, that contains the additional

5    information about those factors relating to the forward-looking

6    statement; and

7           (iii) the information contained in that written document is a

8    cautionary statement that satisfies the standard established in paragraph

9    (1)(A).

10    15 U.S.C. §78u-5(c)(2). Courts hold that vaguely referring investors to SEC filings is

11    insufficient to invoke the safe harbor. *In re Apple Comput., Inc. Sec. Litig.*, 2003 WL

12    26111982, at *2 (N.D. Cal. Aug. 13, 2003) (referring generally to "Apple's SEC

13    filings" was insufficient as it "'identifies' no specific documents or page numbers or

14    even a date on which the relevant documents were filed"); *Lomingkit v. Apollo Educ.*

15    *Grp. Inc.*, 2017 WL 633148, at *18 (D. Ariz. Feb. 16, 2017) ("vaguely refer[ing]

16    investors to 'ICC filings'" insufficient).

17         81.    The introductory comments to CLNS's 4Q 2016 earnings call explained

18    that: "Potential risks and uncertainties that could cause the Company's business and

19    financial results to differ materially from these forward-looking statements are

20    described in ***the Company's periodic reports filed with the SEC from time to time***."

21    This tepid language, which was the boilerplate introduction used for every earnings

22    call, failed to "identif[y] the document, or portion thereof, that contains the additional

23    information about those factors relating to the forward-looking statement" as the

24    statute requires. 15 U.S.C. §78u-5(c)(2)(B)(ii). Any forward-looking statement made

25    during the call thus does not qualify for safe harbor protection as CLNS failed to

26    satisfy the statute's express requirements.

27         82.    Even if CLNS had "identifie[d] the document, or portion thereof, that

28    contains the additional information about those factors relating to the forward-looking

- 39 -

statement," any cautionary language referenced would not invoke the safe harbor. Indeed, the Ninth Circuit holds that "[w]here a forward-looking statement is accompanied by a non-forward-looking factual statement that supports the forward-looking statement, cautionary language must be understood in the light of the non-forward-looking statement" and that "[i]f the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language – short of an outright admission of the false or misleading nature of the non-forward-looking statement – would be 'sufficiently meaningful' to qualify the statement for the safe harbor." *In re Quality Sys. Sec. Litig.*, 865 F.3d 1130, 1146-47 (9th Cir. 2017). Defendant Saltzman's statement during the earnings call forecasting 2017 Core FFO at a range between $1.40 to $1.58 was supported by his accompanying discussion about CLNS experiencing purported "momentum" in retail IM fundraising where the "the tide appears to have turned for both institutional and retail placements" and where "the environment is as positive as it is," which were false and misleading for the reasons alleged at ¶¶78-79.  Any cautionary language in the unidentified "***periodic reports filed with the SEC from time to time***" was thus not "'sufficiently meaningful' to qualify the statement for the safe harbor" since it was not accompanied by "an outright admission of the false or misleading nature of the[se] non-forward-looking statement[s]." *Quality Sys.*, 865 F.3d at 1146-47.  In any event, the cautionary language contained in CLNS's periodic reports did not "'relate directly to that to which plaintiffs claim to have been misled'" for the reasons alleged *supra* at ¶95. *See Atossa Genetics*, 868 F.3d at 798.

83.    Defendant Saltzman's statements that the Company's guidance "assumes $2 billion of new fundraising in 2017" and "so yes, there is a mix of institutional and retail" in that assumption are admissions by Saltzman that he ***knew*** that retail IM fundraising was a substantive component of guidance that mattered to analysts and the market.  And, by purposely concealing the relative mix of institutional and retail IM fundraising while speaking about the $2 billion fundraising assumption, Saltzman

- 40 -

4840-4394-8197.v1

intentionally misled investors and thus acted with scienter. Indeed, investors did not know that CLNS could not achieve even the low end of the guidance range if institutional IM fundraising was the primary source of incremental IM funds, as CLNS's 2017 actual results reveal was the case. CLNS achieved the $2 billion fundraising assumption in 2017 with a ratio of a 10-to-1 mix of institutional to retail funds and *missed* guidance by an extraordinary $145 million. The size of this miss in combination with the $2 billion fundraising figure (91% of which was institutional IM funds), confirms that incremental retail IM fundraising was a critical component of guidance, a fact which Saltzman's comments show he knew. *See Novak*, 216 F.3d at 312-13 ("significant write-off of inventory directly following the Class Period . . . tends to support the plaintiffs' contention that inventory was seriously overvalued at the time the purportedly misleading statements [during the Class Period] were made").

84.   The circumstances surrounding the merger confirm that defendant Saltzman also knew that the NorthStar entities would not contribute to the 33%-50% growth figures that CLNS's Core FFO guidance required without substantial retail IM fundraising. Indeed, he participated in the earnings call where defendant Tangen, as alleged below, explained that CLNS would "no longer use fair value accounting for certain legacy NRF assets," which eliminated a $197 million adjustment in 2015 and $186 million adjustment in 2016 used by NRF to convert losses into positive CAD. Combined with NRF's negative 40% CAD growth in 2016, NSAM's 0.9% CAD growth in 2016, and NSAM's loss of its $186 million management agreement with NRF, Saltzman knew that Core FFO guidance was unattainable given the state of retail IM fundraising and therefore acted with scienter when issuing guidance.

85.   Defendant Tangen, who was also involved in issuing the press release that identified him as the primary investor contact, had actual knowledge that CLNS's Core FFO guidance depended on a substantial contribution from incremental retail IM funds and thus lacked a reasonable basis. In fact, he participated in the March 1, 2017 earnings call where defendant Saltzman admitted that guidance depended on retail IM

fundraising but refused to identify the required mix.  He also revealed his knowledge that guidance was unattainable by explaining that NRF's Fair Value Adjustment affected CLNS's guidance:

> The new guidance is based on a new core FFO definition . . . .
>
> *          *          *
>
> [Specifically,] core FFO does not add back provisions for loan losses [and] Colony NorthStar will no longer use fair value accounting for certain legacy NRF assets.

86.     As with defendant Saltzman, defendant Tangen's knowledge of NRF's negative 40% CAD growth in 2016, its loss of the Fair Value Adjustment,  NSAM's 0.9% CAD growth in 2016, and its loss of the $186 million NRF management agreement, combined with these statements revealing his knowledge, demonstrates that Tangen knew that Core FFO guidance was unattainable given the state of retail IM fundraising and thus acted with scienter.  *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000) ("[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements.  If nothing else, the former official is at fault for a material omission in failing to correct such statements in that context."); *Meyer v. Concordia Int'l Corp.*, 2017 WL 4083603, at *9 (S.D.N.Y. July 28, 2017) (same).

87.     Defendant Saltzman also knew or recklessly disregarded that his statements that CLNS presently was experiencing "momentum" in retail IM fundraising where the "the tide appears to have turned for both institutional and retail placements" and where "the environment is as positive as it is" were false and misleading.  As he knew from reporting CLNS's fundraising results and his direct involvement with the funds, the fundraising environment was the ***opposite*** of what he described because the fees the funds sought to charge far exceeded the returns that those funds were generating.  It was Saltzman's responsibility to know these facts.  He

- 42 -

1    certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that CLNS had

2    sufficient disclosure controls in place "to ensure that material information relating to

3    [CLNS], including its consolidated subsidiaries, [was] made known to us by others

4    within those entities."  And consistent with this responsibility, he admitted during

5    CLNS's 1Q 2017 earnings call that "investment management fundraising across both

6    our institutional and retail platforms" was a "top strategic priorit[y]" on which "we

7    have focused" "[s]ince the January merger closing."  At the same time, he was

8    identified by name as one of the "key personnel" on whom the success of the funds

9    depended.[10]  Saltzman made these statements with scienter.

10            88.     Defendant Tangen also knew or recklessly disregarded that defendant

11   Saltzman's statements that CLNS presently was experiencing "momentum" in retail

12   IM fundraising where the "the tide appears to have turned for both institutional and

13   retail placements" and where "the environment is as positive as it is," which were

14   made during an earnings call in which he participated, were false and misleading.

15   Like Saltzman, Tangen knew from reporting CLNS's fundraising results and his direct

16   involvement with the funds that the fundraising environment was the opposite of what

17   Saltzman described because the fees the funds sought to charge far exceeded the

18   returns that those funds were generating.  And like Saltzman, it was also Tangen's

19   responsibility to know these facts.  He certified pursuant to SOX that CLNS had

20   sufficient disclosure controls in place "to ensure that material information relating to

21   [CLNS], including its consolidated subsidiaries, [was] made known to us by others

22   within those entities."  And consistent with this responsibility, Saltzman admitted

23   during CLNS's 1Q 2017 earnings call that "investment management fundraising

24   across both our institutional and retail platforms" was a "top strategic priorit[y]" on

_____

25   [10]   NorthStar/RXR's Form 10-K dated March 21, 2017 reported that "[o]ur success
26   depends to a significant degree upon the contributions of key personnel of our
     Advisory Entities and their affiliates, such as Messrs. . . . Hamamoto, . . . Saltzman,
27   [and] Tangen."  It also reported that "[o]ur future success depends, to a significant
     extent, upon the continued services of key personnel of our Co-sponsors, such as
28   Messrs. . . . Hamamoto, . . . Saltzman, [and] Tangen."

- 43 -

which "we have focused" "[s]ince the January merger closing." Saltzman's statement that the collective "we" had focused on "investment management fundraising across both our institutional and retail platforms" as a "top strategic priorit[y]" "[s]ince the January merger closing" implicates CLNS's upper management, including Tangen. Tangen was also identified by name as "key personnel" on which the success of the funds depended.[11]  Given these facts, Tangen knew or recklessly disregarded that Saltzman's statements were false and misleading and acted with scienter by not correcting those statements. *SmarTalk Teleservices*, 124 F. Supp. 2d at 543 ("[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements.  If nothing else, the former official is at fault for a material omission in failing to correct such statements in that context."); *Meyer*, 2017 WL 4083603, at *9 (same).

89.     On the same day that defendants announced the Company's 4Q 2016 standalone financial results and post-merger update, February 28, 2017, the Company also filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"), which was signed by defendants Saltzman, Tangen, and Hamamoto.  The 2016 10-K included the standalone financial results of the pre-merger entities and included five core strategic real estate segments of the newly formed CLNS: (1) Healthcare; (2) Light Industrial; (3) Hospitality; (4) Other Equity and Debt; and (5) Investment Management.

90.     Presented in the 2016 10-K were the historical financial results and capital-raising details of NSAM.  For example, the 2016 10-K included a summary table of the Retail Companies, which included their capital-raise activity and

---

[11]   NorthStar/RXR's Form 10-K dated March 21, 2017 reported that "[o]ur success depends to a significant degree upon the contributions of key personnel of our Advisory Entities and their affiliates, such as Messrs. . . . Hamamoto, . . . Saltzman, [and] Tangen."  It also reported that "[o]ur future success depends, to a significant extent, upon the continued services of key personnel of our Co-sponsors, such as Messrs. . . . Hamamoto, . . . Saltzman, [and] Tangen."

- 44 -

investments up through February 23, 2017.  The table detailed that only two of the Retail Companies, NorthStar/RXR and the NorthStar Capital Income Fund, had a current active offering.   The table also included a representation that "Colony NorthStar expects [NorthStar/RXR's] capital raise to *accelerate* in 2017" and further noted that CLNS expected a third Retail Company with a total offering amount of $1 billion, NorthStar/Townsend, to become active and "*begin raising capital from third parties in the first half of 2017*."

91.   The 2016 10-K also referenced the *potential* for a conflict of interest involving Townsend in its section on Risk Factors:

> In addition, subject to compliance with Investment Advisers Act rules, we may allow our managed vehicle to enter into principal transactions with us or cross-transactions with other managed vehicles or strategic vehicles.  For certain cross-transactions, we may receive a fee from the managed company *and conflicts may exist*.  If our interests and those of the 84% interest in Townsend Holdings, LLC that NSAM acquired on January 29, 2016, or Townsend, or our managed vehicles are not aligned, *we may face conflicts of interests that result in action or inaction* that is detrimental to us, our managed vehicles, our strategic partnerships or our joint ventures.

92.   Defendants' statements about CLNS's capital fundraising, including that NorthStar/RXR's capital raising would "accelerate" in 2017, were false and/or misleading.  Defendants had no reasonable basis to believe that NorthStar/RXR's capital raise would accelerate in any material amount.  Defendants were charging investors extremely high fees (up to 11%, including 10% in sales-related commissions and fees even after defendants cut their fees in February 2017 and eliminated acquisition and disposition fees) for a fund that had been producing returns lower than a 10-year Treasury note, which at the time was 2.4%. As defendants knew from CLNS's fundraising totals, investors and their financial advisers were largely

- 45 -

unwilling to pay the fees CLNS was demanding under these circumstances.  In fact, it was for this reason that retail fundraising was anemic.  Despite having fundraised for nine months, NorthStar/RXR's cumulative capital raise from third parties had only reached approximately $8.5 million through 4Q 2016, less than 0.5% of its Offering Amount, less than 1% of the projected $1.5 billion that NSAM expected in November 2016, and less than 1% of defendants' $2 billion fundraising assumption.  By omitting these material facts, defendants created a misleading impression about the state of the retail IM business.

93.     Defendants' statement in the table that the NorthStar/Townsend offering was expected to start raising capital in the first half of 2017 omitted a material fact making the statement false and misleading, and its statements about Townsend that "conflicts may exist" and "we may face conflicts of interests that result in action or inaction" were simply false.  As CLNS would reveal months later in its September 2017 press release announcing the Townsend sale to Aon plc, "by the closing of the Colony Capital/NorthStar merger *in January of this year*, it became clear that the market perceived a conflict with Colony's institutional investment management business," requiring CLNS to sell a business that had represented over 60% of NSAM's AUM.  Defendants thus knew about the conflict in January 2017 – over four weeks before they made the false statement – and, importantly, knew Townsend would be put up for sale when they filed the 2016 10-K: CLNS's 1Q 2017 Form 10-Q acknowledged that the entire Townsend business was "held for sale" at March 31, 2017, the same quarter in which CLNS filed the 2016 10-K.  The 2016 10-K did not, however, mention the conflict or the imminent sale.  Defendants' statements describing the conflicts of interest and resulting "action or inaction" as merely potential when they had already come to fruition were admittedly false.  *Mauss v. Nuvavsive, Inc.*, 2015 WL 10857519, at *15 (S.D. Cal. Aug. 28, 2015) ("'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with

near certainty that the Grand Canyon lies one foot away.'") (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)).  And CLNS's statement that it expected the NorthStar/Townsend fund to "begin raising capital from third parties in the first half of 2017" thus misled investors.  Without knowing about this conflict, investors were unable to accurately assess the actual impact of the NorthStar/Townsend capital raise on CLNS's business and financial prospects and did not know that CLNS would be losing an important part of its business.

94.  Defendants' statements in the 2016 10-K that they expected NorthStar/Townsend to "begin raising capital from third parties in the first half of 2017" and that "Colony NorthStar expects [NorthStar/RXR's] capital raise to accelerate in 2017" do not qualify for safe harbor protection.  The PSLRA's safe harbor applies only if "the forward-looking statement is – (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. §78u-5(c)(1)(A)(i).  The Ninth Circuit holds that "[w]e measure the protective function of forward-looking cautionary language using the 'bespeaks caution' doctrine" which "'provides a mechanism by which a court can rule as a matter of law . . . that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.'"  *Atossa Genetics*, 868 F.3d at 798 (quoting *Worlds of Wonder*, 35 F.3d at 1413).  For the doctrine to apply, "[t]here must be sufficient cautionary language or risk disclosure such that reasonable minds could not disagree that the challenged statements were not misleading.'"  *Id.* (quoting *Livid Holdings*, 416 F.3d at 947).  "To meet this standard, 'the language bespeaking caution [must] relate directly to that to which plaintiffs claim to have been misled.'"  *Id.* (quoting *Worlds of Wonder*, 35 F.3d at 1415) (alteration in original).

4840-4394-8197.v1

95.     CLNS's 2016 10-K explained that "[t]he following factors, among others, could cause actual results and future events to differ materially from those set forth or contemplated in the forward-looking statements:

- the market, economic and environmental conditions in the industrial real estate, single-family rental, healthcare, commercial real estate debt and equity, investment management and hospitality sectors; [the "Market, Economic, and Environmental Conditions Warning"];

- any decrease in our net income and funds from operations as a result of the Mergers (as defined in Item 1. - Business), or our other acquisition activity [the "Mergers & Acquisitions Warning"];

- our ability to manage and integrate following the Mergers and our other acquisitions effectively and maintain consistent standards and controls and realize the anticipated benefits of the acquisitions [the "Managing Mergers & Acquisitions Warning"];

- our exposure to risks to which we have not historically been exposed, including liabilities with respect to the assets acquired through the Mergers and our other acquisitions [the "Liabilities From Mergers & Acquisitions Warning"];

- our business and investment strategy, including the ability of the businesses in which we have a significant investment to execute their business strategies [the "Business Strategy Warning"];

- our ability to grow our business by raising capital for the companies that we manage [the "Raising Capital Warning"];

- the ability to realize substantial efficiencies and synergies as well as anticipated strategic and financial benefits, and the impact of

- 48 -

legislative, regulatory and competitive changes [the "Synergies & Legislative, Regulatory, and Competitive Changes Warning"];

- performance of our investments relative to our expectations and the impact on our actual return on invested equity, as well as the cash provided by these investments and available for distribution [the "Investment Performance Warning"];

- the impact of adverse conditions affecting a specific asset class in which we have investments [the "Adverse Conditions Warning"];

- the impact of economic conditions on third parties on which we rely [the "Economic Conditions on Third Parties Warning"];

- adverse domestic or international economic conditions and the impact on the commercial real estate or real-estate related industries [the "Economic Conditions Warning"];

- actions, initiatives and policies of the U.S. and non-U.S. governments and changes to U.S. or non-U.S. government policies and the execution and impact of these actions, initiatives and policies [the "Government Warning"];

- our ability to obtain and maintain financing arrangements, including securitizations [the "Financing Warning"];

- the availability of attractive investment opportunities [the "Investment Opportunities Warning"];

- our ability to satisfy and manage our capital requirements [the "Capital Requirements Warning"];

- the general volatility of the securities markets in which we participate [the "Securities Market Volatility Warning"];

- changes in interest rates and the market value of our target assets [the "Interest Rate Warning"];

- 49 -

- •    our ability to maintain our qualification as a real estate investment trust for U.S. federal income tax purposes [the "REIT Warning"];

- •    our ability to maintain our exemption from registration as an investment company under the Investment Company Act of 1940, as amended [the "Investment Company Exemption Warning"];

- •    the availability of qualified personnel [the "Qualified Personnel Warning"]; and

- •    our understanding of our competition [the "Understanding Competition Warning"]."

96.    These cautions were required to, but did not, "'relate directly to that to which plaintiffs claim to have been misled.'" *Atossa Genetics*, 868 F.3d at 798.  The Mergers & Acquisitions Warning, the Managing Mergers & Acquisitions Warning, the Liabilities From Mergers & Acquisitions Warning, the Business Strategy Warning, the Raising Capital Warning, the Synergies & Legislative, Regulatory, and Competitive Changes Warning, the Investment Performance Warning, the Adverse Conditions Warning, the Economic Conditions on Third Parties Warning, the Economic Conditions Warning, the Government Warning, the Financing Warning, the Investment Opportunities Warning, the Capital Requirements Warning, the Securities Market Volatility Warning, the Interest Rate Warning, the REIT Warning, the Investment Company Exemption Warning, the Qualified Personnel Warning, and the Understanding Competition Warning spoke to completely different aspects of CLNS's business.  And while the Market, Economic, and Environmental Conditions Warning listed unidentified market, economic, and environmental conditions and superficially addressed the investment-management sector, it said nothing about an actual, existing conflict of interest between Townsend and Colony's legacy institutional IM business, the imminent sale of Townsend, or a lack of retail fundraising because of the underlying funds' fees and performance, which are the relevant truths that defendants concealed in the 2016 10-K.  These warnings did not relate directly to that which

- 50 -

plaintiff claims to have been misled such that reasonable minds could not disagree that the challenged statements were not misleading.  In fact, the only warning in CLNS's 2016 10-K that addressed the Townsend conflict was false and misleading and thus cannot qualify as a meaningful caution for purposes of the safe harbor application.  *See Quality Sys.*, 865 F.3d at 1146-47 ("If the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language – short of an outright admission of the false or misleading nature of the non-forward-looking statement – would be 'sufficiently meaningful' to qualify the statement for the safe harbor.").

97.  Defendant Saltzman knew that the statements in the 2016 10-K (which he signed) that he expected NorthStar/Townsend to "begin raising capital from third parties in the first half of 2017" and his warnings about ***potential*** conflicts of interest involving Townsend, were false and misleading.  In CLNS's September 1, 2017 press release announcing the sale of Townsend to Aon, Saltzman admitted that he had known about the conflict in January 2017, explaining that "Townsend is a terrific non-core legacy NorthStar business, but ***by the closing of the Colony Capital/NorthStar merger in January of this year, it became clear*** that the market perceived a conflict with Colony's institutional investment management business."  And the Townsend business was "held for sale" at March 31, 2017, the same quarter in which Saltzman discussed CLNS's results during its earnings call and filed and signed the 2016 10-K with the SEC.  Saltzman was obviously aware of these material facts and Townsend's imminent sale when he signed the 2016 10-K.  In fact, he followed these conflicts closely.  He even met with defendant Hamamoto in March 2016 and discussed conflicts-of-interest concerns arising from the potential merger, as confirmed in the jointly filed merger proxy statement.

98.  Defendant Saltzman also knew that the statement in the 2016 10-K that CLNS expected that NorthStar/RXR's capital raise would "accelerate in 2017" was false and misleading.  In fact, there was no basis for that statement.  As he knew from

1    reporting CLNS's fundraising results and from his direct involvement with the funds,
2    there was no basis to believe that fundraising in NorthStar/RXR would accelerate
3    given that the fees that NorthStar/RXR sought to charge far exceeded the returns that
4    any of CLNS's funds were generating.  And it was Saltzman's responsibility to know
5    these facts.  He certified pursuant to SOX that CLNS had sufficient disclosure controls
6    in place "to ensure that material information relating to [CLNS], including its
7    consolidated subsidiaries, [was] made known to us by others within those entities" and
8    consistent with this responsibility, he acknowledged during CLNS's 1Q 2017 earnings
9    call that "investment management fundraising across both our institutional and retail
10   platforms" was a "top strategic priorit[y]" on which "we have focused" "[s]ince the
11   January merger closing."  He was also identified by name as among "key personnel"
12   at the underlying funds and would undoubtedly have known about the funds' fees and
13   performance.[12]  Saltzman was thus clearly aware that the statement about expecting
14   accelerated fundraising at NorthStar/RXR lacked a reasonable basis, and thus acted
15   with scienter when signing the 2016 10-K without their disclosure.

16         99.    Defendant Tangen also knew that the statement in the 2016 10-K (which
17   he signed) that he expected NorthStar/Townsend to "begin raising capital from third
18   parties in the first half of 2017" and his warnings about *potential* conflicts of interest
19   involving Townsend were both false and misleading.  In CLNS's September 1, 2017
20   press release announcing the Townsend sale to Aon, defendant Saltzman admitted that
21   it "became clear" in January that "the market perceived a conflict with Colony's
22   institutional investment management business."  Saltzman was not speaking just about
23   himself but instead about the collective CLNS, which included Tangen.  And like with
24   Saltzman, the Townsend business was "held for sale" at March 31, 2017, the same

---

[12]   NorthStar/RXR's Form 10-K dated March 21, 2017 reported that "[o]ur success
depends to a significant degree upon the contributions of key personnel of our
Advisory Entities and their affiliates, such as Messrs. . . . Hamamoto, . . . Saltzman,
[and] Tangen."  It also reported that "[o]ur future success depends, to a significant
extent, upon the continued services of key personnel of our Co-sponsors, such as
Messrs. . . . Hamamoto, . . . Saltzman, [and] Tangen."

1  quarter in which Tangen discussed CLNS's results during its earnings call and filed

2  and signed the 2016 10-K with the SEC.  In addition, as CFO responsible for CLNS's

3  financial reporting, Tangen would undoubtedly have known about the Townsend

4  conflict, its imminent sale, and NorthStar/RXR's anemic fundraising performance

5  when he signed the 2016 10-K.  Indeed, Tangen in CLNS's 2016 10-K certified

6  pursuant to SOX that CLNS had sufficient disclosure controls in place "to ensure that

7  material information relating to [CLNS], including its consolidated subsidiaries, [was]

8  made known to us by others within those entities."  Saltzman's statement that the

9  collective "we" had focused on "investment management fundraising across both our

10 institutional and retail platforms" as a "top strategic priorit[y]" "[s]ince the January

11 merger closing" implicates CLNS's management, including Tangen, and leaves little

12 doubt that Tangen was aware of these material facts when signing the 2016 10-K.  The

13 loss of $66 million in fees and $14 billion in AUM would not have gone unnoticed by

14 Tangen, especially given Saltzman's acknowledgment that CLNS management was

15 focused on the IM business as well as the funds, where Tangen was identified by

16 name as a "key personnel."[13]  Tangen was clearly aware of these material and omitted

17 facts and acted with scienter when signing the 2016 10-K without their disclosure.

18      100.   Defendant Tangen also knew that the statement in the 2016 10-K that

19 CLNS expected that NorthStar/RXR's capital raise would "accelerate in 2017" was

20 false and misleading.  Like with defendant Saltzman, there was no basis for that

21 statement.  As Tangen knew from reporting CLNS's fundraising results and from his

22 direct involvement with the funds, there was no basis to believe that fundraising in

23 NorthStar/RXR would accelerate given that the fees that NorthStar/RXR sought to

24 charge far exceeded the returns that any of CLNS's funds were generating.  And like

---

[13]   NorthStar/RXR's Form 10-K dated March 21, 2017 reported that "[o]ur success depends to a significant degree upon the contributions of key personnel of our Advisory Entities and their affiliates, such as Messrs. . . . Hamamoto, . . . Saltzman, [and] Tangen."  It also reported that "[o]ur future success depends, to a significant extent, upon the continued services of key personnel of our Co-sponsors, such as Messrs. . . . Hamamoto, . . . Saltzman, [and] Tangen."

- 53 -

with Saltzman, it was Tangen's responsibility to know these facts.  He certified pursuant to SOX that CLNS had sufficient disclosure controls in place "to ensure that material information relating to [CLNS], including its consolidated subsidiaries, [was] made known to us by others within those entities."   And consistent with this responsibility, Saltzman acknowledged during CLNS's 1Q 2017 earnings call that "investment management fundraising across both our institutional and retail platforms" was a "top strategic priorit[y]" on which "we have focused" "[s]ince the January merger closing."  Saltzman's statement that the collective "we" had focused on "investment management fundraising across both our institutional and retail platforms" as a "top strategic priorit[y]" "[s]ince the January merger closing" implicates CLNS's management, including Tangen.  Tangen was also identified by name as "key personnel" at the underlying funds and would undoubtedly have known about the funds' fees and performance.[14]  Saltzman was thus clearly aware that the statement about expecting accelerated fundraising at NorthStar/RXR lacked a reasonable basis and acted with scienter when signing the 2016 10-K.

101.   Defendant Hamamoto also knew that the statement in the 2016 10-K (which he signed) that he expected NorthStar/Townsend to "begin raising capital from third parties in the first half of 2017" and his warnings about *potential* conflicts of interest involving Townsend were false and misleading, and thus signed the 2016 10-K with scienter.  As disclosed in the jointly filed merger proxy statement, both Hamamoto and defendant Saltzman met in March of 2016 and discussed conflicts-of-interest concerns arising from the potential merger.  Indeed, as NSAM's Executive Chairman when it acquired its majority stake in Townsend and as the chief architect of the NorthStar entities' merger with Colony, Hamamoto was keenly aware of the

---

[14]   NorthStar/RXR's Form 10-K dated March 21, 2017 reported that "[o]ur success depends to a significant degree upon the contributions of key personnel of our Advisory Entities and their affiliates, such as Messrs. . . . Hamamoto, . . . Saltzman, [and] Tangen."  It also reported that "[o]ur future success depends, to a significant extent, upon the continued services of key personnel of our Co-sponsors, such as Messrs. . . . Hamamoto, . . . Saltzman, [and] Tangen."

- 54 -

conflict that would force CLNS to jettison Townsend once the merger was consummated.  Further, in CLNS's September 1, 2017 press release announcing the Townsend sale to Aon, Saltzman admitted that it "became clear" in January that "the market perceived a conflict with Colony's institutional investment management business."  Saltzman was not speaking just about himself but instead about the collective CLNS, which included Hamamoto.  And like with Saltzman, the Townsend business was "held for sale" at March 31, 2017, the same quarter in which Hamamoto filed and signed the 2016 10-K with the SEC.

102.    Defendant Hamamoto also knew that the statement in the 2016 10-K that CLNS expected that NorthStar/RXR's capital raise would "accelerate in 2017" was false and misleading.  As NSAM's Executive Chairman, Hamamoto was well aware of NorthStar/RXR's actual fundraising results, including that it had raised a mere $8.5 million through 4Q 2016 – less than 0.5% of its Offering Amount after nine months – because NSAM was charging investors exorbitantly high fees for a fund that had produced returns lower than a 10-year Treasury note.  And like with defendants Saltzman and Tangen, Hamamoto was focusing on retail IM fundraising efforts. Saltzman's statement that the collective "we" had focused on "investment management fundraising across both our institutional and retail platforms" as a "top strategic priorit[y]" "[s]ince the January merger closing" implicates CLNS's management, including Hamamoto.  Hamamoto was also identified by name as a "key personnel" for the underlying funds and was therefore in a position to know about fees, performance, and fundraising.[15]  Hamamoto was thus clearly aware that the statement about expecting accelerated fundraising at NorthStar/RXR lacked a reasonable basis and acted with scienter when signing the 2016 10-K.

---

[15]  NorthStar/RXR's Form 10-K dated March 21, 2017 reported that "[o]ur success depends to a significant degree upon the contributions of key personnel of our Advisory Entities and their affiliates, such as Messrs. . . . Hamamoto, . . . Saltzman, [and] Tangen."  It also reported that "[o]ur future success depends, to a significant extent, upon the continued services of key personnel of our Co-sponsors, such as Messrs. . . . Hamamoto, . . . Saltzman, [and] Tangen."

- 55 -

### 2. False and Misleading Statements When Reporting CLNS's First Quarter Results

103.   On May 9, 2017, CLNS issued a press release and filed a Form 8-K, which was signed by defendant Tangen, announcing its 1Q 2017 financial results. The Company reported Core FFO for the quarter of $173.1 million, or $0.31 per share, tracking to 11% below the low point and 21% below the high point of the 2017 Core FFO guidance – an inauspicious performance, given that these were CLNS's first combined post-merger financial results.  In the press release, defendant Saltzman reassured investors that "*[w]e remain on track to achieve our 2017 full year goals for Core FFO* including synergies, new investor client capital formation, and simplification; notwithstanding some seasonal and other timing related performance differences in the first quarter."

104.   Defendant Saltzman's statement that CLNS "remain[ed] on track to achieve our 2017 full year goals for Core FFO" was false and misleading.  The sheer number of shares issued and outstanding, combined with the revised Core FFO calculation that eliminated the very adjustments that NRF used to inflate CAD, along with the business conditions of the three merged entities – including the low and nonexistent CAD and Core FFO growth rates as alleged at ¶66 – made the guidance hurdle insurmountable and any claim to be "on track" to meet guidance false and misleading.  The Core FFO results for the quarter, at $0.31 per share, proved that neither NRF nor NSAM would produce in a manner to contribute to the 33%-50% growth CLNS's guidance required.  On a straight-line basis, CLNS was not "on track to achieve [its] 2017 full year goals for Core FFO"; it was actually tracking to miss the bottom end of the guidance range by $0.16 per share (11%) and the top end by $0.34 per share (21%).  To the extent defendants were describing the current state of the business, they knew those statements were false or misleading.  CLNS was certainly not on track to meet guidance. It had dug a $0.04 hole to guidance with poor first quarter results and now needed even stronger growth from these low-growth and, in

the case of NRF, no-growth businesses.  And the prospect of recouping lost ground to guidance was unrealistic.  Defendants had liquidated approximately half of NRF's real estate assets, were continuing to liquidate assets as they were "running for the exit" on NRF's primary businesses, and were experiencing nearly nonexistent retail IM fundraising results at NSAM, which had lost the $186 million NRF Management Agreement and faced the imminent sale of Townsend.  To the extent defendants were projecting the future, they simply had no reasonable basis for the same reasons. Indeed, these results confirmed that the legacy NorthStar entities would not contribute sufficiently for CLNS to meet its guidance range.

105.   Defendants' statements in CLNS's May 9, 2017 press release that "[w]e remain on track to achieve our 2017 full year goals for Core FFO" do not qualify for safe harbor protection.  The PSLRA's safe harbor applies only if "the forward-looking statement is – (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement . . . ."  15 U.S.C. §78u-5(c)(1)(A)(i).  The Ninth Circuit holds that "[w]e measure the protective function of forward-looking cautionary language using the 'bespeaks caution' doctrine" which "'provides a mechanism by which a court can rule as a matter of law . . . that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.'"  *Atossa Genetics*, 868 F.3d at 798 (quoting *Worlds of Wonder*, 35 F.3d at 1413).  For the doctrine to apply, "[t]here must be sufficient cautionary language or risk disclosure such that reasonable minds could not disagree that the challenged statements were not misleading.'"  *Id.* (quoting *Livid Holdings*, 416 F.3d at 947).  "To meet this standard, 'the language bespeaking caution [must] relate directly to that to which plaintiffs claim to have been misled.'"  *Id.* (quoting *Worlds of Wonder*, 35 F.3d at 1415).

4840-4394-8197.v1

1    106.   CLNS's May 9, 2017 press release for 1Q 2017 contained an excerpt at

2    the end of the release that effectively duplicated the cautions made a quarter earlier

3    (¶68) as follows:

4            Forward-looking statements involve known and unknown risks,

5        uncertainties, assumptions and contingencies, many of which are beyond

6        the Company's control, and may cause the Company's actual results to

7        differ significantly from those expressed in any forward-looking

8        statement.  Factors that might cause such a difference include, without

9        limitation, [1] our failure to achieve anticipated synergies in and benefits

10       of the completed merger among NorthStar Asset Management Group

11       Inc., Colony Capital, Inc. and NorthStar Realty Finance Corp. [the

12       "Synergy Warning"], [2] Colony NorthStar's liquidity, including its

13       ability to complete identified monetization transactions and other

14       potential sales of non-core investments [the "Liquidity Warning"], [3]

15       whether Colony NorthStar will be able to maintain its qualification as a

16       real estate investment trust, or REIT, for U.S. federal income tax

17       purposes [the "REIT Warning"], [4] the timing of and ability to deploy

18       available capital [the "Deploying Capital Warning"], [5] the timing of

19       and ability to complete repurchases of Colony NorthStar's stock [the

20       "Stock Repurchase Warning"], [6] Colony NorthStar's ability [to]

21       maintain inclusion and relative performance on the RMZ [the "RMZ

22       Warning"], [7] Colony NorthStar's leverage, including the timing and

23       amount of borrowings under its credit facility, increased interest rates

24       and operating costs, adverse economic or real estate developments in

25       Colony NorthStar's markets [the "Leverage Warning"], [8] Colony

26       NorthStar's failure to successfully operate or lease acquired properties,

27       decreased rental rates, increased vacancy rates or failure to renew or

28       replace expiring leases, defaults on or non-renewal of leases by tenants

- 58 -

[the "Property Warning"], [9] the impact of economic conditions on the borrowers of Colony NorthStar's commercial real estate debt investments and the commercial mortgage loans underlying its commercial mortgage backed securities [the "Borrower Warning"], [10] adverse general and local economic conditions [the "Economic Conditions Warning"], [11] an unfavorable capital market environment [the "Capital Market Warning"], [12] decreased leasing activity or lease renewals [the "Leasing Warning"], and [13] other risks and uncertainties detailed in our filings with the U.S. Securities and Exchange Commission ("SEC") [the "Catchall Warning"]. All forward-looking statements reflect the Company's good faith beliefs, assumptions and expectations, but they are not guarantees of future performance. Additional information about these and other factors can be found in Colony NorthStar's reports filed from time to time with the SEC.

107.   These cautions were required to, but did not, "'relate directly to that to which plaintiffs claim to have been misled.'" *Atossa Genetics*, 868 F.3d at 798.  In fact, none of the warnings had anything to do with CLNS's ability or progress at the time to achieve its 2017 Core FFO guidance.  The Synergy Warning, the Liquidity Warning, the REIT Warning, the Deploying Capital Warning, the Stock Repurchase Warning, the RMZ Warning, the Leverage Warning, the Property Warning, the Borrower Warning, and the Economic Conditions Warning spoke to completely different aspects of CLNS's business.  And the Capital Market Warning only cautioned investors about the possibility of an unfavorable capital market environment while remaining silent on the numerous obstacles already making the statement that CLNS "remain[ed] on track to achieve our 2017 full year goals for Core FFO" false and misleading – including the fact that the Company had dug a $0.04 hole to guidance and that it could not expect IM economies to make up the ground because its

- 59 -

1    retail fees and the Retail Companies' poor performance were causing financial

2    advisers and their clients to avoid investing new capital in these vehicles.

3        108.   During the earnings call the next day, defendant Saltzman reiterated the

4    falsehood that CLNS remained on track to achieve full year Core FFO guidance:

5            Our core FFO for the quarter was $0.31 per share, which Darren

6        will discuss in greater detail on this call.   This result reflects the

7        seasonality of our hospitality segment as well as other timing

8        differences, and *we remain on track to achieve our 2017 full year goals*

9        *for core FFO*.   For example, the first quarter did not reflect the full

10       impact of capital raising and investments that occurred during the

11       quarter, including our common stock repurchases, which generally

12       happen later in the quarter or subsequent to quarter end.

13       109.   Defendant Tangen also reassured investors that CLNS "*remain[ed] on*

14   *track to achieve the full year 2017 core FFO guidance range,*" in particular, because

15   of retail investment management:

16       Results, which we do not consider as representative of the company's

17       stabilized earnings potential.   Notably, the seasonal impact of our

18       hospitality business in the first quarter was approximately $0.02 per

19       share, which is the difference between actual Q1 results and the simple

20       quarterly average based on expected results in this segment over the

21       calendar year.   Furthermore, if we apply the forecast $80 million cash

22       G&A synergy benefit and the stock repurchases, which happened in the

23       past 2 months, core FFO would have been a further (technical difficulty)

24       per share higher.   Additional core FFO upside exists from reaching full

25       capital deployment and expected ramp up over the course of the year

26       from other investments and businesses, *including retail investment*

27       *management*.   For these reasons, we believe *we remain on track to*

28

4840-4394-8197.v1

1    ***achieve the full year 2017 core FFO guidance range presented on our***
2    ***last call***.

3    110.   Despite disappointing IM results from the Retail Companies, defendant
4    Saltzman falsely described the "positive momentum" in "our . . . fundraising" and
5    "acceleration in the pace of [our retail] fundraising" with funds that "are structured to
6    be highly attractive to a very broad group of financial advisers and their clients":

7          Turning to our retail platform.   After an extended period of
8          extraordinary market disruption mainly driven by significant regulatory
9          changes, ***we are finally seeing positive momentum in the overall retail***
10         ***marketplace as well as in our own fundraising***.  We've positioned our
11         retail platform and product lineup to take full advantage of the evolving
12         market environment and to support our goals of broadening the pool and
13         channels of capital we access, which now includes registered investment
14         advisers and traditional Wall Street firms, in addition to the historical
15         network of independent broker-dealers, all with an objective of bringing
16         Colony NorthStar's institutional asset management acumen and best
17         practices to the retail investor client.   And post merger, this includes
18         using our balance sheet to foster better alignment of interest with
19         investors.   Our offerings include nontraded REITs and 40 Act funds
20         allowing us to serve both long-term existing relationships and targeted
21         new pools of capital.   Product structures are innovative and best-in-class,
22         well suited to the new market environment and reflect our drive to be a
23         visionary value-producing leader in the marketplace.

24         ***In connection therewith, we've seen strong progress in building***
25         ***the selling groups in our current offerings and a commensurate***
26         ***acceleration in the pace of fundraising***.   More than $6 billion of
27         targeted capital is anticipated to be raised in products that are generally
28         early in their life cycles and just starting the capital raising process,

- 61 -

4840-4394-8197.v1

including our 2 effective programs the $2 billion NorthStar/RXR New York Metro real estate nontraded REIT and a $3.2 billion NorthStar Real Estate Capital Income 40 Act closed-end fund, as well as our soon-to-be effective $1 billion NorthStar/Townsend Institutional Real Estate 40 Act interval fund.  Privately placed retail products, or institutional funds that have a retail sleeve, are also in various stages of development.  ***All of these are structured to be highly attractive to a very broad group of financial advisers and their clients***.

111.   Defendants Saltzman and Tangen's statements during the earnings call that CLNS "remain[ed] on track" to meet the $1.40 to $1.58 guidance range were false and misleading.  The number of shares issued and outstanding, combined with the revised Core FFO calculation that eliminated the very adjustments that NRF used to inflate CAD, along with the business conditions of the three merged entities – including the low and non-existent CAD and Core FFO growth rates as alleged at ¶66 – made the guidance hurdle insurmountable and any claim of being "on track" to meet guidance false and misleading.  The Core FFO results for the quarter, at $0.31 per share, proved that neither NRF nor NSAM would produce in a manner to contribute to the 33%-50% growth defendants' guidance required.  On a straight-line basis, CLNS was not "on track to achieve our 2017 full year goals for Core FFO."  It was actually tracking to miss the bottom end of the guidance range by $0.16 per share (11%) and the top end by $0.34 per share (21%).  To the extent defendants were describing the current state of the business, they knew those statements were false or misleading.  Indeed, CLNS was certainly not on track to meet guidance. It had dug a $0.04 hole to guidance with poor first quarter results and now needed even stronger growth from these low-growth and, in the case of NRF, no-growth businesses.  And the prospect of recouping lost ground to guidance was unrealistic.  Defendants had already liquidated approximately half of NRF's real estate assets, were continuing to liquidate assets as they were "running for the exit" on NRF's primary businesses, and were experiencing

- 62 -

nearly nonexistent retail IM fundraising results at NSAM, which had lost the $186 million NRF Management Agreement and faced the imminent sale of Townsend.  To the extent defendants were projecting the future, they simply had no reasonable basis for the same reasons.  Indeed, these results confirmed that the legacy NorthStar entities would not contribute sufficiently for CLNS to meet its guidance range.

112.    Defendants' statements that "we are finally seeing positive momentum in the overall retail marketplace as well as in our own fundraising," that "we've seen strong progress in building the selling groups in our current offerings and a commensurate acceleration in the pace of fundraising," and that "[a]ll of these are structured to be highly attractive to a very broad group of financial advisers and their clients" were false and misleading.   CLNS was not experiencing "positive momentum" or an "acceleration in the pace of fundraising"; to the contrary, its capital-raising activity had collapsed and was continuing to slide from 2016 levels as reflected in the graph below:



113.    Fundraising from the active funds – *i.e.*, the funds necessary to meaningfully contribute to Core FFO – were not experiencing "positive momentum"

1  or acceleration.  They were actually anemic and falling.  Only one of the two active

2  retail funds, NorthStar/RXR, had raised any funds at all and those had *declined* from

3  $6.5 million in 4Q 2016 to $5.2 million in 1Q 2017 when defendants Saltzman and

4  Tangen made these statements, as investors continued to avoid NorthStar/RXR not

5  only given the size of its fees but also given its performance.  The other active retail

6  fund, NorthStar Capital Income Fund, which CLNS offered to investors that quarter,

7  raised no third-party capital whatsoever.  Like NorthStar/RXR, investors and their

8  financial advisors refused to pay its high fees for the NorthStar Capital Income Fund

9  given its underlying performance, leaving CLNS without a meaningful incremental

10  contribution to its $2 billion fundraising assumption.  By omitting that these funds, in

11  reality, were not "highly attractive to a very broad group of financial advisers and

12  their clients" because of their high fees and poor performances, Saltzman's statement

13  that they were "structured" as such was materially misleading.

14      114.  Defendants' statements during the earnings call that CLNS was "on

15  track" to achieve the Company's full year 2017 core FFO guidance range do not

16  qualify for safe harbor protection.  The PSLRA's safe harbor applies to oral forward-

17  looking statements only if:

18          (A) the oral forward-looking statement is accompanied by a cautionary

19          statement –

20              (i) that the particular oral statement is a forward-looking

21          statement; and

22              (ii) that the actual results might differ materially from those

23          projected in the forward-looking statement; *and*

24          (B) if –

25              (i) the oral forward-looking statement is accompanied by an oral

26          statement that additional information concerning factors that could cause

27          actual results to materially differ from those in the forward-looking

28

- 64 -

1   statement is contained in a readily available written document, or portion

2   thereof;

3       (ii) the accompanying oral statement referred to in clause (i)

4   identifies the document, or portion thereof, that contains the additional

5   information about those factors relating to the forward-looking

6   statement; and

7       (iii) the information contained in that written document is a

8   cautionary statement that satisfies the standard established in paragraph

9   (1)(A).

10   15 U.S.C. §78u-5(c)(2).  Courts hold that vaguely referring investors to SEC filings is

11   insufficient to invoke the safe harbor.  *Apple Comput.*, 2003 WL 26111982, at \*2

12   (referring generally to "Apple's SEC filings" was insufficient as it "'identifies' no

13   specific documents or page numbers or even a date on which the relevant documents

14   were filed"); *Lomingkit*, 2017 WL 633148, at \*18 ("vaguely refer[ing] investors to

15   'ICC filings'" insufficient).

16       115.   The introductory comments to CLNS's 1Q 2017 earnings call explained

17   that: "Potential risks and uncertainties that could cause the Company's business and

18   financial results to differ materially from these forward-looking statements are

19   described in ***the Company's periodic reports filed with the SEC from time to time***."

20   This introduction, which was the boilerplate introduction used for every earnings call,

21   did not "identif[y] the document, or portion thereof, that contains the additional

22   information about those factors relating to the forward-looking statement" as the

23   statute requires.   15 U.S.C. §78u-5(c)(2).   Any forward-looking statement made

24   during the call thus does not qualify for safe harbor protection as CLNS failed to

25   satisfy the statute's express requirements.

26       116.   Even if CLNS had "identifie[d] the document, or portion thereof, that

27   contains the additional information about those factors relating to the forward-looking

28   statement," any cautionary language referenced would not invoke the safe harbor.

- 65 -

1     Indeed, the Ninth Circuit holds that "[w]here a forward-looking statement is
2     accompanied by a non-forward-looking factual statement that supports the forward-
3     looking statement, cautionary language must be understood in the light of the non-
4     forward-looking statement" and that "[i]f the non-forward-looking statement is
5     materially false or misleading, it is likely that no cautionary language – short of an
6     outright admission of the false or misleading nature of the non-forward-looking
7     statement – would be 'sufficiently meaningful' to qualify the statement for the safe
8     harbor." *Quality Sys.*, 865 F.3d at 1146-47.

9         117.   Defendants' statements that CLNS was "on track" to reach guidance
10    were accompanied by present-tense assertions that "we are finally seeing positive
11    momentum in the overall retail marketplace as well as in our own fundraising," that
12    "we've seen strong progress in building the selling groups in our current offerings and
13    a commensurate acceleration in the pace of fundraising," and that "[a]ll of these are
14    structured to be highly attractive to a very broad group of financial advisers and their
15    clients," which were false and misleading for the reasons alleged at ¶104.   Any
16    cautionary language in the unidentified "periodic reports filed with the SEC from time
17    to time" was not "'sufficiently meaningful' to qualify the statement for the safe
18    harbor" since it was not accompanied by "an outright admission of the false or
19    misleading nature of the[se] non-forward-looking statement[s]." *Quality Sys.*, 865
20    F.3d at 1146-47.   Moreover, the cautionary language contained in CLNS's periodic
21    reports throughout the Class Period – which largely duplicate the cautions made in the
22    Company's 2016 10-K – did not "'relate directly to that to which plaintiffs claim to
23    have been misled'" for the reasons alleged at ¶¶95-96. *See Atossa Genetics*, 868 F.3d
24    at 798.

25        118.   Defendant Saltzman knew that his statements about being "on track" to
26    guidance and about "positive momentum" in retail IM fundraising, "acceleration in
27    the pace of fundraising," and "highly attractive" fund structures were false and were
28    thus made with scienter.  For the reasons alleged at ¶¶66, 70-72, Saltzman had actual

- 66 -

1   knowledge that guidance, as originally issued, lacked a reasonable basis and was
2   aware that the NorthStar entities would not contribute to the growth necessary to meet
3   guidance.  In fact, with NRF's 2016 CAD growth at a negative 40%, NSAM's 2016
4   CAD growth at 0.9%, and Colony's Core FFO growth of 4.5%, Saltzman knew that
5   the combined entities, even with the all of the projected synergies, would not reach
6   even the bottom of the growth rates originally projected.  With a quarter that fell $0.04
7   short of the run rate necessary to meet guidance, necessitating even more aggressive
8   growth rates going forward, and retail IM fundraising that was nearly nonexistent and
9   continuing to slide, Saltzman knew that his statement about being "on track" lacked a
10  reasonable basis and that his statements about "positive momentum" in retail IM
11  fundraising, "acceleration in the pace of fundraising," and  "highly attractive" fund
12  structures were simply false.  Indeed, as alleged at ¶87, Saltzman was focusing on
13  retail IM fundraising as a "top strategic priorit[y]" and, as a specifically named "key
14  personnel" of the Advisory Committee and Co-Sponsors of the underlying funds, was
15  in a position to know and discover critical information about the causes of CLNS's
16  failed retail IM fundraising efforts.  *See In re Apple Comput. Sec. Litig.*, 886 F.2d
17  1109, 1113 (9th Cir. 1989) ("A projection or statement of belief contains [the] implicit
18  factual assertion . . . that there is a reasonable basis for that belief.").

19       119.   Defendant Tangen similarly knew that his statements about being "on
20  track" to guidance and the statements about "positive momentum" in retail IM
21  fundraising, "acceleration in the pace of fundraising," and  "highly attractive" fund
22  structures were false and were thus made with scienter.  For the reasons alleged at
23  ¶¶66, 73-74, Tangen had actual knowledge that the guidance, as originally issued,
24  lacked a reasonable basis at the time and was aware that the NorthStar entities would
25  not contribute to the growth necessary to meet guidance.  In fact, with NRF's 2016
26  CAD growth at a negative 40%, NSAM's 2016 CAD growth at 0.9%, and Colony's
27  Core FFO growth of 4.5%, Tangen knew that the combined entities, even with all of
28  the projected synergies, would not reach even the bottom of the growth rates

- 67 -

originally projected.  Like defendant Saltzman, faced with a quarter that fell $0.04 short of the run rate necessary to meet guidance, necessitating even more aggressive growth rates going forward, and retail IM fundraising that was nearly non-existent and continuing to slide, Tangen knew that his statement about being "on track" lacked a reasonable basis and that Saltzman's statements during the earnings call, in which Tangen participated, about "positive momentum" in retail IM fundraising, "acceleration in the pace of fundraising," and "highly attractive" fund structures were simply false.  Indeed, as alleged at ¶88, Tangen was focusing on retail IM fundraising as a "top strategic priorit[y]" and was a specifically named "key personnel" of the Advisory Committee and Co-Sponsors of the underlying funds, putting him in a position to know and discover critical information about the causes of CLNS's failed retail IM fundraising efforts.  *See Apple Comput.*, 886 F.2d at 1113 ("A projection or statement of belief contains [the] implicit factual assertion . . . that there is a reasonable basis for that belief.").

### 3. False and Misleading Statements When Reporting CLNS's Second Quarter 2017

120.   On August 8, 2017, CLNS issued a press release and filed a Form 8-K, which was signed by defendant Tangen, announcing its 2Q 2017 financial results, which included Core FFO of $203.6 million, or $0.35 per basic share.  CLNS also included with its Form 8-K filing a financial supplement that outlined the "Capital Raising Status" of its Retail Companies.  The press release that accompanied the financial supplement noted that CLNS "and its share of affiliates raised approximately $285 million of ***third-party capital*** from institutional clients and retail investors."  Retail capital raised during the quarter totaled $59.1 million, $34.6 million of which came from dividend reinvestments in CLNS's three closed funds, leaving just $24.4 million from the two active funds.  Of those two, NorthStar/RXR and the NorthStar Capital Income Fund were reported to have raised $12.4 million and $12.1 million, respectively.

1    121.   The following day, during the Company's earnings call to discuss its

2    results, defendant Saltzman recognized certain purported "industry challenges" facing

3    the retail IM business for the first time, but made clear that the Company "***remain[ed]***

4    ***optimistic***" that it "***will continue to institutionalize and rebound***":

5            On the other hand, an extended period of extraordinary structural

6            change and market disruption, including the very recent Department of

7            Labor fiduciary for adoption and implementation in June, has negatively

8            impacted the retail investment management business year-to-date.

9            ***Despite these industry challenges, we remain optimistic that the retail***

10           ***investment management business will continue to institutionalize and***

11           ***rebound***.

12   122.   CLNS's statements in ¶120 about its fundraising totals were false and

13   misleading.  CLNS reported that total fundraising from the active funds had jumped

14   from $5.2 million in 1Q 2017 to $24.5 million in 2Q 2017 – a ***threefold*** increase in

15   retail IM fundraising – but in doing so omitted a material fact that made their

16   statements misleading.  *See* Exhibit 6.  As reported in SEC filings through the

17   underlying NorthStar Capital Income Fund, of the $24.5 million retail IM fundraising

18   total, defendants concealed that CLNS was the source of ***50% of the increase*** and

19   ***nearly all*** of the capital raised by the NorthStar Capital Income Fund in 2Q 2017.  In

20   fact, CLNS purchased 1.3 million shares of the NorthStar Capital Income Fund for

21   $12.1 million during the quarter, leaving just $44,000 raised from third parties.  And

22   while defendants footnoted that CLNS's "Capital Raised" figures "[i]nclude[d]

23   amounts contributed by CLNS," they did not reveal the amounts or the funds to which

24   CLNS contributed.  In fact, the footnote accompanied the heading that applied to

25   "Capital Raised" for all funds, including CLNS's closed funds.  Coupled with CLNS's

26   prior statement that it "expect[ed] NorthStar Capital Fund to begin raising capital from

27   third parties in the first half of 2017," CLNS's fundraising totals thus created the

28

4840-4394-8197.v1

1   misleading impression that CLNS's retail IM fundraising was increasing at a much

2   faster rate than it actually was.

3       123.   Defendants' statement that they "remain[ed] optimistic that the retail

4   investment management business will continue to institutionalize and rebound" was

5   also false and misleading.  Given the actual fundraising totals combined with the

6   performance of the underlying funds, defendants could not have had a reasonable

7   basis to believe that retail IM fundraising would "rebound," at least not anytime soon.

8   Indeed, at $24.5 million raised, the retail IM capital fundraising totals from the active

9   funds represented a nearly 66% collapse in fundraising year-over-year, even with

10  CLNS's undisclosed contribution, and continued its descent from 2016 levels:



24  124.   Excluding CLNS's contributions, the year-over-year shortfall amounted

23  to $58.9 million (82.6%) from active fund fundraising.  Indeed, that CLNS felt

25  compelled to infuse $12.1 million into the NorthStar Capital Income Fund reflects the

26  reality that defendants did not feel optimistic about retail IM fundraising prospects.

27  By publicly expressing optimism that retail IM would "continue to institutionalize and

28  rebound" while concealing that CLNS was the source of half of the active retail

4840-4394-8197.v1

fundraising totals during the quarter, defendants misled investors about the true state of the retail IM business.

125.    Defendant Saltzman knew or recklessly disregarded that CLNS made an undisclosed contribution of $12.1 million to the funds and passed those contributions off as third-party fundraising, making the fundraising totals and his statements of "optimism" that "the retail investment management business will continue to institutionalize and rebound" false and misleading.  In fact, the press release in which Saltzman participated in issuing and in which he was quoted stated that the capital raised was composed "of third-party capital from . . . retail investors."  A contribution of this size and importance (and source) does not escape the attention of the top executives, especially an executive like Saltzman who was tracking and reporting quarterly IM fundraising figures, who admitted that he had been focused on IM fundraising as a "top strategic priorit[y]" since the merger closed in January, and who was identified by name as "key personnel" responsible for the funds' current and future success.  Indeed, as CEO, Saltzman was responsible for CLNS's public financial reporting and certified that the Company had sufficient disclosure controls in place "to ensure that material information relating to [CLNS], including its consolidated subsidiaries, [was] made known to us by others within those entities."  He was in a position to know and thus knew, or recklessly disregarded, that CLNS's fundraising totals were false and misleading.  That CLNS did not also reveal the amount of contribution and that the Company itself was the source of those funds reveals Saltzman's intent to mislead.  In fact, months earlier, when making a disclosure about contributions that CLNS made to the NorthStar/RXR and the NorthStar Capital Income Fund in 4Q 2016, CLNS had placed a footnote next to the contributions expressly disclosing the source and the amount.  The change in disclosure pattern by August 2017, which would not have escaped Saltzman's notice given his involvement and focus on that particular segment and that particular subject, reveals the importance of the information and Saltzman's intent to mislead investors.

4840-4394-8197.v1

1  It also demonstrates Saltzman's **lack of** optimism about the future of the retail IM

2  business and its fundraising prospects.

3      126.  Defendant Tangen knew or recklessly disregarded that CLNS made an

4  undisclosed contribution of $12.1 million to the funds and passed those contributions

5  off as third-party fundraising, making the fundraising totals and defendant Saltzman's

6  statements of "optimism" that "the retail investment management business will

7  continue to institutionalize and rebound," which he made during the earnings call in

8  which Tangen participated, false and misleading.  In fact, the press release that was

9  filed with the SEC and signed off on by Tangen, stated that the capital raised was

10  composed "of third-party capital from . . . retail investors."  A contribution of this size

11  and importance (and source) does not escape the attention of a CFO like Tangen, who

12  was reporting quarterly IM fundraising figures and, as acknowledged by Saltzman, IM

13  fundraising had been a "top strategic priorit[y]" since the merger closed in January.

14  And like Saltzman, Tangen was identified by name as "key personnel" responsible for

15  the funds' current and future success.  Indeed, as CFO, Tangen was responsible for

16  CLNS's public financial reporting and certified that the Company had sufficient

17  disclosure controls in place "to ensure that material information relating to [CLNS],

18  including its consolidated subsidiaries, [was] made known to us by others within those

19  entities."  Tangen was in a position to know and thus knew, or recklessly disregarded,

20  that CLNS's fundraising totals were false and misleading.  That CLNS did not also

21  reveal the amount of contribution and that it was the actual source of those funds

22  reveals Tangen's intent to mislead.  In fact, months earlier, when making a disclosure

23  about contributions that CLNS made to the NorthStar/RXR and the NorthStar Capital

24  Income Fund in 4Q 2016, CLNS had placed a footnote next to the contributions

25  expressly disclosing the source and the amount.  The change in disclosure pattern by

26  August 2017, which would not have escaped Tangen's notice given his involvement

27  and focus on that particular segment and that particular subject, reveals the importance

28  of the information and Tangen's intent to mislead investors.  It also demonstrates

Tangen's **lack of** optimism about the future of the retail IM business and its fundraising prospects.

### 4.   False and Misleading Statements When Reporting CLNS's Third Quarter 2017 Results

127.   On November 9, 2017, CLNS issued a press release and filed a Form 8-K, which was signed by defendant Tangen, announcing its 3Q 2017 financial results, which included Core FFO of $193.4 million, or $0.33 per basic share – again below the low end of guidance.  CLNS also included with its Form 8-K filing a financial supplement that outlined its retail fundraising results.  The press release that accompanied the financial supplement noted that CLNS "and its share of affiliates raised approximately $327 million of **third-party capital** from institutional and retail investors."  However, retail capital raised during the quarter had **declined** to $47.8 million, $34.4 million of which came from dividend reinvestments in CLNS's three closed funds, leaving just $13.4 million raised from the two active funds.  Of those two, NorthStar/RXR and the NorthStar Capital Income Fund were reported to have raised $4.9 million and $8.7 million, respectively.

128.   Regardless of the concerning result, in CLNS's earnings call the same day, defendant Saltzman downplayed the Company's poor performance by focusing on the IM business's ability to "fill that gap" between targeted Core FFO and actual results:

> In terms of operating performance for the quarter, we generated core FFO of $193 million or $0.33 per share, which covered our dividend of $0.27 per share after adjusting for $0.06 per share of net gain contribution in the quarter.  A solid quarterly result, but admittedly, cumulative year-to-date core FFO has been **below our beginning of the year target**.  As we invest on more than $1 billion of dry powder and **grow our investment management business** through complementary

1    coinvesting and related fund placements, **we expect to fill that gap over**

2    **time**.

3         129.   Specifically, and as he would later acknowledge during the following

4    quarter's earnings call, defendant Saltzman's "fill[ing] the gap over time" comment

5    was tethered to CLNS's 2017 Core FFO guidance – leaving the Company less than

6    two months to make good on its assurance.

7         130.   Defendants' statements in ¶127 about CLNS's fundraising totals were

8    false and misleading.  Defendants' report that total fundraising figures from the active

9    funds were $13.4 million in 3Q 2017 omitted a material fact that made their

10   statements misleading.   *See* Exhibit 6.   As reported in SEC filings through the

11   underlying NorthStar Capital Income Fund, of the $13.4 million retail IM fundraising

12   total, defendants concealed that CLNS itself was the source of nearly **47% of the total**

13   and **most** of the capital raised by the NorthStar Capital Income Fund in 3Q 2017.  In

14   fact, CLNS purchased over 700,000 shares of the NorthStar Capital Income Fund in

15   3Q 2017 for $6.25 million, leaving just $2.4 million actually raised from third-parties.

16   While defendants again footnoted that CLNS's "Capital Raised" figures "[i]nclude[d]

17   amounts contributed by CLNS," they again failed to also reveal the amounts

18   contributed or identify the funds to which CLNS contributed.  Defendants' statements

19   thus created the false and misleading impression that CLNS's retail IM fundraising

20   was increasing at a much faster rate than it actually was.

21        131.   Defendant Saltzman knew or recklessly disregarded that CLNS made an

22   undisclosed contribution of $6.3 million to the funds and passed those contributions

23   off as third-party fundraising, making the fundraising totals false and misleading.  In

24   fact, the press release in which Saltzman participated in issuing and in which he was

25   quoted stated that the capital raised was composed "of third-party capital from . . .

26   retail investors."  A contribution of this size and importance from the Company itself

27   does not escape the attention of the Company's top executives, especially an executive

28   like Saltzman who was tracking and reporting quarterly IM fundraising figures, who

- 74 -

admitted that he had been focused on IM fundraising as a "top strategic priorit[y]" since the merger closed in January, and who was identified by name as "key personnel" responsible for the funds' current and future success. Indeed, as CEO, Saltzman was responsible for CLNS's public financial reporting and certified that the Company had sufficient disclosure controls in place "to ensure that material information relating to [CLNS], including its consolidated subsidiaries, [was] made known to us by others within those entities." Saltzman was in a position to know and thus knew, or recklessly disregarded, that CLNS's fundraising totals were false and misleading. That CLNS did not also reveal the amount of contribution and that it was the source of those funds reveals Saltzman's intent to mislead. In fact, months earlier, when making a disclosure about contributions that CLNS made to the NorthStar/RXR and the NorthStar Capital Income Fund in 4Q 2016, CLNS had placed a footnote next to the contributions expressly disclosing the source and the amount. The subsequent change in disclosure pattern, which would not have escaped Saltzman's notice given his involvement and focus on that particular segment and that particular subject, reveals the importance of the information and Saltzman's intent to mislead investors.

132. Defendant Tangen knew or recklessly disregarded that CLNS made an undisclosed contribution of $6.3 million to the funds and passed those contributions off as third-party fundraising, making the fundraising totals and his statements of "optimism" that "the retail investment management business will continue to institutionalize and rebound" false and misleading. In fact, the press release that was filed with the SEC and signed off on by Tangen stated that the capital raised was composed "of third-party capital from . . . retail investors." A contribution of this size and importance by the Company itself does not escape the attention of a CFO like Tangen who was reporting quarterly IM fundraising figures and, as acknowledged by defendant Saltzman, IM fundraising had been a "top strategic priorit[y]" since the merger closed in January. And like Saltzman, Tangen was identified by name as one of several "key personnel" responsible for the funds' current and future success.

- 75 -

1    Indeed, as CFO, Tangen was responsible for CLNS's public financial reporting and
2    certified that the Company had sufficient disclosure controls in place "to ensure that
3    material information relating to [CLNS], including its consolidated subsidiaries, [was]
4    made known to us by others within those entities."  Tangen was in a position to know
5    and thus knew, or recklessly disregarded, that CLNS's fundraising totals were false
6    and misleading.  That CLNS did not also reveal the amount of contribution and that it
7    was the source of those funds reveals Tangen's intent to mislead.  In fact, when
8    making a disclosure about contributions that CLNS made to the NorthStar/RXR and
9    the NorthStar Capital Income Fund in 4Q 2016, CLNS had placed a footnote next to
10   the contributions expressly disclosing the source and the amount.  The subsequent
11   change in disclosure pattern, which would not have escaped Tangen's notice given his
12   involvement and focus on that particular segment and that particular subject, reveals
13   the importance of the information and Tangen's intent to mislead investors.

14          133.  Defendants' statement that they "expect to fill that gap" between
15   "cumulative year-to-date core FFO [and] . . . our beginning of the year target" with the
16   IM business also was false and misleading.  Specifically, and as he would later
17   acknowledge during the following quarter's earnings call, defendant Saltzman's
18   "fill[ing] that gap over time" comment was tethered to CLNS's 2017 Core FFO
19   guidance – leaving the Company less than two months to make good on its assurance.
20   But by 3Q 2017, CLNS had exhausted the legacy assets that were generating the
21   capital gains that bolstered CLNS's reported Core FFO the prior two quarters.  CLNS
22   had previously announced that approximately 20% of its Core FFO would be
23   attributable to one-off asset-sale gains, or $0.28 per share of the low end of CLNS's
24   $1.40 to $1.58 Core FFO guidance.  By the end of the third quarter, however, CLNS
25   had already recorded gains of $0.28 per share.  And given that in the three previous
26   quarters it had produced Core FFO of $0.99 per share, CLNS now had to produce
27   $0.41 per share to reach the low end of its guidance range.  With 597.8 million shares,
28   CLNS had to produce $245 million in Core FFO in 4Q 2017 just to reach the bottom

end of the guided range, a feat the combined companies had not achieved in any quarter for at least a year before the Class Period.  There was simply no reasonable basis for defendants to believe that CLNS could "fill that gap" between "cumulative year-to-date core FFO [and] . . . our beginning of the year target" in 4Q 2017.

134.   Defendants also could not have reasonably expected the IM business to fill the $0.41 gap either.  The actual retail fundraising totals and the performance of the underlying funds were so dismal that CLNS was compelled to infuse over $18 million of its own funds the last two quarters into the NorthStar Capital Income Fund, without also revealing to investors that it was the source of those funds.  And even with the undisclosed infusion, the retail IM capital fundraising totals from the active funds represented an over-76% collapse in fundraising year-over-year, and continued its dramatic descent from 2016 levels:



135.   While institutional fundraising was keeping pace, the fees that institutional funds were generating were of no help.  Year-to-date institutional IM fees

actually came in *lower* than what Colony's legacy institutional IM business had produced a year earlier:



136. Defendant Saltzman's statement about expecting "to fill that gap" between "cumulative year-to-date core FFO [and] our beginning of the year target" does not qualify for safe harbor protection. The PSLRA's safe harbor applies to oral forward-looking statements only if:

(A) the oral forward-looking statement is accompanied by a cautionary statement –

(i) that the particular oral statement is a forward-looking statement; and

(ii) that the actual results might differ materially from those projected in the forward-looking statement; ***and***

(B) if –

(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause

4840-4394-8197.v1

actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

(ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

15 U.S.C. §78u-5(c)(2). Courts hold that vaguely referring investors to SEC filings is insufficient to invoke the safe harbor. *Apple Comput.*, 2003 WL 26111982, at *2 (referring generally to "Apple's SEC filings" was insufficient as it "'identifies' no specific documents or page numbers or even a date on which the relevant documents were filed"); *Lomingkit*, 2017 WL 633148, at *18 ("vaguely refer[ing] investors to 'ICC filings'" insufficient).

137.   The introductory comments to CLNS's 3Q 2017 earnings call explained that: "Potential risks and uncertainties that could cause the Company's business and financial results to differ materially from these forward-looking statements are described in ***the Company's periodic reports filed with the SEC from time to time***." This introduction, which was the boilerplate introduction used for every earnings call, failed to "identif[y] the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement" as the statute requires.   15 U.S.C. §78u-5(c)(2).   Any forward-looking statement made during the call thus does not qualify for safe harbor protection as CLNS failed to satisfy the statute's express requirements.

138.   Moreover, even if CLNS had "identifie[d] the document, or portion thereof, that contains the additional information about those factors relating to the

4840-4394-8197.v1

forward-looking statement," any cautionary language referenced would not invoke the safe harbor.  Any cautionary language in the unidentified "***periodic reports filed with the SEC from time to time***" was not meaningful to qualify the statement for the safe harbor because the cautionary language contained in CLNS's periodic reports did not "'relate directly to that to which plaintiffs claim to have been misled'" for the reasons alleged at ¶¶95-96, 117.  *See Atossa Genetics*, 868 F.3d at 798.

139.   Defendant Saltzman knew that his statements about "fill[ing] that gap" between "cumulative year-to-date Core FFO [and] . . . our beginning of the year target" in 4Q 2017 lacked a reasonable basis and thus made it with scienter.  For the reasons alleged at ¶¶66, 70-72, Saltzman had actual knowledge that guidance, as originally issued, lacked a reasonable basis and was aware that the NorthStar entities would not contribute to the growth necessary to meet guidance.  In fact, with NRF's 2016 CAD growth at a negative 40%, NSAM's 2016 CAD growth at 0.9%, and Colony's Core FFO growth of 4.5%, Saltzman knew that the combined entities, even with all of the projected synergies, would not reach even the bottom of the growth rates originally projected.  With the first quarter that fell $0.04 short of the run rate necessary to meet guidance and the third quarter that fell another $0.02 short of the run rate necessary to meet guidance, Saltzman was aware that the "gap" to which he was referring was $0.41 per share ($245 million) and that the combined entities had not accomplished that amount in over a year.  With capital gains exhausted and retail IM fundraising that continued to be nearly nonexistent to such an extent that it required undisclosed contributions from CLNS, Saltzman knew that his statement about "fill[ing] that gap" lacked a reasonable basis.  Indeed, as alleged at ¶87, Saltzman was focusing on retail IM fundraising as a "top strategic priorit[y]" and, as a specifically named "key personnel" of the Advisory Committee and Co-Sponsors of the underlying funds, was in a position to know and discover critical information about the causes of CLNS's failed retail IM fundraising efforts.  *See Apple Comput.*,

- 80 -

886 F.2d at 1113 ("A projection or statement of belief contains [the] implicit factual assertion . . . that there is a reasonable basis for that belief.").

140.    Defendant Tangen knew that Saltzman's statements about "fill[ing] that gap" between "cumulative year-to-date Core FFO [and] . . . our beginning of the year target" made during an earnings call in which Tangen participated, lacked a reasonable basis and was thus made with scienter. For the reasons alleged at ¶¶66, 73-74, Tangen had actual knowledge that guidance, as originally issued, lacked a reasonable basis and was aware that the NorthStar entities would not contribute to the growth necessary to meet guidance. In fact, with NRF's 2016 CAD growth at a negative 40%, NSAM's 2016 CAD growth at 0.9%, and Colony's Core FFO growth of 4.5%, Tangen knew that the combined entities, even with all of the projected synergies, would not reach even the bottom of the growth rates originally projected. With the first quarter that fell $0.04 short of the run rate necessary to meet guidance and the third quarter that fell another $0.02 short of the run rate necessary to meet guidance, Tangen was aware that the "gap" to which Saltzman was referring was $0.41 per share ($245 million) and that the combined entities had not accomplished that amount in over a year. With capital gains exhausted and retail IM fundraising that continued to be nearly nonexistent to such an extent that it required undisclosed contributions from CLNS, Tangen knew that Saltzman's statement about "fill[ing] that gap" lacked a reasonable basis. Indeed, as alleged at ¶88, Tangen was also focusing on retail IM fundraising as a "top strategic priorit[y]" and, as a specifically named "key personnel" of the Advisory Committee and Co-Sponsors of the underlying funds, was in a position to know and discover critical information about the causes of CLNS's failed retail IM fundraising efforts. *See Apple Comput.*, 886 F.2d at 1113 ("A projection or statement of belief contains [the] implicit factual assertion . . . that there is a reasonable basis for that belief.").

- 81 -

## C. Hamamoto Dumps Nearly $27 Million Worth of Stock as He Resigns Prematurely

141. On November 9, 2017, CLNS also announced that defendant Hamamoto had delivered his voluntary resignation from all director and officer positions held with the Company and any of its affiliates. CLNS provided no information for Hamamoto's abrupt departure beyond the platitude that it was a "personal life choice decision" and that his "resignation did not involve a disagreement with the Company or any matter relating to the Company's operations, policies or practices." Hamamoto's unceremonious exit from CLNS was in stark contrast to the remarks made by Mr. Barrack during the merger's announcement that "David [Hamamoto], Richard [Saltzman], myself and our teams are ***personally committed to partner in leading the new combined company*** to become the dominant performer of global real estate." Indeed, Hamamoto was one of just two NorthStar executives highlighted by the merger's promotional presentation as being a part of the "highly experienced [six-person] team, providing ***continuity***, transparency and a clear, ***consistent*** vision." Hamamoto's departure was also in stark contrast to CLNS's representation at the beginning of the Class Period that Hamamoto was a key part of its "cohesive" management team characterized as having "unwavering commitment" to the Company and its shareholders.

142. Defendant Hamamoto's departure was not just contrary to CLNS's rhetoric, it was also inconsistent with the spirit of his employment agreement with the Company. As Hamamoto's Letter Agreement outlined, CLNS clearly expected him to remain with the Company for at least two years following the merger.[16] As consideration for the merger, CLNS agreed to compensate Hamamoto with over $52 million worth of the Company's shares that, importantly, were "subject to

---

[16] On June 2, 2016, each of NSAM's named executive officers, including defendant Hamamoto, Gilbert, Albert Tylis (CEO and President of NSAM), Debra Hess (CFO of NSAM and NRF) and Ronald Lieberman (General Counsel of NSAM and NRF), entered into a letter agreement with NSAM and NRF that described, among other things, the compensation each executive would receive at the closing of the merger.

- 82 -

[Hamamoto's] continued employment with [CLNS] or one of its subsidiaries through the Vesting Date," the one-year anniversary of the merger's closing – January 10, 2018.  In addition, CLNS further incentivized Hamamoto to remain at the Company by subjecting his shares to a holding requirement through the first anniversary of the Vesting Date – January 10, 2019.  But despite his Letter Agreement and CLNS's intentions, Hamamoto announced his resignation on November 7, 2017, a mere 10 months after the merger's closing and well before his one-year tenure vesting requirement.  Conveniently, Hamamoto made his resignation effective on January 11, 2018 – thus allowing his exit at nearly the earliest possible date without forfeiting any of his merger-related stock.

143.   Defendant Hamamoto, as NSAM's former Chairman and CEO, knew firsthand that CLNS's retail-capital-raising expectations were unreasonably high, which rendered the Company's 2017 Core FFO guidance unreachable.  In fact, Hamamoto signed the Registration Statement containing NSAM's projection for $1.5 billion in retail IM fundraising in 2017.  Recognizing the inevitable reality, the month after announcing his resignation and right after CLNS had to infuse another $1.2 million into the NorthStar Capital Income Fund, Hamamoto dumped over 2.2 million of his artificially inflated CLNS shares in a four-day time period, a stake representing nearly 57% of his total unrestricted Company shares.  In doing so, Hamamoto pocketed nearly $27 million at the expense of the Company's unsuspecting shareholders.  These sales, however, may be the tip of the iceberg because, due to his resignation, Hamamoto is no longer required to report his CLNS sales.  In fact, a Koneko Research analyst issued a report on January 29, 2018, stating that "Colony NorthStar shares ha[d] fallen sharply in recent weeks (-18% YTD)" and that he "believe[d] the selling pressure comes from ex-NorthStar executives."

4840-4394-8197.v1

### D.   Gilbert, the Lone NorthStar Executive Remaining at CLNS, Also Resigns Prematurely

144.   Like defendant Hamamoto, Gilbert was the other NorthStar executive praised during the merger's announcement as a member of the "highly experienced team" that would lead CLNS with a "clear, consistent vision."  Gilbert was tapped as head of CLNS's newly combined retail platform and, during the June 3, 2016 earnings call to announce the merger, defendant Saltzman even deferred to him when asked about "growth and leveraging the retail network."  As with Hamamoto, Gilbert's Letter Agreement also provided the same one-year continued employment stock vesting and additional one-year stock holding requirements.  And, like Hamamoto, by the end of 2017, Gilbert was gone.

145.   On December 15, 2017, and right after CLNS had to infuse $1.2 million into the NorthStar Capital Income Fund, NorthStar Income I announced through an SEC filing that Gilbert had tendered his resignation from the Company and its affiliates.  In doing so, Gilbert announced his resignation on December 15, 2017.  However, like Hamamoto, Gilbert made his resignation from CLNS effective on January 11, 2018 – thus enabling him to leave the Company with all of his shares intact.

146.   Neither CLNS nor any of its entities provided a reason for Gilbert's purported resignation.  Indeed, the only pronouncement made about Gilbert's exit was the same boilerplate language provided when defendant Hamamoto resigned: "The decision of Gilbert was not a result of any disagreement with [CLNS] or the Trust on any matter relating to their operations, polices or practices."  Nevertheless, when Gilbert resigned, it was clear that CLNS's retail fundraising was significantly underperforming and that it would ultimately lead to the Company failing to meet its Core FFO guidance.[17]

---

[17]  In the same December 15, 2017 SEC filing, NorthStar Income I also announced that yet another former NorthStar executive, Brett S. Klein, had announced his intent to resign from CLNS and its affiliates by the end of the first quarter of 2018

- 84 -

### E.   Defendants Reveal the Truth When Reporting CLNS's Fourth Quarter and Fiscal Year 2017 Results

147.   On March 1, 2018, CLNS announced its fourth quarter and full-year 2017 financial results.  In doing so, CLNS shocked investors by revealing that its full-year 2017 Core FFO was just $1.16 per share – a 17%-27% miss from the Company's $1.40 to $1.58 per share guidance repeatedly made throughout the Class Period – and that it was taking impairment charges of $375 million related to the Company's IM segment.  Specifically, the Company impaired goodwill related to its IM reporting unit by $316 million, which was primarily attributable to the failing retail broker-dealer distribution business.  Additionally, the Company impaired two of its struggling Retail Companies, NorthStar Healthcare and NorthStar/RXR, for $59 million.   The Company's 2017 Form 10-K stated, in relevant part:

> Investment Management – The impairment recognized in 2017 consisted of the following:
>
> - $316.0 million write-down in goodwill, which represents the excess in carrying value of our investment management reporting unit, including its assigned goodwill, over its estimated fair value . . . ; and
>
> - write-down of management contract intangibles for non-traded REITs that were acquired through the Merger, specifically $55.3 million for NorthStar Healthcare Income Inc. . . . based on an amendment to its advisory agreement as part of our efforts to preserve liquidity in NorthStar Healthcare and $3.7 million for NorthStar/RXR NY Metro Real Estate Inc[.] . . . based on revised capital raising projections.

---

("1Q 2018").  Predictably, NorthStar Income I indicated that Mr. Klein's purported "decision . . . was not a result of any disagreement with Colony NorthStar or the Trust on any matter relating to their operations, polices or practices."

4840-4394-8197.v1

148.   One of the primary reasons for CLNS's disappointing Core FFO result, as defendant Saltzman acknowledged, was the Company's third-party capital raising and, in particular, its retail broker-dealer distribution business acquired from NSAM: "we did not raise as much incremental fee bearing third-party capital [*i.e.*, retail capital] as we had hoped ***to fill the gap***."  Saltzman's admission made clear that CLNS had expected, but failed, to "fill the gap" during fiscal year 2017.  Saltzman further explained that:

> Retail broker-dealer distribution was another area of very disappointing results.  The industry generally remains in enormous transition for major regulatory headwinds, including the newly implemented fiduciary rule, as well as a change in product constructs, more conservative, 40 Act in interval funds that operate with less leverage and offer more liquidity options.

> Capital raising in 2017 from these channels totaled only $137 million, down from past levels of an excess of $1 billion per year.

> *         *         *

> Our business model is to fill in as much of the earnings [gap] as we can through Investment Management economics both recurring fees and profits interests.  ***But in 2017, we merely treaded water in that regard***.

149.   After three quarters of boasting about the supposed benefits of the merger, defendant Saltzman owned up to the disappointing results from the inherited NorthStar businesses:

> The NorthStar merger, which closed a little over 1 year ago, has not produced the math tha[t] we anticipated when we completed the transaction.  It was a merger that was supposed to be earnings neutral at worst.  And so far, it has proven to be earnings dilutive.  Furthermore, the merger integration has taken longer than expected.  We believe that

- 86 -

1   we are largely at the end of that process, and we have much greater

2   confidence around the go-forward anticipated results from the inherited

3   NorthStar businesses **that have been the primary source of our**

4   **underperformance in 2017**.

5   150.   CLNS further disclosed that it was slashing its dividend from $1.08 per

6   share in 2017 to $0.44 per share in 2018 – a nearly 60% reduction to the dividend:

7   Let me next focus on our go-forward business, including the

8   resetting of our dividends.  Based on the confidence we have around our

9   new baseline of recurring earnings, excluding gains, combined with a

10   generally conservative bias we have toward preserving cash at this

11   juncture of the real estate and economic cycles.  Earlier today, via our

12   earnings release, we announced expected dividend level of $0.44 per

13   share for the calendar year 2018. **This is a meaningful reduction from**

14   **$1.08 per share we paid in 2017**.

15   151.   On this news, CLNS's stock price plummeted $1.78 per share to close at

16   $6.00 per share on March 1, 2018, a one-day decline of nearly 23%.  CLNS's market

17   capitalization had been approximately $9 billion when it announced the merger.  By

18   March 1, 2018, however, CLNS's market capitalization was approximately $3.2

19   billion – approximately a mere third of its original valuation.  Similarly, despite the

20   merger's promises of growth and enhanced value, the Company's AUM had cratered

21   down to $42.7 billion from $56 billion at the time of the merger.

22   152.   Securities analysts covering CLNS connected defendants' disclosures and

23   the stock-price decline to the facts alleged in this case:

24   •   CLNS's "[v]aluation is more than pricing-in underperformance," which

25   included its Core FFO results "impacted by slow asset redeployment, no

26   gains, and lower management fee revenue, while an unexpectedly sizable

27   dividend cut and asset management business write-downs were also

28   negatives."

- 87 -

- CLNS's "[l]ackluster" results were the results of "relatively weak results in 3rd party fundraising, especially in its broker dealer which it has now agreed to merge with S2K."

- CLNS's "private capital, particularly the non-traded business, has failed to live up to expectations, illustrated by a $300M+ impairment this quarter."

- CLNS's "fourth quarter and full-year earnings results were a disappointment, as the merger and subsequent portfolio rationalization strategy failed to materialize in earnings creation."

- "The NorthStar merger has proven to be a ***dud***."

153.   In 1Q 2018, the Company continued to write down the IM business, recognizing another approximately $140 million in impairments of its management contract intangible assets for certain of its Retail Companies.  Then, in the second quarter of 2018, defendants wrote off another $60 million in intangible assets associated with the NorthStar trade name, changing CLNS's name back to Colony Capital.  And, in the third quarter of 2018, defendants wrote off $7 million of its NorthStar Healthcare Management Contract intangible assets based on revised estimated future cash flows.

154.   The extreme nature of CLNS's retail fundraising collapse for the Company's two active funds in 2017 (NorthStar/RXR and NorthStar Capital Income Fund) is further demonstrated by CLNS deciding to liquidate both funds.  For example, NorthStar/RXR, which raised a grand total of $28.3 million in 2017 from a $2 billion total offering, was liquidated in October 2018.  As disclosed in the Company's 2018 Form 10-K, "In October 2018, NorthStar/RXR NY Metro was liquidated, as approved by its board of directors and shareholders.  We wrote off our $1.5 million investment in NorthStar/RXR NY Metro in the third quarter of 2018 as we effectively forfeited our shareholding upon liquidation."  Similarly, NorthStar Capital Income Fund raised a grand total of $28.7 million (most of which was the

- 88 -

Company's own money) in 2017 from a $3.2 billion total offering.  According to the Company's 2018 Form 10-K, the Board of Directors of NorthStar Capital Income Fund approved a plan to liquidate the fund in February 2019.

## V.      ADDITIONAL SCIENTER ALLEGATIONS

155.   As alleged herein, defendants acted with scienter in that they either knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of CLNS were materially false and misleading and that such statements or documents would be issued or disseminated to the investing public, and they substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding CLNS, their control over, and/or receipt and/or modification of CLNS's allegedly materially misleading misstatements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning CLNS, participated in the fraudulent scheme alleged herein.

156.   Defendants had actual knowledge that their Core FFO guidance of $1.40 to $1.58 was unattainable given the number of shares outstanding, the asset sales of NRF, and the lack of retail IM fundraising, and thus had no reasonable basis.  Defendant Tangen admitted his knowledge when he explained how the new Core FFO definition would eliminate adjustments that inflated CAD at NRF.  During the 4Q 2016 earnings call, in which defendant Saltzman participated, Tangen explained that "[t]he new guidance is based on a new core FFO definition" and outlined how the new definition affected NorthStar's CAD, explaining that:

> [T]he legacy Colony core FFO definition differs from the legacy NorthStar CAD definition in two primary respects.  Number one, core FFO does not add back provisions for loan losses.  And two, Colony NorthStar will no longer use fair value accounting for certain legacy NRF assets.

- 89 -

157.   Given the size of the "fair value" adjustments at NRF, which totaled $197 million in 2015 and $186 million in 2016, both defendants Saltzman and Tangen knew that NRF's CAD would experience a substantial and corresponding decline.  They also knew that NRF had liquidated $6.6 billion (45%) of its real estate assets by November 2016, and continued to liquidate assets thereafter, not only from the sheer size of the sell-off but also from NRF's press releases, which described the total amount of the sales.  They therefore knew that NRF was not in a position to contribute to the 33%-50% growth rate that was necessary for CLNS to meet Core FFO guidance, and that any growth had to come from NSAM and incremental retail IM fundraising.

158.   But as defendants Saltzman and Tangen also knew from the fundraising totals they released each quarter, incremental retail IM fundraising had effectively dried up.  Saltzman and Tangen also knew from CLNS's 2016 10-K that the management agreement with NRF that brought $186.8 million in fees to NSAM in 2016 would be cancelled as part of the merger closing, and that in January 2017 – just one month before the start of the Class Period – that the market perceived a conflict between NSAM's Townsend business and Colony's legacy institutional IM business, requiring CLNS to sell Townsend and eliminating its $14 billion in AUM, including its $66 million in fees.  Saltzman and Tangen thus knew that NSAM was in no position to contribute to the 33%-50% growth rate necessary for CLNS to meet its Core FFO guidance.  At a minimum, they were aware of facts that seriously undermined their guidance – giving them actual knowledge that their statements were "false *or misleading*."  15 U.S.C. §78u-5(c)(1)(B)(i) (safe harbor inapplicable if "made with actual knowledge by that person that the statement was false *or misleading*").

159.   Defendants knew from Colony's reported financial results that it, too, was in no position to produce the 33%-50% growth that CLNS's guidance demanded.  Indeed, in the year before the merger, Colony's total Core FFO had increased *only*

- 90 -

*4.5%* from $260 million in 2015 to $272 million in 2016.  On a share count of a fraction of the total shares and operating units outstanding after the merger, Colony's reported per share Core FFO actually *declined* from $2.03 per share in 2015 to $2.02 per share in 2016.  Defendants thus knew that Core FFO guidance, which required a growth rate between 33%-50% on nearly 600 million shares, lacked a reasonable basis.

160.   Defendants had actual knowledge that CLNS's 2017 retail-capital-raising expectations were unreasonably high and, as a result, that the Company would be unable to meet its 2017 Core FFO guidance.  As one of CLNS's "top strategic priorities" highlighted soon after the merger, each defendant knew about and closely followed the Company's IM fundraising performance.  In fact, the projected retail IM fundraising total of $1.5 billion was listed in the November 18, 2016 Registration Statement for the merger, just three months before the start of the Class Period, which defendant Hamamoto signed.  Defendant Saltzman also admitted his knowledge about the importance of retail IM fundraising to meeting guidance when he acknowledged during the 4Q 2016 earnings call that CLNS's $2 billion IM fundraising assumption included "a mix of institutional and retail."  And defendants Saltzman, Tangen, and Hamamoto tracked those figures closely.  In fact, CLNS had previously disclosed those figures, including retail capital raised by fund, on a quarterly basis.

161.   The level of defendants' scrutiny of CLNS's third-party capital raising efforts was magnified by their concern over recent regulatory changes, which caused severe fundraising constraints because they required CLNS to disclose its numerous and high fees.  And the acts that CLNS took to address their concerns reflect their knowledge.  Indeed, they introduced a new "T-share" class in October 2015 for the NorthStar/RXR fund and cut fees in February 2017 – just days before issuing guidance.  The T-share was designed to minimize the appearance of the fees that NorthStar/RXR was charging investors, reducing up-front sales commissions while adding other fees to compensate for the reduction.  As a November 13, 2015 article by

- 91 -

4840-4394-8197.v1

*InvestmentNews.com* entitled "Nontraded REIT sponsors changing compensation for advisers" described it, the "new share class dubbed a 'T share' . . . cuts the upfront commission brokers are paid . . . but creates an annual trailing commission." While minimizing the appearance of upfront fees, this trailing commission and/or other similar types of annual fees could actually increase the cost to investors. The February 2017 fee cuts actually went a step further. NorthStar/RXR actually reduced management fees by 20% and eliminated the acquisition and disposition fees that the funds charged when acquiring or selling property or debt, which were 1% for debt and between 2% and 2.25% on property. The introduction of new share classes and fee cuts do not occur without the knowledge of senior executives, including the CEO and CFO like defendants Saltzman and Tangen. In fact, NorthStar/RXR's SEC filings recognized the involvement of the Individual Defendants, stating that "[o]ur success depends to a significant degree upon the contributions of key personnel of our Advisory Entities and their affiliates, such as Messrs. . . . Hamamoto, . . . Saltzman, [and] Tangen." The filings also recognized that NorthStar/RXR's "future success depend[ed], to a significant extent, upon the continued services of" the Individual Defendants.

162. Each defendant was well aware of the deleterious implications that the new rule changes could have on NSAM's retail fundraising efforts prior to the merger. In fact, this concern was a reason why Colony originally walked away from a merger with NSAM. As disclosed in the jointly filed merger proxy statement:

> Colony had concerns regarding the current status of [NSAM's] non-traded REIT business resulting from recent regulatory changes, which had affected the ability of non-traded REIT's to raise capital in the retail investor market. Colony believed that changes would need to be made to this market to make it more investor friendly and "institutionalized."

163. Defendants also knew that retail IM fundraising was insufficient to contribute to CLNS's growth. In fact, after telling investors in the 2016 10-K that

- 92 -

"Colony NorthStar expects NorthStar Capital Fund to begin raising capital from third parties in the first half 2017," CLNS made an undisclosed contribution of $18.35 million in funds to the NorthStar Capital Income Fund that materially inflated the retail IM fundraising totals in 2Q 2017 and 3Q 2017.  And they did so while stating in the press releases announcing CLNS's financial results for those quarters that the amounts that the Company and its share of affiliates raised were "of third-party capital from . . . retail investors."  A contribution of this size and importance does not escape the attention of the top executives, especially executives that were tracking quarterly IM fundraising figures like defendants Saltzman and Tangen.  That CLNS did not also reveal the amount of contribution and that it was the source of those funds reveals defendants' intent to mislead.  In fact, when making a disclosure about contributions that CLNS made to the NorthStar/RXR and the NorthStar Capital Income Fund in 4Q 2016, it had placed a footnote next to the contributions expressly disclosing the source and the amount.  The subsequent change in disclosure pattern, alone, reveals the importance of the information and defendants' intent to mislead investors.

164.  Defendants knew that retail IM fundraising would be far below the amount defendants assumed for the purpose of contributing to meeting guidance because of the fees that NSAM was charging and the performance of the funds, which included up-front sales-related commissions and fees of up to 10% of the investment.  Indeed, they were aware from actual fundraising that the results were far below the $1.5 billion that NSAM had projected for the year.  Both defendants Saltzman and Tangen, who were described in NorthStar/RXR's SEC filings as "key personnel" that were utilized by "Advisor Entities" to the NorthStar/RXR's Fund, were obviously aware of this performance.  In fact, NorthStar/RXR's performance was tracked in industry reports and was the cause of the collapse in CLNS's active retail fundraising.  Defendants' response was to further cut fees.  In February 2017 – the very beginning of the Class Period – CLNS cut its asset-management fees on the two funds that were supposed to drive CLNS's retail capital fundraising – NorthStar/RXR and the

4840-4394-8197.v1

1    NorthStar Capital Income Fund.  NorthStar/RXR reduced its asset-management fee by

2    approximately 20% and eliminated all acquisition and disposition fees.  And the

3    NorthStar Master Fund reduced management fees from an annual rate of 2.0% of its

4    average *gross* assets to an annual rate of 1.25% of its average daily *net* assets.  These

5    fee cuts, which also do not occur without the knowledge of senior executives, confirm

6    that defendants knew it was CLNS's high fees that precluded the retail fundraising

7    CLNS needed to meet its Core FFO target and that, as retail fundraising continued to

8    fall, their fee cuts did not remedy the problem.

9          165.   Defendants were closely tracking CLNS's retail fundraising performance

10   because, despite NSAM's fundraising collapse the previous year, growing its AUM

11   fee income was critical to meeting the Company's 2017 Core FFO guidance.  In fact,

12   they made clear throughout the Class Period that CLNS was relying heavily on its

13   capital-raising efforts to meet its 2017 Core FFO guidance.  As previously detailed,

14   defendant Tangen informed investors during the Company's May 10, 2017 earnings

15   call that CLNS was on track to achieve its 2017 Core FFO guidance because

16   "[a]dditional core FFO upside exists" from an expected retail IM "ramp up."

17   Defendant Saltzman, for his part, also stated during the Company's November 9, 2017

18   earnings call that CLNS would "fill" its Core FFO "gap" by growing its IM business.

19   These statements confirm defendants' knowledge about the importance of IM

20   fundraising to guidance, and that they were tracking it throughout the Class Period.

21         166.   Beyond CLNS's ability to meet its 2017 Core FFO guidance, defendants

22   Saltzman and Tangen had an additional motive to continuously monitor the

23   Company's third-party fundraising performance – their annual cash bonus.  Under

24   CLNS's 2017 Annual Incentive Plan, 15% of Saltzman's and Tangen's annual cash

25   bonuses were based on "the amount of third-party capital raised, *a key strategic*

26   *objective for the Company*."  But despite failing to meet the minimum adjusted Core

27   FFO goal under the 2017 Annual Incentive Plan – a performance metric that

28   represented 45% of the entire incentive award –Saltzman's and Tangen's annual cash

bonuses for 2017 were nonetheless over $1.4 million and nearly $900,000, respectively, based on (purportedly successful) third-party capital raising and other individual personal-performance targets.  At the same time, Colony had implemented an incentive plan that tied up to 4.5 million common shares and operating company units, in part, to capital fundraising.  Thus, because they were able to nearly double their base salary through a cash bonus system and stock awards based largely on CLNS's capital raising, Saltzman and Tangen had a strong pecuniary interest in closely monitoring the Company's institutional and retail fundraising progress throughout the Class Period.

167.   Defendants Hamamoto and Tangen also had an additional motive to keep CLNS's stock price artificially inflated – to cash out their Company shares at the expense of unsuspecting shareholders.  Hamamoto, as NSAM's former Chairman and CEO, knew firsthand that CLNS's retail capital-raising expectations were unreasonably high, which rendered the Company's 2017 Core FFO guidance unreachable.  In December 2017, less than three months before the market learned the truth about CLNS's precarious financial condition and just after CLNS had infused the NorthStar Capital Income Fund with $1.2 million of its own funds, Hamamoto sold nearly 2,226,000 CLNS shares, pocketing over $26.9 million:

| David T. Hamamoto - Insider Sales | | | | | | |
|---|---|---|---|---|---|---|
| Pre-Class Period Sales | | | | | | |
| Insider | Date Sold | Company | Shares Sold | Price | Proceeds | Percent of Holdings Sale Represents |
| Hamamoto | 3/2/2015 | NSAM | 400,000 | $23.74 | $9,496,280 | 21.7% |
| Hamamoto | 4/2/2015 | NRF | 400,000 | $18.22 | $7,288,600 | 51.2% |
| | | 2015 Totals: | 800,000 | n/a | $16,784,880 | n/a |
| | | 2016 Totals: | 0 | n/a | $0 | |
| Class Period Sales (through 1/10/2018) | | | | | | |
| Hamamoto | 12/14-18/2017 | CLNS | 2,225,909 | $12.04 - $12.15 | $26,920,442 | 56.8%* |
| | | 2017 Totals: | 2,225,909 | n/a | $26,920,442 | n/a |

* Based on common share equivalents owned of 3,919,542.  CLNS's 2016 Proxy states that defendant Hamamoto's common share equivalents owned as of February 28, 2017 was 7,425,929 shares, but this figure erroneously includes his 3,506,387 Replacement Award shares which would not vest until January 10, 2018.

168.   Defendant Hamamoto's sales were suspicious in timing and amount for the following reasons: (i) these sales were the first time that Hamamoto sold as much

as a single CLNS share since the merger; (ii) Hamamoto's sales were strategically timed after CLNS's cash infusion and occurred near CLNS's all-time trading high of $14.70 per share after the merger's completion was announced; (iii) Hamamoto sold approximately half of his total unrestricted Company shares; (iv) previously, Hamamoto had not sold any stock since April 2015; and (v) Hamamoto sold nearly two million shares and reaped at least $23.4 million *more* than any other CLNS insider.

169.   Recognizing that the market's reaction would be swift once CLNS revealed that its capital fundraising was insufficient to both meet Core FFO guidance and sustain its dividend, defendant Tangen also cashed out a significant amount of his Company shares while the stock price remained artificially inflated.  During 2Q and 3Q 2017 – the quarters in which CLNS infused the NorthStar Capital Income Fund with $18.35 million in capital without also revealing the source or the amount – Tangen sold just under 276,000 shares for nearly $3.5 million in total proceeds:

| Darren J. Tangen - Insider Sales | | | | | | |
|---|---|---|---|---|---|---|
| **Pre-Class Period Sales** | | | | | | |
| Insider | Date Sold | Company | Shares Sold | Price | Proceeds | Percent of Holdings Sale Represents |
| Tangen | 1/2/2015 | Colony | 10,279 | $24.07 | $247,419 | 8.7% |
| Tangen | 1/7/2015 | Colony | 4,647 | $24.26 | $112,754 | 3.2% |
| | | 2015 Totals: | 14,926 | n/a | $360,173 | n/a |
| | | 2016 Totals: | 0 | n/a | $0 | |
| **Class Period Sales** | | | | | | |
| Tangen | 5/12/2017 | CLNS | 75,926 | $13.12 | $996,149 | 15.0% |
| Tangen | 9/28/2017 | CLNS | 200,000 | $12.42 | $2,484,000 | 46.4% |
| | | 2017 Totals: | 275,926 | n/a | $3,480,149 | 54.4% |

170.   Similar to defendant Hamamoto's sales, defendant Tangen's sales were suspicious, not only because of the timing of CLNS's undisclosed contributions but also because he sold over half of his CLNS holdings and the sales occurred near CLNS's all-time trading high of $14.70 per share after the merger's completion was announced.  Also, prior to then, Tangen had not sold any stock since January 2015 – and that sale was significantly less, at approximately 15,000 shares.  And Tangen's larger stock sale in September 2017 was made with full knowledge that CLNS had

- 96 -

1  exhausted its 2017 capital gain contributions to Core FFO, demonstrating that a

2  guidance miss and dividend cut were inevitable.

3  171.  The departures of defendant Hamamoto and Gilbert, who headed the

4  retail IM business, also supports an inference of scienter.  When the merger was

5  announced, both Hamamoto and Gilbert were included as part of the "highly

6  experienced [six-person] team, providing *continuity*, transparency and a clear,

7  *consistent* vision."  CLNS also identified Hamamoto during the Class Period as a part

8  of the six-person "*cohesive*" team with an "*unwavering commitment*" to creating the

9  Company and its shareholders.  As the Letter Agreements demonstrated, CLNS

10  clearly expected both executives to remain with the Company for at least two years

11  and set up their stock awards accordingly.  On the June 3, 2016 earnings call,

12  defendant Saltzman even deferred to Gilbert when asked a question about the retail

13  IM business and stated: "I'm going to turn it over to Dan Gilbert, who runs that

14  business today for NorthStar and who will continue to run that business for the

15  combined companies."

16  172.  Pursuant to their Letter Agreements, former NorthStar executives were

17  entitled to receive substantial compensation at the closing of the merger.  Specifically,

18  defendant Hamamoto received a one-time equity award worth $52.6 million and

19  Gilbert's award was worth $23.1 million.[18]  The Letter Agreements stated that

20  Hamamoto would serve as Executive Vice Chairman of CLNS, Gilbert would oversee

21  the retail platform of CLNS, and Mr. Tylis, Mrs. Hess and Mr. Lieberman would

22  provide one-year transition services.  The one-time equity award granted to the

23  executives was subject to vesting based on continued employment with the Company

24  through the first anniversary of the closing of the merger.  However, for Hamamoto

25  and Gilbert, an additional one-year post-vesting holding requirement was required

26

---

27  [18]  Albert Tylis, CEO of NSAM, received $29.9 million; Debra Hess, CFO of NSAM

28  and NRF, received $8.6 million; and Ronald Lieberman, General Counsel of NSAM
     and NRF, received $5.4 million.

- 97 -

1   before they could sell any of the stock award. This additional provision was put in

2   place for Hamamoto and Gilbert, as their departures from CLNS were not supposed to

3   be imminent, unlike the other former NorthStar executives.

4         173.   Yet both defendant Hamamoto and Gilbert resigned less than a year into

5   the merger and timed their departures to be effective the day after the merger's

6   one-year anniversary, thereby retaining their full merger windfall.   Specifically,

7   Hamamoto announced his resignation on November 7, 2017, while Gilbert announced

8   his resignation on December 15, 2017.   Both resignations had an effective date of

9   January 11, 2018, one day after the one-year anniversary of the merger, and just over

10   two months before investors would learn that the retail IM business had collapsed.

11   These supposed "resignations" appear extremely suspicious, as NorthStar's

12   businesses, with Gilbert's retail IM platform leading the way, significantly

13   underperformed during 2017.   As defendant Saltzman stated on the last day of the

14   Class Period:

15           The NorthStar merger, which closed a little over 1 year ago, has

16           not produced the math tha[t] we anticipated when we completed the

17           transaction.   It was a merger that was supposed to be earnings neutral at

18           worst.   And so far, it has proven to be earnings dilutive.   Furthermore,

19           the merger integration has taken longer than expected.   We believe that

20           we are largely at the end of that process, and we have much greater

21           confidence around the go-forward anticipated results from ***the inherited***

22           ***NorthStar businesses that have been the primary source of our***

23           ***underperformance in 2017***.

24   **VI.   LOSS CAUSATION/ECONOMIC LOSS**

25         174.   During the Class Period, defendants made false and misleading

26   statements about CLNS's 2017 Core FFO guidance and its retail IM business.

27   Defendants' misrepresentations and material omissions artificially inflated and

28   maintained the inflation in the prices of CLNS securities and operated as a fraud or

- 98 -

1    deceit on members of the Class (as defined below).  Then, when the true facts were

2    revealed, the prices of CLNS's securities fell significantly, as the prior artificial

3    inflation came out of the prices.  As a result of their purchases of CLNS securities

4    during the Class Period, plaintiff and other members of the Class suffered an

5    economic loss, *i.e.*, damages, under the federal securities laws.

6        175.   On March 1, 2018, before the market opened, CLNS issued an earnings

7    press release announcing its fourth quarter and full-year 2017 financial results.  As

8    discussed more fully in ¶¶147-148, CLNS revealed that its full-year 2017 Core FFO

9    results were well below its guidance, that the Company was taking impairment

10   charges of $375 million related to its IM business, and that the Company was cutting

11   its dividend by nearly 60%.  During the earnings call with analysts held later that day,

12   defendant Saltzman acknowledged that a primary reason for CLNS's significant Core

13   FFO miss was the "more challenging industry conditions in Healthcare Real Estate as

14   well as our retail broker-dealer distribution business" – the Company's retail third-

15   party capital-raising segment.  The relevant truth was thus directly related to the fraud

16   alleged herein.

17       176.   The disclosure on March 1, 2018 had a direct impact on CLNS's stock

18   price.  As set forth in the chart below, the price of CLNS stock tumbled $1.78 per

19   share, to close at $6.00 per share, a one-day decline of nearly 23% with abnormally

20   high volume of nearly 69 million shares.  As one analyst aptly commented on

21   March 2, 2018, CLNS's "[v]aluation is more than pricing-in underperformance,"

22   which included its "[v]ery [d]isappointing" Core FFO results "impacted by slow asset

23   redeployment, no gains, and lower management fee revenue, while an unexpectedly

24   sizable dividend cut and asset management business write-downs were also

25   negatives."

26       177.   The decline in CLNS's stock price on March 1, 2018 was a direct result

27   of the nature and extent of defendants' prior misstatements and omissions being

28   revealed to investors and the market.  The timing and magnitude of CLNS's stock

- 99 -

price collapse negates any inference that the losses suffered by plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors, or by Company-specific factors unrelated to defendants' misrepresentations.

178.   The economic losses suffered by plaintiff and other members of the Class were a direct result of defendants' misrepresentations that inflated CLNS's stock price and the subsequent decline in the value of that stock when defendants' prior misrepresentations and omissions were revealed.



## VII.   NO SAFE HARBOR

179.   CLNS's verbal safe harbor warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective under the PSLRA to shield those statements from liability.

- 100 -

180.   As alleged in ¶¶80-81, 114-115, 136-137, CLNS's boilerplate verbal safe harbor warnings introduction used during every relevant call failed to "identif[y] the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement" as the statute requires.  15 U.S.C. §78u-5(c)(2).  And even had CLNS properly identified a document, or portion thereof, containing the additional information, none of the Company's risk factors suffice because, as discussed in ¶¶82, 116, 138, they failed to "relate directly to that to which plaintiffs claim to have been misled."  *Atossa Genetics*, 868 F.3d at 798 (quoting *Worlds of Wonder*, 35 F.3d at 413).

181.   Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of CLNS who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.  On the contrary, such statements concealed critical information about CLNS's financial performance.

## VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

182.   Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact that there was a duty to disclose.  In particular, as more fully alleged above, defendants failed to disclose that CLNS's 2017 Core FFO guidance was in significant jeopardy throughout the Class Period, that retail IM capital fundraising was insufficient to support growth

4840-4394-8197.v1

requirements because of CLNS's high fees and poor performance of its funds, and that CLNS was the source of a material amount of what defendants described as third-party capital.

183.     Alternatively, plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased CLNS securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

184.     At all relevant times, the market for CLNS securities was efficient for the following reasons, among others:

(a)     Since January 2017, CLNS's stock has been listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, CLNS filed periodic public reports with the SEC;

(c)     CLNS regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

4840-4394-8197.v1

(d)     There is a cause-and-effect relationship between unexpected corporate events and/or financial releases and an immediate response in the stock price as evidenced, for example, by the 23% stock price decline following the disclosure on March 1, 2018.

## IX.     CLASS ACTION ALLEGATIONS

185.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased CLNS publicly traded securities during the Class Period (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of CLNS and their families, and defendants' legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

186.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  CLNS has more than 542 million Class A common shares of stock outstanding, owned by thousands of persons.

187.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the prices of CLNS securities were artificially inflated; and

- 103 -

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

188.   Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

189.   Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

190.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

191.   Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.  This Count is asserted against all defendants pursuant to §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder by the SEC.

192.   As alleged herein, throughout the Class Period, defendants, individually and in concert, directly and indirectly, by use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading and carried out a plan, scheme and course of conduct in violation of §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.   Defendants intended to and did, as alleged herein: (i) deceive the investing public, including plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of CLNS securities; and (iii) cause plaintiff and members of the Class to purchase CLNS securities at artificially inflated prices.

4840-4394-8197.v1

193.    The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

194.    As set forth above, defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon plaintiff and the other members of the Class who purchased CLNS securities during the Class Period.

195.    In ignorance of the false and misleading nature of defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for CLNS securities, plaintiff and other members of the Class purchased CLNS securities at artificially inflated prices during the Class Period. But for the fraud, plaintiff and members of the Class would not have purchased CLNS securities at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the prices of CLNS securities declined precipitously and plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of CLNS securities at artificially inflated prices and the subsequent decline in the prices of those securities when the truth was disclosed.

196.    By virtue of the foregoing, defendants are liable to plaintiff and members of the Class for violations of §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

4840-4394-8197.v1

## COUNT II

### For Violation of §20(a) of the 1934 Act Against All Defendants

197.   Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.  This Count is asserted pursuant to §20(a) of the 1934 Act against all defendants, based upon their status as controlling persons.

198.   As alleged above, CLNS violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of CLNS securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.  This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate and/or reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

199.   As set forth above, the Individual Defendants were controlling persons of CLNS during the Class Period due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations.  By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of CLNS, including the content of its public statements.

200.   CLNS had the power to control and influence the Individual Defendants and other Company executives through its Board of Directors and its power to hire, fire, supervise and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation and other employment considerations.  By virtue of the foregoing, CLNS had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Individual Defendants, including the content of their public statements.

4840-4394-8197.v1

1    201.   By reason of the foregoing, defendants are liable to plaintiff and the

2    members of the Class as controlling persons of CLNS in violation of §20(a) of the

3    1934 Act.

**PRAYER FOR RELIEF**

5    WHEREFORE, plaintiff prays for judgment as follows:

6    A.    Declaring this action to be a proper class action, appointing Lead Plaintiff

7    to serve as a Class representative, and appointing Lead Counsel as Class Counsel;

8    B.    Awarding plaintiff and the members of the Class damages and interest;

9    C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

10   D.    Awarding such equitable/injunctive or other relief as the Court may deem

11   just and proper.

**JURY DEMAND**

13   Plaintiff demands a trial by jury.

14   DATED:  September 16, 2019          ROBBINS GELLER RUDMAN
                                          & DOWD LLP
15                                       SPENCER A. BURKHOLZ
                                         DOUGLAS R. BRITTON
16                                       JUAN CARLOS SANCHEZ

18                                              s/ DOUGLAS R. BRITTON
                                              DOUGLAS R. BRITTON

19                                       655 West Broadway, Suite 1900
20                                       San Diego, CA  92101
                                         Telephone:  619/231-1058
21                                       619/231-7423 (fax)

22                                       Lead Counsel for Plaintiff

- 107 -

4840-4394-8197.v1

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on September 16, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dougb@rgrdlaw.com

- 108 -

4840-4394-8197.v1

# Mailing Information for a Case 2:18-cv-02888-GW-MRW Brian Barry v. Colony NorthStar, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Douglas R Britton**
  dougb@rgrdlaw.com,kathyj@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Spencer Alan Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Rachele R Byrd**
  byrd@whafh.com,roman@whafh.com,cabrera@whafh.com,boyles@whafh.com,warren@whafh.com,loutsenhizer@whafh.com

- **Matthew W Close**
  mclose@omm.com,matthew-close-5511@ecf.pacerpro.com,arudzin@omm.com,brogers@omm.com

- **Brittany DeJong**
  dejong@whafh.com

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com,lionel-glancy-2522@ecf.pacerpro.com,info@glancylaw.com

- **John T Jasnoch**
  jjasnoch@scott-scott.com,ksteinberger@scott-scott.com,edewan@scott-scott.com,efile@scott-scott.com

- **Marisa C Livesay**
  livesay@whafh.com,boyles@whafh.com

- **Betsy C Manifold**
  manifold@whafh.com,roman@whafh.com,cabrera@whafh.com,boyles@whafh.com,warren@whafh.com,loutsenhizer@whafh.com

- **Adam C McCall**
  amccall@zlk.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com

- **Daniel M Petrocelli**
  dpetrocelli@omm.com,daniel-m-petrocelli-4368@ecf.pacerpro.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Brittany Rogers**
  brogers@omm.com,mpeters@omm.com,brittany-rogers-4851@ecf.pacerpro.com,kvolkar@omm.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

- 109 -